BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
144 N. Beverwyck Road, # 187
Lake Hiawatha, New Jersey 07034
(973) 335-6409
        - and -
DAVID ROSTAN, ESQ.
248 Columbia Turnpike, Bldg. 1
Florham Park, NJ 07932
(973) 520-8301
Attorneys for defendant/third party plaintiff
JESUS J. PALMERONI

                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF NEW JERSEY

-----------------------------------X
N.V.E., INC.,                      :        Civil Action No.:
                                            2:06-CV-05455(HAA)(ES)
        Plaintiff,                 :

     - v. -                        :        **MOTION DATE:**
                                            *June 11, 2010*
JESUS J. PALMERONI, a/k/a Joseph   :
Palmeroni, RONALD SUMICEK, SUNBELT :
MARKETING, ABC CORPORATIONS 1-10   :
and JOHN DOES 1-10,                         ***ORAL ARGUMENT REQUESTED***
                                   :
        Defendants.
                                   :
-----------------------------------X        **DECLARATION OF**
JESUS J. PALMERONI,                :        **JESUS JOSEPH PALMERONI**

        Third-party plaintiff,     :

     - v. -                        :

ROBERT OCCHIFINTO and WALTER       :
ORCUTT,
                                   :
        Third-party defendants.
                                   :
-----------------------------------X

JESUS JOSEPH PALMERONI, being duly sworn, hereby declares the following to be true under penalty of perjury:

1.    I am a defendant and third party plaintiff in this action.  I am also the principal of NATIONAL RETAIL CONSULTING GROUP, INC. (herein, "Consulting") and am fully authorized by that entity to make this Declaration on its behalf.

2.    I make this declaration upon my own personal knowledge in support of my and Consulting's application to quash subpoenas served in this action upon non-party witness LAKELAND BANK and in support of my application for a protective order.

*My role at NVE*

3.    In October, 1999, I was hired by plaintiff N.V.E., Inc. ("NVE") to assist its then sales manager. At the beginning of the year 2000, that sales manager left NVE and I was placed in charge of sales.  I remained in charge of NVE's sales department until the beginning of 2006, when I was abruptly terminated.

4.    At the time I was put in charge of NVE's sales, I advised its principal, Mr. Robert Occhifinto, that I believed I would be able to increase NVE's sales, in part by altering its broker relationships.  At that time, NVE made use of three brokers, each of which was paid a 10% commission for placing NVE products with distributors or stores.  Based upon my prior career experiences in the supermarket industry, I felt sure that I would

-2-

be able to find brokers who would place NVE products more successfully, and who would do so for commissions significantly lower than the 10% NVE was then paying.  I so advised Mr. Occhifinto.

5.   Mr. Occhifinto appeared to be completely skeptical of these claims.  However, he told me that if I could indeed find such brokers, I could negotiate arrangements with them under which they would pay me a portion of the brokerage commissions they received.

6.   As I understood Mr. Occhifinto's intentions in this regard, he wished to provide me with an incentive to find the sorts of brokerage relationships I had described too him. Additionally, he liked the idea that my compensation for so doing would be paid by somebody other than NVE.

7.   As I had expected, I was able to reach agreements with brokers such as I had described to Mr. Occhifinto, including the present defendants SUNBELT MARKETING and its principal, RONALD SUMICEK (together, "Sunbelt").  As Mr. Occhifinto had authorized me to do, I negotiated arrangements with such brokers pursuant to which (1) they were paid commissions lower than the 10% commissions NVE was paying on my arrival there, and (2) in some cases, they paid a portion of their brokerage commissions to me.

These commissions were directed to Consulting, a corporation I had established.

8.   I advised my accountant of all of the monies paid by NVE brokers pursuant to the commission-sharing arrangement.  To the very best of my knowledge and belief, every penny of these monies were reported on Consulting's tax returns, and all taxes on these monies have been paid.

9.   Largely in consequence of these brokerage relationships I initiated, NVE's sales soared, exponentially.  To the best of my recollection, NVE's annual sales increased from two or three million dollars to over $80 million during the first four years of my tenure as head of NVE sales.

10.   In light of this increase, which made Mr. Occhifinto a spectacularly wealthy man, I periodically asked him to increase my own compensation.  In rebuffing these requests, or in granting compensation increases that were frankly tiny in comparison with the great wealth I had brought him, Mr. Occhifinto repeatedly cited the fact that he had already authorized me to take a portion of brokerage commissions paid by NVE, and that I was therefore effectively receiving compensation additional to my NVE salary.

*My termination*

-4-

11.  As of the time I was terminated at the beginning of January 2006, neither Mr. Occhifinto nor anyone else had ever confronted me with or spoken to me about the issue that become the subject matter of this lawsuit, i.e., his claim that Sunbelt and I had plotted to steal brokerage commissions relating to two NVE accounts.  Such a conversation would have been ridiculous, as Mr. Occhifinto had himself authorized and was fully aware of the relevant arrangements.

12.  I was told that I was being terminated for "poor performance".  I laughed when I heard this allegation, as it had been my performance that had provided NVE with such impressive revenue growth.

13.  After my termination, I was advised by various persons who dealt with Mr. Occhifinto and/or NVE that he had told them he was going to destroy me, and would put me in jail.  He also directed them not to do business with me, and threatened to take away their NVE business if they did do business with me.  He also instructed them not to assist me or to testify on my behalf in this litigation.

14.  Nevertheless, because these brokers and other business associates and I wished to do business together, we did so, on the mutual understanding that our business relationships would not be disclosed to NVE or to Mr. Occhifinto.

-5-

15.  These brokers and business associates have indicated to me their fear of retaliation from Mr. Occhifinto if our relationships are discovered.  Such retaliation would deprive me of significant income.  Moreover, I am concerned that Mr. Occhifinto's threats or conversely, his promises of lucrative business opportunities, may persuade some of these people to testify falsely against me or at least to feign forgetfulness of facts helpful to my position in this litigation.  Mr. Occhifinto is a powerful and intimidating man.

*Occhifinto's treatment of brokers*

16.  During the course of my time at NVE, Mr. Occhifinto would sometimes abruptly decide that he had paid an NVE broker enough for their efforts in nurturing and developing relationships between NVE and its distributors and other customers.  Upon deciding that such brokers had become expendable, Mr. Occhifinto would direct that they no longer be paid any brokerage commission, or that their brokerage commission be reduced.  This practice, to which I objected both because I believe it is wrong and also because I believe it harms manufacturers such as NVE in the long run, is not unique to Mr. Occhifinto.  It is referred to in the industry as "having your throat cut".

-6-

17.  Mr. Occhifinto disliked and resisted written agreements of all kinds, I believe in part because such agreements create obstacles to "cutting the throat" of a broker.  Sunbelt, for instance, presented Mr. Occhifinto with a proposed written agreement, but he declined to sign it.

18.  Defendant Sunbelt had its throat cut by NVE for the first time when Mr. Occhifinto directed that its brokerage commission (and hence, Consulting's portion of that commission) be reduced from 5% to 2 1/2%.  Mr. Occhifinto's current claim that he was defrauded by me and Sunbelt constitutes another instance of Sunbelt having its throat cut.

19.  It appears to me that Mr. Occhifinto got Mr. Bengoa to support his claim by allowing him to try to take over Mr. Sumicek's NVE-related business opportunities.

20.  It is precisely this sort of conduct that I fear will occur if plaintiff is allowed free rein over my and/or Consulting's financial records.

*NVE as criminal haven*

21.  When I was a young man in need of money, I foolishly committed a drug offense involving marijuana.  That action has caused me endless pain and regret, and probably will for the rest of my life.  I was convicted and incarcerated; since my release, I have resolved never again to involve myself in illegality.

-7-

22.  It appears to me however that Mr. Occhifinto, who is
himself a two-time criminal convict, hired me at least in part
because of my past criminal conviction.  He would sometimes say
that he liked hiring convicts because they are not in any
position to complain about being mistreated by their employers
and have nowhere else to go.  During the time I worked at NVE, a
number of its employees were ex-convicts, and office conversation
was sometimes filled with their boasts of their past criminal
exploits.

23.  Mr. Occhifinto befriended and partnered with an
individual named Jared Wheat who was engaged in what appeared to
me to be a highly illegal drug manufacturing business based in
Belize.  During the period prior to my termination, Mr.
Occhifinto wanted me to represent and try to promote the products
made by Wheat's company, Hi-Tech Pharmaceuticals.  I refused,
incurring Mr. Occhifinto's displeasure, because of what looked to
me to be illegal activity.  Sure enough, Mr. Wheat was later
indicted.

Executed on April 28, 2010

JESUS V. PALMERONI

-8-