1
            UNITED STATES DISTRICT COURT
               DISTRICT OF NEW JERSEY
2

3   N.V.E., INC.,                      :   Civil Action No.:
                                       :   2:06-cv-5455-GEB-ES
4           Plaintiff,                 :
                                       :
5      vs.                             :
                                       :
6   JESUS J. PALMERONI, a/k/a Joseph   :
    Palmeroni, RONALD SUMICEK, SUNBELT :
7   MARKETING, ABC CORPORATIONS 1-10   :
    and JOHN DOES 1-10,                :
8                                      :
            Defendants.               :
9   ---------------------------------- :
    JESUS J. PALMERONI,                :
10                                     :
            Third-Party Plaintiff,    :
11                                     :
       vs.                             :   Newark, New Jersey
12                                     :   Thursday, May 26, 2011
    ROBERT OCCHIFINTO and WALTER       :   2:50 p.m.
13  ORCUTT,                            :
                                       :
14          Third-Party Defendants.    :

15              TRANSCRIPT OF MOTION HEARING
            BEFORE THE HONORABLE ESTHER SALAS
16             UNITED STATES MAGISTRATE JUDGE

17  APPEARANCES:

18  For Plaintiff and
    Third-Party Defendants:        Pashman Stein, PC
19                                 By:  ELLEN W. SMITH, ESQUIRE
                                        AIDAN P. O'CONNOR, ESQUIRE
20                                 Court Plaza South
                                   21 Main Street, Suite 100
21                                 Hackensack, NJ  07601-7054

22  Transcription Company:         KLJ Transcription Service, LLC
                                   P.O. Box 8627
23                                 Saddle Brook, NJ  07663
                                   (201)703-1670 - Fax (201)703-5623
24

    Proceedings recorded by electronic sound recording, transcript
25  produced by transcription service.

2

```
 1    APPEARANCES (Cont.):

 2    For Defendant/Third-Party
      Plaintiff Jesus Palmeroni:      FRED SHAHROOZ SCAMPATO, ESQUIRE
 3                                     445 East Broad Street, 2nd Floor
                                       Westfield, NJ  07090
 4
                                       DAVID ROSTAN, ESQUIRE
 5                                     248 Columbia Turnpike, Building 1
                                       Florham Park, NJ  07932
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

I N D E X

                                                              PAGE

Synopsis by the Court.. . . . . . . . . . . . . . . . 5

Consent by Mr. Palmeroni. . . . . . . . . . . . . . . 6

DEFENDANT'S MOTION FOR SANCTIONS:                      PAGE

Argument by Mr. Scampato. . . . . . . . . . . . . . . 8

Argument by Mr. O'Connor. . . . . . . . . . . . . . . 31

Argument by Mr. Scampato. . . . . . . . . . . . . . . 68

Argument by Mr. O'Connor. . . . . . . . . . . . . . . 72

Argument by Mr. Scampato. . . . . . . . . . . . . . . 81

Synopsis by the Court.. . . . . . . . . . . . . . . . 83

Argument by Mr. Scampato. . . . . . . . . . . . . . . 84

Argument by Mr. O'Connor. . . . . . . . . . . . . . . 86

Argument by Mr. Rostan. . . . . . . . . . . . . . . . 88

Argument by Mr. Scampato. . . . . . . . . . . . . . . 89

Argument by Mr. Rostan. . . . . . . . . . . . . . . . 91

Argument by Mr. O'Connor. . . . . . . . . . . . . . . 102

Argument by Ms. Smith.. . . . . . . . . . . . . . . . 110

Colloquy re Insurance Documents Located.. . . . . . . 140

Argument by Mr. Scampato. . . . . . . . . . . . . . . 158

| WITNESSES FOR | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| THE PLAINTIFF: | | | | |
| Erling Jensen | | 128 | 141 | 150 |
|   By the Court | 113 | | | |

1                          I N D E X (Cont.)

2    MOTION TO WITHDRAW AS COUNSEL:                              PAGE

3    Colloquy. . . . . . . . . . . . . . . . . . . . . 159

4    Reading into Record by the Court. . . . . . . . . . 162

5    Argument by Mr. Scampato. . . . . . . . . . . . . . 163

6    Argument by Mr. Rostan. . . . . . . . . . . . . . . 167

7    Argument by Mr. Scampato. . . . . . . . . . . . . . 173

8    Argument by Mr. Palmeroni.. . . . . . . . . . . . . 174

9    Ruling. . . . . . . . . . . . . . . . . . . . . . . 181

10   OBJECTION TO REQUEST FOR IRS RECORDS:                      PAGE

11   Argument by Mr. O'Connor. . . . . . . . . . . . . . 188

12   Argument by Mr. Palmeroni.. . . . . . . . . . . . . 189

13   Argument by Mr. O'Connor. . . . . . . . . . . . . . 190

14   Ruling. . . . . . . . . . . . . . . . . . . . . . . 190

15

16

17

18

19

20

21

22

23

24

25

Colloquy / Synopsis by the Court                                    5

1              (Conference commenced at 2:50 p.m.)

2         THE COURT:  -- <u>et al.</u>, Civil Action Number 06-5455.

3         Can I have appearances by counsel, please?

4         MS. SMITH:  Ellen Smith from Pashman Stein, Your

5    Honor; and Mr. O'Connor just stepped out for a second.

6         THE COURT:  All right.  I'll --

7         MS. SMITH:  He'll be right back in.

8         THE COURT:  I'm sure I'll see him shortly.

9         And for the defendants?

10         MR. SCAMPATO:  Good afternoon, Your Honor.  Fred

11    Shahrooz Scampato, representing defendant/third-party

12    plaintiff, Mr. Palmeroni.

13         MR. ROSTAN:  Good afternoon, Your Honor.  David

14    Rostan on behalf of third-party plaintiff and defendant, Mr.

15    Palmeroni.

16         THE COURT:  All right.  And Mr. Palmeroni is present

17    in court; I can see him in the back.

18         So, the Court is going to do two things.  We have

19    actually two matters to address today.

20         The first matter that we have to address is the

21    sanctions motion that was filed by Mr. Palmeroni; and that

22    sanction motion was filed back on February 15, 2011.  I did

23    review the motion itself; that's document 180-1.  There were

24    several attachments, as well, that were reviewed by the Court.

25         And of course we have an opposition; that's document

1   186, filed March 2nd, along with declarations by Mr. Yang, Mr.

2   Jensen and by Ms. Smith.

3           Then we have a reply brief that was also filed in

4   this matter; and I have had the benefit of --

5           Hello, Mr. O'Connor.  How are you?

6           I've had the benefit of looking at the reply brief,

7   as well, in preparation for today's argument.

8           So, I am going to hold the argument on the sanctions

9   motion.  Counsel, during a previous conference with me,

10  indicated that they had, despite the pending motion to

11  withdraw, which is the next issue that we have to address at

12  the end of today's hearing, counsel indicated to me that they

13  were willing at least to argue the sanctions motion.  Is that

14  still correct, counsel?

15          MR. SCAMPATO:  Yes, Your Honor.

16          THE COURT:  All right.

17          MR. O'CONNOR:  Judge, if we might ask Mr. -- I

18  believe Mr. Palmeroni is here and I just want to make sure

19  that he understands that, although his counsel have made a

20  motion to withdraw, that he consents to them arguing this

21  motion on his behalf.

22          THE COURT:  All right.  Mr. Palmeroni, do you

23  consent?

24          MR. PALMERONI:  Yes, Judge.

25          THE COURT:  All right.  And he has consented to them

1   and the record will reflect that he also nodded when Mr.

2   O'Connor was speaking.

3        So, Mr. Palmeroni, one more time, just please stand

4   and say once again; do you understand it's kind of a weird

5   situation, in that you have attorneys that are seeking to

6   withdraw from the case and you're opposing that withdrawal, so

7   we have to address that?  But they have written and

8   extensively on this issue of sanctions, a 52-page brief on it,

9   along with a reply brief; it is being opposed.  So, it's an

10  awkward posture for the parties to be in.

11       But you still, despite the motion to be relieved as

12  counsel or to withdraw as counsel in this case, you consent to

13  them arguing the sanctions motion?

14       MR. PALMERONI:  Yes, Your Honor.  I feel that there

15  was a lot of work put into the motion.  I feel the motion was

16  a proper motion and I think that --

17       THE COURT:  You're going to have to come forward, Mr.

18  Palmeroni.  Come to the podium, please.

19                         (Extended pause)

20       THE COURT:  Go ahead.  You were saying?

21       MR. PALMERONI:  I was saying that I think the motion

22  is a proper motion, they spent a lot of time on it and I feel

23  that they can argue the motion.  So, I do agree with it.

24       THE COURT:  All right.  And you do consent?

25       MR. PALMERONI:  Yes, I do consent.

1            THE COURT:  All right.

2            MR. PALMERONI:  Yes, Your Honor.

3            THE COURT:  Thank you so much, sir.

4            Mr. O'Connor, do you have any questions to ask of Mr.

5    Palmeroni?

6            MR. O'CONNOR:  No, sir.  I believe that was

7    sufficient, Your Honor.

8            THE COURT:  Okay.  So, we're going to start with --

9    let's start with the sanctions motion.  We'll start with

10   defense counsel.  And I have, again, had the benefit of

11   reading the brief and I do have a couple of questions for both

12   sides, but I'll allow you to at least place on the record your

13   arguments.  And feel free to refer to the submission and

14   amplify any portions of the submission you feel necessary.

15           MR. SCAMPATO:  Thank you, Your Honor.  Is it okay to

16   argue from here, Your Honor?

17           THE COURT:  It is.  We're picking you up just fine.

18           MR. SCAMPATO:  May it please the Court, Your Honor,

19   Fred Shahrooz Scampato on behalf of Mr. Palmeroni.

20           There's no way I could really give you all of the

21   information that has already been meticulously provided in our

22   papers.  The few points that I wanted to highlight are that,

23   key to this litigate -- to this motion are two issues:  one is

24   the --

25           THE COURT:  You know what, Mr. Scampato?  I'm going

1    to ask you come forward.

2            MR. SCAMPATO:  Okay.

3            THE COURT:  Because sometimes we pick you up and

4    sometimes we don't.

5            MR. SCAMPATO:  Right.

6                          (Extended pause)

7            MR. SCAMPATO:  Key to the issue that is before Your

8    Honor are two issues:  the first one is --

9            THE COURT:  Put that mic close to you, sir.

10           MR. SCAMPATO:  The first one is prejudice; the second

11   one is culpability.

12           The prejudice here is extensive.  In our reply brief,

13   we tried as well as we could to identify specific categories

14   that -- of documents that no longer exist.  Those are on pages

15   6 through 10.  It would include sales data records,

16   commissions, broker and distributor records, financial

17   compensation records, insurance documents, documents requested

18   in defendants' requests for admissions, internal and external

19   correspondences, the MACS generated documents and computer and

20   e-mails.  And e-mails I think are -- is extremely important

21   here.  The --

22           THE COURT:  But here's what I want to do, because I

23   want to try to understand and it's not clear -- believe me, I

24   have read these submissions actually several times in trying

25   to get to the bottom of some of this information.

1          The issues we have, we have the MACS system issue; we

2   have the shredded documents issue; and then the e-mails and

3   server issue.  Right?

4          MR. SCAMPATO:  Yes, Your Honor.

5          THE COURT:  Okay.  So, what I want to deal with first

6   off is I want to start talking about when your first requests

7   for production went out and when you first requested e-mails,

8   as well as the sales and commission information.  When did you

9   -- when did your client first make that request?

10         MR. SCAMPATO:  The first request was in the initial

11  disclosures, where --

12         THE COURT:  Okay.

13         MR. SCAMPATO:  -- I believe the plaintiff --

14         MR. ROSTAN:  No, when was the defendants' first

15  request?

16         THE COURT:  Right, your -- well, --

17         MR. SCAMPATO:  Defendants.  Defendants --

18         MR. ROSTAN:  It was in March of --

19         MR. SCAMPATO:  It was -- there was indication, I

20  think by both sides, that sales records -- and that was in

21  2007 -- that sales records that -- as well as sales documents

22  were relevant.

23         What's really key, even before those, is the fact

24  that, unlike a lot of litigations, as soon as the parties

25  parted ways, there was an understanding that there was going

1    to be a lawsuit here.  There was no question about it.

2           THE COURT:  Your understanding is that -- was there

3    ever a litigation hold in this case?

4           MR. SCAMPATO:  No.  We've requested it.  We have not

5    been provided with --

6           THE COURT:  And you would argue -- and I tend to

7    agree with you -- that the minute that Mr. Palmeroni was

8    terminated on January 6th of 2006, right?

9           MR. SCAMPATO:  That's right.

10          THE COURT:  That would be a red flag to the company

11   that there was an issue with respect to Mr. Palmeroni,

12   correct?

13          MR. SCAMPATO:  Right, because very, very shortly

14   after Mr. Ozzie Torres, Mr. Palmeroni's personal attorney,

15   sent a letter in stating --

16          THE COURT:  January 24th.

17          MR. SCAMPATO:  -- stating that we're going to bring a

18   lawsuit against you.  Right at that point, the machinery

19   started working for N.V.E. to obtain Pashman Stein as their

20   counsel to handle this specific litigation.

21          THE COURT:  When did -- you referenced it, but I want

22   it on the record.  When did Pashman Stein come into the case?

23          MR. SCAMPATO:  I think it was --

24          MR. ROSTAN:  Exhibit 7.

25          MR. SCAMPATO:  I'm sorry?

1          MR. ROSTAN:  What the Ozzie Torres letter is Exhibit

2     7.

3          MR. SCAMPATO:  No.  The -- when did they get

4     permission from the bankruptcy attorney?

5          MR. ROSTAN:  That was the -- that was I believe --

6          MR. SCAMPATO:  In March.

7          MR. ROSTAN:  -- January 25, 2006 was the Daniel Stolz

8     letter --

9          MR. SCAMPATO:  Okay.

10          MR. ROSTAN:  -- from the --

11          THE COURT:  Okay.

12          MR. SCAMPATO:  That's when it started.

13          THE COURT:  Right.  So, you --

14          MR. SCAMPATO:  So they had ultimately got permission.

15          THE COURT:  So, here is my question.  So, your

16     understanding as an attorney would be that January 6th was as

17     far back when they terminated him.

18          MR. SCAMPATO:  Right.

19          THE COURT:  You have a January 24th letter that's

20     sent out by Osvaldo F. Torres.  Then you have a letter that we

21     know counsel is now being requested and obtained as far back

22     as January 25th.

23          MR. SCAMPATO:  Yes, Your Honor.

24          THE COURT:  Correct?

25          MR. SCAMPATO:  Yes.

1          THE COURT:  And a litigation hold at the time, would

2    you argue, would have been -- a litigation hold is generally a

3    very general hold; anything to do with Mr. Palmeroni --

4          MR. SCAMPATO:  Right, right.  Yes.

5          THE COURT:  -- arguably.

6          MR. SCAMPATO:  Exactly.  That's exactly our point.

7    Our point is that he was the national sales manager, so any

8    transactions that dealt with him being in the role of national

9    sales manager, regardless of what they uncovered at that

10   point, should have been placed on hold.  That's why, you know,

11   if we had that, if we had that general hold, then we would

12   have no -- absolutely no problem with being able to defend

13   against the Smart World allegations that have now occurred.

14         THE COURT:  But you would argue -- because what the

15   other side says in their opposition is that they had no idea;

16   you know, they were focusing, when they focused on relevant

17   documents and what to -- obviously, what to obtain, had to do

18   with Smart -- they had no idea that Smart World was even in

19   the picture, they were just looking at Sumicek and Sunbelt.

20         But you would argue, right, because there were

21   counterclaims involved, CEPA claims -- they had notice of

22   various issues -- that the relevant documents and the span of

23   relevant documents went outside Sunbelt and went outside

24   Sumicek.

25         MR. SCAMPATO:  Yes.  Absolutely, Your Honor.  And in

1    addition to that, they weren't even sure and in their pleading,

2    the way that they wrote the pleading, they said, at this time,

3    we are aware of this, but we're not -- you know, we don't know

4    for sure if there's going to be other things coming out.  So,

5    they were just beginning their investigation.  They weren't --

6    they weren't sure what they uncovered; and that  even before, I

7    guess a year before the litigation began, in  the summer of

8    2006, they started taking depositions that were relevant to

9    this litigation through the bankruptcy powers, the powers

10   through the bankruptcy trustee.

11          So, they knew that they had investigations to be

12   conducting and they didn't know exactly how broad or how un --

13   how narrow these investigations would be.

14          THE COURT:  So, what's -- you know, obviously there's

15   certain categories of documents missing, all right?  And what

16   I'm trying to figure out is, what's on the server --

17          MR. SCAMPATO:  Right.

18          THE COURT:  -- and what was shredded.

19          MR. SCAMPATO:  Right.  Right.

20          THE COURT:  Right?  Because what's on the server --

21   now, we know that they started this conversion in November of

22   2000 -- they actually say, November 1st of 2005.

23          MR. SCAMPATO:  Right.

24          THE COURT:  And then they actually finished the

25   conversion in May of '06, right?  Into the new system.  Into

1   the --

2           MR. SCAMPATO:  We know that as of through a document

3   that I was able to uncover, having read all of the 10,000 that

4   they supplied.  There was one particular document that

5   indicated that the MACS system was still in operation in May

6   of 2007.  So, that's obviously along the way into this.  If

7   they had a litigation hold, they would have been able to

8   place --

9           THE COURT:  At minimum, backup.

10          MR. SCAMPATO:  Backup, of course.  Not -- we're not

11  asking them to do anything, but certainly it's not hard to get

12  a backup.  That's part of it.  The -- I don't -- the story

13  morphs over the period of time.  Every time we would obtain

14  information, something different would be told.

15          As we stand here to -- I stand here today, Your

16  Honor, I don't know what part of their e-mail server is

17  intact, is not intact; that's never been supplied.  The only

18  thing that we know for sure is that, when it comes to Joseph

19  Palm -- Jesus Palmeroni, Vincent Rosarbo and two of Mr.

20  Palmeroni's assistants, they are no longer on --

21          THE COURT:  Jennifer Hunsicker and Jacqueline Prasse.

22          MR. SCAMPATO:  Right.  They are no longer on the

23  e-mail server.  We don't know any other information, other

24  than that.

25          What's extremely key in this case is that in our

1    initial interrogatories, we describe documents in a broad way,

2    to include e-mails.  And as we stand here today, the only

3    settled documents that were produced by plaintiff, that have

4    more than literally a handful of e-mails contained in it, are

5    only those documents from Mr. Perdell (phonetic) from 2005, I

6    believe, to 2007 dealing with Smart World.

7         We don't have any other e-mails.  And the e-mails

8    that were missing are relevant to so many different areas.

9    They're relevant to Smart World.  What was the profit?  What

10   kind of profit did you have?  What was the percentage of

11   profit that you're going to get?  We would have been able to --

12        THE COURT:  Well, arguably, the e-mails would contain

13   even the commission information and back and forth from Mr.

14   Occhifinto to Mr. Palmeroni on here.

15        MR. SCAMPATO:  Exactly.  The commission information --

16        THE COURT:  And here's a question that I'm -- you

17   know, I'm going to ask you, but I really want to hear from Mr.

18   O'Connor, because I disagree with N.V.E. strongly that this is

19   a non-issue.  I am very concerned about some of this e-mail

20   and being wiped -- his computer being wiped clean.  And let me

21   tell you why.

22        This has been a litigation that has been ongoing and

23   hotly contested.  I have had to have numerous conferences with

24   the parties throughout the years.  For me to hear for the

25   first time that Mr. Palmeroni's computer, which they had

1   possession of, was wiped clean, now in opposition, and that

2   there is some kind of -- they are intimating or they seem to

3   be intimating that he was friends with the system

4   administrator and that the system administrator was fired in

5   March or -- February or March of 2006, and that I never heard

6   from N.V.E. that there was a spoliation issue they had on

7   their end with respect to -- because they're in the process of

8   uncovering all this stuff and nobody bothers to look at his

9   hard drive?  That's just mind boggling to me right now.

10       And then I'm hearing for the first time, we don't

11  know who wiped it clean; we don't know how it happened; that

12  it was not only wiped off the computer, but wiped off the

13  server; and that I never heard from N.V.E., in all these years

14  of litigation, their own request for spoliation as it relates

15  -- if they thought he did it or had any hand in doing it.

16       So, I guess I want to hear your comment -- and then,

17  of course, I'm going to want to hear from Mr. O'Connor on it --

18  your comment on this issue, because that -- in that system and

19  in those e-mails there's a lot of information you seek, is it

20  not?

21       MR. SCAMPATO:  Yes, Your Honor.  I think our -- the

22  authority on this issue is with Major Tours, which applied the

23  Zubulake case.  And in that case, as I put in the reply brief,

24  the obligation isn't only to provide a litigation hold, but to

25  have -- for the attorneys to have an active role in making

1    sure that those litigation holds are followed through, that

2    documents that need to be preserved, computers need to be

3    backed up, are done properly.

4         That, if there is a destruction of any documents,

5    such as they had made in 2009, that that be under the

6    supervision of an attorney.  We don't have the litigation

7    hold.  We don't have any proof.  We don't have an inventory of

8    the documents that were lost.  We don't have an inventory of

9    the documents --

10         THE COURT:  Or a protocol.

11         MR. SCAMPATO:  -- that were shredded.

12         THE COURT:  Or a protocol.

13         MR. SCAMPATO:  Or a protocol.  There was no protocol

14   in place for this company, even though it has been in numerous

15   litigations throughout the years.  This isn't an isolated case

16   where this is the only litigation N.V.E. has been in.  It's

17   been in a number of litigations over the period of time in the

18   last 11 years.  Therefore, it's even more, it gives more

19   reason as to why a protocol should have been in place.

20         Obviously, the lack of it is an issue of credibility.

21   The fact that their story morphs from when we first learn

22   about it until the --

23         THE COURT:  Tell me how it morphed.

24         MR. SCAMPATO:  -- the opposition.

25         Well, for example, when we originally found out about

Scampato - Argument                                    19

1    the shredding, we were told that this administrative assistant

2    was shredding documents.  That she went through this storage

3    area and she just picked up files and started shredding

4    documents.  That was --

5         THE COURT:  Heather Gamboa, right?

6         MR. SCAMPATO:  That was what our understanding was.

7    And that it occurred at a certain time in 2009.

8         The second time that we learned about it --

9         MR. ROSTAN:  It was an unspecified time.

10        MR. SCAMPATO:  An unspecified time, but sometime in

11   2009.

12        The second time we learned it, it was a little bit

13   earlier in 2009 and this time she had Mr. Jensen being more

14   involved in it.  In their opposition brief, for the first time

15   Mr. Jensen, in his affidavit, states that he took his time to

16   go through everything, to make sure that there was nothing

17   relevant about it, with the understanding that this is now two

18   years after the fact that this affidavit is coming out.  That

19   we weren't advised of any shredding in 2009, 2010.

20        Another --

21        THE COURT:  When were you first --

22        MR. SCAMPATO:  Another morphing, --

23        THE COURT:  -- advised of it?

24        MR. SCAMPATO:  I'm sorry?

25        THE COURT:  That you were first advised in -- on

1   November 19th, right?

2           MR. SCAMPATO:  Right; 2010.

3           THE COURT:  Of 2010, right?

4           MR. SCAMPATO:  And another morphing, Your Honor, just

5   as significant, is the MACS system.  In one group of papers,

6   they state that the MACS system -- in the first, the initial

7   document that we received, they said that the MACS system was

8   an accounting system.  In their opposition brief, they stated

9   the MACS system is not an accounting system; that it is a data

10  entry system.  So, we don't even know what the MACS system is.

11  And I believe that's highlighted, that discrepancy is

12  highlighted in the reply brief in our papers.

13          So, these internal discrepancies are -- go to

14  culpability.  They go to -- I think that Your Honor had an

15  earlier case that dealt with a similar type of a situation

16  where, at some point we know that the defendant had control of

17  this.  Or the party in that particular -- and now we know that

18  the defendant no longer has control of it.

19          So, that's really what the issue is and that's what I

20  would submit is what controls here, is the fact that they had

21  everything, they had the ability to put through the --

22          THE COURT:  So, tell me what you're missing.

23          MR. SCAMPATO:  -- protocols and follow through.

24          THE COURT:  Tell me what you're missing, because what

25  I'm trying to understand is what you don't have in hand with

1    respect to any of your defenses and/or counterclaims.

2          MR. SCAMPATO:  Right.  There's a number of -- I guess

3    the one that I would start with is the lack of sales data that

4    would otherwise have allowed us to find out what their profit

5    was for Smart World.  If there's no loss of profit, then there

6    is no damages with regard to that amended complaint, that

7    aspect of the amended complaint.

8          We can no longer determine what their profit was,

9    because we don't have the e-mails, we don't have the

10   commissions, we don't have any of the information that we

11   have.  The example, with Sumicek.  All of the documentation

12   that we have with Sumicek, we don't have any of that

13   documentation.  But even -- regardless of whether it's Sumicek

14   or it's Smart World, we don't have e-mails between the sales

15   people, we don't have e-mails between the customers, we don't

16   have e-mails between the brokers.  We don't have all of those

17   things that would confirm the oral conversations that they

18   have.

19         And so that prevents us, not only from being able to

20   defend Smart World -- and that is the main reason why we're

21   seeking exclusion of that count, as opposed to an adverse

22   inference -- but with regard to the brokers, that is something

23   that rises in one of our defenses; and that is that, if Mr.

24   Palmeroni asserts that, yes, he did get a certain amount of

25   percentage of income from Sunbelt, but that was something that

1    was dealt -- was negotiated with Mr. Occhifinto.

2           And the reason why it was negotiated with Mr.

3    Occhifinto was because Mr. Palmeroni said "Your brokers are

4    charging you way too much; they are charging you ten percent.

5    I can bring you -- I can make them bring it down."  And Mr.

6    Occhifinto allegedly said something to the effect that "If you

7    can bring that down, then you can keep a percentage of what

8    you save for us."

9           It's very clear from all of this litigation that Mr.

10   Occhifinto and N.V.E. does not like to have written contracts.

11   So, the fact that this was an oral contract is not something

12   that is really unusual regarding the *modus operandi* of N.V.E.,

13   so why -- so the -- it becomes absolutely critical as to what

14   documents we can obtain regarding the original brokers, the

15   brokers that existed before Mr. Palmeroni --

16           THE COURT:  And those original brokers, --

17           MR. SCAMPATO:  -- became involved.

18           THE COURT:  -- are those the three brokers you noted

19   with respect to Wayne Dail, Harold Miller and Kris Sujack?

20           MR. SCAMPATO:  That's right, Your Honor.

21           THE COURT:  And you say you have no information with

22   respect to Sujack?

23           MR. SCAMPATO:  Yeah, they have made -- they lost him.

24   They don't -- they don't have him.  One of the three.  I don't

25   know which one it was, but one of the three.

1          MR. O'CONNOR:  That's just a mischaracterization of

2   our position.

3          THE COURT:  It says missing -- you're missing

4   information concerning -- at least what I obtain from page 12

5   of your brief, is that you're missing info concerning broker

6   Sujack, and there is actually no actual sales and commission

7   data for all three brokers.

8          MR. SCAMPATO:  Right.  And that -- if we had the

9   e-mails, the e-mails would also have the discussions regarding

10  what the percentages were.

11         THE COURT:  So, you're missing the -- but I'm trying

12  to be clear.

13         MR. SCAMPATO:  Right.

14         THE COURT:  So, we're missing e-mail, totally.

15         MR. SCAMPATO:  We're missing e-mails.  We're miss --

16         THE COURT:  We're missing e-mails, --

17         MR. SCAMPATO:  -- brokerage information.

18         THE COURT:  -- but you're also missing the actual

19  sales and commission information with respect to those

20  brokers.  You don't have any of that?

21         MR. SCAMPATO:  Some of them we have, but with regard

22  to Sujack we do not.

23         THE COURT:  Okay.

24         MR. SCAMPATO:  I believe there was one broker that,

25  upon us filing this motion, we received information about one

1    of the three brokers.

2                    (Discussion among counsel, off the record.)

3              MR. SCAMPATO:  I don't remember which one it was, but

4    there was -- it was shortly after we filed a motion that we

5    obtained some of the information.  The --

6                         (Extended pause)

7              THE COURT:  All right.  So, you -- you --

8              MR. SCAMPATO:  The insurance documents go towards the

9    counterclaim.  And Mr. Rostan has been seeking information and

10   that -- that is absolutely critical to that count -- that

11   particular counterclaim that has now -- that has not been

12   provided to us.  We assume that it was lost.

13             One of the ways that we really found out about this --

14   how broad-based this was, was the fact that after we found out

15   about the spoliation issue, we went back to plaintiff's

16   request for admissions, which took place I believe in March of

17   2010, so several months earlier, and that's when we first

18   found out that their answers said we don't have documents that

19   are responsive to this.

20             THE COURT:  Let me ask you about your -- because I

21   was confused and I was following that in your brief and I

22   don't know if this -- this is on page of your brief.  Exhibit

23   17, when I pull Exhibit 17?

24             MR. SCAMPATO:  Yes.

25             THE COURT:  It is --

1              MR. SCAMPATO:  It's the wrong one.

2              THE COURT:  Okay.

3              MR. SCAMPATO:  Yes.  I know, Your Honor.  I believe

4    what we did was --

5              THE COURT:  Counsel, when I am trying to prepare for

6    this, --

7              MR. SCAMPATO:  Right.

8              THE COURT:  -- and you guys cite the wrong thing, --

9              MR. SCAMPATO:  We did.

10             THE COURT:  -- you don't understand what it does to

11   me.

12             MR. SCAMPATO:  We did.

13             THE COURT:  Because you have Response of Defendant

14   Palmeroni to Plaintiff's Requests for Admissions.

15             MR. SCAMPATO:  Yeah, we tried to -- I  believe we

16   fixed that when we did the reply brief and --

17             MR. ROSTAN:  The reply.  I believe we did.

18             MR. SCAMPATO:  We included this.

19             MR. ROSTAN:  My apologies, Your Honor, --

20             MR. SCAMPATO:  But we can probably --

21             MR. ROSTAN:  -- that was my mistake.

22             THE COURT:  All right.  Just give me the oral -- give

23   me your argument about this, because it --

24             MR. SCAMPATO:  Sure.  There's a number of things that

25   were -- that they should have had, but they didn't have.  One

1   dealt with Mr. Palmeroni's -- let's see.  Specifically, of you

2   just -- one second, Your Honor.

3                        (Extended pause)

4           MR. SCAMPATO:  One of which -- one of them dealt with

5   the brokers.  That was the first time that we found out about

6   the brokers.  That they said that they didn't have information

7   about the brokers.  But there were approximately five or six

8   questions that, upon us providing you with that document, you

9   will read that their answer was always the same, that we've

10  done a diligent search and we have not been able to obtain of

11  this information.

12          Now, these attorneys didn't know what was going on.

13  We're not assume -- we're not asserting that they did.  But

14  the client, at that point in time the client knew that they

15  shredded some documents, the client knew that there was

16  documents that now we're requesting that they don't have.

17  This is six months before they finally fessed up to the fact

18  that, yeah, we don't have certain documents.  They didn't

19  inform their own attorneys and certainly they didn't inform

20  the Court or us about this.

21          That's when it should have been triggered.  At any

22  point in time, as soon as they destroyed anything, as soon as

23  they found out that their MACS system wasn't working in 2006,

24  that's when they should have informed the Court and us of the

25  fact that they no longer have access to their MACS system.

1   And as soon as they shredded some documents and somebody found

2   out, oh, they're asking us questions, maybe some of the quest

3   -- the answers were in the documents we shredded.  Well, let's

4   not tell them about this.  Let's just say we did a diligent

5   search and we can't find them.  That's really what this

6   amounted to.

7           THE COURT:  When did Mr. Palmeroni -- and I know the

8   state, actually we had it in the last oral argument, but I

9   don't have it on hand now.  What's the time period of

10  employment for Mr. Palmeroni?

11          MR. SCAMPATO:  I believe it's 2 -- it's 1999 to 2006,

12  Your Honor.

13          THE COURT:  And you, again, would argue that any

14  litigation hold should have -- the litigation hold should have

15  been a general hold for anything that Palmeroni had --

16          MR. SCAMPATO:  Yes.

17          THE COURT:  -- been involved in.

18          MR. SCAMPATO:  Because of the nature of his role, he

19  was in charge of all sales.  Therefore, if -- at that point in

20  time, we don't know exactly what the specific battle is going

21  to be, but we know that it has to do with sales.  It has to do

22  with those transactions.  That he was -- that were made during

23  his tenure as the sales director.

24          THE COURT:  And I'm being told on page 5 of

25  plaintiff's opposition that what was discarded were documents

1   that went from 1980 to 19 -- to 2004.  We know that, --

2          MR. SCAMPATO:  Right.

3          THE COURT:  -- at minimum.  They say it included

4   accounts payable and accounts receivable records, time cards,

5   purchase orders, commission statements, catalogues,

6   correspondence files, marketing and promotional literature and

7   then, of course, the other materials which I have no idea what

8   that means.

9          So, I guess my question:  what, out of the little --

10  of what we -- the little that I do know -- I hope I know more

11  when Mr. O'Connor stands up -- but the little that I do know

12  at this point, what would you say would be relevant or

13  potentially relevant to your claims, your counterclaims and/or

14  defenses?

15         MR. SCAMPATO:  Well, --

16         THE COURT:  I would say commission statements.  I

17  mean, --

18         MR. SCAMPATO:  Yes, Your Honor.

19         THE COURT:  Correspondence.

20         MR. SCAMPATO:  Commission statements, all sales

21  documentation that -- between N.V.E. and its customers, all

22  distributors --

23         THE COURT:  Not all.

24         MR. SCAMPATO:  Well, --

25         THE COURT:  During his employment.

1          MR. SCAMPATO:  Well, of course.  I'm sorry, yes.

2    During --

3          THE COURT:  1999 to 2006.

4          MR. SCAMPATO:  Exactly.  The same -- all of the

5    documentation regarding the relationship between N.V.E.  and

6    their distributors, such as CB Distributors, as an  example.

7    All of their documentation for the relevant time period

8    between their brokers and N.V.E.  So, --

9          MR. ROSTAN:  And Sunbelt, in particular.

10          MR. SCAMPATO:  Including Sunbelt, obviously.  And, of

11    course, if they have paper files, they probably had e-mails,

12    so they probably had accounting documents.  So, there was

13    probably an overlap between the paper files and the lost MACS

14    information, the information lost in the MACS system.  There

15    probably was an overlap between the paper files and the lost

16    hard drive of Mr. Palmeroni, the lost e-mail server for Mr.

17    Palmeroni, Mr. Rosarbo and the two assistants.

18          And now that Mr. Rosarbo is in this case, now that he

19    is -- his company and Mr. Palmeroni's company, the Smart World

20    company is front and center, it's even become more relevant

21    the fact that Mr. Rosarbo's computer was also wiped clean.

22          But the -- what the plaintiff wrote in their

23    opposition brief is more specific than what they initially

24    told us.  What they initially told us basically was,

25    everything is gone, except anything that we were able to hold

1    onto in personnel files.  If somebody -- if the individual

2    sales people held onto their own person -- they held onto

3    files dealing with their customers, then we were able to

4    obtain information from that.  Other than that, everything

5    else is gone.

6            So where it was, again, we don't have.  We have never

7    been provided with an inventory of everything that's been

8    lost.  So, that's -- that is -- it makes it hard for us to

9    even know what was lost, when they can't even tell us what was

10   lost.

11           And of course, Your Honor, we're seeking exclusion of

12   the claim regarding Smart World when it come -- with regard to

13   the adverse inference, as another alternative.  The first

14   point being that there is documents in the possession of the

15   plaintiff, documents in plaintiff's control; I think that

16   that's very clear that we can meet that actual suppression or

17   withholding of evidence.

18           We believe that the MOSAID case is very much

19   applicable in this particular situation where, once they have

20   control and they know that they have control of documents,

21   they know that there is litigation, even if they don't

22   specific -- have a specific intent to destroy that -- those

23   documentation, they should be held responsible for their

24   negligent and/or reckless behavior.

25           The evidence destroyed was relevant to our claims,

Scampato / O'Connor - Argument                           31

1    our counterclaims and our defenses.  As I mentioned in my

2    brief and earlier in this discussion, it's foreseeable that

3    the evidence would have been discoverable, because of the fact

4    that they knew that, right from the moment that they fired

5    him, that they were going to be in litigation.  And Mr.

6    Palmeroni let them know, as well.

7           So, it's not a case where we don't know, we never

8    really -- we never thought we were going to be in litigation,

9    they knew it right from the get go, that's when they should

10   have had their protocols executed, that's when they should

11   have had their litigation hold.

12          And once we do get the litigation hold letters -- and

13   that is one of the things that we're going to be asking --

14   that we ask in our requests for remedies -- that may shed more

15   light as to exactly what degree of culpability N.V.E. has.

16   And in our proposed order, we basically have a list, Your

17   Honor, of the different remedies that we're seeking.

18          THE COURT:  All right.

19          MR. SCAMPATO:  Thank you, Your Honor.

20          THE COURT:  Thank you, counsel.

21          Mr. O'Connor?

22          MR. O'CONNOR:  Yes, Your Honor.

23          THE COURT:  I have a lot of questions.

24          MR. O'CONNOR:  Okay.

25          THE COURT:  And I want to start with, was there ever

O'Connor - Argument                                     32

1    a litigation hold put in place?

2            MR. O'CONNOR:  There was no official letter, Your

3    Honor.  But these -- this is a company that --

4            THE COURT:  Come to the podium, Mr. O'Connor.

5            MR. O'CONNOR:  Sure.

6            THE COURT:  And please explain that to me.

7            MR. O'CONNOR:  Yes, Your Honor.

8            Your Honor, there was no litigation letter sent by

9    the law firm to the company.  It is my understanding, Your

10   Honor, that this is a company that had been involved in a

11   series of litigations and understood their responsibilities

12   and acted accordingly.

13           THE COURT:  Obviously not.

14           MR. O'CONNOR:  Well, I disagree, Your Honor.

15           THE COURT:  All right.  Let's talk a little bit about

16   what should have happened here, all right?

17           MR. O'CONNOR:  Very well, Your Honor.

18           THE COURT:  They terminate this man on January 6.

19   Rightfully, wrongfully; I am not rendering an opinion.

20           MR. O'CONNOR:  Okay.

21           THE COURT:  There's termination.

22           MR. O'CONNOR:  Correct.

23           THE COURT:  There's letters by an attorney that's

24   representing him at the time putting you guys on notice that

25   there's going to be counterclaims.  You don't think that, at

1   that time back in January of 2006, people needed to start

2   looking at holding anything this -- that Palmeroni may have

3   dealt with in general?

4             MR. O'CONNOR:  Your Honor, I think what the

5   obligation is, is that if there is documents, evidence or

6   materials relating to the proposed claims, then they would

7   have to hold onto that.  But what we have --

8             THE COURT:  You mean to tell me, for a litigation

9   hold, it's going to be that narrowly construed, Mr. O'Connor?

10  That it's only going to deal with Palmeroni, Sunbelt and

11  Sumicek?

12            MR. O'CONNOR:  And the counterclaims that were

13  eventually raised, in terms of this, you know, the FDA or the

14  bankruptcy fraud or whatever is the issue that he raised --

15            THE COURT:  Or the tax -- right and the tax and --

16            MR. O'CONNOR:  But what they're trying to do here,

17  Your Honor, and which goes contrary to the decision this Court

18  has already rendered, that N.V.E. could not have known about

19  the Sun -- the Smart World --

20            THE COURT:  I'm with you on Sunbelt, but I've got

21  counterclaims, Mr. O'Connor.

22            MR. O'CONNOR:  Right.

23            THE COURT:  I've got counterclaims and claims that

24  are directly asserted against you and this is where I have a

25  problem.  I'm not going to say you knew about Smart World;

1    I've already ruled that you had no way to know about Smart

2    World.

3            MR. O'CONNOR:  Okay.

4            THE COURT:  But you knew that this gentleman was

5    arguing and was arguing as far back as when he put you on

6    notice on January 4th, but at least when he filed his

7    counterclaim on February 7th and when he amended his

8    counterclaim on April 25th of 2007.  You knew the various

9    arguments he was making with respect to being entitled to

10   commissions, being entitled and also arguing CEPA-related

11   violations.

12           So, here's where my question is.  How can you start

13   going -- let's not -- you start changing a system and you

14   don't think at some point in time you need to start making

15   backups of whatever this man may have touched, based on the

16   universe of counterclaims that now have been asserted against

17   you?

18           MR. O'CONNOR:  I think the question, Judge, is where

19   is that universe.  And they kept the system.  I mean, they

20   make it sound like we took it and we threw it in the ocean.

21   All right?  The system is there.  The MACS computer is there.

22   We've hired a forensic expert --

23           THE COURT:  How come you didn't -- but how come they

24   didn't do backups?

25           MR. O'CONNOR:  They had --

1          THE COURT:  While they started doing this, couldn't

2   they have not protected themselves and began to make copies

3   and backups of some of the information?

4          MR. O'CONNOR:  Look.  What they did, Your Honor, is

5   they acted in a commercially reasonable manner, is that the

6   system that they had for running their business was they kept

7   it on this computer.  Right?  So, this is how they ran their

8   business.  They kept their information on this computer.

9          They didn't have a backup to run their business on a

10  regular day-to-day basis, so what they did is, they kept that

11  machine.  They didn't throw it away.  They didn't delete it.

12  They didn't get rid of the data.  They kept the machine.

13         Now, what's happened is, six or seven years later,

14  when this conspiracy finally gets unearthed in 2010, we then

15  go back and say, now we know that there may be stuff that is

16  now relevant to the expanded universe of what's in our amended

17  complaint and now, for technical reasons, we can't into this

18  machine.  We've tried to get into the machine, we've had our

19  own computer systems administrator, we've hired a retired FBI

20  agent to look at the machines.

21         And I know you're talking about the MACS system, Your

22  Honor, but I want to tell you that just this week I have --

23  the FBI, a retired FBI expert, the forensic expert has been

24  able to recover e-mails from Mr. Palmeroni from his hard drive

25  of his desktop computer and I think it's in the thousands of

1    e-mails, somewhere 8 to 9,000 e-mails that we just got this

2    week.  We're going through to see if there's any privilege

3    issues with regard to them.  As soon as we go through the

4    privilege review, we're going to duplicate those and give

5    those to the defendant; all the e-mails from what was on the

6    hard drive of his computer.

7            It is my understanding, from talking to the forensic

8    expert -- his name is Brian Orsak -- sorry, thanks.  It is my

9    understanding that his -- let me -- this is what he explained

10   to me, Your Honor, okay?  That there should be an identical

11   copy on what was on the hard drive of Mr. Palmeroni's computer

12   and what was on the e-mail server.  So, we should have all of

13   Mr. Palmeroni's e-mails that were extant at the time that this

14   happened.  So, we will be turning those over, somewhere in the

15   neighborhood of 8 to 9,000 e-mails, once we finish with the

16   privilege review.

17           THE COURT:  Well, that's good news, because I tell

18   you what, I was not happy to hear that this system was wiped

19   clean and that you're telling me, in all these years, you guys

20   never bothered to see whether -- that you never checked his

21   hard drive?

22           MR. O'CONNOR:  Judge, I'm not happy that the system

23   was wiped clean either.  And apparently it was not -- because

24   all the hiatuses in the litigation as it went forward, that

25   they had not taken a forensic expert to go look at this or see

O'Connor - Argument                                          37

1   what was there and there was inclinations that all the other e-

2   mails that were available were turned over.  And if I can just

3   jump to the other e-mail server issue, which we raised before,

4   as long as we're talking about the forensic expert.

5         My understanding, Your Honor, is, after talking to

6   the forensic expert, is that the old e-mail server -- and I

7   ask the Court to take judicial notice -- over the last ten

8   years, we've had a lot of changes in computer hardware and

9   software that run all these programs.  They upgraded the

10  server somewhere in the 2005-2006, which is why we have that

11  sort of line that we're dealing with here.

12        Again, they kept the old server.  They have tried to

13  get into that system, Your Honor, and what I'm told is the

14  system just won't power up, is the words that have been used.

15  They try to turn it on, it won't power up.

16        My understanding -- and this is a layman's

17  understanding, Judge -- is that a server like this generally

18  has six or seven or eight hard drives inside it and that what

19  happens is, that there is something wrong with the hard

20  drives, the machine won't power up, it just won't turn on, so

21  they can't get in there.  And what happens is, is the data is

22  spread across all seven or so hard drives to try and deal with

23  the problem that if one goes bad, you don't lose everything.

24        And but the problem that we have right now, Your

25  Honor, is a monetary problem with regard to this.  I am told

O'Connor - Argument                                    38

1   by the forensic expert that it may, it may be possible to

2   recreate the machine for this e-mail server.  I am told it

3   will cost thousands upon thousands of dollars to do so.

4   Another expert would have to be hired.  It's beyond the

5   expertise of the retired FBI agent.  They have to hire someone

6   who actually builds a new computer and then tries to work it

7   and there's still no guarantee.

8           And what I get to, Judge, is what expenses do we have

9   to go to, to deal with this, when it's not something that

10  we've destroyed, it's not something we've gotten rid of, we

11  have held onto it.

12          THE COURT:  But it's something that --

13          MR. O'CONNOR:  We've held onto it.

14          THE COURT:  -- quite frankly, I'm considering in the

15  form of sanction, because I am not pleased that N.V.E. knew as

16  of January 2006 that litigation was imminent, all right, and

17  yet they did not do anything to back the system up.

18          MR. O'CONNOR:  Yeah, but I -- Judge, I think you're

19  missing the -- the system on the MACS system is a matter of,

20  as I understand it, an order comes in, say on a fax or by

21  telephone and says, you know, we want to order how many of

22  these pill -- these -- these -- this stuff, the Stacker 2 or

23  whatever the nutritional supplement is, and they just kind of

24  put it, okay, you know, we want, like, 100 boxes of this, send

25  it off, mark it up, and then it gets invoiced out and that's

O'Connor - Argument                          39

1   it.  This is not something you go back to.  It's just a matter

2   of saying, okay, that --

3           THE COURT:  There's no e-mails on the MACS system?

4           MR. O'CONNOR:  No.  At least to my understanding,

5   there's no e-mails, it's purely a system for if the order came

6   in and my understanding is back then most of the orders were

7   coming in by fax or by phone or have you and they'd say, okay,

8   we need to send out 100 boxes of Stacker 2 to this client or

9   this store or whatever and then you fill order, you do like a

10  -- generate I think -- and, Your Honor, I forget some of the --

11  but my understanding is it generates an invoice.  It generates

12  an invoice and, boom, that's it, you're done.

13          Once that invoice is paid, that information is no

14  longer relevant to the company.  They sent out a thousand

15  dollars worth of stuff, they got a thousand dollars done.

16  Done.  We're on to the next thing.

17          THE COURT:  So, you're telling me now on the record --

18  because I need you to tell me definitively what's on this MACS

19  system --

20          MR. O'CONNOR:  That --

21          THE COURT:  What is on the system?  No e-mail?

22          MR. O'CONNOR:  No, there's two computers, just so we

23  know, Judge.  There is the MACS system, which is -- it's my

24  understanding there's no e-mails on; and there's an e-mail

25  server.  So, there's two different machines.

1          THE COURT:  Okay.  So, how about --

2          MR. O'CONNOR:  There's two different machines.

3          THE COURT:  How about correspondence or anything

4    related to sales, commissions, anything?  Any of that on the

5    MACS system?

6          MR. O'CONNOR:  Can I get a second, Your Honor?

7          THE COURT:  I would have hoped we had that

8    information already.

9          MR. O'CONNOR:  I thought -- I tried to put it into

10   the affidavit of Mr. Jensen what was on there, but I just want

11   to double check, Your Honor.

12                    (Extended pause)

13         MR. O'CONNOR:  Here, Your Honor, no -- as I said,

14   there is no correspondence or no e-mails on the MACS system.

15   It's purely a system so that when the orders come in, it

16   generates the invoice and the shipping information, so that

17   the product can be shipped out.  And as I said, there's two

18   machines.  There is an e-mail -- there is no -- there is a

19   server.  I mean, that's -- that -- on that server would have

20   been the e-mails.  And that -- but that's not the MACS system.

21         THE COURT:  How about -- and again, it was just a

22   straight order invoice --

23         MR. O'CONNOR:  Yes.

24         THE COURT:  -- type of system.  Nothing else is on

25   that system?

O'Connor - Argument                                    41

1           MR. O'CONNOR:  If we looked at -- there is --

2           THE COURT:  I saw it.  I read it, Mr. O'Connor.

3           MR. O'CONNOR:  Well, I just want to make sure I --

4           THE COURT:   I want it confirmed from you, though.

5           MR. O'CONNOR:  I just want to make sure I don't

6    misspeak; that's all, Judge.

7                        (Extended pause)

8           MR. O'CONNOR:  Your Honor, I think, as set forth in

9    the affidavit of Mr. Jensen, it was a system that did order

10   entry, sales order and subsequent invoicing system.  That's

11   what the MACS system did.

12          THE COURT:  So, the only thing that would be relevant

13   to arguably, Mr. Scampato, would be what?  That information

14   with respect to what was sold and what was generated, in terms

15   of revenue?

16          MR. SCAMPATO:  According to the January 18, 2011 that

17   I received from Ms. Ellen Smith, she stated that the MACS

18   system was an accounting system.

19          MR. O'CONNOR:  Would -- could you read the full --

20          MR. SCAMPATO:  So, --

21          MR. O'CONNOR:  Could you read the full sentence?

22          MR. SCAMPATO:  What it is and what it --

23          MR. O'CONNOR:  Could you read the full sentence?

24          MR. SCAMPATO:  -- isn't, I don't know.  But there is

25   one thing that's really relevant that now we're learning for

O'Connor - Argument                                    42

1    the very first time, is that when we were provided information

2    about Smart World and we were told, okay, here's 50 pages from

3    here, here's 50 pages from there; the reason why we don't have

4    more information is because the MACS system went down.  That's

5    what we were told.

6         Then why is it, if the MACS system doesn't have any e-

7    mails, that all the e-mails relating the Smart World only start

8    in 2005?  Where are the e-mails between --

9         MR. O'CONNOR:  It's not --

10        MR. SCAMPATO:  -- N.V.E. and Smart World between 2001

11   and 2005?

12        THE COURT:  Let's get an answer.  Where are the e-

13   mails from 2001 to 2005?

14        MR. O'CONNOR:  Judge, there's two computers.  I --

15   this is not -- this is -- they are trying to make an issue

16   where there is none.

17        First of all, he would not read the rest of Ms.

18   Smith's letter, which talks about an accounting system for

19   invoicing.  If they want to make a distinction between an

20   accounting system for invoicing and a system that does

21   invoicing, God bless them, Judge.  I -- this is making

22   something out of nothing.

23        With regard to the e-mails, we've already told you

24   there's two computers.  There's a MACS system for the

25   invoicing and there is another server that had the e-mails on

1    that we can't get powered up.  We haven't got rid of it.  We

2    didn't get -- we didn't lose it.  We didn't hide it.  It's

3    there.

4         And what happened is, previously Mr. Yang had gone

5    and got some information, which is how we knew that -- that

6    these e-mail accounts had been deleted without our knowledge.

7         THE COURT:  All right.  So, the MACS system is --

8    there's two systems.

9         MR. O'CONNOR:  Yes.

10        THE COURT:  Right?  The MACS --

11        MR. O'CONNOR:  There's two different machines.

12        THE COURT:  Two different machines:  the MACS system,

13   which is, as you call it, you know, the accounting invoice

14   system; and then the other e-mail system that you can't power

15   up.

16        MR. O'CONNOR:  Yes, it's -- they call them -- the

17   computer guys call it a server.  So, that's --

18        THE COURT:  The server.

19        MR. O'CONNOR:  A server.

20        THE COURT:  And the server, even though you -- there

21   was this transition, you say that server had nothing to do

22   with this transition you made to the MACS, or did it?

23        MR. O'CONNOR:  No, it had -- the MACS system is

24   completely different.  The server was replaced by a new

25   Outlook or Outlook Express, whatever the new -- there's a new

O'Connor - Argument                                    44

1   server for the e-mail system that came into place at some

2   point, but that's not the MACS system.  So, there's two

3   different machines.  The --

4          THE COURT:  Okay.  So, when you -- when the

5   transition occurred finally in May of 2006 or thereabouts,

6   you're saying you also upgraded the e-mail service.

7          MR. O'CONNOR:  Somewhere around that time they also

8   upgraded the e-mail server.

9          THE COURT:  And in upgrading the e-mail server, you

10  say that you didn't -- there wasn't an intentional -- I'm

11  looking to see whether you made this inaccessible and you say

12  it wasn't and that you didn't make it inaccessible.

13         MR. O'CONNOR:  no.

14         THE COURT:  You had it just in case, but now all of a

15  sudden, lo and behold, you just can't power it up.

16         MR. O'CONNOR:  Yeah, we have it.  I mean, if they

17   want to hire an expert to come look at it, hire an expert and

18  we'll make it available.  And the same with the MACS system.

19  If they want to hire an expert to look at the MACS system,

20  we'll make it available, as long as it's with the, you know,

21  with our expert be in there to make sure that none of the data

22  gets ruined.  You know, let them do it under conditions.

23         But the MACS system and the computer, which is this

24  old HP UNIX system and the --

25         THE COURT:  Well, did anyone do anything?  Because

O'Connor - Argument                                    45

1    you had an obligation, once you knew litigation was imminent,

2    you had an obligation to confirm that the machine was being

3    kept -- I mean, we have to now try to preserve the

4    information.  What was done to preserve that e-mail server so

5    that it wouldn't go down the way it has gone down?  Was it

6    properly cared for?  Where was it stored?  What did people do

7    with it?

8            MR. O'CONNOR:  Well, I --

9            THE COURT:  See, that's all -- before I'm going to

10   make them pay for it, I'm going to look to you to tell me what

11   you did to ensure that the information was preserved.

12           MR. O'CONNOR:  It is my understanding that these

13   computers were kept -- the company, like many companies, has a

14   computer room.  And they were basically, when they replaced it

15   with the new system, they -- the computer stayed there.  And

16   they stayed under the control of the systems administrator,

17   which since around 2006 or so, this is still under Mr. Yang,

18   who is there.  The other fellow who was there at the time Mr.

19   Palmeroni was fired was a fellow named Diaba (phonetic) and he

20   was fired for cause by the company and we believe that he was

21   on good terms with Mr. Palmeroni.  And so, Mr. Yang was not

22   the systems administrator at the time Mr. Palmeroni was let go

23   by N.V.E.

24           So, and that's how we kept the hard drive to Mr.

25   Palmeroni's computer off his desktop computer.  We understood

O'Connor - Argument                                    46

1    that there was litigation going on, so even though Mr.

2    Palmeroni left the company, it's not like in many companies,

3    okay, you left, new guy comes in, you know, we'll give you the

4    computer and off you go, because we want to reuse it.  That

5    hard drive, Mr. Yang has held onto that hard drive, because he

6    knew that there was litigation going on.

7         He couldn't access it.  He tried to access it.

8    That's where he got the information that he believed that had

9    been scrubbed clean; there was no data on it.  The forensic

10   expert, the retired FBI agent was able, through whatever he

11   does as a forensic expert, was able to recover a series of

12   e-mails, both from the current e-mail server and the old

13   e-mail server, some of the old stuff that was on the hard

14   drive and a very limited amount of documents.  There were more

15   e-mails than documents.  I don't know what the number of

16   documents was, but it was a very small number of documents.

17        THE COURT:  Okay.

18        MR. SCAMPATO:  Your Honor, can I respond?

19        MR. O'CONNOR:  Well, can I just --

20        THE COURT:  No, no, no.  He's not done yet.

21        MR. SCAMPATO:  I'm sorry.

22        MR. O'CONNOR:  I've got --

23        THE COURT:  I've got a number of -- a series of

24   questions.  So go on, Mr. O'Connor.

25        MR. O'CONNOR:  Your Honor, I just note that, you

1   know, part of what happens is, when Mr. Palmeroni wants to

2   argue that he had an oral agreement --

3          THE COURT:  So, we're -- let's not move --

4          MR. O'CONNOR:  Okay.

5          THE COURT:  Let's not move.  My next question now --

6          MR. O'CONNOR:  Okay.

7          THE COURT:  -- and this I am waiting to hear an

8   answer.  No litigation hold letter sent, which boggles my

9   mind.  Continue -- as I sit here, it's just a hard thing for

10  me to fathom.  But, okay, no litigation letter sent.

11  Litigation hold letter sent.  What the heck happened in 2009

12  and where was your firm in overseeing Mr. Jensen and

13  overseeing this receptionist as they began to purge documents

14  from 1980 -- which I could -- I don't care about.

15         MR. O'CONNOR:  Right.

16         THE COURT:  But the ones I do care about are the ones

17  from 1999 to 2006.  And you stopped at 2004, I think at some

18  point, maybe because she leaves.

19         MR. O'CONNOR:  Right.

20         THE COURT:  But who authorized that?  Who oversaw --

21  who was overseeing what was being purged?  Where is the

22  protocol on what's being purged and where is the inventory

23  lists?

24         MR. O'CONNOR:  Okay.  What happened, Your Honor, is

25  that obviously this lawsuit has been going on for a number of

O'Connor - Argument                                    48

1   years.  Based on what we knew going through 2006, 2007, 2008,

2   2009 were the allegations in our original complaints, the

3   allegations in the counterclaims by Mr. Palmeroni, and the

4   allegations for Mr. Sumicek and Sunbelt.  Right?

5          So, folks at N.V.E., namely Mr. Jensen and others,

6   went through the hard copies of -- well, not hard copies, but

7   the hard files, the paper files that were in their storage and

8   culled through those documents, those files, pulled out the

9   stuff that was responsive to all of the pending discovery

10  requests, that was responsive to all the claims that N.V.E.

11  was aware of.  As you know, we were not aware of the Smart

12  World conspiracy at that time.

13         And after pulling out what was reasonably foreseeable

14  to be relevant and what was relevant, based on discovery

15  requests we received and based on what we thought we needed to

16  prove our case -- because quite frankly, Your Honor, the stuff

17  in Smart World, you know, we're hurt more by the loss of

18  documents than is Mr. Palmeroni at the end of the day.

19         But after Mr. Jensen had gone through, based on

20  communications with our law firm and the requests for

21  discovery, those documents were pulled out of the hard copies

22  and made available to our firm and then turned over in

23  discovery as appropriate.

24         So, what was left were the documents that were not

25  relevant.  What was left is the documents that --

1          THE COURT:  We're making relevance determinations and

2     who is making them?

3          MR. O'CONNOR:  Well, the relevance determinations

4     were made by -- after you say, okay, this is the stuff -- what

5     happens in any litigation?  The people go through the

6     documents.  Someone goes through the documents, whether from

7     the company, from the law firm, whoever.  Someone initially

8     goes through it in a case, usually someone from the company

9     initially makes the first cut through the documents, say,

10    okay, I need all the documents relevant to what our lawsuit

11    is.  And they made that determination.  These are all the

12    relevant documents for the lawsuit.

13         And after that determination was made by Mr. Jensen,

14    who is the chief financial officer of this corporation, then

15    what was left was stuff that was determined it wasn't

16    relevant.  And that's what was destroyed.  Not stuff that was

17    relevant.

18         They -- and the idea -- the misstatements that are

19    made in the papers that Sun -- that what happened is, Mr.

20    Jensen went in there in 2009, looked at the stuff and then got

21    rid of everything; that's not what happened.  What happened

22    is, this determination was made in 2006, 2007, 2008.  When, as

23    the case went forward through this Court, to say these are the

24    discovery requests, these are the claims that are involved,

25    this is the areas of interest.  The areas of interest

1   regarding Sunbelt, regarding Sumicek, regarding the van

2   program, regarding, you know, allegations of misconduct or

3   bankruptcy courts.  Those issues are what's in this case.

4            So that the idea that there is -- no one knew about

5   the Smart World conspiracy, so no --

6            THE COURT:  I'm not talking Smart World, I'm talking

7   about the other count --

8            MR. O'CONNOR:  But -- but that is what they're

9   talking about, Judge.

10           THE COURT:  No, no, no, no, no.  They're talking

11  about claims and defenses.  And it's not for your client to

12  make determinations as to what the possible claims and defense

13  -- counterclaims and defenses.  I mean, there is arguably

14  information that we don't know, because no one did an

15  inventory, that go to perhaps commission and issues.

16           MR. O'CONNOR:  Let me ask you this, Judge.  I mean,

17  let me -- a hypothetical.  I mean, just -- say nothing had

18  been shredded.  All right?  Just allow me just a little leeway

19  if you would, Your Honor.  Say nothing had been shredded and

20  we didn't tell him nothing.  All right?  What happens is, we

21  get a discovery request.  Okay, we want these documents in the

22  discovery request.  And we tell the company, you know what, go

23  -- this is -- we have this discovery request, this is what you

24  need to produce, produce -- give us these documents so we can

25  produce them.  And we do that.  And you know what?  That's

1    sort of where we are, Judge.

2          What happens is, we went through the documents we

3    had, based on the discovery request and based on the claims

4    and issues that we were aware of.  Right?  And if we were

5    sitting here today and these documents haven't been shredded,

6    no one would ask me, well, who went through it?  Did Mr.

7    Jensen go through it or did Aidan O'Connor go through it?  You

8    would never ask me that question, Your Honor.  I -- with all

9    due respect, that would not --

10         THE COURT:  No, you're dead wrong.  Because I asked

11   that question.  I had this issue come up time and time again

12   as a United States Magistrate Judge for the last four-and-a-

13   half years, Mr. O'Connor.

14         MR. O'CONNOR:  Okay.

15         THE COURT:  The questions I ask --

16         MR. O'CONNOR:  I stand corrected.

17         THE COURT:  -- generally are custodian issues.  How

18   is information compiled?  I have this issue come up all the

19   time.  And I do ask these questions.  And when one is as hotly

20   contested as this one, I would expect that we would have had a

21   little bit more communication going on between the client and

22   your office.  And at the time that your client decided to

23   start shredding away, were you notified?

24         MR. O'CONNOR:  We were notified.  I think -- I don't

25   -- I wasn't at the firm in 2009, Judge.

1          THE COURT:  Well then, find out from Ms. Smith who

2   was.

3          MR. O'CONNOR:  Okay.

4             (Discussion among counsel, off the record.)

5          MR. O'CONNOR:  Your Honor, it's my understanding that

6   we did not find out about the shredding until recently when we

7   advised the other side about the shredded documents, and we

8   told them.  And my understanding is, is that the company

9   believed that they had gone through all the documents for all

10  the issues, as we discussed, regarding to the complaints and

11  the counterclaims, and had gone through all the stuff that was

12  relevant to any of the claims that they were aware of at the

13  time.

14         And so that, if any documents are missing, Your

15  Honor, at this stage, it's my understanding that there may

16  highest and best documents missing regarding to Smart World,

17  but any documents relating to the counterclaims of Mr.

18  Palmeroni or relating to the claims that N.V.E. raised in its

19  complaint were already pulled out of those hard paper

20  documents.  And so the stuff that was destroyed did not have

21  anything relating to any of those issues.

22         THE COURT:  So, and we don't have an inventory of

23  what was actually destroyed, do we?

24         MR. O'CONNOR:  No.

25         MS. SMITH:  Your Honor, if I could just add one

1    thing?  We produced -- because N.V.E. had culled it out

2    beforehand, we produced all of the commission statements for

3    all of the brokers, except for one person who -- one of the

4    three that they just mentioned at the end -- but Kris Sujack

5    was not a broker for N.V.E., she worked for a radio station

6    and tried to cut some deals, but apparently never succeeded.

7    She was not a broker.  And I think we have that in our

8    responding papers.

9          We gave then thousands upon thousands of pages of

10   commission statements for all the other brokers for N.V.E.,

11   with monthly backup sheets.  As I say, thousands and thousands

12   and thousands of pages for each of them.

13         THE COURT:  What about -- is there a formal document

14   retention policy in the company?

15         MR. O'CONNOR:  No.

16         THE COURT:  The e-mail situation.  Can we talk a

17   little bit about that, in terms of what e-mails you have been

18   able to pull?  With respect to the e-mails from the

19   assistants, were those obtained?

20         MR. O'CONNOR:  I'm sorry, I didn't hear you, Your

21   Honor.

22         THE COURT:  The assistants.  Mr. Palmeroni's

23   assistants.

24         MR. O'CONNOR:  Judge, there's some e-mails, as we

25   laid out, of Mr. Palmeroni, Mr. Rosarbo and two of the ladies,

1  that those were deleted.  What I -- and -- and I have gone

2  through with N.V.E. and the system is administrator says he

3  didn't do it.  It is his understanding that only the -- a

4  systems administrator had the password or the authority to

5  actually go into the system and delete them.  He didn't do it.

6         We've tried to contact this fellow, Rader, who was

7  the assistant administrator at the time.  I have not been able

8  to do so.  They reached out to the man by e-mail and he

9  refused to respond to -- to -- as to what happened.  My

10 understanding of it, he left on -- you know, he was fired and

11 let go.

12        But no one -- you know, Mr. Occhifinto, Mr. Jensen,

13 Mr. Yang, they didn't delete these accounts.  We don't know

14 what happened to them.

15        THE COURT:  And you just found out about these

16 accounts being wiped clean?

17        MR. O'CONNOR:  Yeah, because what hap -- yes, Your

18 Honor.  You know, what happened is, when they did the searches

19 for accounts, they put in certain keywords for search terms to

20 try and pull accounts and we -- we've asked the other side,

21 you know, if you want to sit down and go through search terms

22 to go through this, then tell us what search terms you want,

23 and that's never happened.

24        You know, there's not been no meet and confer to say,

25 okay, these are the search terms we now want to go through,

1   based on the new issues involved in the amended complaints.

2   And we're willing to run the search through the information

3   that we do have if they have other search terms.  And we did

4   run search terms on the issues that we were aware of based on

5   the request that we received.

6            THE COURT:  With respect to all of the -- I mean,

7   it's not clear what you're not producing and when I look at --

8   you know, we start on page 8 and we take -- and it takes us

9   all the way to page 15.  But I mean, some of this information,

10  it's not clear what's accessible and what's -- or what's been

11  produced or what's not accessible or inaccessible now with

12  respect to the MACS system.

13           Is -- you know, I want to go through all these 18.

14  And some of these you say are not ready or even ripe for the

15  Court's consideration, because you think it's -- it has

16  nothing to do with spoliation, it has more to do with perhaps

17  a motion to compel some of the information.

18           But now, with respect to the e-mails, so you are

19  going to provide e-mails?

20           MR. O'CONNOR:  Your --

21           THE COURT:  You have been able to pull those.

22           MR. O'CONNOR:  Yeah.  As I said, Your Honor, the

23  forensic expert was able to retrieve e-mails of Mr. Palmeroni

24  from the hard drive of his computer, I believe it's somewhere

25  in the neighborhood of 8 to 9,000, and we're just doing a

O'Connor - Argument                                    56

1    review for privilege and once we're done with that we will

2    provide those to defendant.

3           THE COURT:  "N.V.E. produced no e-mails bearing on

4    the commission and compensation agreements for brokers,

5    distributors, customers and employees."  Are we going to be

6    able to comply with that?

7           MR. O'CONNOR:  My understanding is that we produced

8    the information that we have regarding brokers and commission,

9    all the brokers' information in the files we have.  If they

10   want to suggest search terms for them, we'll run another

11   search.

12          THE COURT:  Personnel file.  They make an issue with

13   respect very few documents in the person -- in Palmeroni's

14   personnel file.  What do you say back to that?

15          MR. O'CONNOR:  There's nothing to say, Judge.  I --

16   the -- we gave them the entire personnel files.  Again, this

17   goes back to when Mr. Palmeroni wants to have an oral

18   agreement for his case, that's okay.  When we say there's oral

19   agreements, then we're destroying evidence.  You know, you

20   can't have it both ways and that's what he's trying to do

21   here, Judge.

22          He wants this -- the Court to believe or the jury to

23   believe that he had an oral agreement for these commissions

24   and there's no documentation for it.  But then, when we

25   respond to him that certain of the agreements with other folks

1   are oral agreements or that, you know, he got a promotion and

2   it's just a small enough company, so the fact that they made

3   him the head of sales, it -- Mr. Occhifinto didn't need to

4   write a memo.  I mean, he did it.

5        You know, it's not a very -- it's just not IBM or

6   General Motors, Judge, it's a relatively small company and

7   those decisions were made and there wasn't necessarily a memo

8   to the file or to a personnel file saying, okay, yesterday you

9   were assistant sales director and today you're sales director.

10  He became sales director and there's no issue.

11       I mean, it's not an issue as to whether he was a

12  sales director or not.  He was.  What they're complaining

13  about is that there should be more pieces of paper in his

14  personnel file.  He got -- we produced his personnel file.

15  There was nothing taken out of it, there was nothing

16  destroyed.

17       THE COURT:  How about with respect to e-mail or

18  correspondence from Import Warehouse or CB Distributors nor

19  the raw data for its sales figures or shown the connection

20  between this data and the calculation of sales commissions?

21       MR. O'CONNOR:  Your Honor, I believe that part of the

22  stuff with the raw data was the substance of much litigation

23  before this Court a year ago, in terms of the joint protocol.

24  And it's my understanding that we have complied with what was

25  in the joint protocol.  And so now, to kind of get there on

1   the back door and say, well, the Court -- you know, we

2   litigated, we came to an agreement, the Court ordered that we

3   produce certain information relating to this raw data, in

4   terms of the sales.

5        We did that, pursuant to the Court's joint protocol

6   and now they want to say, because we have complied with the

7   Court protocol in terms of what we produced, that because we

8   didn't produce stuff that we were not -- that wasn't in the

9   joint protocol, we must have destroyed it.  It's a circular

10  argument, Judge.  You know, if they think that there is

11  something that we should have produced, pursuant to the joint

12  protocol that we haven't, I'd be happy to sit down and discuss

13  that with them.

14       THE COURT:  Anything else, Mr. O'Connor, that you

15  want to be heard on?

16       MR. O'CONNOR:  Just give me one second, Judge.

17                      (Extended pause)

18       MR. O'CONNOR:  Judge, I think what I came back to in

19  a lot of the arguments and that counsel tried to mush a lot of

20  stuff together and I -- and I know that the Court is aware of

21  this and -- and I ask for your indulgence -- is that there

22  really has to be some showing here that, if any documents

23  were, you know, negligently or wilfully destroyed or hidden or

24  taken away, that they have to show that it was foreseeable or

25  reasonably foreseeable that N.V.E. knew that that was going to

1  be an issue in the case.

2           And that's why they talk about Smart World, they talk

3  about a lot of the new claims, they talk about, you know,

4  there's other brokers that were not involved in the original

5  complaint, and we have given them all this broker information,

6  but there's really been no showing that any of the information

7  that they claim is gone had anything to do with any of the

8  stuff that happened in the complaint up until we found out

9  about the Smart World stuff in mid-to-late 2010.

10          And I just ask the Court to keep it in mind, that you

11 don't allow them too mush what we should have known after we

12 found out about the expanded conspiracy versus what was

13 foreseeable, reasonably foreseeable to N.V.E. at the time that

14 the shredding took place and in terms of what reasonable

15 actions of this company were, is that we're talking about

16 technological failures here, Judge.  We're not talking about

17 wilful destruction.  We're talking about, we kept the machine.

18 We kept the two computers we had.  We didn't destroy them.  We

19 didn't get rid of them.  We didn't delete the data.  We have a

20 technological problem in terms of trying to get into this

21 machinery.

22          In terms of the MACS system, the company that sold us

23 the software, it seems that it's, you know, out of business.

24 We're trying to find the successor company, if there is one.

25 We tried to find someone who had some expertise with this MACS

O'Connor - Argument                                    60

1  software.  We found one person, but he's employed by someone

2  else and he can't do consulting work for other companies.

3       You know -- you know, so we have tried to find

4  someone who can get into this system and see what's there, but

5  we're talking about a technological issue, not a wilful

6  destruction.  It's not as though we said, like in some of the

7  cases I think you've had, where people have purposely, you

8  know, let items be deleted.  We're not talking about, you

9  know, a document that someone relied upon and then says, oh I

10 lost it or I don't have it, and the inclination is maybe it's

11 a forgery to start with.  That's not what's going on here,

12 Judge.

13       THE COURT:  I guess what I'd like to do is look at --

14 because we know that you had notice as of February and April

15 of 2007 some of the counterclaims.  And this is where I really

16 do have and perhaps, you know, we need to look specifically

17 and maybe I need to pull that off the docket to see

18 specifically what were the counterclaims in February and

19 April.

20       Because the problem I have, Mr. O'Connor, is I agree

21 with you, you had no idea on Sunbelt -- or not Sunbelt -- on

22 Smart World.  I understand that.  That's not where my concern

23 is.

24       MR. O'CONNOR:  Okay.

25       THE COURT:  My trouble is actually in the defenses

O'Connor - Argument                                    61

 1   and/or counterclaims and what was pulled and gathered that

 2   could have been used by the defendant, you know, whether, you

 3   know, you all label him what you want to label him, he has a

 4   right --

 5          MR. O'CONNOR:  Mm-hmm.  Right.

 6          THE COURT:  -- to try to defend against this action.

 7   And he has a right, since the documents are in your

 8   possession, to try to get documents that support his defenses

 9   and/or claims against you.

10          And the problem I have is, is that when people were

11   pulling this stuff and gathering the information that was

12   responsive to either in order for you answer interrogatories

13   and/or comply with doc requests, that that information was

14   looked at and that, indeed, they knew -- they knew, as it --

15   since it wasn't lawyers, that your client knew what might be

16   relevant for a claim --

17          MR. O'CONNOR:  Yeah.

18          THE COURT:  -- against you and/or defenses.  And I'm

19   jut not so concerned -- I'm not so clear that a CFO would

20   understand, unless somebody specifically told him that some of

21   this information might be actually useful for the defendant

22   and you need to preserve that.

23          MR. O'CONNOR:  I -- I -- I --

24          THE COURT:  And that's my concern.  Not about Smart

25   World, --

1           MR. O'CONNOR:  Okay.

2           THE COURT:  -- but what was done to adequately

3    preserve the documents so that defense counsel inform -- and

4    we all know how this works.  You start with interrogatories

5    and doc requests -- and, in fact, there was an amendment of

6    the counterclaims a few months later -- that they then start

7    to look and say, hey, you know what; we might -- in defending

8    this action, we might need to get certain information with

9    respect to commissions or with respect to sales and what he

10   was entitled or what money he saved for the company.

11          Because the argument was -- and whether you believe

12   it or not, and then of course this is for a trier of fact to

13   determine -- whether indeed these oral agreements that were

14   going back and forth and his assertions to Occhifinto that I

15   can make you more money, you're being charged too much by your

16   brokers, --

17          MR. O'CONNOR:  Right.

18          THE COURT:  -- all of that information could have

19   been contained in those documents and I am not comfortable

20   sitting here today that Mr. Jensen -- and I am not going to

21   say that there was -- you know, that we -- that this seems to

22   be negligent, as I see it.  That we went ahead and pulled what

23   was clearly relevant for your case, but I am not so sure the

24   eyes were being looked at and the documents were being looked

25   at with as an eye towards defending the action.

1          MR. O'CONNOR:  Right.

2          THE COURT:  And so, when you destroy stuff and after

3     the fact now telling me, well, believe me, there wasn't

4     anything relevant in there, it's a little hard for me to

5     really feel comfortable here, as I sit here today.

6          MR. O'CONNOR:  And I understand that, Judge.  That

7     makes sense.  And we are asserting that the fellow, Mr.

8     Jensen, who is sitting here today -- and you can see him -- in

9     court, you know, he is the chief financial officer.  It's not,

10    look, we delegated this to some minor functionary within the

11    company.  He is someone who has been very much involved in

12    managing this litigation and in managing other litigations

13    that this company has been involved in.  So, it's not some

14    neophyte that you send -- okay, we're going to send, you know,

15    some secretary or the -- you know, the woman, Ms. Gamboa, her

16    job is to take documents given to her and shred those.  I

17    mean, she was not a decision maker.  You know, you -- and I

18    think that there's been --

19         THE COURT:  So, what was the procedure?  Did he go

20    through all these -- because there must have been thousands of

21    documents --

22         MR. O'CONNOR:  Yes.

23         THE COURT:  -- from 1980.  We're talking 1980 to

24    2004.  Can you for certain tell me what was the date that

25    everything ceased with respect to --

1          MR. O'CONNOR:  The last box that was shredded?  I

2    believe it was approximately 2004.  That's my understanding.

3          But, Judge, I think what's sort of the misconception

4    here is, is that someone --that the ins -- the conception of

5    the picture that's being painted is that in 2009 that's the

6    first time that someone decided to make a decision as to what

7    was in these hard documents.  That someone went in there and

8    said, okay, this is in, this one shred, this is in, this one

9    shred.  That's not exactly what happened.

10          It's my understanding, Your Honor, that as this

11    lawsuit started in 2007, 2006 and when the bankruptcy order

12    came back, there was document requests, interrogatories.  That

13    culling of going through the papers happened back then.  So, I

14    mean, if someone wanted to destroy a document, they could have

15    gone in 2007 and done this, right?  They could have done some,

16    you gotta get rid of this stuff in a hurry.

17          But what happened is, they already had gone through

18    all the document requests, all the information requested, had

19    already gone through it and at that point, Mr. Jensen goes,

20    like, we've already gone through these boxes of documents

21    looking for stuff for the trial, that he had already been in

22    oral or telephonic communication with the lawyers previous,

23    prior to 2009 as to what were the issues in the case, as to

24    what we needed to produce, what our obligations were.

25          THE COURT:  So, you're making a representation that

1    he was told what was relevant with respect to not only Sumicek

2    and Sunbelt, but he was also told to go through these

3    documents with a fine-toothed comb as it related to defenses

4    and/or claims?

5          MR. O'CONNOR:  I don't want anyone to use the word

6    fine-toothed comb, Judge, but he was certainly told that,

7    look, these are the claims being made by Mr. Palmeroni, these

8    are the document requests that they have served, these are the

9    interrogatories that they have served; we need to respond to

10   this, we need documents, anything that's relating to these

11   issues, we need the whole -- we need to produce, because

12   that's our obligation, is to produce this.

13         And he had been involved in document production in

14   other cases, so it's not -- you know, so can I say was the

15   entire, you know, discovery process explained to Mr. Jensen

16   with regard specifically to this case?  I don't know, Judge,

17   but what I do know is that he had been involved in more than

18   one lawsuit, more than one lawsuit where we're told you have to

19   produce documents, you have to give them the documents

20   relating both to our claims and their claims.

21         So, yes, that happened over a period of years.  And

22   so, to say that all of a sudden in 2009 that's the first time

23   someone looked at these documents to try to decide whether

24   they're relevant or not, that's inaccurate, that's not what

25   happened, Judge.

O'Connor - Argument                                    66

1          THE COURT:  So, you're saying that he had done this

2     over a period of time and that everything that you had in hand

3     before 2009, in terms of RFAs, requests for production and

4     interrogatories, all of that was -- those documents were

5     culled through --

6          MR. O'CONNOR:  Yes.

7          THE COURT:  -- and you pulled everything.  And the

8     fact that you don't have these documents now today, how do we

9     explain that?  I mean, these documents at some point existed,

10    right?

11         MR. O'CONNOR:  What documents?

12         THE COURT:  Well, counsel has cited to me a number of

13    documents that he is looking for with respect to sales and

14    what -- I mean, I understand the Smart World documents are

15    gone, but at the time --

16         MR. O'CONNOR:  But all the documents relating to the

17    brokers that we knew about, we've given to them.  You know,

18    and all the terms of -- you know, and, you know, the documents

19    and terms were there.  Those -- that was produced.

20         THE COURT:  How about the insurance information?

21         MR. O'CONNOR:  Well, Judge, the problem with -- we

22    have produced a lot of insurance information.  The problem is,

23    is what defendant complains about, he never asked for.  You

24    know, and this is -- you know, he just did -- he asked for the

25    documents from N.V.E. to the insurance company.  That's what

O'Connor - Argument                    67

1    he asked for.  You know, if you read it, that's what he asked

2    for.  Now what he complains about is we didn't provide

3    information relating to N.V.E. to our customers regarding

4    insurance.  Well, they didn't ask for it.

5         I -- the -- so to say that we didn't produce

6    something they didn't ask for and that is the basis of a

7    spoliation is illogical, it doesn't make sense.  I mean, they

8    -- even after we told them they didn't ask for it, they still

9    haven't asked for it.  I -- you know, with -- you know, I

10   don't know if they're there, but we will do a search and go

11   look for it.

12        But, quite frankly, if you say I want, you know, the

13   information you had with your insurance company -- and the way

14   this works, as I understand it, Judge, is N.V.E. produces this

15   product.  All right?  And so they were -- got some kind of

16   insurance, so that if the seller -- CVS or Rite Aid or, you

17   know, 7-Eleven or whatever -- got sued, they would have some

18   coverage.  So, there were sort of three parties here.

19        Well, what they asked for was N.V.E. to the insurance

20   company, they didn't ask N.V.E. to the customer.

21             THE COURT:  Anything else?

22                  (Extended pause)

23             MR. O'CONNOR:  One second, Judge.  That's all, Your

24   Honor.  Thank you very much.

25             THE COURT:  All right.  I'll let you respond.  Go

1    ahead, Mr. Scampato.

2            MR. SCAMPATO:   Thank you, Your Honor.

3                        (Extended pause)

4            MR. SCAMPATO:   We --

5            THE COURT:   You know what I find troubling, Mr.

6    Scampato?  And maybe it was just the way it was briefed.  It

7    would have been a good idea for us to sort of really get an

8    idea -- I could get a better assessment of what was asked,

9    because now I'm hearing and now you're hearing that Mr.

10   Jensen, throughout the course, has been very involved in this

11   litigation, as well as other litigation, the CFO, and as prior

12   counsel -- it wouldn't have been you -- prior counsel was

13   requesting information as it relates to the claims and/or

14   defenses in this case from Mr. Palmeroni's perspective, that

15   they went into this room and they pulled these requested

16   documents.

17           And of what your -- not -- we can't go -- you know,

18   we can't play Monday morning quarterback and look back and say

19   what you'd like now.  I think it's only fair to assess what

20   was asked at the time prior to 2009 and what perhaps you feel

21   is missing and that you feel probably would have been in the

22   universe of the documents that were shredded.

23           MR. SCAMPATO:   To respond, Your Honor, I want to just

24   give a little bit of a background.  We were never told in 2009

25   that anything was lost.  We were not told in 2010, until the

1   end of 2010.  Something had just happened that caused Ms.

2   Smith to send the letter over to us informing us about this.

3   That was that the -- we just learned about the allegations

4   regarding Smart World and they looked at their Smart World

5   file and they had 50 pages.  That's it.  They got 50 pages.

6           So, they figured, okay, well, then we're going to

7   send a letter.  This is what the letter says.  Now, you

8   remember Mr. O'Connor just told you that it was only

9   irrelevant documents that were destroyed.  That's what the

10  story is May 26, 2011.  This is what was told in November of

11  2010:

12          "Towards the end of 2009, N.V.E.'s storage room

13      containing hard copy paper files was purged in the regular

14      course of business and substantially all records from

15      2004" -- all records from 2004 -- "and earlier years,

16      except files that were subject to litigation, personnel

17      records and certain bank records, were shredded."

18          That was the information that we had.  There was no

19  information stating that, yes, Mr. Jensen, who is not an

20  attorney, is fluently -- understands the litigation assertions

21  in the complaint, the defenses that plaintiff -- the defendant

22  has and their counterclaims.  There was -- there is nothing

23  there.  It was -- it just states that everything was lost.

24          Now, why is that -- why did they say that?  Because,

25  at that time -- and they also said that the MAC machine --

1    MACS system was gone.  There was no mention that the e-mail

2    servers were gone, too.  There was no mention of that.  The

3    first time we learn anything about any aspect of the e-mail

4    server being lost is in the opposition certification of Mr.

5    Yang.  And in that certification, he says, essentially --

6    Yang, pages -- paragraphs 9 through 13 -- that:

7              "The hard drive of the computer Mr. Palmeroni used

8         while employed by N.V.E. was wiped clean and the e-mail

9         accounts of potential defendants, Vincent Rosarbo, two

10        Palmeroni assistants Hunsicker and Prasse have been

11        deleted from the sever."

12             Still, even in that declaration, there is no

13   indication that that entire server went down.  That that

14   entire server, the e-mail server, which we learned I believe

15   today from Mr. O'Connor told us today that two computer

16   systems went down:  one was the e-mail server and one was the

17   MACS system; they both went down.  Today is the first time we

18   learned that the entire e-mail server went down.  Up until

19   today, we were only informed that it was defendant

20   Palmeroni's, Rosarbo's and the two assistants that they were

21   unable to locate.

22             Now, here's another part of the puzzle.  Back in when

23   they sent us the initial letter in November of 2010, they said

24   we lost all documents prior to 2004.  They send us e-mails

25   relating to Smart World.  E-mails all start January 2005 and

1    go forward.  There are no e-mails, no correspondences that go

2    back from 2004 and earlier.  It's our understanding that

3    they've had a relationship with Smart World from 1999.

4           If -- what is the answer as to where these e-mails

5    are?  I still don't know.  Were they dest -- was the entire

6    e-mail server destroyed and these e-mail server -- these

7    e-mails from Smart World are also gone?  Were these --

8    according to Mr. O'Connor, I believe, well, you never really

9    just asked us for -- you never gave us the search terms, so we

10   have not provided you with any e-mails.  That's not correct.

11          Our most recent interrogatories that Your Honor

12   allowed us to submit to them before we brought the -- before

13   they brought the motion, we asked them, give us all your

14   information about Smart World.  Give us e-mails.  Give us all

15   the files that you have.  And they said, well, the only thing

16   that we have are these 50 pages.  We only have these 50 pages

17   that we were able to cull from our personnel files and they

18   are only after 2005.

19          THE COURT:  When did you make that request?

20          MR. SCAMPATO:  I'm sorry?

21          THE COURT:  When did you make that request?

22          MR. SCAMPATO:  That request was -- we -- when they

23   wanted to file a motion to amend the complaint, we asked you

24   if we can send a -- bring another --

25          THE COURT:  I just want the --

1           MR. SCAMPATO:  -- interrogatories.

2           THE COURT:  I just want the time frame on the record.

3           MR. SCAMPATO:  I think this was November or December.

4           THE COURT:  November or December.  So, --

5           MR. SCAMPATO:  Of last year.

6           THE COURT:  Okay, of last year.  And you're saying

7    that in response to that request, you never heard anything

8    about these e-mail systems being down.

9           MR. SCAMPATO:  That's correct.  The first time we

10   learned about the e-mail server being down was in the

11   opposition papers --

12          THE COURT:  Why?

13          MR. SCAMPATO:  -- that we received here.

14          THE COURT:  Why, Mr. O'Connor?  Let's stop and ask

15   him that question.

16          MR. O'CONNOR:  Your Honor, first of all, with regard

17   to -- I think I did state earlier and I'll say again, is that

18   we did run a search on the terms of Smart World and I think

19   that's in Mr. Yang's declaration that he ran under those

20   terms.

21          And in terms of this -- as you can see, that Mr. Yang

22   had gone into the system and I think again there's two -- I

23   don't want to make it make more computers that I need -- but I

24   told you they replaced the server for the e-mail system, too.

25   So they ran through the searches through all the computers

1    they could.

2             When I went with the FBI, retired FBI expert to do --

3    have him try and figure out -- let me start over.  What we

4    wanted to do, Judge, was find out if we could determine off

5    the old e-mail server when these files had been deleted.  It

6    is my understanding Mr. Yang had been able to get into that

7    server and had found out that those accounts had been deleted.

8    I brought --

9             THE COURT:  When did you tell Mr. Scampato all this?

10            MR. O'CONNOR:  When we found out.

11            THE COURT:  Didn't you respond to the e-mails?  I

12   mean, wasn't there an initial request from defense counsel,

13   supplemental requests and did you tell him at that point?

14            MR. O'CONNOR:  In the fall -- yeah, when it -- in

15   late 2000 -- when we found out about it, as soon as we found

16   about it, we -- we went through it -- I went out with the FBI

17   expert within the last two weeks or so --

18            THE COURT:  You're telling me what you did recently.

19   I want to know what you did in response to the request when it

20   was initially --

21            MR. O'CONNOR:  I believe that we asked --

22            THE COURT:  -- propounded upon you.

23            MR. O'CONNOR:  -- we asked the systems administrator

24   to run the search of the e-mail using the Smart World -- the

25   Jeroen, Gravelijn, Mr. Sikkink -- the principals of the Dutch

1    company and had him to run a search.

2          THE COURT:  And you didn't notice that were nothing

3    that predated 2004?

4          MR. O'CONNOR:  Whatever we had, we gave them.  Hold

5    on a second, Judge.

6             (Discussion among counsel, off the record.)

7          MR. O'CONNOR:  We ran the search and that's what we

8    came up with, Judge.

9          THE COURT:  And you just didn't notice that there was

10   nothing -- what did your request specifically -- what was the

11   temporal scope of the request?

12         MR. SCAMPATO:  I believe it was 1999 until to the

13   present, because there is these two, allegedly two Smart World

14   companies and they were dealing with both of them, so we

15   wanted to get all of the information.

16         THE COURT:  So, the request was the --

17         MR. O'CONNOR:  Well, that -- that's --

18         MR. SCAMPATO:  Right.  But again, remember what --

19         MR. O'CONNOR:  That's not accurate, that we're

20   dealing with both of the companies.

21         MR. SCAMPATO:  What I'm saying here today, let me

22   just be very clear, is all of the papers that you have before

23   you, the only thing that they say regarding e-mail servers

24   that they don't have is Rosarbo, plaintiff -- I'm sorry --

25   defendant and the two assistants.  Those are the four accounts

1   that they say are not available.

2          Today I believe we heard something different.

3          THE COURT:  We did.

4          MR. SCAMPATO:  Today we heard the entire e-mail

5   server was lost.

6          MR. O'CONNOR:  No, that -- that's not --

7          MR. SCAMPATO:  That's why --

8          MR. O'CONNOR:  That's not what we said, okay?

9          MR. SCAMPATO:  Well -- well --

10         THE COURT:  Well, let's then clarify it.

11         MR. SCAMPATO:  What I said is that -- as I said

12  earlier, the e-mail server was updated and upgraded with a new

13  e-mail server.  And then, when we ran a search recently within

14  the last two weeks on the old e-mail server, again, when we

15  went into that, that's when we couldn't get it to do another

16  search on that computer, we couldn't get it to work when we

17  went in there two weeks ago.

18         So that there is a new e-mail server when Microsoft,

19  whenever they came up with the new Outlook system, they

20  upgraded that and that's the stuff from 2005 going forward.

21  And that we ran the searches on both computers, but now we

22  can't get into the older server.  It won't turn on.

23         THE COURT:  Okay.  No.  Let me understand this.

24         MR. O'CONNOR:  It did turn on previously.

25         THE COURT:  Let me understand this, because, Mr.

1    O'Connor, I can see the frustration that the defendants have,

2    because now it's changing, too.  So maybe we're get --

3         MR. O'CONNOR:  No it's not, Judge.  We just went

4    through this.  Nothing comes up about Smart World until late

5    2010 and we all find out about this and when we find out about

6    it, we tell them in, like, February or March of this year, but

7    they made their motion in March, so we tell them when we found

8    about it.  We don't know about this stuff until November 2010,

9    and now we're -- now what we're arguing about is the period

10   between November 2010 and, like, February or March of 2011.

11   That's what we're --

12        THE COURT:  No, we're not.

13        MR. O'CONNOR:  That's -- yes, we are, Judge.

14        THE COURT:  No, that's not what he's asking for.

15        MR. O'CONNOR:  That is what he's arg -- that's what

16   he's accusing us of, Judge.

17        THE COURT:  No.  Mr. O'Connor, he is saying that the

18   request that they made was a request back in the fall of 2010,

19   in which they asked you for all e-mails that related to Smart

20   World, that -- from what they understood at the beginning of

21   the request -- let's -- I mean, if we need to take out the

22   request, we will.  And that you provide -- you say you did a

23   search back then, --

24        MR. O'CONNOR:  Right.

25        THE COURT:  -- because you would have responded

O'Connor - Argument                                77

1   within 30 days, I assume.

2         MR. O'CONNOR:  Whatever time we responded, we did.

3         THE COURT:  And you're saying to me that you searched

4   both servers.  You --

5         MR. O'CONNOR:  That's my understanding.

6         THE COURT:  You searched both, and yet zero documents

7   came from the older server, that was --

8         MR. O'CONNOR:  That's -- I -- I --

9         THE COURT:  -- was working in the fall of 2010.

10        MR. O'CONNOR:  I'll have to talk to Mr. Yang and find

11  out what he -- how he did his search.  But again, we're

12  talking about the time difference between November and when --

13  and February, when they found about it.  That's the time

14  difference.  That's the time lag we're arguing about, Judge.

15        THE COURT:  No.  They're complaining about the

16  production you gave them in the fall.  That the production you

17  gave them in the fall had zippo with respect to anything 2005

18  -- predating 2005.  And so, if your assertion is correct, that

19  you just two weeks ago found out that the e-mail server, the

20  old one -- I'm going to say the new server, so we're not

21  confused --

22        MR. O'CONNOR:  Right.  Right.

23        THE COURT:  -- the new e-mail server, the old e-mail

24  server and the MAC, all right?  That you're saying that when

25  the request was first made in November, in the fall of 2010,

1   you're saying and representing that the search was done of the

2   old server, right?

3          MR. O'CONNOR:  I'm going to have to ask Mr. Yang,

4   because I just -- I -- now I don't know, Judge.  I don't know.

5          THE COURT:  We're here for a spoliation motion.

6          MR. O'CONNOR:  I -- Judge, this is the first time

7   we've come to this issue of the time lag between November and

8   February as to how we did the search and when we notified them

9   that the old e-mail server we couldn't power up when we tried

10  to get in there.  So, I mean, I have to ask Mr. Yang to make

11  sure that he did that.  It's my -- that was my belief, is that

12  he searched through all the e-mails and I'm going to have to

13  ask him and find out.

14         MR. SCAMPATO:  Respectfully, Your Honor, --

15         MR. O'CONNOR:  But the problem is, is, you know, as

16  we said, some of the e-mails have been deleted and we don't

17  know how they got deleted.

18         THE COURT:  So, when you were responding to this

19  production request, this supplemental production that was the

20  fall of 2010, you didn't know that the e-mail servers had been

21  wiped clean?

22         MR. O'CONNOR:  I'm not sure when -- what they -- that

23  we got out --

24         THE COURT:  See, this is all very important for me.

25         MR. O'CONNOR:  I -- no, I -- I -- I -- I --

1          THE COURT:  So, you know what?  Because I'm telling

2    you now, I'm not comfortable with what I am hearing and the

3    responses I'm hearing, Mr. O'Connor, and you can look at me

4    and --

5          MR. O'CONNOR:  No, I -- I -- I -- I --

6          THE COURT:  -- you can look at me anyway you want to

7    look at me, --

8          MR. O'CONNOR:  I don't mean to be disrespectful,

9    Judge.

10          THE COURT:  Well, I really hope not.

11          MR. O'CONNOR:  Please --

12          THE COURT:  Knowing your reputation, I really hope

13    not.

14          MR. O'CONNOR:  I'm just puzzled and I don't mean to

15    be disrespectful, Judge.  Please -- please, Judge, I mean that

16    very sincerely.

17          THE COURT:  All right.  Well then, let's stop with

18    the faces --

19          MR. O'CONNOR:  All right.  So, --

20          THE COURT:  -- and let's go with the answers that I'm

21    looking for.

22          MR. O'CONNOR:  Absolutely, Judge.

23          THE COURT:  Now, what I am looking for here, is I am

24    trying to understand, because it's hard for me to understand,

25    how now we didn't have a clear understanding of these various

O'Connor - Argument                                80

1   servers now -- we knew about the MAC, I knew about the MAC.  I

2   knew about the new system.  Now I'm understanding that there

3   is an e-mail server that now is down and has been down as

4   recently as you two weeks ago going with the FBI agent.

5        But I want to know why no one else knew about the

6   e-mails being deleted when you responded in the fall of 2010

7   to the requests that were being made of you.

8        MR. O'CONNOR:  My understanding, Judge, is that the

9   search was done using search terms.  And so, my understanding

10  as to how the search was done is that we told Mr. Yang, run it

11  on everybody and then go see what comes out.  And then, only

12  later on did we go in and sort of try to look for these

13  specific accounts and found out that the accounts had been

14  deleted.  That's my understanding, Judge.

15       THE COURT:  And you let the defendants know that

16  when?

17       MR. O'CONNOR:  I have to pull out the letter, Judge.

18       THE COURT:  In the opposition, right?  Can we concede

19  that the first time you let them know that the e-mails were

20  wiped clean was when?

21       (Discussion among counsel, off the record.)

22       MR. O'CONNOR:  When we found out when we had to

23  respond, Judge.  That's when we found out and we told them

24  about it.

25                    (Extended pause)

1          MR. SCAMPATO:  One last thing, Your Honor, if --

2          THE COURT:  Am I missing something?

3          MR. SCAMPATO:  No, Your Honor.  The -- we -- in

4   November of 2010, I was supposed to get my Smart World

5   documents.  I didn't get any e-mails.  Back in November of

6   2010, if their attorneys see that there are no e-mails, they

7   would say, well, where are the e-mails.  We have all of these

8   e-mails from 2005 onwards, where are all the N.V.E./Smart

9   World e-mails from 2004 earlier?  We don't have any.  What

10  happened?

11         It doesn't appear that any of those questions were

12  asked, because we don't have them.  We still don't have them.

13  Mr. O'Connor is not telling us today that he is able to find

14  them.  The only thing that he is telling us today is that one

15  particular computer hard drive that was of Mr. Palmeroni, that

16  they have been able to retrieve 8,000 e-mails from; 8 to

17  10,000 e-mails from.  We still don't know what happened to

18  this.

19         How hard, if you have protocols in place, how hard

20  would it be to make a backup of an e-mail sever?

21         THE COURT:  Tell me what you asked of -- tell me --

22  because I'm curious.  Tell me what you requested pre-2010,

23  fall of 2010, by way of what e-mails, because now am I

24  understanding this correctly that you haven't received any

25  e-mails for Mr. Palmeroni to Rosarbo or to -- you're saying

1    there are no e-mails --

2         MR. SCAMPATO:  Right, that's exactly what we're

3    saying, Your Honor.

4         THE COURT:  There are no e-mails from Occhifinto to

5    Palmeroni, Palmeroni to Rosarbo; no e-mails.  Were those --

6    when were those requested?  That type of that -- those --

7         MR. SCAMPATO:  Right, and if you could just give me

8    one second, because --

9         THE COURT:  You can sit, Mr. O'Connor.  I'll ask --

10        MR. O'CONNOR:  Thank you, Judge.

11        (Discussion among counsel, off the record.)

12        THE COURT:  I want to take a break.  And what I want

13   specifically the defendants to tell me -- and it may take some

14   time -- I want to know what you asked them, all right?

15        MR. SCAMPATO:  Right.  We have it in our brief, Your

16   Honor.

17        THE COURT:  All right.  What you asked them for, by

18   way of document production --

19        MR. SCAMPATO:  Right.

20        THE COURT:  -- and e-discovery requests pre-fall of

21   2010.  All right?  Pre the shredding in 2009, all right?

22   Because I want to know what was out there, in terms of

23   specific requests, Mr. Rostan.  I want to know, did you ask

24   for e-mails back in 2007 and 2008?  All right?

25        MR. ROSTAN:  We did.

Synopsis by the Court                                          83

1          THE COURT:  I want to know what was asked

2     specifically by the plaintiffs with respect to doc production

3     and e-discovery.  Because, at some point, this arguably was

4     looked at.  Someone looked at this hard drive and must have --

5     there must have been a request for the Palmeroni information

6     on this hard drive.

7          MR. ROSTAN:  There were, Your Honor.  There was.

8          THE COURT:  Then get it for me and I want to know

9     specifically.

10          MR. SCAMPATO:  Okay.

11          THE COURT:  Call Mr. Yang.  I want to know what Mr.

12     Yang --

13               (Recess from 4:25 p.m. to 4:52 p.m.)

14          THE COURT:  Okay.  We're back on the record in the

15     matter of N.V.E. versus Palmeroni, et al., Civil Action Number

16     06-5455.

17          I took a little break and requested a number of

18     things from both sides.  First I asked defense counsel to give

19     me the very first request.  I want the date of the first

20     request in which correspondence, which I assume also included

21     e-mails, was specifically requested by defense counsel to

22     N.V.E..

23          I then asked Mr. Aidan O'Connor to go out and speak

24     to his systems administrator, because I wanted an idea of what

25     was done in the fall of 2010 once they received the

1   supplemental requests for production -- requests for

2   production, rather, from defense counsel and what was

3   specifically searched.  And I want to get confirmation that

4   the e-mail syst -- what I am calling the e-mail server, the

5   old e-mail server, was up and running at least in the fall of

6   2010.  And then at some point, we now know from Mr. O'Connor's

7   arguments on the record, that when he went two weeks ago with

8   their forensic specialist, former FBI agent, that indeed the

9   system won't boot up or the system is inaccessible at this

10  point.

11       With respect to that, I assume defense counsel did

12  what I asked and got me a date certain and what was requested.

13  And also, I'm again trying to get counsel -- and I'm not

14  trying to make arguments for you; you need to make the

15  argument as to what you requested back then that would assist

16  in both your prosecution of any counterclaims against N.V.E.,

17  but also in your defense to any of the claims asserted against

18  your client pre-2009.

19       MR. SCAMPATO:  Yes, Your Honor.

20       Your Honor, you have the reply brief that we filed.

21  And if you could turn to page 2?  At the bottom of page 2 is --

22  we mentioned that Mr. Grossman, prior counsel, submitted

23  interrogatories as of September 2007.  And the term document

24  is in bold -- is, I'm sorry, indented at the bottom of 2 and

25  at the top of 3 and it also includes computerized

1    correspondences.

2          We -- furthermore, definition 8 -- this is in the

3    instructions as to what documents mean.  Furthermore,

4    definition 8 asks for the identify -- the indem --

5    identification of any document that's unavailable.

6          Notably, these interrogatories requested, among other

7    things, all documents pertinent to the case, detailed

8    information of how Import Warehouse and CB Distributors became

9    distributors to N.V.E., including all communications involved

10   in this process, as well as all agreements.

11         If you then turn to page --

12         THE COURT:  So, that was 2007.

13         MR. SCAMPATO:  That was 2007.  We also have Mr. --

14   and it's not as an exhibit -- but we also have Mr. Rostan in --

15         MR. ROSTAN:  December 2009.

16         MR. SCAMPATO:  December 2009, he asked for all

17   documents, including all e-mails.  Right, Mr. Rostan?

18         MR. ROSTAN:  Yes.  It was in a definition of

19   documents.  Yes, Your Honor.

20         THE COURT:  Okay.

21         MR. SCAMPATO:  We -- and the reason why I want to

22   direct the Court's attention to another part of the reply

23   brief is that, in the MOSAID case, there was an argument

24   raised that, well, you didn't specifically mention e-mails,

25   you don't say e-mails, you use something close to it, like in

1   our case, computerized documents.  And the court in the <u>MOSAID</u>

2   case -- and what page is that in our reply brief, David?

3        MR. O'CONNOR:  Judge, I -- I don't think we're -- the

4   question here is not arguing whether e-mails are encompassed

5   in documents, the question is, is what the substance of it

6   was.  I mean, if we can just short circuit this?  I have read

7   <u>MOSAID</u> or <u>MOSAID</u> -- or however you pronounce it -- as well and

8   I don't think the question is whether e-mails are a subset of

9   document or communication.  That's not our argument.  I mean,

10  if the question is, is what was the substance of what they

11  asked for.

12       THE COURT:  Well, that's the question, but also the e-

13  mails would be important, because if indeed you were requested

14  e-mails in 2007 and at minimum -- so, let's take Rosarbo out of

15  it; let's just keep it at Palmeroni, Occhifinto and Palmeroni's

16  assistants -- any and all e-mails, right?  We would have known

17  in 2007 when we went to do our -- when we  went to comply and

18  respond to the request, you would have  known that Palmeroni's

19  hard drive was deleted, because it was wiped clean, was it not?

20

21       And you guys say that Yang didn't do it and Yang took

22  over once the prior systems administrator left in 2006.  So,

23  at some point, when you're looking for e-mails, especially

24  Palmeroni's e-mails, I am still not linking how we didn't know

25  Palmeroni's hard drive was wiped clean until recently.  That's

1    a big question in my mind.

2              MR. O'CONNOR:  Well, I just want to separate out two

3    things and get to it.

4              The first is, on a search for e-mails, my

5    understanding is the searches were not done through the hard

6    drive, it was done through the server.  And searches were

7    done, you know, look for Sunbelt, look for Sumicek.  As

8    opposed to saying give me all the Palmeroni e-mails, the

9    search was done with a search term of the substance as to

10   Sumicek or Sunbelt or whatever those issues were back before

11   2010.

12             And so, I don't know that anyone sort of sat there

13   and put the dots together and said, okay, we did a search for,

14   for example, Sumicek and this is what spit out of the

15   computer, as -- and that that was done through the whole

16   server, as opposed to saying just run the search on

17   Palmeroni's account, just run this search on Occhifinto's

18   account, it was run -- run the search on the server and see

19   what pops up, because that's what I think the understanding of

20   the request was.

21             THE COURT:  And in the prosecution of this case, no

22   one from the plaintiff's side thought to examine a hard drive

23   of an individual that you terminated and in which you were now

24   beginning to uncover and, as you said, unearth a massive

25   conspiracy amongst not only Sunbelt, but all these other

1  people?  No one bothered to look at the hard drive?

2           MR. O'CONNOR:  Apparently not.

3           MR. ROSTAN:  Your Honor, if I may?  Just because I

4  may have a more specific recollection.

5           Shortly after I became involved in the case, which

6  was December of 2009, I submitted a set of interrogatories to

7  plaintiff regarding the third-party complaint, and that

8  detailed all the elements in the third-party complaint:  the

9  cash transactions, the allegations regarding insurance fraud,

10 bankruptcy, the vans that were purportedly used to gain cash

11 which were allegedly not reported in the bankruptcy.  And

12 there was -- all the elements of that complaint were

13 incorporated into interrogatories.  And in the instructions,

14 the term document was defined to include e-mails.  And beyond

15 that, there was a further instruction which stated that any

16 document that had been misplaced or not -- unavailable should

17 be accounted for.

18          And then Your Honor might recall that at or around

19 the time of the joint protocol, which was I think in June 15th

20 or June 25th of 2010, I had requested permission from the

21 Court to file supplemental insurance interrogatories.  So --

22 and that's listed as Exhibit 19 and attached to the

23 defendant's brief as Exhibit 19.  And that also includes a

24 definition of document to include, I believe electronic

25 correspondence or e-mails -- I don't have it right in front of

1   me -- and it also asked specifically, if any documents had

2   been discarded or unavailable, that an explanation be

3   provided.

4         THE COURT:  And no such explanation was provided,

5   correct?

6         MR. SCAMPATO:  Correct, Your Honor.  And one last

7   thing, because this goes to the second part of your request

8   that we provide you with how we have been prejudiced.

9         Mr. Palmeroni provided a detailed certification which

10  is Exhibit 21 of our moving papers and he indicated that, on

11  the MACS system, the MACS system wasn't simply data entry, he

12  also kept notes on the MACS system, the MACS system for each

13  sale.  And it also was where one would find if there were cash

14  sales.  So, if there was cash sales that -- such as the cash

15  sales that Mr. Palmeroni raised in his counterclaim, if there

16  were cash sales, they would be found in one of two places:

17  the first place it would be found would be the MACS system;

18  and the second place that they would be found would be in the

19  hard copy backup, which was in the boxes.

20        Now that the MACS system is no longer accessible,

21  there was no backup made for it, now that the hard copies have

22  been destroyed, Mr. Palmeroni is no longer able to assert --

23  has no ability to obtain evidence to be able to assert his

24  counterclaim relating to cash sales.  In other words, N.V.E.

25  has obliterated any reference, any evidence of cash sales,

Scampato - Argument                                          90

1    which Mr. Palmeroni objected to and raised as part of his

2    counterclaim.

3            Thank you.

4            THE COURT:  Can I have counsel point out the

5    interrogatory that relates to e-mail and what type of e-mail

6    you were requesting of -- Mr. Rostan, of -- so that the

7    defendants -- so that the plaintiffs, rather, would have known

8    to search for these e-mails and what specifically were you

9    looking for?

10           MR. SCAMPATO:  Well, with regard to Mr. Grossman's --

11   and I'll let Mr. Rostan talk about his own interrogatories.

12   With regard to Mr. Grossman, document is the -- the

13   interrogatories is Exhibit 8 -- Exhibit 16.  That is Mr.

14   Grossman's initial interrogatories.

15           And in the first question, we ask that they provide

16   us with all relevant documents.  In the instruction, we request

17   that computerized correspondence be included.  In other words,

18   computerized correspondence is one of the definitions of

19   documents that we were looking for.

20           So, right at the very beginning, at least with regard

21   to all of the claims and the counterclaims as of 2007, the

22   requests for all relevant documents includes requests for

23   computerized correspondence or e-mails.

24           Mr. Rostan, if you can talk about your 2009

25   interrogatory requests?

1          MR. ROSTAN:  Your Honor, unfortunately I don't have

2     that particular interrogatory request before me, so I am

3     basing what I'm saying on my recollection.  It wasn't actually

4     referenced as an exhibit to the -- to this pap -- to the

5     papers, although the second -- the supplemental

6     interrogatories of June or July of 2010 in Exhibit 19 were.

7          My recollection is that I went through all the

8     elements of the amended answer and counterclaim and asked

9     questions with respect to each one.  There were -- the vans

10    were covered, the evidence of cash transactions, and I believe

11    that what I wrote in each question was, and attach any

12    documents that were pertinent to the questions.  So, there was

13    a question regarding insurance, I believe there was a question

14    regarding insurance certificates, but I honestly don't

15    remember the verbiage, the specific verbiage, because I don't

16    have it in front of me.

17         But I did go through each element of the counterclaim

18    and, you know, it was the bankruptcy, the cash transactions,

19    the insurance, each things that -- and then I believe the

20    sexual harassment -- the Christmas party, which is part of the

21    allegation -- and there were questions regarding each element

22    in the counterclaim.

23         THE COURT:  And you were asking for any and all

24    documents, including e-mail documents -- you may have said

25    electronic correspondence -- as it relates to the particular

1    question at --

2         MR. ROSTAN:  Yeah.  My recollection is that I asked

3    for any -- to attach any pertinent documents that were related

4    to the quest -- answering the question.

5         THE COURT:  And when you received responses to those

6    interrogatories and/or doc requests, at any time were you told

7    -- I mean, did you receive e-mails?

8         MR. ROSTAN:  No, I don't believe I did receive

9    e-mails.  What we did receive was I think about -- there were

10   -- there was the employment handbook, which we asked for.  We

11   asked for the reasons that Palmeroni was terminated, any

12   e-mails that were associated with the termination.  There were

13   no e-mails associated with the termination.

14        But we -- but I came to learn in the deposition of

15   Mr. Caldwell, who was then was the general counsel, that there

16   was correspondence between the insurance carriers and N.V.E.

17   regarding the lapse of payment to the insurance companies.

18   And that was done I believe in 2006, which was at or about the

19   time of the bankruptcy.  I think the bankruptcy was in 2005,

20   August of 2005.  And Mr. Caldwell, you know, testified about

21   how there were problems paying people.

22        And what I had asked for in the supplemental

23   interrogatories was to know whether that these insurance

24   certificates -- because we got insurance certificates which

25   basically said, you know, CVS $5 million dollars, Walmart

1   $5,000, etcetera, etcetera.  At the time that these

2   certificates were issued, did N.V.E. know -- I mean, say -- or

3   did the parties that were being insured, who were the subject

4   of these certificates, know that there was a lapse in payment

5   to the insurance providers?  And there were colloquy back and

6   forth with counsel regarding that.

7           So, that -- that -- there were deficiency letters

8   back and forth, there were three deficiency letters that I

9   sent between December 2009 and I think May.  And Mr. Samaro

10  and I think Mr. White were correspondence on that.  And I

11  don't believe that there were any e-mails or other letters and

12  correspondence.  And that's also contained in the reply brief

13  in one of the boxes that we made.

14          So, clearly, correspondence and e-mail correspondence

15  was requested, because we were specifically looking at

16  insurance, not only in the deficiency letters, but in the

17  supplemental request that was made in the summer of 2010.

18          THE COURT:  And at any time, again -- and I'm hearing

19  from Mr. O'Connor that they would have only searched the

20  server for those e-mails and we now know there's two servers,

21  an old server and a new server.  At any time, were you made

22  aware of which server was searched and which server wasn't?  I

23  mean, I, reading the papers, didn't know there were different

24  servers until Mr. O'Connor specified that on the record.

25          MR. ROSTAN:  My recollection is that there was no

1    reference to a search on a server as such.  In fairness, I

2    don't believe that the interrogatory specifically directed

3    them to look on a server or gave them a search term, but the

4    interrogatory questions themselves I think were sufficiently

5    specific to have triggered the search.

6              THE COURT:  But the parties never engaged in, say, a

7    dialogue with respect to e-discovery we now know and call them

8    e-protocols, and you never engaged in that; there wasn't

9    keyword searches that were agreed upon.  This was sort of, you

10   relied on and you gave them this interrogatory and/or doc

11   request.  Seem to suggest -- and I don't have the ones that

12   you supplemented, but -- unless I do.  I didn't see it.  Did

13   you provide that in the exhibits, your different set that you

14   supplemented with?

15             MR. ROSTAN:  Did I --

16             MR. SCAMPATO:  One is Exhibit 19.

17             MR. ROSTAN:  Yeah, Exhibit 19 was the supplemental

18   interrogatories.

19                        (Extended pause)

20             THE COURT:  Right.  So, but at the time that you

21   provided the supplemental interrogatories, which seemed to

22   request documents in response to these interrogatories,

23   correct?  Did you --

24             MR. ROSTAN:  Yes.  I mean, I believe -- I don't have

25   the verbiage in front of me, but I believe that there is the

1    requested information that was pertinent to that, including

2    documents.

3         THE COURT:  And you say that you left it to their

4    discretion to sort of search what they needed to search and

5    comply with the request or at least, you know, advise you if

6    there were any documents that were not available and why they

7    were not available.

8         MR. ROSTAN:  Right.  What we got were certificates.

9    We got a whole bunch of certificates, but we didn't get any of

10   the colloquy between the insurance companies and N.V.E., which

11   is what we were looking for.  Because we knew from Mr.

12   Caldwell that N.V.E. wasn't paying these insurance companies

13   and there was -- and he stated in his deposition -- I think it

14   was page 50, if I remember, or something like that -- when I

15   first got involved in the case, that there was communication

16   between one insurance company that was called universal and

17   there was a second one, but that was a little bit earlier, I

18   think, in 2003, something in Illinois and I forget the name.

19   But there was communication, according to Mr. Caldwell.

20   That's what we never got.

21        So, we know there was communication.  I don't know if

22   it was in a letter form or an e-mail, but there was back and

23   forth and it was -- and insofar as the insurance was

24   concerned, for Mr. Palmeroni's sake we were trying to

25   establish that perhaps N.V.E. knew at the time it was issuing

1    these certificates, that the certificates were bogus.

2            And Mr. Palmeroni contends that one of the reasons he

3    was fired was that he was complaining about these certificates

4    being falsified and Mr. Prindell (phonetic) in particular

5    falsifying them or being a participant in the process.  And

6    there were interrogatory questions concerning Mr. Prindell.

7            And interestingly enough, speaking of Mr. Prindell,

8    the Smart World e-mails, the ones we did get, are all from Mr.

9    Prindell.  There's hundreds of them.  But why would Mr.

10   Prindell have all of these e-mails after 2005 and suddenly he

11   is silent before 2005?  It just didn't make sense to us, so --

12           THE COURT:  And that's when you realized you hadn't

13   gotten productions that were --

14           MR. ROSTAN:  Right.

15           THE COURT:  That's when you realized that there were

16   no productions that were responsive to dates pre-2005.

17           MR. ROSTAN:  The --

18           MR. SCAMPATO:  Yes.

19           MR. ROSTAN:  I think their response, you know, was

20   deficient and, you know, and then November of 2010 is when we

21   first learned of the amended complaint and then Smart World,

22   and that's when we submitted the supplemental submissions.

23           But I believe that all of the interrogatory requests

24   that I worked on specifically included as a definition of a

25   document anything that was electronic.

1               (Extended pause)

2          THE COURT:  All right.  So, for example,

3     interrogatory 6:

4          "If any document during the period of Mr. Palmeroni's

5          employment" -- which would have been 1989 to 2006 -- "with

6          N.V.E. concerning insurance for N.V.E. and/or its

7          customers was at one time in existence, but has been lost,

8          discarded or destroyed or not retained, identify each such

9          document and provide the following information in a

10         written response designating and identifying the documents

11         that cannot be produced."

12         And then you have a list of things:

13         "The date and/or approximate date it was lost,

14         discarded or destroyed; the circumstances and the manner

15         in which it was lost, discarded or destroyed; the reasons

16         for disposing of the document, if discarded or destroyed;

17         the identity of all persons authorizing or having

18         knowledge of the circumstances surrounding the disposal of

19         the document; the identity of all persons who lost,

20         discarded or destroyed the document; the identity of all

21         persons having knowledge of the content thereof; and the

22         identity of the person last known to have custody of the

23         document."

24         All right.  And we see, upon response to

25    interrogatory number 6 -- and I'm just picking this one:

1          "Upon advice of counsel, objection is made to this

2       interrogatory as vague, ambiguous and impossible to

3       respond  to.  Without waiver of the objection, N.V.E. has

4       produced all documents it has within its files, including

5       all certificates of insurance it was able to locate, but

6       cannot identify what documents, if any, may have been

7       discarded in the usual course of business."

8          And here we find that you say it was not only

9  important for them to tell you that there was a purging of the

10  documents in 2009, but you were not told that, correct?

11          MR. ROSTAN:  That's correct.  And I might add that I

12  think, for the perspective of the Court, I would argue that

13  the various forms of destruction or loss or in-operation of

14  documents, whether it's the MACS system, the destruction of

15  boxes or the wiping clean of the hard drives, has to be viewed

16  by the Court or should be viewed by the Court in a cumulative

17  fashion, in terms of the contents.

18          Now, with respect to Ms. Gamboa, in sometime I

19  believe in the beginning of 2009, when she's destroying box

20  after box, purportedly that's done for two reasons.

21          One reason is that N.V.E. needs storage space.  Now,

22  this is a $60 million dollar company.  Because we have their

23  bar chart, if you recall, and, you know, there are tens and

24  tens of millions of dollars that this company is making and I

25  think they said there were 15 boxes that were destroyed.

1          Now, my personal storage space, which I pay 35 bucks

2     for, is -- you know, could contain that many boxes.  Maybe

3     even 30 boxes.  So, you know, and then their Web site says

4     that they have a huge storage space.  So, we have that.  And

5     then we have that there's this receptionist who is destroying

6     the boxes and then after the fact we hear, oh, Mr. Jensen was

7     supervising that process.  But we never really heard what

8     happened between January of 2009 to -- 2009; yeah, 2009 -- and

9     May, when Mr. Jensen becomes involved and it's very murky.

10         We don't know if the boxes were destroyed in serial

11    fashion.  It's referred in one case as a project.  Well, it's

12    not -- I mean, a receptionist is -- however capable Mr. Jensen

13    may or may not be -- and we have the <u>Zubulake</u> argument and

14    <u>Major Tours</u> argument that it should be supervised by an

15    attorney.  But assuming, for sake of argument, that it's --

16    that Mr. Jensen was somehow relatively qualified to supervise

17    the process, it's really not clear that it was just him and it

18    almost appears to be that it was Ms. Gamboa alone.  At least

19    it's an open question.  It's --

20         THE COURT:  At least for the early part of 2009.

21         MR. ROSTAN:  For the earlier part of 2009, because I

22    just don't think they told their attorneys what was really

23    going on, but --

24         THE COURT:  Can I ask you, counsel, a question with

25    respect to the argument that I believe I'm hearing probably

1   for the first time today from Mr. O'Connor, that everything in

2   this room was already just information that had been culled

3   through in the course of discovery.  That, you know, that Mr.

4   Jensen was involved, intimately involved in this case and, you

5   know, short of having a degree, he knows -- he can tell what's

6   relevant and not relevant and he pulled out very carefully,

7   from the months of complying with the requests for production

8   of documents and interrogatories, he was able to get through

9   these documents, these documents in this storage room and it

10  was all garbage in there, it was all stuff that had been

11  sifted through, culled, collected and everything there was

12  just pretty much not relevant to either the claims against

13  your client and/or his defenses and his counterclaims.

14         And that he would have been provided -- and that's

15  what I'm being asked to accept here -- that he would have been

16  provided by the attorneys -- who never provided a litigation

17  hold letter -- but he would have been provided by his

18  attorneys a good understanding of the causes of action against

19  Mr. Palmeroni and also would have been told, when you're doing

20  this gathering of all this relevant information, you're also

21  going to, by the way, be on the lookout for information that

22  might be helpful to Mr. Palmeroni in his defenses and/or

23  counterclaims against us.

24         That when it was finally done -- I mean, that was

25  done years ago, in '07 and '08 and then in '09, this useless

1    information that's in this room, that's when they decide to

2    let Gamboa, on her own, sort of dispose of this, you know,

3    useful -- I mean, you know, not -- for lack of a better way of

4    saying it -- stuff that just clearly is not relevant and isn't

5    useful in any of the litigation.

6           MR. ROSTAN:  Well, I guess you're asking me a

7    question and I'll answer your question with a question.  How

8    difficult would it be for N.V.E. to take those boxes -- and

9    I'm sure they had pretty good printers and copiers -- to take

10   them, copy it and say here's the -- here's what we got, you

11   know, can you lawyers come on down, take a look at it or we'll

12   send it to you by Fed-Ex, these are the documents.

13          Or Mr. -- and I imagine also Mr. Jensen, being an

14   intelligent person who was involved with the David Caldwell

15   deposition, he was there, that in going through that, he might

16   have had a question or two.  Where are the records of the

17   questions?  Is this relevant?  Is that not relevant?  I mean,

18   presumably he was selected as CFO to exercise his analytical

19   ability to discern from one fact to another.  Presumably there

20   would be at least one or two questions that he might have

21   raised for some record of that and some communication or

22   colloquy with the lawyers; if, in fact, that was the process.

23   Even assuming that that's a process that would have been

24   permissible under Zubulake or Major Tours.

25          But for sake of argument, there's no contemporary

1   inventory.  The triggering for the going through these

2   documents is to create storage space, no greater purpose than

3   that, and it just -- you know, it seems difficult to believe

4   on its face.

5          THE COURT:  Anything further, Mr. Rostan?

6          MR. SCAMPATO:  Anything further?

7          MR. ROSTAN:  Oh.  Nothing further.

8          THE COURT:  Okay.  Mr. Scampato, is there anything

9   that you want to?

10         MR. SCAMPATO:  No, Your Honor.

11         THE COURT:  All right.  Mr. O'Connor, a couple

12  questions.

13         MR. O'CONNOR:  Yes, Your Honor.

14         THE COURT:  What did your systems specialist or

15  administrator say to you?

16         MR. O'CONNOR:  About -- can I just make one brief

17  point, Your Honor, if I might?  Mr. Rostan pointed out that

18  N.V.E. did have a general counsel up until about I think April

19  or June of 2007, which is the David Caldwell he referred to

20  deposing back some time ago in the case.  So, at least for

21  that first year-and-a-half up to mid -- like, somewhere

22  between April and June of 2007, there was a general counsel at

23  N.V.E. who was responsible, as well as Mr. Jensen, with

24  handling discovery requests.  So, it wasn't as if there was no

25  lawyer involved.  It's for a limited period of time up to

O'Connor - Argument                                      103

1    2007.  Okay?

2          I think that Mr. Yang, Your Honor, what he told me

3    was that the new e-mail server appears to have been instituted

4    prior to the time when Mr. Palmeroni was let go.  Okay.  So

5    that -- and it was his understanding that the prior system

6    administrator, when they upgraded the system or bought the new

7    computer or whatever you want to call it, they were supposed

8    to have migrated all of the information from the old e-mail

9    server onto the new e-mail server.  And so that, up until

10   recently, he never searched the old e-mail server, because he

11   was under the impression that everything had been migrated

12   onto the new e-mail server from approximately 2005, and so

13   that he thought everything was there.

14         The searches that were done previously were not done

15   a search for e-mail, the Palmeroni e-mails, they were done on

16   search terms.  You know, just push a search term into the

17   computer, give me everything on, say Smart World, and out pops

18   all the e-mails.  And all he did was download it onto a disk

19   and handed it over to be -- to the lawyers to be produced, as

20   what happens.  He didn't look to see whether the Palmeroni

21   account was there or the Rosarbo account is there, all he did

22   was, someone said to him, Philip, you know, we need to search

23   for X, Y and Z, he did the search.  He did not search the old

24   server, --

25               THE COURT:  But he must have searched Palmeroni's

1    name.

2           MR. O'CONNOR:  I don't think he searched Palmer -- I

3    don't know.  My understanding is he did search terms, rather

4    than just every Palmeroni --

5           THE COURT:  Yeah, but I know about search terms.

6           MR. O'CONNOR:  Yeah.

7           THE COURT:  And what you do is, you have connectors

8    and --

9           MR. O'CONNOR:  Right.

10          THE COURT:  -- you know, and you have "but fors" and

11   you have "have nots" and so that, you know, you limit and

12   you're able to at least get -- you've got to use the name

13   Palmeroni if --

14          MR. O'CONNOR:  Right.

15          THE COURT:  -- the case is --

16          MR. O'CONNOR:  No, no.

17          THE COURT:  -- involving Palmeroni, right?

18          MR. O'CONNOR:  I think that's very astute, Your

19   Honor, but I think that's different from saying I want you

20   just to download all of Palmeroni's e-mails, which maybe

21   should have been done, but apparently wasn't done.  There was

22   no, look, just give me the Palmeroni e-mails, whether they are

23   relating to Smart World or whether they're related to, you

24   know, he got some junk e-mail or related to, you know, Stacker

25   2.  It wasn't just sort of a general, say, give me every

O'Connor - Argument                                    105

1   Palmeroni e-mail, it was a search term; give me the stuff that

2   relates to, for example, Sumicek or Smart World or what have

3   you with that.

4          At some point much more recently, when I was -- we

5   got involved, there was -- okay, we found out about that there

6   was this other old e-mail server that hadn't been searched and

7   then we tried to find out, especially after we found out that

8   these e-mail accounts had been deleted, at which point --

9          THE COURT:  When you say very recently, I need --

10         MR. O'CONNOR:  Within the last --

11         THE COURT:  For purposes of this motion, --

12         MR. O'CONNOR:  Within the last six months.  Within

13  the last six months.

14         THE COURT:  Okay.

15         MR. O'CONNOR:  At which point, I can tell you that I

16  told Mr. Yang and said don't even bother looking in that, so

17  you don't get accused of anything, we'll hire an expert and

18  then have him look at the old e-mail server.  Just leave it

19  alone for now.  And then is when we hired the retired FBI

20  agent, this fellow Brian Orsak, to come in, is when they try

21  to power up, is when they found out in the two to three weeks

22  when we found out that we couldn't even turn on the old e-mail

23  server, although it was sitting in the computer room with the

24  stuff, it was just sitting there.

25         THE COURT:  So, you never at any time in the fall of

O'Connor - Argument                                106

1  2010 told -- you said within the last six months -- you never

2  told the other side, though, that there was this other e-mail

3  server.

4          MR. O'CONNOR:  No, because I don't think anyone --

5  no.  I don't -- I don't think anyone understood the relevance

6  until we got there and then found out we don't have an account

7  for Palmeroni, for Rosaro (sic), for these two ladies, and

8  that the -- there appears to be information that's not going

9  back far enough for like when we talked about the Smart World,

10 we only stuff from 2005 forward.

11         At that point, we're like, well, is there anywhere

12 else to look?  And at that point, he said, well there is this

13 old e-mail server, and then we went to look for that and we

14 went to hire the expert to sort of see if we could find out

15 what was on it.  And then it was only when we did that, within

16 the last couple weeks, we found out we couldn't -- we couldn't

17 turn it on.  So, that server was not searched in the past.

18         THE COURT:  Okay.

19         MR. O'CONNOR:  There --

20         THE COURT:  Can you -- I don't want to cut you off,

21 Mr. O'Connor.

22         MR. O'CONNOR:  No, no, that's fine.

23         THE COURT:  At some point -- and I'm not going to

24 interrupt your flow here -- but at some point before you sit

25 down, I want you to reconcile what was written in the letter

O'Connor - Argument                                              107

1   by Ms. Smith to counsel on November 19th and what you're

2   saying now.

3             MR. O'CONNOR:  Okay.  Could I --

4             THE COURT:  Because November 19th, when it's read

5   verbatim by counsel, seems to suggest, by at least the letter

6   that Ms. Smith wrote, that everything is gone.  And there is

7   no explanation that everything is gone, but it was culled

8   through by Mr. Jensen and all requested documents have already

9   previously been provided.

10            Can you reconcile why one attorney is making a

11  representation on November 19th in writing and now I'm hearing

12  you stand up here today and give me your arguments -- and I

13  understand you're advocating, but I am trying to understand

14  why we didn't get this understanding of Mr. Jensen, who is not

15  an attorney, who I'm going to reserve on my opinion with

16  respect to allowing Mr. Jensen and entrusting him with the

17  obligation of not only pulling documents that are relevant to

18  the claims you're asserting against Mr. Palmeroni, but also

19  having an eye out for any documents that may be relevant to

20  the defenses against those direct claims, as well as the

21  counterclaims that were asserted in February of '07 and April

22  of '07.

23            But none of that -- we didn't get that from that

24  letter and I'm guessing and I'm wondering why that wasn't

25  explained.

1          MR. O'CONNOR:  And maybe it's in-artfully drafted,

2   Your Honor.  We did put it in the certification or the

3   declaration of Mr. Jensen that we submitted to the Court, so

4   we have a sworn statement saying that he did it.  And I'm not

5   sure -- and I apologize for my memory, Judge -- what exactly

6   the language of Ms. Smith you're referring to.  Just --

7          THE COURT:  The language in the letter.  What was the

8   paragraph you read, Mr. Scampato, which it says on November

9   19th you received this letter and --

10          MR. SCAMPATO:  Just one moment, Your Honor.

11          MR. O'CONNOR:  If you could just refer to what

12   Exhibit, so I can pull it up?

13          THE COURT:  Mr. O'Connor, --

14          MR. SCAMPATO:  I -- it's --

15          THE COURT:  -- also a quick question.  Wait, I'm just

16   -- I'm going to -- is it also attached to -- can you -- where

17   is it attached, --

18          MR. ROSTAN:  Here it is.

19          THE COURT:  -- so that I can read directly from it?

20          MR. SCAMPATO:  Yeah, where is it attached?  Where is

21   it attached?  Smith letter of -- that's Exhibit 2, Your Honor.

22          MR. ROSTAN:  Exhibit 2.

23          THE COURT:  Okay.  And Mr. O'Connor, just with

24   regards to this migration issue that Mr. Yang thought.  Were

25   the e-mails ever -- were the old server e-mails ever -- did

O'Connor - Argument                                    109

1   they ever get migrated to the new server?

2           MR. O'CONNOR:  My understanding -- and unfortunately,

3   Your Honor, Mr. Yang was heading to a wake when I spoke to him

4   just now, so he wasn't in front -- access to the computer.  My

5   understanding is that the old e-mails were migrated to the new

6   server, but it appears that they only go back as far as 2004.

7   Which --

8           THE COURT:  But --

9           MR. O'CONNOR:  Which I don't -- that the e-mail --

10  there's no e-mails prior to 2004 on the new e-mail server and

11  it is my understanding that that e-mail came into play in and

12  around 2005, prior to Mr. Palmeroni being terminated by N.V.E.

13  So, whatever decisions were made as to what to migrate or move

14  from the old server to the new server were done before Mr.

15  Palmeroni was terminated.

16          So, those -- I mean, so there's no issue that they

17  were somehow should have been held onto, because there was --

18  that was a decision made before he was terminated.

19          THE COURT:  I will tell you, Mr. O'Connor, that again

20  I understand from reading your position that you didn't view

21  this from your perspective as real serious arguments that the

22  defendants were putting forward, that these were delay tactics

23  and the like, but when people are faced with potential -- as

24  you all are -- of an adverse inference minimum, it may have

25  been a good idea to have your systems administrator here to go

1   under oath so that I could question him as to what occurred

2   specifically.

3           And I am not saying that I'm going to hold that

4   against you, but this has been pending for some time.  This is

5   an -- this, quite frankly, is an '06 matter that I have been

6   given a directive on.  Today was the day.  It has been set for

7   some time and I don't understand why we didn't have -- we have

8   Mr. Jensen here, but we don't have the person that seems to be

9   the most knowledgeable with respect to what was searched; how

10  was it searched; what key terms were used; what were -- why

11  did they think something had migrated; why no one noticed that

12  they were providing in response to a request that requested

13  all e-mails and correspondence, that we were only giving

14  documents and/or e-mails that were post-2005; why nobody

15  caught this in the course of litigating this matter.

16          Those are all questions that I would love to have

17  someone here to ask, but that's neither here nor there.  We

18  now have a letter that I'm looking at from Ellen Smith,

19  November 19th, --

20          MS. SMITH:  Your Honor, if I could respond to that,

21  since it's my letter?

22          THE COURT:  Sure.

23          MS. SMITH:  In the third paragraph it says:

24          "In addition, towards the end of 2009 N.V.E.'s

25       storage room, containing hard paper files was purged in

1          the regular course of business and substantially all

2          records from  2004 and earlier years, except files that

3          were the subject of litigation."

4               Now, maybe it required more explanation, but to me I

5     knew that they had culled out and taken everything that they

6     needed.  We removed everything that related to litigation and

7     then they were purged.  But I mean, and to say if it's not

8     artfully worded, I take responsibility for that.

9               THE COURT:  All right.  So when you say that you --

10    subject of litigation, can you -- were you involved in the

11    culling through of the documents, Ms. Smith?

12              MS. SMITH:  No.

13              THE COURT:  Did you, in writing this letter, did you

14    have any contact with Mr. Jensen?  Were you the person who

15    told him what documents to pull and -- from the storage room?

16    Did that include defenses, possible defenses and/or

17    counterclaims that you were on notice as far back as February

18    of 2007 and amended in April of 2007?

19              MS. SMITH:  That was done much earlier in response to

20    the lit -- discovery and the discovery requests were funneled

21    through and handled by the legal -- the in-house legal counsel

22    and his several paralegals that he had.  They -- we would give

23    them the request and they would give us the responses.  So,

24    there was an attorney there during that --

25              THE COURT:  But you can't speak --

1              MS. SMITH:  No, I can't.

2              THE COURT:  -- definitively as to what Mr. Jensen may

3     have been told or not told --

4              MS. SMITH:  No.

5              THE COURT:  -- in what to do.

6              MS. SMITH:  No.  I mean, Mr. Jensen would be able to

7     tell you what his -- what he knew --

8              THE COURT:  Does Mr. Jensen want to take the stand

9     and tell me?

10             MR. O'CONNOR:  If you find that useful, Your Honor,

11    we'll have Mr. Jensen testify.

12             THE COURT:  Let's swear Mr. Jensen in.

13                       (Extended pause)

14             MR. SCAMPATO:  Your Honor, if I could just --

15             THE CLERK:  Raise your right hand.

16             MR. SCAMPATO:  -- relay one bit of information to you

17    before he goes -- he's sworn?  It's our understanding that the

18    in-house counsel, Mr. Caldwell, left in late 2006.

19             MR. ROSTAN:  Or early 2007.

20             MR. SCAMPATO:  Or early 2007.

21             THE COURT:  Well we'll ask Mr. Jensen when he left.

22    I'm going to ask Mr. Jensen some questions and then, if anyone

23    wants to supplement, you can feel free to.

24             ERLING JENSEN, COURT'S WITNESS, SWORN

25             THE CLERK:  Okay.  Please be seated.

1                          DIRECT EXAMINATION

2      BY THE COURT:

3      Q    Good afternoon, Mr. Jensen.

4      A    Good afternoon.

5      Q    Can you spell your complete -- say and then spell your

6      complete name.

7      A    Erling Jensen.  E-R-L-I-N-G  J-E-N-S-E-N.

8      Q    All right.  Mr. Jensen, you have been present when we

9      commenced with oral argument today -- and we started a little

10     bit about 2:30-2:40 in the afternoon -- were you not, sir?

11     A    I was here.

12     Q    Okay.  So, you've got a pretty good understanding of what

13     we're talking about in terms of both the electronic files --

14     which I am not going to ask you too many questions about --

15     but more importantly the files that were purged in 2009.

16     A    Yes.

17     Q    Okay.  Well, let's first start talking about discovery.

18     Counsel has told me that you're intimately involved in this

19     matter and you have been over the course of the last few

20     years, is that correct?

21     A    That's correct, yeah.

22     Q    Okay.  And in response, either by direction of in-house

23     counsel -- which, by the way, who at the time was in-house

24     counsel in 2006 and 2007?

25     A    David Caldwell.

Jensen - Direct                                    114

1   Q    Do you know when Mr. Caldwell left?

2   A    I -- my recollection was that it was in either April or

3   June of 2007.

4   Q    April or June of 2007.

5   A    I believe it was in June of 2007.

6   Q    Okay.  In the course of discovery -- and this complaint

7   was actually filed on November 15th of 2006, right?  So, after

8   the complaint was filed, you understand that there are

9   requests for both answers in a written form -- those are

10  called interrogatories -- and then there's also requests for

11  production of documents; you have a general understanding?

12  A    Yes, I do.

13  Q    Okay.  And in the course of trying to cull through all of

14  the documents that you had in the storage room and elsewhere,

15  who gave you an overview of what you were looking for?

16  A    Well, first of all, when it all started, David Caldwell

17  did.  And while he was still here, he would give me all the

18  directions as to what it was I was supposed to produce and

19  what it was I was supposed to find.  And I did that.

20        And in doing so, I would go through files at the

21  storage room, I would talk to other people, I would go into my

22  accounting system, which was the MAS system.  I have never

23  seen, had never had anything to do with the MACS system; that

24  was before I came there.  And then, whatever it was that was

25  being requested, I would produce.

1          If there wasn't anything, I would say I can't find

2    anything, I don't have anything and that's it.

3    Q   Did he explain to you what the allegations the company had

4    against Mr. Palmeroni?  Did you have an understanding of what

5    the allegations were in 2006 and 2007?

6    A   Yes, against -- absolutely, yeah.

7    Q   So, you knew what you guys were looking for, in terms of

8    trying to prove your case against Mr. Palmeroni.

9    A   That's correct.

10   Q   And you did your best to pull that information and provide

11   that to your in-house counsel, who then ultimately would

12   provide it to outside counsel.

13   A   Yes.

14   Q   What about, did he ever explain to you what the

15   allegations were against you all?  That there were certain

16   claims that were being filed -- they're called counterclaims --

17   by Mr. Palmeroni and, in fact, there were actual defenses that

18   he would have also asserted when he answered your complaint

19   after November 15, 2006.  Did he talk to you about the

20   defenses in the case?

21   A   Well, I mean, I -- I don't particularly recall that.

22   Q   You don't recall him kind of giving you an overview of,

23   you know, things that you needed to look at that were relevant

24   to, you know, the things that were being lodged against you,

25   allegations against you with respect to insurance or the vans

1   or income tax or anything like that?

2   A    Oh, I believe that everything with all the insurance

3   certificates and all that, I am not certain, but that came

4   later on, as far as I am concerned.  While David Caldwell was

5   here, I do not recall anything about insurance companies,

6   insurance certificates or any such things.  It wasn't until

7   later on, after he left and --

8   Q    And he said that was around April of 2007.

9   A    Yeah, I believe it was June of 2007.

10  Q    Okay.

11  A    But it could have been April of 2007.  But the records,

12  you know, would indicate --

13  Q    When he left.

14  A    When it was.  And it wasn't until after that, that I even

15  heard about insurance correspondence or anything like that,

16  and I heard that from Pashman Stein, not from David Caldwell.

17  And whatever time frame it was, I mean, I looked -- I looked

18  through the old legal files, I looked through the storage room

19  and there was -- yeah, there was correspondence and policies

20  from Universal, from Evanston in Illinois, and they were also

21  part of the bankruptcy case and there were paperwork in

22  connection with that.  That has all been produced.

23        There is nothing at N.V.E. that has anything to do

24  with Universal, with insurance or anything like that.  There

25  is absolutely not a piece of paper.  Everything has been

1   turned over, you know, to these people.

2   Q    When you went looking -- do you remember how often you

3   would go to the storage room and try to look for things?  Did

4   you do it all sporad -- like, was it one time that you did it

5   or did you find yourself going back to the storage room

6   several times?

7   A    Several times, depending on what the issue was at the

8   time.

9   Q    And what they were asking you to look for?

10  A    That's right.

11  Q    Did you ever look for, like, communication in any form,

12  but in the storage room with respect to commissions?

13  A    Well, it -- yeah, absolutely.  We have also -- we have

14  produced -- when I say we, that's N.V.E., --

15  Q    Mm-hmm.

16  A    -- you know, including myself.  We have produced I can't

17  even tell you how many, I would think in the thousands of

18  pages of commission statements, check stubs, you know, that

19  had to do with commissions.

20  Q    Did you look for information with respect to the brokers

21  and any of the brokers you heard mentioned here today?  And I

22  know that counsel is saying one of them was not a broker.  But

23  in particular, Wayne Dail, Harold Miller and Kris Sujack?

24  A    yeah.

25  Q    And you remember physically going into that storage room

Jensen - Direct                                                118

1   and looking for information with respect to that?

2   A    Yes, I absolutely do.

3   Q    So, you believe what was -- whatever was asked, at least

4   during the period of time where in-house counsel was there and

5   guiding you, and even past his departure, that you went into

6   that room and pulled all of the information that was requested

7   of you?

8   A    Absolutely.

9   Q    And when you say you did, like, what would you do?  Would

10  you go box by box?  How was everything kept in there?

11  A    Well, it depends on what it was.  For argument sake, if it

12  was commission statements for Sunbelt, I'd go into the box

13  that was marked Sunbelt at the end and then I would take that

14  out.  That may not be the best example, because all of these

15  things, they were taken out prior.  But if it was a term, if

16  it was a customer, say a CB Distributor, who has been involved

17  in the case, then I would go in wholesale orders A through J

18  or something like that and then I would go to C and take out

19  CB.

20  Q    Now, I'm going to jump around a bit.  But you heard

21  counsel stand up a moment ago, counsel for the defense, Mr.

22  Scampato, and he said one of the things that we're alleging

23  are these cash payments that were received by the company and

24  that those payments would be documented in one of two places:

25  the MACS system -- which you say you had really no contact

Jensen - Direct                                                    119

1    with; you were only doing the MAS system, right?  M-A-S?

2    A    That's correct.  Yes.

3    Q    You didn't have anything to do with the MACS system, the

4    M-A-C (sic) system?

5    A    That's correct.

6    Q    All right.  So, I can't ask you about that, because you

7    wouldn't know whether those cash payments were noticed on the

8    MACS system, you had no -- you didn't look at that system.

9    Correct?

10   A    No, I did not.  No.

11   Q    So, the other place where they say it would be -- where

12   there would be a record of cash payments would be in hard copy

13   form, if at all, in the storage room.  At any time were you

14   asked to look for that kind of information?

15   A    I can categorically states that since I started in June

16   23, 2006, N.V.E. has never made a cash sale.  And when he

17   brought up cash sales, that's the first time that I have heard

18   the term --

19   Q    So, there was --

20   A    -- cash sales.

21   Q    There was never any box or any type of information that

22   was kept for cash sales?

23   A    Not that I know of.

24   Q    Did you --

25   A    I never saw any.

Jensen - Direct                                                    120

1   Q   Did you look through all the documents?  I mean, there

2   must have been a lot of documents that you purged from 1980 to

3   2004.  Could you say -- and, again, you're under oath.  Could

4   you say you looked at every single piece of paper in that

5   room?

6   A   I would have no reason to look at stuff from 1980, 1981,

7   whatever the years, you know, --

8   Q   Or in 1996?  Did you look at '96?  That's when Palmeroni

9   started with the company.

10  A   I believe that there was a -- you know, there was a term,

11  you know, relative time frame and, yes, I would have.  Did I

12  ever see anything about cash sales?  No, I didn't.  I haven't

13  seen anything about it.  And in the -- I'm in my sixth year.

14  N.V.E. has not made a cash sale in the -- you know, in those

15  five-plus years.

16  Q   All right.  So, you say that there was nothing in that

17  storage room that would support the defendant's assertion that

18  there was a record of cash sales?

19  A   That would be -- no, I -- I would say --

20  Q   You never saw.

21  A   I --

22  Q   You can't say for certain, but as far as you can testify

23  to, having looked through that -- those documents, you came

24  across no documents that support that.

25  A   That's correct.  I did not.

Jensen - Direct                                          121

1   Q    Okay.  So, bring me now to the moment that you decide that

2   you want to get rid of some stuff.  What happened?  What went

3   through your mind and what were your instructions to Ms.

4   Gamboa?

5   A    The so-called storage room, that's a room that's -- I

6   don't know, I can't really tell you how big it is, but it's

7   not like -- it may be one-tenth of this room.  There were all

8   sorts of things in that room and you could -- whenever you

9   needed to find something, you always spend a lot of extra time

10  finding it, because every time a box was pulled out, it never

11  was put back into place.  You know, people would pull a box

12  out, take whatever files out that was needed, and then just

13  leave it on the floor and the next time you needed to pick up

14  another box, you top that on top of the one that was on the

15  floor and took out what was needed.

16       So, at one point in time, everything was helter-

17  skelter and then I decided that we needed to start clearing

18  up, we needed additional storage space, and I told Heather

19  Gamboa that seek and destroy.  In other words, she was

20  sitting, you know, waiting for the telephone to ring, so we

21  brought the shredder, we brought that down next to her desk --

22  Q    Mm-hmm.

23  A    -- and then she would then start to shred documents that

24  was 2004 and prior.

25       Now, those 2004 and prior had been looked at.  And

1   then besides, what was there was --

2   Q    Can I stop you right there?

3   A    Yeah.

4   Q    You use the term helter-skelter, but how did you know that

5   she was only grabbing -- if everything was -- if boxes were

6   out and things were kind of disorganized, how did you know

7   that she wasn't perhaps getting something that wasn't supposed

8   to be shredded?  What kind of supervision were you doing and

9   in what kind of order was everything kept?

10  A    Well, that's -- I can't say that for 100 percent sure,

11  because of the fact that I am not personally 100 percent sure

12  if she herself, after the initial boxes were put out by her --

13  you know, I would put the initial boxes out -- and they would

14  have to do with accounts payables and stuff that had nothing

15  to do with what we are talking about here.  I would bring a

16  number of boxes out to her desk and she would start -- and she

17  would just start shredding, you know, in between the, you

18  know, the phones ringing.

19       Now, did I personally bring her every box that she

20  shredded?  No, I didn't, you know, and I'm not really 100

21  percent sure, after I had brought the initial boxes out and

22  told her, okay, so you get the drill here.  And, yeah, she did

23  get the drill.  Did she then ask some -- one of the guys,

24  because these boxes -- I mean, she could lift them, but I mean

25  it's like -- she was a young woman and I don't know what the

Jensen - Direct                                    123

1   boxes weigh, maybe 25-30 pounds.  Now, did she ask one of the

2   guys that come back and say, oh, can you get me a 2004 or

3   whatever it is prior to 2004 box or if she would herself tote

4   a box out?  That I can't tell for certain.

5   Q   And you don't know where she grabbed them from or where

6   she may have asked the guy to grab them from?

7   A   No, I can't say that for certain.  No.

8   Q   All right.  And the reason that you want -- that you

9   thought it was time to shred this was because you needed the

10  storage space?

11  A   Well, we wanted to go and have a general cleanup, start to

12  make things, you know, look nice.  I mean, that's all.  It is

13  a, you know, sort of in the sense of a pharmaceutical

14  manufacturing plant and, you know, you want things to look

15  nice and I wanted things to look nice and get all the junk

16  that we didn't need.

17          You know, I mean even -- you know, IRS requires you

18  to keep documents for a certain amount of years and, hey, what

19  do we need stuff from 1984 for?  We don't.  So, we wanted to

20  make things that we did need accessible, make everything look

21  nice and so forth.

22          So, that was the motivation for having her, while she

23  was sitting doing nothing, to have her do that.

24  Q   Right.  Did you, in making this decision, did you ever

25  think, hmm, we're in litigation with Mr. Palmeroni, I should

Jensen - Direct                                    124

1    contact my attorney, because now I don't have an in-house

2    attorney to confer with, I should contact Pashman Stein and

3    let them know that I'm intending on shredding documents that

4    clearly fall within, I would argue, the temporal scope here?

5    I'm thinking 1999 to 2006.

6            Did you ever think of calling your attorney -- and I

7    don't want to know the con -- if you had a conversation, we

8    don't want that, we just want to know, did you ever think to

9    notify your attorneys that you were going to start shredding

10   documents?

11   A   No, I -- I didn't -- you know, I mean, there wouldn't be

12   any reason for me to contact them and say that we're going to

13   get rid of, because the stuff that we were getting rid of was

14   stuff that had nothing to do with anything.  Everything --

15   Q   Well, how do you make that determination?

16   A   Well, I -- the determination that I make, the reason for

17   that is that I had already, at that point in time, I had

18   already picked out of that room, out of every box, I had

19   picked every file that had any bearing on what we were talking

20   about at the time.

21   Q   See, but the problem is, sir, that the complaint has

22   subsequently been amended to add new allegations, there were

23   supplemental requests that I authorized the defendants to make

24   in the fall of 2010.  So, what you thought you had -- didn't

25   need, you really didn't know, because litigation was ongoing.

Jensen - Direct                    125

1  A    Well, I mean, if that's the answer, that's the answer.  I

2  mean, I didn't see anything in 2009, I didn't see anything

3  that had to do with what we knew at that time.  And what we

4  knew at the time was commission kickbacks, Palmeroni giving

5  Sunbelt accounts that he shouldn't be getting.  We paid 8,

6  900,000 to Sunbelt on accounts that Sunbelt had nothing to do

7  with.  Sunbelt kicked half of that money back to Palmeroni.

8  That was the case --

9  Q    But there were also --

10 A    -- and there was noth --

11 Q    -- claims against you, too, though.  Do you understand a

12 counterclaim against --

13 A    Yeah, there was a claim of wrongful termination.

14 Q    And other things, too, though.  There were other --

15 A    Yeah, but --

16 Q    There were other claims against --

17 A    There were other such ridiculous things, this sexual

18 harassment at Christmas parties?  There was no paper files on

19 that in those boxes in the storage room anyway.

20 Q    But there were other counter -- there are other

21 counterclaims in the case as well and I guess I'm trying to

22 understand what you did and what your understanding of the

23 universe of documents and what you looked at when you would go

24 in there on these occasions and what you -- everything sounds

25 like, you know, you looked periodically, but I don't know how

Jensen - Direct                                                126

1   much information you were provided, since in-house counsel may

2   have left by the time you were asked to go into this room.

3          So, I am just trying to determine why you felt like

4   these documents had -- were clearly not relevant and not

5   necessary and therefore could be shredded.

6   A   Well, that was because, as an example, there was accounts

7   payables took out or took up a lot of rooms.  That had nothing

8   to do with it.  Accounts payables.  I'm talking about, you

9   know, invoices from our vendors, receiving tickets, you know,

10  bill of ladings that would support the invoice, the check stub

11  that the invoice had been paid.  That clearly is totally

12  irrelevant.

13         In addition to that, there were accounts receivable

14  records and same thing, there were check stubs from, you know,

15  customers, there were backup paperwork from customers that

16  showed deductions, if there were deductions, and other

17  miscellaneous items.  That had nothing to do with it.  There

18  were old time cards.  There were marketing literature, boxes

19  of old catalogues from 1990 and 1984, whatever it was.  There

20  were boxes that contained, you know, cassette tapes which had

21  nothing to do with it.  There were -- you know, there were

22  boxes that had some old, you know, construction information.

23  That kind of stuff.

24         And then, of course, there were also -- you know,

25  there were also retail orders; you know, like Rite Aid, CVS,

1  Walmart.  That all -- not -- that had nothing to do with

2  anything.

3  Q   Now, when you say, again, just so we understand your

4  testimony, you said that you took out the first couple boxes

5  for Ms. Gamboa, but thereafter there wasn't -- you kind of

6  left it to her to go pull what she needed and start shredding

7  what she thought was responsive to your instructions.

8  A   Well, yeah, no, but that was basically everything.

9  Everything from 2004 and -- 2004 and back and earlier and

10 there was also a possibility -- and I -- there's a possibility

11 that she might have erroneously grabbed the 2005 box, but she

12 was specifically instructed to look everything -- there wasn't

13 -- it was not up to her to look through anything that she

14 shredded, you know, whatsoever.

15 Q   It was up to you to make sure that all that was not

16 necessary.

17 A   That's correct.

18 Q   And you did, but you can't say for certain what she might

19 have, in the course of doing what you asked her to do, she

20 might have grabbed something else.

21 A   No, she might have grabbed the box from 2005 erroneously,

22 but not -- not 2 --

23 Q   Why did you pick the 2004 date?

24 A   Well, that was because of the year.  2009 and 2005.  So

25 then I wanted to keep what was five years old, roughly.

1          THE COURT:  Okay.  Any questions, counsel?

2          MR. SCAMPATO:  Yes, Your Honor.

3                    CROSS-EXAMINATION

4   BY MR. SCAMPATO:

5   Q   Just so I'm clear.  Mr. Caldwell gave you instructions

6   during 2006 and up to maybe June of 2007 regarding what to

7   keep and not to keep, is that correct?

8   A   No, I don't believe that's what I said.  I said that I

9   believe that -- or I produced all reports and records that he

10  asked for.

11  Q   So then, knowing what to keep and what not to keep, Mr.

12  Caldwell is the one who told you what to keep and what not to

13  keep?

14  A   No, because back then in 2006 and 2007, there was no

15  question whatsoever about cleaning up the room or throwing

16  anything out.  That wasn't until --

17          THE COURT:  Right, I think the --

18          THE WITNESS:  -- 2009.

19          THE COURT:  I think the question is better suited:

20  what he needed to pull for discovery purposes.

21          MR. SCAMPATO:  Right.  I'm sorry.  That's what I

22  meant.

23          THE COURT:  Okay.

24  BY MR. SCAMPATO:

25  Q   Regarding discovery, what needed to be pulled for

1   discovery, you figured that out based on what the instructions

2   that Mr. Caldwell gave you.

3   A    That's correct.

4   Q    And after Mr. Caldwell left, I believe you testified that

5   there were no other attorneys that explained to you what

6   discovery was to be pulled out.

7   A    Well, then what -- I would then be -- at the time Caldwell

8   left, I would then be responsive to pulling and producing what

9   Pashman Stein -- whatever.  You know, interrogatories would

10  come in, I would look at them and I would be the one who would

11  walk around to everybody in -- that worked at N.V.E. who might

12  have information regarding the questions.  I would go into the

13  storage room, I would look in or ask people to look in their

14  personal files, etcetera, and then after that was completed,

15  then we would have a conversation, you know, the -- well, at

16  the time it was basic -- mostly it was I guess --

17            THE COURT:  Mr. Samaro?  Mr. White?

18            THE WITNESS:  Yeah.  And then we would go through the

19  -- you know, we would go through the questions, we would

20  discuss the questions and then, after that was done -- and

21  there would be many times, you know, the answer to that --

22  some of these questions, the answers would be, well, I have no

23  idea, no one else knows about, you know, that, that's

24  something that happened in 2004 or 2003 or whatever it was and

25  no one knows about that.

Jensen - Cross                                    130

1          And then the -- all the questions would be completed

2    and some of them I would sign and the other -- some other ones

3    would be signed by Robert Occhifinto, if he was the one that

4    had the major input into answering the questions.

5    BY MR. SCAMPATO:

6    Q    But as far as knowing -- having instructions as to what to

7    pull, what discovery to pull and what discovery not to pull --

8    A    Well, that's very -- that's -- that's simple enough.  I

9    read the question and then, if I don't understand what the

10   question is, I will call up Sam Samaro and I would say, Sam,

11   I'm not really sure, what am I supposed to do with this; and

12   then he'd give me the instructions what I am supposed to do

13   and then I would do it, to the extent that it was there, to

14   the extent that some of the people -- and again, there was --

15   there's some of the people in -- you know, that had to do with

16   stuff today, they weren't, you know, back then in 2002 and

17   2003, they were not employed by N.V.E.

18          THE COURT:  But if the people weren't there, you did

19   go to the storage area to look for the documents or did you

20   not?  I mean, I don't --

21          THE WITNESS:  Yes, I did.  Absolutely.

22          THE COURT:  To try to find responsive documents --

23          THE WITNESS:  That's correct.

24          THE COURT:  -- that also were being requested.

25          THE WITNESS:  That's correct.

Jensen - Cross                                      131

1          THE COURT:  And you did that?

2          THE WITNESS:  I did that.

3   BY MR. SCAMPATO:

4   Q   So, what was your understanding of the documents that you

5   had to pull regarding Mr. Palmeroni's counterclaim?  What

6   documents, what categories of documents was it your

7   understanding that you had to pull?

8   A   Well, I mean, I -- to the best of my recollection, I don't

9   think that -- I don't remember specifically, you know, what

10  those interrogatories were, if indeed there were any.  I don't

11  remember specifically that.

12  Q   Okay.

13         THE COURT:  So you don't -- I'm sorry, counsel, I

14  just have one.  You don't specifically remember particular

15  documents that were being requested that related to the

16  counterclaims.  You can't say that you recall having those

17  conversations and/or looking for those documents?

18         THE WITNESS:  Yeah, but what -- can we recap what

19  were those -- what exactly are -- let's recap what are the

20  counterclaims and what kind of documents were requested in

21  connection with those.  Every document that has been requested

22  that we had has been produced, whether it's on one side or

23  whether it's on the other side.  That didn't make any

24  difference to me.

25  BY MR. SCAMPATO:

1   Q   Okay.  Well, for example, sales generated in paper by the

2   MACS system.  How -- what did you do?  Did you provide any

3   documents regarding the MACS system?

4   A   No, because the --

5   Q   In your response to any questions that were asked?

6   A   Well, the -- the --

7           MR. O'CONNOR:  Objection --

8           THE WITNESS:  -- the questions when it came to that --

9           MR. O'CONNOR:  -- to the hypothetical nature of that

10  question.

11          THE WITNESS:  -- are relatively simple to --

12          MR. O'CONNOR:  But just wait.  Mr. Jensen!

13          THE COURT:  Rephrase the --

14          THE WITNESS:  Oh, I'm sorry.

15          THE COURT:  Wait.  Hold on.  What's the objection?

16          MR. O'CONNOR:  The objection is to the hypothetical

17  nature of the question.  It was a question that might have

18  been asked.  If there was a request made, then he can ask what

19  it was, not as did you respond to a question that may or may

20  not have been made, because that's an impossible question.

21          THE COURT:  Ask if there was a specific request made.

22          MR. SCAMPATO:  Well, the question was really the

23  category of the MAC forms.

24          THE COURT:  Were there any documents in the storage

25  room that were -- that appeared to be hard copy forms of

Jensen - Cross                                    133

1   information that was kept on the MACS system?

2          THE WITNESS:  No.

3          THE COURT:  And you say no and I know you hesitated,

4   I'm just -- were there any boxes that were marked, you know,

5   specifically MAC docs or --

6          THE WITNESS:  No, there was not.  The information

7   that was kept in the MACS system -- and, again, I did not, you

8   know, work on the MACS system, that had been discarded before

9   I came to N.V.E. -- the information that was in the MACS

10  system was -- it was an order entry system, substantially, --

11         THE COURT:  Yeah, but -- okay.

12         THE WITNESS:  Yeah, no.  Orders were, you know,

13  purchase orders from customers were entered into the system --

14         THE COURT:  Where do you get that knowledge from, Mr.

15  Jensen, since you didn't work on the system?  Who is telling

16  you what it contained?

17         THE WITNESS:  Well, I mean, that's -- I talk to

18  people on my staff that work the system.

19         THE COURT:  But you never actually worked on the

20  system, so you can't --

21         THE WITNESS:  I never --

22         THE COURT:  -- specifically tell me what was on the

23  system.

24         THE WITNESS:  No.  I mean, I can -- I know from

25  talking to the staff.  I would say, do you have -- can you

Jensen - Cross                                    134

1    generate sales statistics for a given customer for a given

2    period of time and then they either could or they could not.

3    It depended on sometimes the -- sometimes you could get

4    scanned information out of the system and other times you

5    couldn't.

6          It was -- then at one point in time, it was on the so-

7    called fritz, if you will, and it had been on the fritz for

8    quite a while and that was the reason why a new system was

9    brought on board.  And I can assure you, if you know Mr.

10   Occhifinto, he was not one to spend money frivolously and if

11   he were to put out a quarter of a million dollars for a new

12   accounting system or a new -- you know, yeah, software system,

13   then I can assure you that the old one was on its very, very,

14   very, very last leg.  And eventually it just totally bombed

15   out.

16          THE COURT:  Okay.  Continue.

17   BY MR. SCAMPATO:

18   Q   But there were no hard copy of the MACS system documents,

19   you know, purchases, etcetera.

20   A   No, it --

21   Q   There were no hard copies.

22   A   There was not.  It was the other way around.  It was based

23   on hard copies that the system -- or the stuff was entered

24   into the MACS system.

25   Q   So, what happened to those hard copies?  Where were they

Jensen - Cross                                    135

1   kept, if they weren't kept at that particular location?

2   A   They were -- they were --

3   Q   Were they kept at another location?

4   A   They were kept -- for a current year, it was kept at

5   whoever customer service rep that was responsible for a

6   certain set of customers.  Was it EDI customer, a retail

7   customer, wholesale customers?  And then, when the year was

8   up, you know, it would basically be boxed and put into a

9   storage room.

10          And the files that were pulled out of there were CB,

11  Import Warehouse, Sunbelt International Sales Group and

12  anything else that had to do with Sumicek and all the accounts

13  that we were talking about here and all their orders were

14  pulled out, all the commission statements, not only from

15  those, but I believe that I pulled out all commission -- yeah,

16  I did, as a matter of fact -- all commission statements, be it

17  Profit Motivator or this guy or that guy, that was all pulled

18  out of the storage room.  Stuff like that was never on the

19  MACS system or any other place.

20          THE COURT:  When you say pulled out of the storage

21  room, pulled out of the storage room by whom?

22          THE WITNESS:  By me.

23          THE COURT:  Oh, and provided to counsel?

24          THE WITNESS:  Yeah.

25          THE COURT:  Okay.

1   BY MR. SCAMPATO:

2   Q   If there was a cash sale, how would -- what kind of an

3   N.V.E. form would it be documented on?

4   A   I have no idea.

5   Q   Wouldn't it have been --

6   A   I have never seen anything that had to do with cash sales

7   the five-plus years that I have been with N.V.E., which

8   included, by the way, the birth period of operating under

9   Chapter 11.  We have never done a five dollar cash sale.

10  Never.

11  Q   Isn't it correct that if there was a cash sale, that it

12  would have been identified on a hard copy of the MAC generated

13  documents?

14  A   I have no idea.  I can't answer that.

15  Q   How big is the facility that your storage room was located

16  in?

17  A   That's -- I would say there's about roughly 10,000 square

18  foot of office area.

19  Q   Okay.

20  A   Including the storage room.

21  Q   Ten thousand square feet and yet how large was the storage

22  room?

23  A   Maybe -- let me try to think.  I would say that maybe 15

24  feet wide, 25 feet deep.  No, 15-18 by 30, approximately.

25  Q   So, there was plenty of room to -- elsewhere in the

Jensen - Cross                                                137

1   facility to store boxes in, isn't that correct?

2   A    Yeah, but that has -- that's got nothing to do with it.  I

3   said earlier and I'm going to repeat again, it wasn't a space

4   problem that prompted me to clean out the storage room and

5   then get rid of stuff that would never be needed for anything,

6   it was simply to, in an effort to make the place look nice.

7   That was the motivation.  It wasn't that we didn't have room.

8              As a matter of fact, we cleaned out another room and

9   whatever we wanted to keep from the storage room, 2005

10  onwards, we started to separate it so that we had certain

11  items in the original storage room and then brought other

12  items into the other room, which was under double lock and

13  key.  And as an example of what was brought into the new

14  storage room, those were bank records that we didn't -- that

15  the first storage room anyone can walk in and look, so we kept

16  bank records, personnel records, some time cards and a certain

17  amount of, you know, legal stuff.  There were confidential

18  files from my office that would be boxed and then put into the

19  new storage room that where only certain people had a key to

20  get into.

21             So, it was in an effort of cleaning up things,

22  sprucing up things, making it more efficient when you needed

23  something.

24             THE COURT:  Can I --

25             THE WITNESS:  That was the motivation.

1          THE COURT:  Can I ask you a question?  And I'm going

2    to call it the double lock and key storage room.

3          THE WITNESS:  Yeah.

4          THE COURT:  When you would look for responsive

5    documents, did you go to the double lock and key storage room,

6    too?

7          THE WITNESS:  Yes, I did.

8          THE COURT:  Okay.

9    BY MR. SCAMPATO:

10   Q   And one last question.  I believe you testified that prior

11   to Mr. Caldwell leaving, a lot of documents were taken out?

12   A   That's correct.

13   Q   What percentage would you say of the documents that were

14   taken out had -- were taken out from the storage room prior to

15   him leaving?

16   A   That's -- you know, that's -- if you count catalogues,

17   accounts payable pages and things like that, and then put that

18   -- put the commission statements, the order file for CB,

19   Important Warehouse and I forget what the third one was that

20   was in -- oh, the Sunbelt Marketing and things like that, when

21   you pulled out those, I mean, in terms of percentage, what the

22   entire number of pages, it wasn't that much in terms of

23   percentage, because generally what would happen is that an

24   order from CB, for instance, that ord -- that would only be

25   two pages; that would be the order itself and then there would

1   be the submission form that Sunbelt would -- you know, that

2   Sunbelt would submit it to N.V.E.  And if you looked at the

3   dates, it was very clear that the order from CB had come to

4   N.V.E. first and then someone within N.V.E. had been notified

5   and sent it to Sunbelt, so that Sunbelt could make up their

6   order form, so that it appeared that the order came from

7   Sunbelt.

8           Now, there was only two pages on an order and if you

9   take, for example, a account payable transaction, then you

10  have a packing slip, you have a bill of lading, you have an

11  invoice and then you have a check copy.  So, you have four

12  pieces of paper versus two pieces of paper.

13          And when you were talking about CB, Sunbelt, Import

14  Warehouse and somebody else, then you're talking about six or

15  seven entities in total.  On the other hand, you've got 500 or

16  more vendors, you've got 500 or more customer records, you

17  know, as far as accounts receivables are concerned.  So, hey,

18  you know, you figure out what the percentages are; I can't.

19  Q    Now what I meant was, what percentage of all the documents

20  that were supplied to -- in discovery, what percentage of that

21  -- those documents, if you can tell me, were done -- were

22  taken out prior to Mr. Caldwell leaving?

23  A    I would say that a -- I would say that probably at least

24  maybe 80 percent of them were taken out prior to David

25  Caldwell leaving.  That would be my guess.

Jensen - Cross / Colloquy                    140

1    Q   Okay.  But interrogatories that you received in September,

2    the first set of interrogatories that you received in

3    September 2007, they -- those were only served upon -- given

4    to you after Caldwell left, right?

5    A   Yeah, certainly.

6                MR. SCAMPATO:  Okay.

7                MR. O'CONNOR:  May I?

8                THE COURT:  Questions?  Of course, Mr. O'Connor.

9                        (Extended pause)

10               MR. ROSTAN:  Your Honor?

11               THE COURT:  Mm-hmm.

12               MR. ROSTAN:  I have to call my daughter's babysitter

13   to make -- and I don't have a cell phone and I was wondering

14   if we could just take a two-minute break and I could use a

15   phone?

16               THE COURT:  Certainly.

17               MR. O'CONNOR:  Judge, I'll give him my cell phone.

18               THE COURT:  Okay.  Let's take a break.

19                   (Recess from 6:18 p.m. to 6:27 p.m.)

20               THE COURT:  All right.  We're back on the record in

21   the matter of N.V.E. versus Palmeroni, et al.  The time is now

22   6:29.  We took a small break to allow counsel to make a

23   personal call.

24               Yes, Ms. Smith?

25               MS. SMITH:  In addition to the Palmeroni e-mails that

Colloquy / Jensen - Redirect                    141

1    we're going through, I also have some insurance documents that

2    Mr. Jensen located when he searched Mr. Caldwell's old office

3    and I think they were in (indiscernible).  It has a lot of

4    attorney-client privilege and so I am in the process of

5    redacting them, but I will be serving them eventually.

6            THE COURT:  Well, that's good to know.  All right.

7    We'll be getting some insurance documents and --

8            MR. SCAMPATO:  Yes, Your Honor.

9                         (Extended pause)

10           MR. O'CONNOR:  Yes, Your Honor.  The --

11           THE COURT:  They're going to redact those and we -- I

12   still have to deal with the motion to withdraw, so I assume

13   they'll be provided to Mr. Palmeroni if he's pro se and/or --

14   you know, assuming I grant your motion -- and/or provided to

15   new counsel, if and when Mr. Palmeroni obtains new counsel.

16           MR. O'CONNOR:  Your Honor, --

17           MR. SCAMPATO:  Thank you, Judge.

18           Do you have any other questions?

19           MR. ROSTAN:  I didn't have any other questions.

20           MR. SCAMPATO:  Then let's let Mr. O'Connor --

21           THE COURT:  Go ahead, Mr. O'Connor.

22           MR. O'CONNOR:  May I proceed?  Thank you, Your Honor.

23                   REDIRECT EXAMINATION

24   BY MR. O'CONNOR:

25   Q   Mr. Jensen, what is your -- just your title at N.V.E.,

1    Inc.?

2    A    Chief financial officer and corporate secretary.

3    Q    During the course of your employment there, this -- -- you

4    have been involved in this lawsuit, is that correct?  In terms

5    of helping to manage the lawsuit?

6    A    Correct.

7    Q    First with Mr. Caldwell, who was the general counsel of

8    N.V.E.?

9    A    Yes.

10   Q    And then directly with the lawyers of Pashman Stein?

11   A    Yes.

12   Q    Okay.  During that, do you get copies of all the documents

13   that are filed in this case?

14   A    I would say I believe so, yeah.

15   Q    Okay.  Do you -- but do the lawyers provide you with

16   documents in this case?

17   A    Yes.

18   Q    Okay.  Have you --

19          MR. SCAMPATO:  Your Honor, if I could --

20          THE COURT:  But there's an objection?

21          MR. SCAMPATO:  Objection.  Under the circumstances, I

22   don't think Mr. O'Connor should be leading Mr. --

23          THE COURT:  I'm going to give him a little leeway.

24   I'm going to give him a little -- it's an evidentiary hearing.

25          Go ahead, counsel.

Jensen - Redirect                                     143

1          MR. O'CONNOR:  I'm sorry, Judge.  I'm just trying to

2    go as -- because I know the hour and we've been here a long

3    time.

4          THE COURT:  Don't worry about the hour, counsel.  It

5    doesn't matter.

6          MR. O'CONNOR:  All right.  Thank you, Judge.

7    BY MR. O'CONNOR:

8    Q   During the course, then, had you seen a copy of N.V.E.'s

9    original complaint?

10   A   Yes, I have seen a -- I've seen a copy of that, yes.

11   Q   Okay.  And you also -- you got a copy of N.V.E.'s amended

12   complaint, which was just filed recently, correct?

13   A   Yes.

14   Q   And what about the answers and the counterclaims filed by

15   Mr. Palmeroni?  Had you seen copies of those?

16   A   Yes.

17   Q   And had you read them?

18   A   Yeah.

19   Q   Okay.  And had you read them at about the time they were

20   filed back in 2007?

21   A   I believe so, yeah.

22   Q   Okay.

23   A   I believe so.

24   Q   And so, I think you testified earlier you knew that part

25   of the claims dealt with issues of insurance coverage, is that

Jensen - Redirect                                        144

1   correct?

2           THE COURT:  You've got to stay by the mic, Mr.

3   O'Connor.

4           MR. O'CONNOR:  I apologize, Judge.  I'm sorry, I --

5           THE COURT:  That's okay.

6           MR. O'CONNOR:  You know I like to walk.

7   BY MR. O'CONNOR:

8   Q   Mr. Erling, you testified earlier that you knew that one

9   of the issues in this case dealt with insurance coverage

10  obtained by N.V.E. for its customers, correct?

11  A   Yes.  Yeah.

12  Q   Okay.  And I think -- I believe you also testified that

13  you knew that some of the allegations dealt with issues of Mr.

14  Palmeroni's termination of employment with N.V.E., is that

15  correct?

16  A   Yes.

17  Q   Including involving some whistleblower provisions?  Were

18  you aware of that?

19  A   Yes.

20  Q   Okay.  And also involved, I think you testified a little

21  bit earlier, about you're aware that there are allegations of

22  sexual harassment going on at N.V.E., is that correct?

23  A   Yeah.  I mean, that was -- I -- I read the -- you know, I

24  read the paperwork.

25  Q   I -- yeah, right.  I'm not asking you whether they're true

1   or they're true, all I'm asking you is whether you knew that

2   that's what Mr. Palmeroni was alleging.

3   A    Yes.

4   Q    Okay.  And did you also know that he had made allegations

5   relating to bankruptcy fraud?

6   A    Yes.

7   Q    And I think you also testified to this a little bit

8   earlier.  The -- did you know that there was also some

9   allegations relating to the so-called van program with N.V.E.?

10  A    Yeah, but I'm not 100 percent sure what the allegations of

11  -- you know, with the vans were, because that was -- that was

12  extremely early in the process while David Caldwell was

13  handling most of it.

14          THE COURT:  So your answer is, you're really not --

15  you're not -- you don't have -- you're not aware of the

16  allegations.

17          THE WITNESS:  I'm not really sure what the details of

18  the van program allegations were, no.

19  BY MR. O'CONNOR:

20  Q    Okay.  Did you know -- do you know generally what the van

21  program was at N.V.E. back at that time that Mr. Palmeroni was

22  employed?

23  A    Yes.

24  Q    Okay.  And did you know that if you saw the documents

25  relating to the van program, that you had to -- you had to

Jensen - Redirect                                              146

1   keep those documents or -- and -- and you might have to

2   produce them in this litigation?

3   A    Yeah, that's -- that's correct.

4   Q    Now, I think Mr. Scampato asked you about cash

5   transactions.  Do you recall Mr. Scampato --

6   A    Yes.  Yeah.

7   Q    Okay.  And, well, you understand that the issue of cash

8   transactions had been raised in this litigation and if you had

9   found documents, that you had to hold onto those or produce

10  them?

11  A    Yeah.  Yeah.

12                      (Extended pause)

13           THE COURT:  While you look, Mr. O'Connor.

14           Before Mr. Caldwell left the company, did he ever go

15  into the storage room with you and look for these documents?

16           THE WITNESS:  To be honest with you, --

17           THE COURT:  You have to be.

18           THE WITNESS:  -- I -- I don't believe so.  David

19  Caldwell was not much of a doer, if you will, so I don't

20  recall specifically that he didn't.  I doubt that he would do

21  that.

22           THE COURT:  So, you don't recall him going in with

23  you and looking at the storage room with the double secret

24  lock and key storage room and the open to the public storage

25  room?

Jensen - Redirect                                    147

1              THE WITNESS:  Yeah, no, I -- I --

2              THE COURT:  It was all you.

3              THE WITNESS:  Yeah.  Yeah.

4              THE COURT:  And when he left in June of 2007, any

5    other attorneys ever come down to the storage room and look

6    around and get a lay of the land of that storage room or the

7    double lock and key storage room?

8              THE WITNESS:  Yeah, but actually the double lock and

9    key wasn't established until we started the process in 2009.

10   So, prior to -- you know, prior to 2009, when we started to

11   shred files, prior to that we only had the so-called open --

12             THE COURT:  Okay.  Okay.  So, double lock and key

13   doesn't happen until you clean up --

14             THE WITNESS:  That -- that's correct.

15             THE COURT:  -- clean up the storage room.  Okay.

16             THE WITNESS:  That's correct.

17             THE COURT:  So, but did attorneys go down and sort of

18   get a lay of the land of the storage room that -- in question?

19             THE WITNESS:  yeah.

20             THE COURT:  They did?  Did they help you search for

21   documents?

22             THE WITNESS:  Well, this was in a different case.

23             THE COURT:  Oh, in a different case.

24             THE WITNESS:  Yeah.  Yeah.

25             THE COURT:  Okay.  But in this case?

1          THE WITNESS:  No, the -- Mr. O'Connor has been

2   looking at it.

3          THE COURT:  But before 2009?

4          THE WITNESS:  No, not before 2009.

5          THE COURT:  (Indiscernible)  Okay.

6          THE WITNESS:  That I -- that I recall.

7          THE COURT:  Okay.

8   BY MR. O'CONNOR:

9   Q   Was it your understanding that Mr. Caldwell relied on you

10  to look for the documents that he talked about a lot, the

11  various issues or types of documents?

12  A   Yes.

13  Q   Okay.  Prior to the time when you asked Ms. Gamboa to

14  start shredding documents out of the storage room, whether the

15  double secret one or the regular storage room, did you believe

16  that you had pulled all the relevant documents out of those

17  boxes?

18  A   Yes.

19  Q   And would that include documents before 2004 and 2005 and

20  later?

21          MR. SCAMPATO:  Your Honor, I -- this is --

22          THE COURT:  I understand why you're trying to speed

23  things along.  Maybe take a couple steps, Mr. O'Connor.  Try

24  not to lead as much --

25          MR. O'CONNOR:  Yes, ma'am.

Jensen - Redirect                                    149

1              THE COURT:  -- as you are at --

2              MR. O'CONNOR:  Yes.  Yes, Your Honor.

3              THE COURT:  -- at this point.

4    BY MR. O'CONNOR:

5    Q    What did you tell Ms. Gamboa with regard to what document

6    -- what boxes of documents to take out of the storage room?

7    A    Anything 2004 and prior.

8    Q    When you did your searched or your review of these

9    documents in response to discovery requests, did you make a

10   distinction in documents before 2004 and after 2005 or did you

11   look at all of them?

12   A    I look -- I -- I looked at all of them.

13   Q    Did anyone ever tell you to destroy documents that are

14   relevant to this lawsuit?

15   A    No.

16   Q    Did anyone, including Mr. Occhifinto, ever tell you to get

17   rid of documents that might be helpful to Mr. Palmeroni?

18   A    No.

19   Q    Did anyone tell you, including Mr. Occhifinto, to get rid

20   of documents that might be helpful to Mr. Sumicek or to

21   Sunbelt Marketing?

22   A    No.

23   Q    Prior to 2010, did you have any knowledge of the

24   conspiracy involving Smart World and Mr. Palmeroni and Mr.

25   Rosarbo?

1    A    No, I did not.

2    Q    Do you have -- to your knowledge -- well, let's start with

3    this first.  Did you ever tell Mr. Yang or Mr. Rader to delete

4    accounts from any N.V.E. computers?

5    A    Absolutely not.

6    Q    And did you ever tell anyone else at N.V.E. that they

7    could delete e-mail accounts or any other documents from

8    N.V.E. computers relating to this lawsuit?

9    A    Absolutely not.

10   Q    Okay.  To your knowledge, did anyone else at N.V.E.

11   instruct any employee or agent of N.V.E. to delete e-mail

12   accounts from any N.V.E. computer?

13   A    Absolutely not.

14          MR. O'CONNOR:  No further questions, Your Honor.

15          THE COURT:  Anything else, Mr. Rostan?

16                    RECROSS-EXAMINATION

17   BY MR. ROSTAN:

18   Q    Mr. Jensen, it's correct that you've never seen a

19   litigation hold letter, correct?

20   A    I've seen a litigation hold letter.

21   Q    Have you ever seen one in this case?

22   A    Not that I recall.

23   Q    And you've never gotten a written protocol as to what

24   documents to save and what documents to keep.

25   A    I want to retract --

1          MR. O'CONNOR:  Objection on attorney-client privilege

2     to the substance of any doc -- of any --

3          MR. ROSTAN:  Well, his receipt of it, not whether --

4     what it contains.

5          MR. O'CONNOR:  All right.  As long as --

6          THE WITNESS:  Yeah, no, I want to retract that.  I

7     believe -- I believe that very, very early on -- I can't be

8     100 percent sure, but I do believe that David Caldwell, if he

9     didn't send out an official letter, I believe that via e-mail

10    and other conversation that he did inform people that they

11    couldn't destroy certain documents.

12    BY MR. ROSTAN:

13    Q    What year was that?

14    A    That would have been in 2006.

15    Q    Okay.  And you said you believed.  Do you know with any

16    certainty?

17    A    Well, I am trying to, you know, like trying to have, like,

18    a photographic mind.  I do believe that I saw something to

19    that extent very early in my employment at N.V.E. and I --

20         THE COURT:  Well, when did you start with N.V.E.

21    again?

22         THE WITNESS:  January 23, 2006.

23         THE COURT:  And you think you saw an e-mail from Mr.

24    Caldwell advising employees what they were to keep and not

25    destroy?

1          THE WITNESS:  I believe that there was something

2   about that, yeah.

3   BY MR. ROSTAN:

4   Q   And that e-mail -- I'm sorry.

5   BY MR. SCAMPATO:

6   Q   And any other subsequent written instructions other than

7   that e-mail?

8   A   No.

9          MR. SCAMPATO:  Okay.

10  BY MR. ROSTAN:

11  Q   And you never saw, is that correct, that the defendant's

12  initial disclosures of 2007?

13  A   I'm sorry, can you just repeat that?  I'm --

14  Q   Isn't it correct that you have never seen the Defendant

15  Palmeroni's initial disclosures of 2007?

16         THE COURT:  Do you know what an initial disclosure

17  is?

18         THE WITNESS:  Yeah, I -- I believe that I saw that.

19  Yeah.

20  BY MR. ROSTAN:

21  Q   And is it correct that you have never reviewed the

22  defendant's first set of interrogatories of 2007?

23  A   I don't recall what the first set was.

24  Q   And isn't it correct that you have never seen defendant's

25  first third-party -- defend -- Mr. Palmeroni's third-party

Jensen - Recross                    153

1  plaintiff's first set of interrogatories dated December of

2  2009?

3  A   No, if it -- if it's dated December 2009, I would have

4  seen it.

5  Q   You said that Mr. Caldwell wasn't a doer?

6  A   That -- yeah.

7  Q   So, when you were in that storage room it was you and you

8  alone, correct, that was reviewing documents?

9  A   Well, yeah.

10  Q   Okay.

11  A   But I -- I'm not reviewing documents at that point in

12  time, I am finding specific documents at that point in time

13  and there's a distinction here.

14        THE COURT:  Can you tell me what the distinction --

15        THE WITNESS:  The distinction is that if --

16        THE COURT:  -- between reviewing and finding?

17        THE WITNESS:  -- if I am reviewing documents, I am

18  going through many, many different types of documents,

19  reviewing them for a specific reason, for a specific purpose.

20  When I am retrieving document, I am only looking for what it

21  is that I'm looking for.  In other words, I am looking for a

22  specific file.  As an example, CB; I have no reason to review

23  Walmart's or Walgreen's or CVS's file, when I know that I am

24  in the room looking for CB.

25        So, that's the distinction  between a specific file

Jensen - Recross                                    154

1    that I am retrieving, that I am looking for, and then

2    reviewing files.

3             THE COURT:  Did you ever review the files in this

4    case?  Did you review any -- what did you do in order to

5    determine that you had gone to the right place to look for the

6    right documents?

7             THE WITNESS:  Well, first of all, at that particular

8    time, the only place there would be documents related to this

9    would be in the storage room and in individual employees'

10   personal files and I would go through -- and with the

11   individual employees, I would go through their personal -- or

12   not personal -- personal file, but, you know, whatever a --

13            THE COURT:  Hard copy or electronic?

14            THE WITNESS:  Hard copy.  Philip would do the

15   electronic.

16            THE COURT:  Who would?  Philip Yang?

17            THE WITNESS:  Philip Yang, yeah, would.  But I would

18   go through the -- I would go through hard copy files that each

19   person would have.  For example, Michele Canzone, she would

20   handle wholesalers and then she would have -- by her desk, she

21   would have files for each of the wholesalers that she dealt

22   with and I would -- with Michele, I would go through those

23   files with her and then take out what was pertinent.

24            THE COURT:  Can I ask you, in the course of -- you

25   said your title was CFO and what was the --

1              THE WITNESS:  Corporate secretary.

2              THE COURT:  Corporate secretary.  So, in the process

3    of gathering this information that was needed for this

4    litigation, did you ever think to review Mr. Palmeroni's hard

5    drive?

6              THE WITNESS:  Actually, no.  For whatever reason,

7    that never really came up.  And it wasn't until, you know,

8    like his personal -- it wasn't until I believe six, you know,

9    maybe six months ago, seven months ago, only in connection

10   with the -- you know, with the Smart World thing.  That was

11   actually the first time that I asked Philip for specifically

12   about Palmeroni, Vinnie and the other two or three girls, and

13   that's when he comes out of the woodwork and say, oh by the

14   way, I have Palmeroni's, you know, personal computer or the PC

15   desktop, I have that, I took that out, because the computer

16   was sitting in Palmeroni's office and no one occupied the

17   office, so then he said, oh, it's sitting there and then he

18   took it out and he said, but there's nothing on it.

19             THE COURT:  Okay.  So, in the course of gathering

20   either with Mr. Caldwell's assistance or the assistance of

21   counsel from Pashman Stein, you never had the occasion to go

22   into Palmeroni's office, that was now unoccupied, and look at

23   his computer and/or in any of the cabinets or anything that

24   was in there?

25             THE WITNESS:  No, I went in there and I looked for

1   hard copy files and there was a whole bunch of mail that was

2   unopened.  I gathered that and opened it to see if there was

3   anything that -- you know, of consequence.

4              THE COURT:  Okay.

5              THE WITNESS:  So, even after Palmeroni was separated,

6   mail that was addressed to him was put into the office that he

7   used to occupy and at one point in time, I went through

8   everything and I opened all the unopened files.  It was mostly

9   junk mail.  I went through, you know, whatever cabinets were

10  there.  It was very scant, there was very little, you know, of

11  these manilla file folders in there.

12             THE COURT:  Okay.

13  BY MR. ROSTAN:

14  Q   And Mr. Jensen, is it correct that you did not keep a

15  written record of the dates that Heather Gamboa was in the

16  storage room?

17  A   That's correct.

18  Q   And isn't it correct that you don't have a written record

19  of the dates that you were in the storage room?

20  A   Oh, well that -- that's true.  I must have been in there

21  500 times.  So, no, I do not have a record, a written record

22  of that.

23  Q   And isn't it correct that you do -- as you sit here today,

24  you do not have a specific recollection of everything that was

25  in the -- the e-mail that you believe was sent by Mr. Caldwell

1   in 2006?

2   A   Yeah, that's correct.

3           MR. ROSTAN:  Okay.

4           THE COURT:  All right, counsel, it's -- one more

5   question.

6           MR. SCAMPATO:  This is the last one.

7           THE COURT:  We're exhausting --

8   BY MR. SCAMPATO:

9   Q   The e-mail that Mr. Caldwell gave you in 2006, that didn't

10  include -- did not include any instructions regarding Mr.

11  Palmeroni's counterclaim, isn't that correct?

12  A   Well, it -- I -- I believe that I said that, as I think

13  about it, I have a scant recollection that there was something

14  to the extent that David had sent around that dealt with --

15  that people couldn't throw out things that had to do with the

16  -- you know, with that particular litigation.

17  Q   No, I'm mentioning specifically Mr. Palmeroni's

18  counterclaim.  The e-mail that you received in 2006 from Mr.

19  Caldwell, it did not have anything regarding instructions as

20  to what to retrieve from Mr. Palmeroni's counterclaim, --

21  A   No, it did not.

22  Q   -- isn't that correct?

23  A   That -- it did not.

24  Q   All right.

25  A   No, I mean, to the best of my recollection, but then

1   again --

2           THE COURT:  Do we have a --

3           THE WITNESS:  -- I -- I said that I only remember it

4   very scant.  I think that there was something, but I can't be

5   100 percent sure.  I said I was trying to draw on my, you

6   know, photographic mind to, you know, bring it up in front of

7   me, but I can't be 100 percent sure.

8           THE COURT:  That's -- very well, Mr. Nelson -- Mr.

9   Jensen.  I want to thank you for your testimony here today.

10  You now may step down from the stand.  Thank you.

11          THE WITNESS:  Thank you.

12                      END OF TESTIMONY

13          THE COURT:  All right, counsel; any further arguments

14  with respect to the spoliation motion?

15          MR. SCAMPATO:  Your Honor, only that it would have

16  been impossible for Mr. Caldwell to have instructed Mr. Jensen

17  regarding Mr. Palmeroni's counterclaim in an e-mail dated

18  2006, because Mr. Palmeroni never filed a counterclaim and an

19  amended counterclaim until 2007.

20          THE COURT:  Okay.  It's noted.  Anything further?

21          MR. O'CONNOR:  No, Your Honor.

22          THE COURT:  All right, counsel.  I am not going to

23  render an opinion or a ruling, better said, here today with

24  respect to the current motion before me.  I am going to take

25  some time to consider some of the arguments that have been

Colloquy                                     159

1   raised.  I am also going to provide the parties either by way

2   of a written ruling in the record and an order regarding that

3   and order the transcript or I'll actually do a written opinion

4   with respect to spoliation.

5         We are now moving to the motion by counsel -- that's

6   document 194, which was filed on May 6, 2011, doc -- again,

7   document 194 -- and that's the notice of motion to withdraw as

8   counsel for Jesus J. Palmeroni.  That motion has been

9   forwarded to the Court by both Mr. Rostan and Mr. Scampato.

10        Counsel, who will be addressing it with respect to

11  the motion to withdraw?

12            (Discussion among counsel, off the record.)

13        MR. ROSTAN:  Your Honor, my understanding is that the

14  -- because the motion to withdraw entails confidential and

15  privileged information, that the protocol would be that we

16  would have information --

17        THE COURT:  Yeah, I'm definitely going, despite Mr.

18  Palmeroni's objection in a letter dated May 13th to me that he

19  would "object to any *in camera* meeting involving my counsel

20  without my presence," I am going to, over Mr. Palmeroni's

21  objection, meet with you.

22        But before I meet with you, there are certainly areas

23  that you've raised within your motion papers that are not

24  privileged that you could elaborate on with respect to

25  problems you may be having in continuing to represent Mr.

1   Palmeroni.  Those are of a financial nature, I believe.

2              And, in fact, Mr. Palmeroni, in his letter seems to

3   intimate that this is really a financial issue, more than it's

4   anything else and I would want to hear from you with respect

5   to the financial aspects of it and all -- any other grounds

6   you seek withdrawal that are not privileged.

7              MR. ROSTAN:  Okay.

8              MR. SCAMPATO:  Okay.  Well, regarding --

9              THE COURT:  Mr. O'Connor, did you want to say

10  something?

11             MR. O'CONNOR:  The only thing I'd just note, Judge,

12  is -- is -- and just for the record -- that we have not seen a

13  letter from Mr. Palmeroni to the Court and I'll leave it to

14  your judgment as to how to deal with that, but I just want to

15  make clear that we have not seen a copy of that letter.

16             THE COURT:  Well, counsel, I don't see any problem in

17  reading in and, in fact -- unless there's objection by counsel

18  -- to read the letter.  I think that it's part of the record

19  and part of what I would consider on the -- and, in fact, I'm

20  overruling his objection, so I think it's necessary that I

21  read the letter into the record.

22             MR. SCAMPATO:  Your Honor, it was really -- we --

23             THE COURT:  God bless.

24             MS. SMITH:  -- we objected based on -- we objected,

25  Your Honor, based on not wanting to reveal anything from Mr.

Colloquy                                  161

1  Palmeroni.  And, really, I don't know if he would consent to

2  allowing that letter to be read or not, but that was really

3  the only reason that we objected to it, because he had not

4  provided it --

5         THE COURT:  In fact, Mr. Palmeroni should be on

6  notice that anything in the future, depending on how I rule,

7  anything he sends to the Court must be scanned if he's a pro

8  se litigant.  So, anything that he sends me from this moment

9  on will be automatically scanned by the clerk's office.  So,

10 he should be aware of that.

11        I don't see that there's anything in this letter that

12 I am not free to discuss, Mr. Palmeroni, do you?

13        MR. PALMERONI:  Well, in terms of (indiscernible) --

14        THE COURT:  You better approach the podium, Mr.

15 Palmeroni.  You might as well come forward and sit right in

16 front of one of those mics.

17                    (Extended pause)

18        MR. PALMERONI:  Only in terms, Your Honor, of in

19 speaking with my lawyers for quite a while now, the -- the

20 things we have talked about between the -- between us and --

21 and I've been --

22        THE COURT:  But that's not in your letter.

23        MR. PALMERONI:  Oh, I --

24        THE COURT:  I'm asking you if I can read your letter.

25        MR. PALMERONI:  Yeah, I believe -- yes.  Uh-huh.

1          THE COURT:  All right.  The letter is dated May 13,

2     2011.  It's addressed to me.  It says:

3          "Dear Magistrate Salas:  I write this letter in

4     response to my co-counsel's motion to withdraw.  To date,

5     I believe counsel has adequately effective" -- I think you

6     might have meant adequately and effectively, but I'll read

7     it as it is -- "has been adequately effective and we have

8     not had any material disagreements regarding any issues of

9     which I am aware of" -- open paren -- "(notwithstanding

10    the opposition to plaintiff's motion to amend, which was

11    not executed as I have requested)." -- close parens,

12    period.

13         "I hereby object to the motion to withdraw on the

14    grounds it would prejudice my case and further delay these

15    proceedings.  I have made various attempts to make

16    adequate assurances of payment to counsel, however,

17    counsel has rejected all such assurances.  I would also

18    object to any *in camera* meeting involving my counsel

19    without my presence.

20         Thank you for your time and consideration.  Joe

21    Palmeroni."  And provides a phone number and he CCs David

22    Rostan and Fred Scampato.

23         That's the extent of the full letter.

24         MR. O'CONNOR:  Thank you, Your Honor.

25                        (Extended pause)

1          MR. SCAMPATO:  First of all, Your Honor, the

2   agreement entered into by Mr. Palmeroni, separate agreements

3   between myself and Mr. Rostan, has one clause that is

4   identical and that clause provides that Mr. Palmeroni is to

5   provide us with payment of any outstanding bill within two

6   weeks of receipt.  That was the contract that he entered into

7   with us.  And as solo practitioners, we have to be able to

8   honor our contracts and also be expected that the people who

9   are entering into contracts with us will honor their

10  contracts.  We make our small business decisions based on such

11  things as contract law.

12         Subsequent to us being retained by Mr. Palmeroni, we

13  indicated to him on numerous occasions that because we are

14  solo practitioners, we basically are -- our firms are month-

15  to-month.  We might have some excess resources, but not

16  anything that would last more than a month or two; therefore,

17  that was one of the reasons why it was absolutely critical

18  that we be paid promptly as according to our contract.

19         As of March of 2011, we had requested Mr. Palmeroni

20  to make his next payment and we indicated what that payment

21  would be to each of Mr. Rostan, to myself and also cover costs

22  for the litigation.  We --

23         THE COURT:  Was he invoiced?

24         MR. SCAMPATO:  He was invoiced.

25         THE COURT:  And what are the total invoices that are

1    outstanding?

2              MR. SCAMPATO:  It was approximately $30,000 for --

3    that are outstanding for Mr. Rostan and myself.  We had asked

4    him for 40, because we also wanted to, at that particular

5    time, because we wanted to get money for costs as well, as we

6    anticipated depositions and litigation costs relating to

7    subpoenas.

8              THE COURT:  So, you have outstanding invoices as of

9    what date?

10             MR. SCAMPATO:  As of present, approximately $30,000.

11             THE COURT:  And how -- what forum did you use to

12   notify Mr. Palmeroni of his outstanding -- of the outstanding

13   invoices and his obligation to pay said outstanding invoices

14   within two weeks of receipt?

15             MR. SCAMPATO:  Always the same way, Your Honor.  We

16   would mail him our invoices and we would also scan the

17   invoices and e-mail them to him in the beginning of the month.

18   And I believe that particular month of -- was it April?

19             MR. ROSTAN:  The last one was April 1st.

20             MR. SCAMPATO:  April.  April 1st we sent it to him.

21   We requested that he provide us payment by the 18th.  He

22   indicated that he would provide us payment by the 18th.

23   Subsequently, we learned that the only promise that he made to

24   us was that he had a condo that he wanted to sell.  He didn't

25   have a seller.  He had just put it out on the market and he

1    said, once it sells and once he collects the money on it, he

2    would be able to pay our bill.

3           We indicated that that was not acceptable under our

4    contract and also was not acceptable, because we don't know,

5    how -- you know, being that the housing market is so bad,

6    there's no way that we can tell when he would actually get a

7    buyer, whether or not that buyer would be able to get a

8    mortgage and when we would actually get paid.

9           So, we also knew at that time that he had other

10   sources of income and we indicated at that time, without

11   getting too --

12          THE COURT:  Right.

13          MR. SCAMPATO:  -- detailed, that there were other

14   sources of income and that we would require that he please

15   provide it with those sources of income.

16          THE COURT:  When was the last payment received by Mr.

17   Palmeroni?

18          MR. SCAMPATO:  It was in March.

19          THE COURT:  The last payment received by Mr.

20   Palmeroni was in March?

21          MR. SCAMPATO:  Yes.

22          THE COURT:  So, he has missed April and you

23   immediately filed this motion?  One miss?

24          MR. SCAMPATO:  Well, we filed the motion in --

25          THE COURT:  You filed it on --

1              MR. ROSTAN:  April.

2              THE COURT:  I know when you filed it.  April --

3              MR. SCAMPATO:  In the end of April.  Right.  The end

4    of April.

5              THE COURT:  You actually notified me of an issue back

6    in April, but you also -- that was April 19th, but you filed

7    the motion to withdraw as counsel on May 6.

8              MR. SCAMPATO:  Yes, Your Honor.

9              THE COURT:  So, he's technically only missed one

10   payment.  That he has been late for.

11             MR. SCAMPATO:  He has -- we continued to send him out

12   bills, that's correct.  There has been no indication that

13   anything other than the sale of the condo will be forthcoming

14   with regard to the payment of our bill.

15             And we explained in great detail, face-to-face and on

16   the telephone, that our bills could not be held that way.  Our

17   vendors won't -- would not be so forgiving and allow us to

18   miss payments.  Therefore, we --

19             THE COURT:  All right.  So, when was the exact date

20   of the invoice?  April 1st was a Friday.  Would it have been

21   at the end of March or would it have been --

22             MR. SCAMPATO:  It was always the first day, Your

23   Honor.

24             THE COURT:  All right.  So, assuming you mail it out

25   and you scan it, he gets it April 4th or 5th.  It was due the

1   19th.  We had a conference on the 19th, so I'm assuming

2   though, based on your communications with him, he had already

3   made it clear he was not going to pay you as the contract

4   required, but instead wanted to try to work out this condo

5   deal.

6           MR. SCAMPATO:  Right.

7           THE COURT:  Okay.

8           MR. SCAMPATO:  Actually, Your Honor, we did request

9   it even prior to the 1st of April, we told him that, you know,

10  the next time we were going to be in -- in March we told him,

11  the next time that we were going to be asking you, we're going

12  to be asking you for this amount of money and we're going to

13  be asking you for the -- from you at this date, can you --

14  will you be able to provide it to us by this date --

15          THE COURT:  Okay.

16          MR. SCAMPATO:  -- and he indicated that he would at

17  that time.

18          THE COURT:  Here's what I'm having trouble

19  understanding.

20          MR. ROSTAN:  Yeah, okay.

21          THE COURT:  You have an outstanding bill of 30,000.

22  I'm assuming there were missed payments at some point.

23          MR. ROSTAN:  Yeah.  Your Honor, if I may add this,

24  because I think it's pertinent?

25          Mr. Palmeroni -- and we have attempted many times to

1   discuss this with you, Mr. Palmeroni -- has made it abundantly

2   clear that not only was the condominium not under a contract,

3   no clear buyers, but that that was his sole source moving

4   forward and that -- and that, in light of the lack of funds

5   and in light of the fact that there was no assurance that

6   future litigation costs would be paid, that if the Court

7   directed us to depose such and such a person or to go to

8   Illinois or Texas, that we would have the ability to pay the

9   plane fare, that we would have the ability to pay the

10  deposition costs and/or indeed the ability to make strategic

11  or legal decisions with regard to the case and there was

12  absolutely no clear -- other than his expressed subjective

13  intention to say that he would like to, you know, make such

14  payments.

15          And I think it's also pert -- worth noting that prior

16  to that, there was never an indication prior to that that he

17  would not be able to make the ongoing costs going forward.

18  And this was, of course, in light of the fact that there was a

19  motion pending to amend the complaint to include 30 parties

20  and that was a case that we were not originally brought on --

21  had not originally part of this.  And there were aspects of

22  this conversation that I think begin to border on attorney-

23  client privilege, so --

24          THE COURT:  I would be careful.  Here's what I am

25  trying to understand.  Where is the 30,000 coming from?  Is it

1   from the month of March that you racked up 30,000 or was it --

2   were there periods where you were --

3            MR. ROSTAN:  No.

4            THE COURT:  -- you were billing him --

5            MR. ROSTAN:  No, actually, --

6            THE COURT:  -- and he wasn't paying you the total

7   amount?

8            MR. ROSTAN:  There -- no.  There was a prior period

9   in which there was only partial payment and there was an

10  arrears for that.  So, it was really --

11           THE COURT:  That's what I need --

12           MR. ROSTAN:  So, really, two months.

13           THE COURT:  -- on the record, counsel.

14           MR. ROSTAN:  It's really -- it's really two months.

15  And what had occurred was that there were a series of requests

16  for XYZ payments and then Mr. Palmeroni would give us

17  approximately two-thirds and then over time we started

18  developing an arrears and then it amounted to 30,000 as of the

19  last billing date.  And with every indication that the arrears

20  would continue to build and we would be out without any

21  ability to pay for costs and really, without even getting into

22  the personal hardship that -- that -- that --

23           THE COURT:  You were to -- well, would you place on

24  the record, please, the makeup of the law offices.  How many

25  attorneys work there.  I'm understanding now that the motion

1   to amend has been granted.  The amount of work that it would

2   require to not only prosecute as you are prosecuting the

3   counterclaims in this case, but also defend against the newer

4   allegations that are contained in the amended complaint.

5         MR. ROSTAN:  That's right.

6         THE COURT:  So, how many -- you have to place that

7   information on the record.

8         MR. ROSTAN:  I'm sorry, say it again?

9         THE COURT:  How many people are in your office,

10  what's the makeup, is it a solo firm.  I heard counsel say

11  solo practitioners.  That needs to be placed on the record.

12        MR. ROSTAN:  Right.  Well, on the record, Your Honor,

13  you're looking at my office.  There is -- we have employed Ms.

14  Carol Stenger to help us with some paralegal work on a --

15        THE COURT:  Per diem?

16        MR. ROSTAN:  On a per diem basis.  And Fred and I,

17  who have known each other for a number of years, and one of

18  the reasons that we joined up was we thought it was way too

19  much for one person and it's probably, you know, in some ways

20  too much for two persons, but we felt that if we worked

21  together, that we'd be able to -- to --

22        THE COURT:  Are your offices affiliated?

23        MR. ROSTAN:  Pardon?

24        THE COURT:  Are you one and the same?

25        MR. SCAMPATO:  No, Your Honor.

1         MR. ROSTAN:  No, we're not.  We're -- we're --

2         THE COURT:  So solo practitioners.

3         MR. SCAMPATO:  Yes.

4         MR. ROSTAN:  Yeah.

5         THE COURT:  Okay.

6         MR. ROSTAN:  I mean, Fred can speak for himself, but

7    Fred is basically a solo practitioner and he has a part-time

8    secretary.

9         MR. SCAMPATO:  A full time.  Full time.

10        THE COURT:  Okay.

11        MR. SCAMPATO:  Full-time secretary.

12        THE COURT:  In any event, --

13        MR. ROSTAN:  A full-time secretary.

14        THE COURT:  -- you're both solo practitioners and you

15   have obviously expressed outstanding invoices in the amount of

16   $30,000; plus, based on the fact that you now have -- that Mr.

17   Palmeroni was in arrears, you felt the need to have up-front

18   payment with respect to perceived cost in the near future.

19        MR. ROSTAN:  Absolutely.

20        THE COURT:  That's summing it up?

21        MR. SCAMPATO:  Yes.

22        MR. ROSTAN:  Yeah, absolutely.  I mean, we were

23   before Judge Garrett Brown and the -- that it was a short

24   phone conference.  Judge Brown made it very clear, you know, I

25   want you to be ready, I want you to, you know, have the

1   depositions scheduled, I want you to -- you know, if you need

2   to fly to Illinois or fly to Texas, you be ready and you do it.

3           THE COURT:  And based on what you're placing on the

4   record right now, you now -- when you wrote this motion,

5   obviously, counsel, the ruling wasn't official with respect to

6   the motion to amend, correct?

7           MR. ROSTAN:  If the ruling, I'm sorry?

8           THE COURT:  The ruling --

9           MR. SCAMPATO:  Was not.  That's correct, Your Honor.

10          THE COURT:  The ruling -- I had not ruled on the

11  motion to amend.  I have since ruled on the motion --

12          MR. ROSTAN:  Yes.

13          THE COURT:  -- to amend, in which I granted the

14  motion to amend.

15          MR. ROSTAN:  That's correct.

16          THE COURT:  And so I am now asking you, do these

17  costs, in terms of trying to defend the action, as well as

18  prosecute the original action, there's no money that is set

19  aside for any costs associated with depositions and/or flying

20  to Illinois and --

21          MR. ROSTAN:  There is $822 sitting in my attorney

22  trust account which we have set aside for working on the

23  motion -- opposing the motion to amend and also on the

24  spoliation, and I have reserved that 822, it's still sitting

25  in the attorney trust account, but that is the sum total of

1    what we have.

2              And we estimated $10,000 of costs between travel and

3    -- it -- I mean, you -- just in the first complaint we have

4    Bengoa, you have --

5              THE COURT:  Counsel, I don't need you to outline.

6              MR. ROSTAN:  Yeah.

7              THE COURT:  I understand this case.  I've been

8    involved in this case for years now.  I understand.  And I

9    also know well my ruling with respect to the motion to amend

10   and I can take judicial notice of the parties that have been

11   added and the extent and complexity of the matter in total.

12   All right?

13             MR. ROSTAN:  Right.

14             THE COURT:  Anything else?

15             MR. SCAMPATO:  Only, Your Honor, I think I made a

16   one-month mistake.  The last payment that we received was in

17   February.  It was on March 1st that we requested the $40,000

18   and it was on March 18th that we had requested that it be

19   provided to us and he has not since provided it to us.  So,

20   the last payment was in February.  April -- March and April

21   and May have not been paid.

22             THE COURT:  Okay.  Thank you, counsel.

23             Before we go into my jury room, I will permit Mr.

24   Palmeroni to place his objections on the record with respect

25   to at least the financial aspects.  I remind you, Mr.

1   Palmeroni, that you don't want to get into conversations you

2   may have had with your attorneys that are privileged and that

3   relate to the defense of this action.

4        We're talking specifically now as to the amounts owed

5   to your attorneys.  That they say, as of March 1st, you

6   received an invoice of $40,000, that includes the $30,000 you

7   still owed them, plus $10,000 in projected costs, to conduct

8   some of the deposition and discovery and provide a defense and

9   prosecute some of the claims in this case.  And that was even

10  before the motion to amend was granted.  You also -- they

11  requested payment on March 18th and the date obviously now is

12  the 26th of May and they have yet to receive payment.

13       What do you say with respect to the financial

14  obligations that you have to your attorneys and, in

15  particular, the contract that you signed that suggested that

16  payment was due and owing to the attorneys within two weeks of

17  the receipt of their invoice?

18       MR. PALMERONI:  First of all, I think there's a small

19  misunderstanding or mischaracterization of how we were paid

20  and billed, and also it leads into how much work there would

21  be or that was projected in this case.

22       Mr. Rostan and Mr. Scampato had al -- has always --

23  has -- I'm sorry -- have always had monies up front as a

24  retainer, so their bills were going against retainers.  And so

25  to characterize it as missing payments, certainly when the

1   most recent payment became due, but I was warning them for

2   months before that I just -- I just -- I was going to be

3   running into trouble and it -- as it -- and, in fact, what --

4   before Mr. Scampato came on, two days before, because you had

5   instructed me I had 30 days to find a new attorney.

6          I had been -- started to talk to Mr. Scampato

7   immediately and wanted to try to make sure he was up and ready

8   before the 30 days.  He expressed to me that he was taking the

9   vacation of a lifetime and he wanted to do a joint contract

10  between the two of them, so that while he was gone, he

11  wouldn't be required to stay and -- by you or give up his

12  vacation.

13         I refused to do that, because Mr. Rostan had already

14  had a contract, but what I ended up getting is, in the mean

15  time, Mr. Samaro sent a letter threatening to extend the scope

16  of the case at that time, before Mr. Scampato came on.  And

17  Mr. Scampato then doubled what he wanted for his retainer.

18  And they have been paid retainers in advance.

19         At a certain time, the retainers did -- did -- with

20  these latest motions, get used up and there was a request for

21  $15,000 a month or when it had to be -- when we got down to

22  $5,000 in the retainer account, for it to be another $15,000

23  to -- for each of them.  And I simply told them what I have

24  been telling them and I -- and I ref -- and part of the reason

25  this was brought so fast was I -- I had been telling them for

1   months, I -- I -- I can't accord $20,000 a month.  I don't

2   know how many human beings can, but I -- I can't and I never --

3   I refused to promise them and string them on and I -- and I

4   requested many times that to -- to put the brakes on, to talk

5   about what we -- because it doesn't make a lot of sense to be

6   going forward with all this without knowing where the end game

7   is or whatever, because in the end, if -- if this is a

8   monetary case, the other side is looking for money and -- and

9   I -- I expressed many, many times that -- where I was

10  financially.

11        When the last retainer ran low is -- immediately I

12  was told -- I was -- I was being requested 30,000 a month, but

13  I wasn't able to do that and so I was -- they were fine with

14  20,000 a month.  When the next retainer came up, I said, well,

15  I don't have 20,000, I can give you 10.  At that point, it was

16  raised to 40.

17        So, you know, technically, I'm absolutely in arrears

18  and -- and it's about six weeks worth of legal work and I

19  don't take that lightly.  But I think there was a

20  mischaracterization.  I have been paying up front for costs as

21  long as I could until it was exhausted.

22        The motion to amend.  I didn't really want to fight

23  that, but I was told that there was a fight there.  That's

24  money that, you know, again is getting taken out of the

25  retainer every time.

1          Without getting into -- I have a lot of issues that I

2   think that could be discussed *in camera*, but without getting

3   into that, I just wanted to address the billing, because it

4   was a mischaracterization.  I have been paying an up-front

5   retainer until the retainer ran out the last time and I said I

6   can -- you know, I can get 10,000, but when I couldn't get 20,

7   it was, well then it's 40.  Because the conference was three

8   days away, three to four days.  It was six days away and I was

9   told there had to be a decision by then.  So, the decision was

10  that -- was then changed to a $40,000 retainer.

11         And at this point, for me, Mr. Scampato insisted on

12  about -- I spent about $15,000 so he could get cut up --

13  caught up with the case and read through the case and I just --

14  I just -- to get another lawyer to do that and to -- and to --

15  I just think it would delay -- delay the procedures.  But

16  certainly, --

17         THE COURT:  The problem I have though, Mr. Palmeroni,

18  is that this case has only got that much more complicated now,

19  based on the ruling on the motion to amend.

20         MR. PALMERONI:  Mm-hmm.  Mm-hmm.

21         THE COURT:  The amount of parties involved.

22         MR. PALMERONI:  Mm-hmm.

23         THE COURT:  The amount of claims against you, as you

24  know.  I mean, there are 30 new parties in this action.

25         MR. PALMERONI:  Mm-hmm.  Mm-hmm.

1          THE COURT:  So, the case is a lot different than what

2    the attorneys signed on for initially and there's a -- you're

3    stating very clearly on the record that there is a cash flow

4    issue coming your way or coming their way from you.  And so,

5    they are solo practitioners and, again, I cannot -- and I have

6    to be cognizant of the financial burden it would place on solo

7    practitioners to be forced to stay in a case in which they

8    haven't been paid thus far for the work that they have done,

9    at least as of March.

10         MR. PALMERONI:  Well, I mean, they have been paid in

11   excess of $100,000, but they haven't -- they haven't been paid

12   -- yeah, the retainer ran out -- I'm not -- I don't believe it

13   ran out in March.  I mean, as the bills came, there was --

14   there was money forward, so I would believe as of April 1st,

15   though, and then -- then that I was in arrears as of April

16   1st.  That's correct.

17         But as far as the scope of the case, as I said,

18   although there wasn't a motion to amend, certainly a motion to

19   amend was out there.  Certainly, the -- Mr. Scampato himself

20   said that those are almost always granted.  So, you know,

21   that's -- I had been saying, since that was even talked about,

22   as I said, my retainer with Mr. Scampato was doubled because

23   of a letter from Mr. -- from Mr. -- you know, and -- and I

24   guess that's attorney-client privilege, but you've asked me

25   and -- and that's -- you know, that's what happened.  You

1   know, I have the e-mails and that's -- that's the position I'm

2   in.

3          I have been asking since the very beginning of this

4   case what we could do to settle the case, what -- what we were

5   looking for and I was finally told by Mr. Rostan and Mr.

6   Scampato that they would ask for a settlement case at the same

7   time they asked to be let off the case.  So, I was always told

8   it wasn't the --

9          THE COURT:  Do you still have an interest to settle

10  this case?

11         MR. PALMERONI:  What's that?

12         THE COURT:  Do you still have an interest to settle

13  this case?

14         MR. PALMERONI:  I have been -- I have had an interest

15  since the beginning, Your Honor.

16         THE COURT:  Have you ever been given a demand?

17         MR. PALMERONI:  Never.  And, in fact, Mr. Scampato

18  did -- he -- you know, because I was -- I was struggling with

19  this.  I don't want to owe anybody anything and I -- and I

20  said, you know, why isn't anybody, you know, talking and all I

21  keep being told by everyone is it's not the time, it's not the

22  time.  And I said, it just doesn't make sense.  And what ended

23  up happening is -- and -- and I understand that this will be

24  on the record, but if we're not *in camera*, I'm going to say it

25  right here.

1          I was on a conference call with Mr. -- and I'm going

2    to release this -- Mr. Rostan and Mr. Scampato and I said "At

3    a certain point, you know -- you know, I'm going to be

4    bankrupt."  And Mr. Rostan said "Well, I want you to contact

5    some bankruptcy attorneys."  The next day is when I was -- I

6    was told that my -- my retainers would be going up, etcetera.

7          I can't blame -- again, I can't blame anybody, but I

8    think everybody was cognizant of where were going here.  I

9    have asked for settlements from day one.  There was -- we have

10   asked even when Mr. Grossman -- in the first month with Mr.

11   Grossman, we sent over formal requests for settlements.  Even

12   a settlement request, as a said, Mr. Scampato said, you know,

13   "I did send something over and I got no reply.  That's all I

14   can do."

15         So, you know, if I don't know a number --

16         THE COURT:  All right.  I understand.  I --

17         MR. PALMERONI:  If I don't know a number -- and --

18   and, you know, now that these records are nowhere to be found

19   and they're talking about Smart World -- they were paid for --

20   from what I --

21         THE COURT:  Be careful, Mr. -- be careful.

22         MR. PALMERONI:  Well, what I -- what I can see is --

23         THE COURT:  Be careful with what you --

24         MR. PALMERONI:  -- there is -- there is no -- without

25   the very records that they destroyed, there is no legitimate

Palmeroni - Argument / Ruling                    181

1  way that they could even say what their damages were.  And --

2  and so, if -- if -- but they've given us a number.  We've

3  asked since the first month and this has been going on five

4  years.

5         THE COURT:  All right.  I am going to at this point

6  break.  The hour is 7:20.  I'll be -- I am going to go into my

7  jury room with both Mr. Rostan and Mr. Scampato to discuss

8  what they deem as privileged and confidential information that

9  they cannot disclose on the record.  I will meet with you now,

10 counsel.

11        (Off the record from 7:19 p.m. to 7:30 p.m.)

12        THE COURT:  Please be seated, everyone.

13        The time is now 7:31.  We're back on the record in

14 the matter of N.V.E., Inc. versus Jesus J. Palmeroni, et al.,

15 Civil Action Number 06-5455.

16        Counsel has provided the Court with both a written

17 document and then I have met with the attorneys as well ex

18 parte do discuss some of the aspects of the motion.  It is

19 clear to this Court that clearly there is a breakdown in the

20 attorney-client relationship.

21        There -- the Court would note that Local Civil Rule

22 102.1 provides that, quote:  "Unless counsel is substituted,

23 no attorney may withdraw an appearance except by leave of

24 court.  After a case has been first set for trial,

25 substitution and withdrawal shall not be permitted, except by

Ruling                                                182

1  leave of Court."  End of quote.

2          As the language in Local Civil Rule 102.1 reflects,

3  quote, "The decision of whether to permit counsel to withdraw

4  is left to the sound discretion of the court."  End of quote.

5  Rusinow versus Kamara, 920 F.Supp. 69, 71 (D.N.J. 1996).

6          In determining if good cause for withdrawal exists,

7  the court begins with Rule of Professional Conduct 1.16(b),

8  which permits an attorney to withdraw from representing a

9  client if withdrawal can be accomplished without material

10  adverse effect on the interest of the client.

11          And I would note that Mr. Palmeroni has indicated

12  that he feels that the case would be delayed and that he would

13  be prejudiced, so I am bearing in mind his statement on the

14  record with respect to that point.

15          I also find, however, that number 5 is applicable,

16  which is "The client fails substantially to fulfill an

17  obligation to the lawyer regarding the lawyer's services and

18  has been given reasonable warning that the lawyer will

19  withdraw unless the obligation is fulfilled."

20          And I have heard counsel's recitation of the facts

21  with respect to the financial obligation in this matter and

22  clearly there was an agreement and a binding agreement upon

23  Mr. Palmeroni in which he was to satisfy any and all

24  outstanding invoices within two weeks of receipt.

25          I understand Mr. Palmeroni's position with respect to

1    the economic constraints he now faces; however, it is clear

2    that this case is only going to be more complex and is more

3    complicated in light of the Court's recent ruling with regard

4    to the motion to amend and, therefore, the outstanding

5    invoices in the amount of 30,000 will likely double, triple in

6    time.

7            So, the Court is cognizant that, in fact, Mr.

8    Palmeroni has already admitted that he does owe the attorneys

9    $30,000 and that amount has not been paid and nor have I heard

10   anything from Mr. Palmeroni that would suggest that he would

11   be able to pay that amount within the time period as required

12   by the contractual agreement.

13           I'm also going to find that 6 is applicable, "The

14   representation will result in an unreasonable financial burden

15   on the lawyer or has been rendered unreasonably difficult by

16   the client."

17           Quite frankly, both gentlemen have spoken candidly to

18   me on the record regarding being solo practitioners and not

19   having any other attorneys there.  Again, the only attorneys

20   working the case, on different aspects, Mr. Scampato defending

21   the claims and Mr. Rostan pursuing the counterclaims in this

22   action.  Based on the fact that they are solo practitioners

23   and understanding, again, the complexity of this case and that

24   a great deal of discovery remains outstanding, including

25   depositions and expert discovery, if necessary, I do find that

Ruling                                    184

1   requiring solo practitioners to remain in a matter such as

2   this one would be -- would impose an unreasonable financial

3   burden on the solo practitioners.

4          I also find that good cause is applicable in this

5   case.  Quite frankly, I'm hearing from the attorneys, and

6   based on -- and I am not going to elaborate based on our

7   meeting, but I will say that it has been made known to the

8   Court that there is an issue with cooperation from Mr.

9   Palmeroni in cooperating with his counsel.

10         MR. PALMERONI:  Your Honor, can I speak to that?

11         THE COURT:  No, you can't.  I'm ruling now.

12         And, quite frankly, I can see the tension between the

13  attorneys and the client and that is no way something that is

14  good for anyone.  These are very serious allegations.  There

15  are in upwards of -- last I heard on the phone, Mr. O'Connor,

16  millions of dollars that would be sought in damages, correct?

17         MR. O'CONNOR:  Yes, Your Honor.

18         THE COURT:  This is a case that involves severe

19  ramifications if indeed Mr. Palmeroni is found liable of some

20  of the claims that are alleged in the complaint and the

21  amended complaint.  There's a lot at stake in this case and we

22  cannot have attorneys and clients that are at odds, and clearly

23  the attorneys are at odds with their client at this juncture.

24  It's evident from the proceeding, it's evident from what I've

25  heard and, in fact, I would have permitted Mr. Palmeroni and I

1   would have gone *in camera* and discussed this matter with Mr.

2   Palmeroni, but I find that it's overwhelmingly clear to this

3   Court that there is a reasonable basis and, in fact, good cause

4   to grant the -- his motion -- your attorneys' motion to

5   withdraw in this case and, therefore, I find that good cause

6   exists.

7          I am going to also remind Mr. Palmeroni, as I have

8   reminded him in the past when faced with yet a similar motion

9   a few months ago from Mr. Grossman, that Mr. Palmeroni is not

10  a licensed attorney, he cannot represent any of the

11  corporations in this matter, corporations cannot be

12  represented by non-attorneys and a corporate entity can only

13  appear in federal court through a licensed attorney, as the

14  Supreme Court of the United States made clear in Rowland v.

15  California Men's Colony, 506 U.S. 194, 202 (1993).

16          "It has been the law of the land" -- and I am

17      quoting.  "It has been the law of the land for the better

18      part of two centuries that a corporation may not appear in

19      federal court" -- well, strike that -- "a corporation may

20      appear in federal court only through licensed counsel."

21      End quote.

22          And counsel, if indeed there are any named defendants

23  that are corporations, they will not be permitted to -- Mr.

24  Palmeroni will not be permitted to represent any of the

25  corporate entities that may be implicated with respect to not

1    only prosecuting any counterclaims, but and/or defending

2    against any claims in this matter.

3            That being said, Mr. Palmeroni, how long do you need

4    to try to find new counsel?

5            MR. PALMERONI:  Sixty days, Your Honor?

6            MR. O'CONNOR:  Judge, --

7            THE COURT:  Mr. O'Connor?

8            MR. O'CONNOR:  Judge, my objection is that I would

9    ask that you give him 30 days to find counsel, because we all

10   know that counsel is going to come in here and they're going

11   to ask for an extension of time to go over stuff and this is

12   going to get delayed for five or six months without anything

13   happening.  So, I really ask that you give Mr. Palmeroni 30

14   days, not 60 days, to find new counsel.

15           THE COURT:  I understand your objection.  I am going

16   to give him slightly more than 30 days.  I am going to give

17   him until the end of June.

18           Mr. Palmeroni shall find new counsel.  His or her

19   appearance must be entered and noticed, formally noticed for

20   the record by June 30th.  Failure to provide -- failure to

21   enter his or her appearance will mean --

22           And I do hereby advise you Mr. Palmeroni that I'm

23   viewing you as pro se at this point, so you are going to have

24   to represent yourself as it relates to any claims you may have

25   between you and against N.V.E., but any claims that may be

1   lodged against you as an individual defendant.  Okay?  Do you

2   understand that?  You're representing yourself.  You're pro se

3   from this moment on.  Until counsel comes in.

4          And you should advise any attorney that comes in that

5   I cannot nor will I give them 60, 90; it's not happening.

6   They're going to have to hit the ground running with respect

7   to defending this action.  And that is, of course, in light of

8   history of this case and, in fact, the age of the case as

9   being of 2006.  It's one of the older cases on His Honor's

10  docket.  I have been given instruction that we need to move

11  this case and, therefore, I will not be permitted nor will I

12  permit any counsel that may come into this case and extend the

13  period of time to get, you know, familiar or acclimated.  It's

14  just not -- it's not something I can give at this time.

15         Counsel, there has been an objection raised in your

16  opposition to the motion and I want to put that on the record.

17  And now that we have Mr. Palmeroni here representing himself,

18  we need to talk about the tax documents that you have

19  requested and what you need from Mr. Palmeroni.  You noted

20  specifically in your objection on page 4 with respect to

21  documents.  And that was on March 9, 2011.

22         And Mr. O'Connor or Ms. Smith, I understand there was

23  a second request of production of documents from his then-

24  counsel relating to IRS proceedings against Mr. Palmeroni.  He

25  has refused to produce a single document, according to your

O'Connor - Argument                                          188

1    papers.  And he -- and with regard to tax-related documents,

2    Mr. Palmeroni has claimed that they are protected by the

3    attorney-client privilege.

4         What is the basis of your objection with respect to

5    these documents and what would you ask as a remedy from this

6    Court?

7         MR. O'CONNOR:  Your Honor, the documents do not seek

8    any information with any attorney-client privilege.  What we

9    have sought is correspondence and other documents between the

10   IRS and Mr. Palmeroni or between the IRS and any tax counsel

11   or lawyer that he's had.  So, we didn't ask for the documents

12   between Mr. Palmeroni's attorney and Mr. Palmeroni, we're

13   asking for the IRS documents.  So, there -- the fact that you

14   give them to your lawyer doesn't make them privileged.

15        We'd ask one of two things, Judge:  one is that you

16   order Mr. Palmeroni to either get us the documents or instruct

17   his tax counsel to provide us the documents; or we had an

18   authorization drafted up to Ms. Judith Harris, Esquire, which

19   we understand to be his lawyer from Mr. Rostan and Mr.

20   Scampato, and we had given them an authorization saying "If

21   you have your client sign the authorization, then we'll get

22   them directly from Ms. Harris."

23        So, I would ask, I guess, for either one or both of

24   those.

25        THE COURT:  Mr. Palmeroni, what is your position with

Palmeroni - Argument                            189

1    respect to the tax documents that have been referenced by the

2    plaintiffs in this matter?

3         And in particular, sir, I would note that clearly

4    these tax documents, they are not asking you for

5    correspondence or communication between your tax attorney, but

6    any tax documents that were provided to your attorney that

7    relate to an IRS proceeding against you.  That's not

8    necessarily privileged and you have an obligation under our

9    discovery rules to provide that information and/or sign an

10   authorization for them to get it.

11        MR. PALMERONI:  Your Honor, originally I discussed

12   this with Mr. Scampato.  He had said that the only thing that

13   he felt was relevant were the tax documents themselves, the

14   tax returns, not tax liens, etcetera, because we didn't feel

15   they were in your original order.  Nor do I feel they are

16   relevant to the case.

17        That being said, we made a counteroffer at the time

18   that said, as long as we could redact anything in there that

19   we found privileged or things such as my children's Social

20   Security Numbers, things that were not relevant to the case,

21   that we --

22        THE COURT:  Well, there's a discovery confidentiality

23   order, is there not?

24        MR. O'CONNOR:  There is, Judge, and this is the first

25   we've heard about redacting his children's Social Security

O'Connor - Argument / Ruling                                190

1  Numbers.

2          THE COURT:  Do you have any objection to that?

3          MR. O'CONNOR:  I don't have an objection to his

4  children's Social Security Numbers.  I have -- what I want is

5  the documents relating to Mr. Palmeroni and if they're related

6  -- well, I guess I'll see the information.  If it turns out

7  that Mr. Palmeroni has transferred assets to his children,

8  then I'm going to want that information to trace the assets.

9  But, you know, that's -- you know, we can do this in steps,

10  Judge, if you -- if that's what you think appropriate.

11          THE COURT:  First of all, there's a discovery

12  confidentiality order that clearly is --

13          MR. O'CONNOR:  That -- and we're --

14          THE COURT:  -- in place; correct, Mr. O'Connor?

15          MR. O'CONNOR:  Yes there is and, you know, we've -- I

16  think the Court ordered a confidentiality order.  If you want,

17  Judge, we will redo the stip -- the standard stipulation that

18  the district court has to deal with that.  We can do that.

19          THE COURT:  No, I have one in place.

20          MR. O'CONNOR:  All right.

21          THE COURT:  Mr. Palmeroni, this information is

22  relevant.  I find that the tax information, including the

23  liens, are relevant in this matter.  I have already ruled on

24  this in a prior proceeding.  You've got to hand this stuff

25  over.

1          So, quite frankly, it probably is safer for you to

2   sign an authorization and let the attorneys get the documents

3   from your attorney; but, if not, you've got to get these

4   documents from your tax attorney and I don't want to hear that

5   you're redacting anything other than your children's Social

6   Security Number.

7          MR. PALMERONI:  Well, Your Honor, I regularly -- what

8   we've received from N.V.E. is regularly redacted, customers'

9   names and things such as that; and, again, in conferring with

10  former counsel, they said nothing should be redacted.  But I

11  see that, in fact, there was some paperwork that came in from

12  a Quality K or something that had been subpoenaed and that was

13  all redacted before it reached them or myself.

14         N.V.E. and Mr. Jensen have redacted dozens and dozens

15  of pages before they've reached me and there were simple

16  things such as there were e-mails suggesting certain things

17  that were going on, but the person to where the e-mail was

18  going was not on there, so we couldn't --

19         THE COURT:  But I'm not dealing with right now

20  redacting -- an objection with respect to redacted documents.

21  I am dealing right now with tax information that I clearly

22  find relevant.  And I understand your concern with your --

23  with respect to your children's Social Security Numbers and it

24  may turn out that, depending on the paper trail, there may be

25  a need to review those Social Security Numbers.

1          But there is a confidentiality order in place that

2    doesn't permit counsel to use the information outside the

3    boundaries of this litigation.  I think that protects you and

4    I find that you're either going to sign the order that -- the

5    authorization or you are going to get these documents and

6    provide them to Mr. O'Connor by June 30th.

7          MR. PALMERONI:  Yes, Your Honor.

8          MR. O'CONNOR:  May I provide Mr. Palmeroni with the

9    authorization?

10         THE COURT:  Is he going to do an authorization or are

11   you going to get the documents, Mr. Palmeroni?

12         MR. PALMERONI:  I'll discuss it with my tax attorney

13   and --

14         THE COURT:  Take the authorization and if you're

15   inclined to take the authorization and sign the authorization,

16   that's probably the easiest thing to do, but I am not telling

17   you what to do.  I am just saying that whatever happens, I

18   want to make sure that it is in the hands of the attorneys by

19   June 30th.  And that's also going to be included in my order,

20   so I am going to ask defense counsel to do an order.  I know

21   you gave me a proposed order, but here is the order:

22         The order has to be amended to indicate that Mr.

23   Palmeroni is deemed pro se from this moment on.  The order has

24   to indicate that Mr. Palmeroni has to find counsel and counsel

25   must enter his or her -- I'm going to be asking withdrawing

Ruling                                                                    193

1    counsel to do this order, so let's make sure we know what

2    we're doing, okay?

3           I am asking withdrawing counsel to give me an order

4    that includes the standard language that was provided in the

5    proposed order.  In addition, it is going to have language

6    that asserts that Mr. Palmeroni is now representing himself

7    pro se.

8           That he is to have counsel that comes into this case

9    no later than June 30th.

10          That he is to provide any and all tax documents as it

11   relates to the second request for production relating to his

12   doc -- relating to documents regarding an IRS proceeding

13   against Mr. Palmeroni.  Those documents need to be produced to

14   N.V.E. no later than June 30th.  He is either going to sign

15   the authorization and provide the -- or -- and -- strike that.

16   He is either to sign the authorization or provide the

17   documents by June 30th.

18          The documents shall not be redacted, with the

19   exception of personal information of his children, that being

20   Social Security Numbers.

21                         (Extended pause)

22          THE COURT:  Anything further that the order should

23   contain, Mr. O'Connor?

24          MR. O'CONNOR:  Your Honor, if I might be so bold?  If

25   you -- to provide docs by June 30th, that's perfectly

1   acceptable.  If he's only going to sign the authorization, can

2   we get that by June 15th, so that we can get the lawyer to

3   provide the documents?

4           THE COURT:  Great.  I don't have a problem.  I was

5   actually thinking that.

6           So, if the authorization is only going to signed,

7   then that should be signed by June 15th.  If Mr. Palmeroni is

8   going to work in conjunction with his tax attorney to prepare

9   those documents, copy them and send them over to N.V.E., then

10  those documents can be received by Mr. O'Connor and his office

11  by June 30th.

12          MR. O'CONNOR:  Thank you, Judge.

13          THE COURT:  Anything further?

14          MR. O'CONNOR:  No, Your Honor.

15          THE COURT:  We're going to have a status conference

16  in early July?

17          MR. O'CONNOR:  Yeah.  Judge, I mean, I -- we have

18  other things.  We have a couple motions to quash and whatnot,

19  but there's nothing further for today and I guess we'll deal

20  with that on June 30th on the motions.

21          THE COURT:  Well, until I know who is in and who is

22  out and if he's representing himself and if any of the

23  corporate entities that, you know, we now know they're going

24  to be seeking documents from, he can't litigate that if he's

25  on his own.  And I know there was an intention to try to quash

Colloquy                                                     195

1  some of the documents that are being sought from some of the

2  new corporate entities, correct?

3          MR. O'CONNOR:  Yes.  There is -- either Mr. Scampato

4  or Mr. Rostan, I forget which one, had written a letter trying

5  to object to the subpoenas.

6          Judge -- and I'm not trying to take advantage.  Can

7  we proceed with preparing other subpoenas, as necessary, as

8  long as we have a return date after June 30th, so at least we

9  get those out?

10          THE COURT:  Sure.  Yeah, I mean we need to move this

11  case.  Nothing is stayed.  You need to move this, prosecute it

12  as you will.  Mr. Palmeroni is going to do what he can do as a

13  pro se litigant and I strongly suggest that Mr. Palmeroni get

14  himself onto the electronic filing, which he can as a pro se

15  litigant.  I also strongly suggest he get the Guide to Federal

16  Litigation and do his best.  He is very articulate.  I have

17  noted that for the record and I think he's going to be able,

18  at least until the -- you know, until we know whether he's

19  going to find new counsel -- and he'll have to do his best to

20  get caught up on what he needs to do in the discovery process.

21          MR. PALMERONI:  Your Honor, could you repeat the --

22  you said get on the electronic filing system?  How would I do

23  that?

24          THE COURT:  You've got to call the clerk's office.  I

25  can't give you legal advice.  Call the clerk's office.  I'm

Colloquy                                          196

1   sure your attorneys will give you the clerk's office number.

2   Do me that favor.

3                 MR. PALMERONI:  And then --

4                 MR. SCAMPATO:  Yes, Your Honor.

5                 MR. PALMERONI:  And then you --

6                 THE COURT:  All right?

7                 MR. PALMERONI:  And then you said the Guide to

8   Federal --

9                 THE COURT:  You can get that from the clerk's office

10  and you can also get it online.

11                MR. PALMERONI:   -- Federal Litigation?

12                THE COURT:  Yeah, the Pro Se Guide to Federal

13  Litigation.

14                Anything else, counsel?

15                MR. O'CONNOR:  No, Your Honor.  Thank you.

16                THE COURT:  I think the courtroom is open, but if you

17  have any trouble getting downstairs, let me know.

18                MR. O'CONNOR:  Judge, thanks for your patience.  I

19  appreciate it.

20                MR. ROSTAN:  Thank you, Your Honor.

21                MR. SCAMPATO:  Thank you, Your Honor.

22                THE COURT:  Not a problem, counsel.  Always a --

23                     (Hearing concluded at 7:49 p.m.)

24

25

197

1                    C E R T I F I C A T I O N

2          I, TERRY L. DeMARCO, certify that the foregoing is a

3    correct transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter.

5

6    _____06/08/11_____              **_S / Terry L. DeMarco_____**
              Date                      Terry L. DeMarco, AD/T 566
7                                       KLJ Transcription Service

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25