## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| N.V.E., INC.,<br><br>       Plaintiff,<br><br>          v.<br><br>JESUS J. PALMERONI, a/k/a JOSEPH PALMERONI and VINCENT ROSARBO.<br><br>       Defendants. | Civil Action No.<br>2:06-cv-05455 (MCA)(JAD)<br><br><br>**FINAL PRETRIAL ORDER** |

This matter having come before the Court for a final pretrial conference pursuant to Fed. R. Civ. P. 16; and Pashman Stein Walder Hayden, P.C. having appeared for plaintiff, N.V.E., Inc. ("NVE"), and Jesus J. Palmeroni ("Palmeroni") and Vincent Rosarbo ("Rosarbo") appearing *pro se*; the following Final Pretrial Order is hereby entered:

      1.    **JURISDICTION** (set forth specifically).

**Plaintiff's Position**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship. The elements of diversity jurisdiction are satisfied because all remaining parties are residents of different states and the amount in controversy is in excess of $8,000,000.00, well beyond the jurisdictional minimum of $75,000.00. NVE is a resident of New Jersey, Palmeroni is a resident of Pennsylvania, and Rosarbo is a resident of Connecticut. This Court also has jurisdiction over this matter under the principles of supplemental jurisdiction set forth in 28 U.S.C. § 1367.

**Palmeroni's Position**

Plaintiff filed its amended complaint asserting subject matter jurisdiction under 18 USC §1964 and supplementary jurisdiction under 28 USC §1367. The court has since dismissed all federal claims. Therefore jurisdiction under neither of these sections is warranted. The court has subject matter jurisdiction over Palmeroni's counterclaims pursuant to 28 USC §1332. Plaintiff Palmeroni is a citizen of Pennsylvania; the plaintiff and the additional defendants on the counterclaim are all citizens of New Jersey. The court has subject matter jurisdiction over Palmeroni's counterclaims pursuant to 28 USC §1332.

**Rosarbo's Position**

States the amount in controversy is in excess of $8,000,000.00. Don't know where this figure came from being that NVE claims there record are missing from that time frame. At recent settlement conferences the total figure didn't go over $4,000,000.00. Therefore before we move on we should come to mutual agreement with all the parties involved.

2.    **PENDING/CONTEMPLATED MOTIONS** (Set forth all pending or contemplated motions, whether dispositive or addressed to discovery or to the calendar. Also, set forth the nature of the motion and the return date. If the Court indicated that it would rule on any matter at pretrial, summarize that matter and each party's position).

   a.  **PENDING:**

      a.  <u>**Plaintiff's Motions**</u>

          i.  <u>**Motion in Limine Seeking to Bar Introduction of Bob Occhifinto's Criminal History**</u>

This motion seeks to preclude any party to this action from referencing Mr. Occhifinto's criminal convictions that are more than ten years old and do not involve dishonesty or false statements.  Those convictions have no probative value and are inadmissible for impeachment purposes pursuant to Fed. R. Evid. 402, 403, and 609.

**Rosarbo's response**

Imperative to include Mr O background because it shows he's a career criminal who uses everyone for his own personal gain and satisfaction. Have many facts to add to this which I will show at a later date. He's not the squeaky clean person that his lawyers are trying to suggest. The jury needs to see this for what it truly is.

         ii.  <u>**Motion in Limine Seeking to bar the introduction of Art Prindle's Criminal History**</u>

Mr. Prindle was hired by Bob Occhifinto in 2000 after meeting Mr. Occhifinto in prison. Mr. Prindle may be a witness in this case and for the same reason that it is unfair to introduce Mr. Occhifinto's criminal history it is unfair to introduce Mr. Prindle's.

**Rosarbo's response**

Mr O looks to hire people with criminal backgrounds so he can use them for his purpose and being that these people can't get a decent job anywhere else they are intimidated into owing

him which is what he likes. I tried to change the company by interviewing college graduates and I was shot down.

### iii.  Motion in Limine Seeking to Bar Introduction of Facts Related to Third-Party Claims

Plaintiff seeks to preclude Palmeroni from referencing the baseless allegations that he was fired for complaining about allegedly illegal activities he witnessed as an employee of NVE because they would have no probative value.  Pursuant to Fed. R. Evid. 404(b), introduction of information related to those allegations would be unduly prejudicial.   We will specifically request that the following topics be deemed off limits by the Court:

1.  Any suggestion that NVE or Mr. Occhifinto engaged in bankruptcy fraud, including, but not limited to, the claim that Mr. Occhifinto received payments in cash in order to deceive the creditors committee;

2. Any suggestion that any employee of NVE committed sexual harassment or engaged in inappropriate behavior of a sexual nature;

3. Mention of the relationship between NVE and an individual by the name of Jarrod Wheat for whom NVE manufactured an herbal supplement that drew attention of the FDA;

4. The suggestion that Mr. Occhifinto bragged of murdering someone;

5. The allegation that NVE defrauded customers by misrepresenting the nature and/or extent of its insurance coverage;

6. The allegation that NVE changed the expiration date on energy drinks;

7. The allegation that Mr. Occhifinto used a contractor paid by the company to perform work on his home; and

8. The alleged illegal drug use of certain NVE employees.

**Rosarbo's Response**

1.      Already answered yes to Mr. O receiving cash payments, wasn't there during his bankruptcy.

2.      When asked about sexual harassment, at one of the hearings I wasn't allowed to talk.  I already answered it was rampant at the work place. I also remember when my daughter Nicole was doing a internship at NVE, a comment was made you better keep her away from Mr. O. I responded but thats my daughter and the answer was so what it doesn't matter.  My wife Angelina informed me that there was a time we were at a tradeshow and I was late getting to the

restaurant. Mr. O asked my wife to take a walk with him and she indicated to me that he was coming on to her in a way to see if she was going to respond to him. My wife kept that in because she knows what kind of temper I have, point being Mr. O is a sexual predator and besides the pressure of selling our product as fast as you can because the ephedra window was closing fast I had to deal with sexual harassment all around me like it was everyday life.


3. Very important because Jarrod Wheat wanted to knock off Viagara with his product Stamina RX. Our dept warned him not to get involved, to no avail and all of a sudden Federal Marshalls came and halted manufacturing. This adds to his mindset of being devious all the time. Also see attached evidence I have found.  (very important document for jury to see)

4. Yes, he did brag of murdering someone, this is a show of intimidation because it makes you think he is capable of anything.

5. N/A

6. expiration dates were changes on products that came back

7. N/A

8. N/A

### iv. <u>Motion in Limine Seeking to bar other irrelevant, prejudicial facts</u>

It is anticipated that defendants will attempt to introduce other irrelevant, prejudicial facts that should be barred by the Court including:

1. Any reference to Mr. Occhifinto having a child with Patti Cosentino;

2. Any reference to Mr. Occhifinto's wealth;

3. The allegation that the company hired illegal immigrants;

4. Any reference to the fact that Palmeroni testified against NVE in a trial held in Michigan in 2016;

5. Any suggestion that ephedra products were marketed with names that sounded like street drugs or to individuals who might use the products improperly; and

6. Any suggestion that members of Rosarbo's family are disabled and/or that he has taken care of them.

**Rosarbo's Response**

1. Mr. O did have a child with Patti Cosentino but that was not his intent. Once pregnant he wanted me to talk her to having an abortion which I didn't do. She was very upset at the time and I tried to comfort her being we did trade shows together and I worked next to her at the office. Once she became pregnant the sales team was instructed to stay away from her which I also didn't do.

2. Mr. O made a lot of money off of my blood and sweat. I just wasn't a saleman, I picked orders, drove trucks and practically moved the warehouse by myself from one location to another.

3. Everyday non-english speaking people came in by bus to work in manufacturing.

4. N/A

5. Yellow Jackets and Black Beauty were street names to stimulants being sold on the street in the late 60's and early 70's.

6. I have a brother who is Autistic from birth and since our parents passed I'm his guardian . Mr. O'Connor asked me on many occasions how my brother was doing. Now I can't talk about him. Just shows you the lengths the law firm go thru to win at any cost.

### v. <u>Motion to Vacate Prior Sanctions Order</u>

A different judge of this Court ruled that a charge should be given to the jury allowing it to derive a negative inference from the fact that certain documents were not preserved by Plaintiff. For various reasons, including that it was wrongly decided, that the law has evolved since the order was entered, and that there is no evidence that Plaintiff had the slightest motive to hide anything, the order should be vacated in its entirety.

**Rosarbo's Response**

Should be noted that records were not preserved especially during the time frame in question. What do they have to hide !

### b. <u>Palmeroni's Motions</u>

None.

### c. <u>Rosarbo's Motions</u>

None.

**b.  CONTEMPLATED:**

**NVE's Contemplated Motions**

NVE plans to file a motion in limine concerning Rosarbo's new allegation that his prior deposition testimony was elicited through coercion or duress.

**Palmeroni's Contemplated Motions**

Defendant Palmeroni anticipates motions to bar testimony of all plaintiff's expert witnesses for lack of expertise and for lack of evidential foundation, Daubert v. Merrill Dow Pharmaceuticals, Inc. 509 U.S. 579 (1993). Palmeroni also will move for in limine instructions permitting impeachment of Occhifinto and others on the basis of prior convictions and barring the use of Palmeroni's convictions to impeach him.

3. **STIPULATION OF FACTS** (Set forth in narrative form a comprehensive listing of all uncontested facts, including all answers to interrogatories and admissions, to which there is agreement among the parties).

Plaintiff, NVE is a corporation organized under the laws and a resident of the State of New Jersey engaged in the manufacture, distribution and sale of nutritional supplements (called nutraceutical products) and energy drinks. Its principal place of business is located at 15 Whitehall Road, Andover, New Jersey.  Robert Occhifinto is the owner of NVE and its President.  Defendant Palmeroni, a resident of Pennsylvania, was employed for over six years in sales for NVE, rising to the positions of Vice President of Sales and National Director of Sales. Defendant Vincent Rosarbo ("Rosarbo"), a resident of Connecticut, was employed by NVE as a salesman from February 5, 2001, through August 18, 2004, when he consented to and executed a Separation Agreement.

On August 10, 2005, NVE filed for Chapter 11 Bankruptcy in the United States Bankruptcy Court, District of New Jersey.

NVE terminated Palmeroni's employment on January 3, 2006.

While they were employed by NVE, Palmeroni and Rosarbo were owners of other businesses, some individually, some together. One of those businesses was called National Retail Consulting Group ("NRCG").  Palmeroni was the 100% owner of NRCG, which was founded by Palmeroni to collect payments that he received from NVE brokers.

6

4.     **PLAINTIFF'S CONTESTED FACTS** (State separately for each plaintiff. Proofs shall be limited at trial to the matters set forth below. Failure to set forth any matter shall be deemed a waiver thereof).

A. Plaintiff intends to prove the following contested facts with regard to liability:

1. At the time that Palmeroni was hired, NVE's best-selling products contained a substance known as ephedra, a natural-occurring stimulant extracted from the ephedra plant.

2. Sales of ephedra products expanded rapidly during the period of Palmeroni's employment until the spring of 2004, when the Food and Drug Administration banned the substance as an ingredient in nutraceutical products.

3. As a result of the ban, NVE anticipated a precipitous drop in sales.

4. NVE's bankruptcy filing reflected the fact that sales were down.  But largely it was precipitated by the fact that over 100 personal injury claims related to ephedra had been filed against NVE across the country.

5. To address these concerns, NVE offered separation agreements to Rosarbo, Palmeroni and other employees.

6. The separation agreement provided employees with two options: 1) accept an approximately 50% reduction in salary; or 2) be laid off from NVE and accept 12 weeks of severance pay at full salary.

7. Rosarbo chose to take the severance package.

8. Palmeroni chose to stay with NVE at half his salary.

9. Robert Occhifinto became suspicious that Palmeroni might be engaged in dishonest behavior when, at a trade show, an individual by the name of Carlos Bengoa did not appear to know an individual by the name of Roger Sumicek.  This was suspicious to Mr. Occhifinto because Palmeroni had claimed that Sumicek was Bengoa's broker.

10. Mr. Occhifinto thereupon began investigating Palmeroni's relationship with Sumicek and other brokers.

11. At all times relevant to this dispute, NVE sold products overseas at roughly half the wholesale price of products sold in the United States.  The reasons for this were that foreign purchasers had to pay shipping, they did not have benefit of NVE's domestic marketing program and NVE wished to promote market penetration in other countries.

12. Palmeroni and Rosarbo were the joint owners of Smart World, Inc. ("Smart World US") and American Wholesale Distribution, Inc. ("AWD").

13. Smart World US was a resident of Nevada and was formed on or about June 26, 2001 in order to purchase NVE products for resale.

14. The name "Smart World US" was chosen by Palmeroni and Rosarbo because it sounded like Smart World Netherlands ("Smart World Netherlands"), a NVE distributor located in the Netherlands.

15. AWD is a resident of Nevada and was incorporated by Palmeroni and Rosarbo on July 8, 2001. AWD was formed to sell the products purchased by Smart World US.

16. Palmeroni and Rosarbo used Smart World US as a vehicle to purchase NVE products at NVE's export price and then resold the products through AWD and VAR.

17. Palmeroni and Rosarbo purchased the products by having representatives of Smart World Netherlands place the orders with NVE pretending that the products were for shipment overseas.  For that service, Palmeroni and Rosarbo paid a percentage of their profits to an entity called T & J Limited through a bank located in Gibraltar. The payments were for the benefit of Thomas Sikkink and Jeroen Garvlijn, the principals of Smartworld Netherlands.  Over the length of the scam, Palmeroni and Rosarbo paid Sikkink and Jeroen over $900,000 for their participation in the scam.

18. After the products were ordered by Smartworld Netherlands on behalf of Smartworld US, they were picked up by a company called Foremost International ("Foremost"), located in Carlstadt, New Jersey, ostensibly for shipment overseas.  Instead, the products were stored in the Foremost warehouse until they were shipped to domestic customers.

19. Palmeroni and Rosarbo sold the products to existing NVE customers at a price lower than NVE was charging those customers for the same products.

20. The following individuals and entities purchased diverted NVE product from AWD: Ronald Sumicek on behalf of International Sales Group, Carlos Bengoa on behalf of CB Distributors, Darren Householder on behalf of Brand New Energy, Steven R. Sessions on behalf of Sessions Specialty Company, John J. Portz, Jarrett Portz and Katherine Portz on behalf of International Wholesale Service, Inc., International Wholesale Supply, Inc. and Alfredo D. Felice, Charmaine C. Felice, on behalf of Curtis Beverage.

21. In his capacity as Vice President of Sales, Mr. Palmeroni's job responsibilities included identifying, managing and negotiating with distributors and brokers of NVE

products.  Generally speaking, distributors are wholesalers who purchase products at wholesale prices and sell them to retailers.  Brokers are entities that convince distributors to carry a manufacturer's product line in exchange for a commission paid by the manufacturer.

22. Through various means including assignment of distribution accounts and threats to take accounts away, Palmeroni convinced certain brokers to pay him approximately 20% of their brokerage commissions as kickbacks.

23. Palmeroni processed the payments he received as kickbacks through NRCG.

24. Ronald Sumicek, principal of Sunbelt Marketing, admitted to Mr. Occhifinto that he paid kickbacks to Mr. Palmeroni.

25. The following individuals and companies paid kickbacks to Palmeroni: Ronald Sumicek on behalf of Sunbelt Marketing, Profit Motivators, Inc., Richard and Jerry Horowitz on behalf of Profit motivators, Inc. and PMI Global Marketing Corp. and Dirk Nieuwenhuis.

B. Plaintiff intends to prove the following contested facts with regard to damages: (This must include each item of damages, the amount of each item, the factual basis for each item and, if punitive damages are claimed, the facts upon which plaintiff will rely to establish punitive damages).

26.  Palmeroni received $1,201,492.98 in kickbacks from NVE brokers.

27.  Palmeroni and Vincent Rosarbo received $2,302,426.02 in profit from the Smartworld scam.

28.  Palmeroni received $870,425 in salary as an employee of NVE

29.  Vincent Rosarbo received $310,578.67 in salary as an employee of NVE.

30. The compensatory damages award against Palmeroni should be $4,374,344, (exclusive of prejudgment interest) of which $2,302,426.02 will be joint and severally owed by Palmeroni and Rosarbo.

31. The compensatory damages award against Vincent Rosarbo should be $2,613,004.69 (exclusive of prejudgment interest) of which $2,302,426.02 will be joint and severally owed by Palmeroni and Rosarbo.

**Rosarbo's Response**

5. Was never offered a separation agreement, was told he couldn't afford me anymore and it was this or nothing.

7. Once again was never offered was told this or nothing.

9. Carlos Bengoa talked about Sumicek many times to me, he knew him so I don't understand the lie

13 Was told with a wink and nod by Mr O that the
14 ephedra window due to the FDA was closing and that he
15 had a lot of inventory and to sell by any means
16 necessary at a price that would move the product. Mr O
17 wasn't interested in the details at long as product moved.
Advantages were all his, product was paid for up front, any
product that came back due to exp dates being wrong or
mislabels we moved, got rid of all his inventory as
requested, was told by overseas people that after having
talks with Mr. O it was decided to send monies to T&J
Limited in Gibraltar and using Smart World US was OK as to
avoid confusion on there end.
18 As I stated before with a wink and a nod was told
19 to get rid of the Ephedra product, same as 13, 14, 15, 16& 17.
20 Everybody was happy, even though the window was closing on Ephedra products, Mr.
O made tens of millions of dollars which allowed him to move on to his next venture.
21
22 have no knowledge of this other then Joe P was ran
23 ragged by all of the people *I* companies mentioned
24 for selling for there own entities, another words
25 petty jealous due to greed because everybody
26 recognized the ephedra issue was closing fast. Joe P was always tired and exhausted.
He was the ends for justifying the means. He was that good of a salesmen that everybody
wanted him. Don't know where this figures are coming from
27 NVE &CB Distributors records of that time period
28 mysteriously disappeared, how do you include our salaries
29 cause like I said before I picked orders, drove trucks
0 for shipment of goods, moved the warehouse from one
31 place to another, when Mr O took the dales team overseas
for vacation I wasn't included. What a sap I turned out to
be. Also the product moved faster because of the pricing
which is what Mr O wanted get rid of inventory that
contained Ephedra. Here's the ends justifying the means
again. When it was all said and done we accomplished
what NVE wanted. Do you have any idea how much
inventory, mislabeled product, product that came back

10

for any reason that was paid for up front. Now you want
to complain about profit margins. Instead of a thank you
we are sued. He would have had half of his warehouse full
of Ephedra products when the FDA came on him. Its all
petty jealousies because we were good salesmen, did our
jobs and then some. Mr O was lucky to have us at that
point in time to blow out inventory and deal with all the BS
that went along with the job.

5.     **DEFENDANT'S CONTESTED FACTS** (State separately for each defendant.
See instructions above).

**A.  Palmeroni intends to prove the following contested facts with regard to liability.**
Any and all actions taken by Palmeroni during his employment at NVE were known to
and authorized by defendant Robert Occhifinto.

Any and all actions taken by Palmeroni during his employment at NVE were known to and
authorized by defendant Robert Occhifinto.…

NVE **through its attorneys has unilaterally eliminated all of my defenses
(Palmeroni) below simply because my counterclaims were dismissed. Whether or not they
were dismissed (and whether my attorney, who was in grave health and is now deceased
was competent to defend those counterclaims), does not change the fact that everything
below happened and was why I became a perceived liability and dismissed. therefore I
demand that my defenses below remain untouched so as not to impinge on my
constitutional due process rights.**

- NVE terminated Palmeroni's employment because he complained about:
- violations of federal bankruptcy law;
- clear violations of public policy;
- about rampant sexual harassment in the workplace constituting a hostile work
  environment.
- More specifically,

Parties

1.     Third party defendant Robert Occhifinto ("Occhifinto") was NVE's president during
the time of Palmeroni's employment by NVE and had supervisory authority over
Palmeroni.  Upon information and belief, Occhifinto is a resident of New Jersey and is
employed in the State of New Jersey.

11

2.      Third party defendant Walter Orcutt ("Orcutt") was NVE's Senior Vice President during the time of Palmeroni's employment by NVE and had supervisory authority over Palmeroni.  Upon information and belief, Orcutt is a resident of New Jersey and is employed in the State of New Jersey.

3.      Palmeroni was employed by NVE during the period commencing in or about October 1999 and continuing until January 3, 2006.  At the time of his termination, Palmeroni was NVE's Vice President of Sales working under the supervision of Occhifinto and Orcutt.

1.      On or about August 10, 2005, NVE filed a voluntary petition of bankruptcy under chapter 11 of the U.S. Bankruptcy laws.  Since that time, NVE has operated the company as debtor and as a "debtor-in-possession."

2.      During the course of his employment, Palmeroni complained to Occhifinto and/or Orcutt about and/ or refused to participate in various of NVE's activities which Palmeroni reasonably believed to be fraudulent and/or illegal. These activities included, but are not limited to, the following:

a.   Palmeroni learned that NVE's National Sales Manager, Arthur Prindle, was falsifying documents, increasing NVE's stated insurance coverage so that it could misrepresent to its customers that it had the amount of insurance those customers required of it.  When Palmeroni spoke to Occhifinto and Orcutt about this, in or about October of 2005, Occhifinto responded that the matter of insurance coverage was not Palmeroni's department and that Palmeroni should not worry about it.

b.   NVE gave Ford cargo vans to customers who agreed to buy certain amounts of NVE's products. In or about the fall of 2005, when one of NVE's customers, International Sales Group, did not meet its commitments, a sales associate, Glenn Lee, was told to auction off several vans for cash.  When Palmeroni told Occhifinto that the collection of the money for the vans would make the creditor happy, Occhifinto sarcastically replied, "What do you have to do with the vans again?"  Palmeroni then went to Orcutt and told him that the assets from the sale of the vans needed to be remitted to the creditors and that not doing so was a serious violation.  Orcutt stated that he would look into it.  Upon information and belief nothing was ever done about the company's not remitting the cash proceeds from the sale of the vans to the creditors.

c.   After the bankruptcy filing, Occhifinto requested that Palmeroni set up numerous cash deals with customers so that they did not have to be reported to the creditor committee. Palmeroni objected to Occhifinto about doing this stating that this would be bankruptcy fraud.  Palmeroni refused to set up the cash deals and further told Occhifinto that he felt very uncomfortable about such transactions.  Occhifinto called Palmeroni a "pussy."  He asked Palmeroni what he was worried about, questioned Palmeroni's loyalty to the

company and stated that the "bankruptcy guys don't know where all the money goes."
After this incident, Palmeroni was not asked to participate in cash deals anymore and,
upon information and belief, was worked around when the company was making such a
deal.

d.      After the bankruptcy petition was filed, Occhifinto had people on NVE's payroll do
        construction on his personal homes.  He charged the work done and the supplies for the
        construction to NVE.  Palmeroni complained to Orcutt about this and stated that such
        activity was going to get the company shut down.  Nothing was done about the situation;

e.      NVE insisted that Palmeroni work with people, such as one Jared Wheat, who was
        engaged in unlawful activities and was fleeing from federal law enforcement officials.

<u>Violations of the LAd</u>

        1.  Prior to his termination, Palmeroni opposed the sexual harassment of certain of NVE's
women employees and complained to Occhifinto and to Orcutt.  These activities included, but
were not limited to the following:

a.      On numerous occasions, Occhifinto bragged in the office about sexual activities he
        had with women employees and other women.  Palmeroni told Occhifinto that this
        was not right and that he had to stop.  Occhifinto told Palmeroni to "mind his own
        business."

b.      In or about the summer of 2005, Palmeroni was informed of an incident in which one
        of NVE's male employees enticed a female former intern into Occhifinto's empty
        office to have sex.  Unbeknownst to the former intern, there was a prearrangement for
        several men, including Occhifinto and Orcutt, to view the sexual encounter through a
        window into the office.  Palmeroni angrily went to Orcutt about what he had heard
        and Orcutt laughed about the incident.  A short while later, Occhifinto called
        Palmeroni into his office, admitted that the incident occurred and asked Palmeroni
        how he had heard about the incident.  Palmeroni did not answer, but told Occhifinto
        that the people involved had "a lot of balls," and that the situation was "serious" and
        "unbelievable."  Occhifinto responded that Palmeroni was "sticking his nose in where
        it didn't belong" and "was stepping on very thin ice."

c.      In or about the fall of 2005, several NVE employees came to Palmeroni to report to
        him that an accounts receivable clerk, Diane Torre, had complained to them that Mr.
        Orcutt continually made comments about her physique and sexually suggestive
        remarks to her.  Such comments included that Ms. Torre's "assets speak for
        themselves," and that Orcutt felt that he and Ms. Torre could "have a lot of fun
        together."  Palmeroni reported these complaints to Occhifinto, who said that he would
        look into them.  Shortly thereafter, Palmeroni was called into Orcutt's office.  Orcutt
        told Palmeroni that there was a misunderstanding that "[I]f that bitch didn't want

people staring at her big tits, she should cover them up more." He further said that Palmeroni was a "little rat" and that he needed to learn to keep his mouth shut if he valued his job.

d.  On numerous occasions, including during the fall of 2005, Orcutt made sexually suggestive and offensive comments in front of employees. For example, when someone was in a bad mood, Orcutt would say that they were "obviously not getting any." He threatened to put young women "over his knee." He talked loudly about prostitutes he engaged on a trip to the Dominican Republic. He drove an employee, Jennifer Duane-Hunsicker, to tears continually commenting on her weight and how large her "ass" had gotten following her pregnancy. He told Ms. Duane, "maybe if you dropped about 30 pounds people would have time for your petty bullshit again." Palmeroni complained to both Orcutt and Occhifinto about these comments on many occasions. Orcutt told Palmeroni that if he didn't like the situation he could quit. With regard to Ms. Duane-Hunsicker, Occhifinto's reply to Palmeroni was "Fuck that bitch. Get out of my office." Occhifinto also told Palmeroni that he was moving into "dangerous territory."

e.  At the company Christmas party in December, 2005, a receptionist, Tiffany Kistle, became very drunk. Male employees of the company attempted to take advantage of her. Among them, Orcutt had her sit on his lap and a sales associate, Robert Cella, grabbed her breasts. Palmeroni put a stop to the situation. The next day, Palmeroni told Occhifinto about the situation and suggested that Cella be fired. Occhifinto said that he did not want to fire Cella and then said "Keep pushing Joe [Palmeroni's nickname.] I don't think it is Cella who needs to worry about getting fired."

Palmeroni is terminated

7.  Palmeroni went on a short vacation between Christmas and New Year's Day and returned to work on January 3, 2006. When he returned, he was called into Occhifinto's office. Occhifinto told Palmeroni, in front of the company's in-house counsel, David Caldwell, that things "were not working out" and that he was fired. Palmeroni was told to leave and was not allowed to go to his office to collect his personal effects.

8.  Upon being escorted out by Mr. Caldwell, Palmeroni told him that he believed he was being fired in retaliation for his complaints. When Mr. Caldwell heard this, he placed Palmeroni into a conference room and asked him to wait there. Mr. Caldwell returned with Occhifinto shortly thereafter. Occhifinto then told Palmeroni that he was being terminated for poor performance.

Fraud and/or contractual breach as to year-end bonus

9.  During the course of Palmeroni's employment by NVE, in the late winter or early spring of 2005, his salary was dramatically reduced, from approximately $175,000 per annum to

14

approximately $75,000 per annum.  In response to Palmeroni's complaints about this salary reduction, Occhifinto told Palmeroni that if he continued to work for NVE notwithstanding the salary reduction, he would be paid a year-end bonus at least equal to the amount of the reduction of his salary.

10.  At the time Occhifinto so advised Palmeroni, Occhifinto knew that no such year-end bonus would be paid to Palmeroni.

11.  In reliance on Occhifinto's representation, Palmeroni continued to work for NVE notwithstanding the dramatic reduction in his salary.

12.  NVE accepted Palmeroni's services but did not pay him the promised year-end bonus.

13.  Occhifinto and NVE thus defrauded Palmeroni of services.

14.  NVE thus breached its agreement with Palmeroni.

Fraud and/or contractual breach as to severance benefit

15.  In late 2005, Occhifinto sought to persuade NVE's employees, including Palmeroni, to sign a draconian non-competition agreement.

16.  In an effort to persuade Palmeroni to enter into that non-competition agreement, Occhifinto advised Palmeroni that he was entitled to a generous severance arrangement as part of his employment.  On this occasion, Occhifinto reminded Palmeroni that other NVE employees had received severance packages upon their separation from NVE's employ.

17.  Palmeroni continued to work for and to provide services to NVE relying in part on Occhifinto's statement that the terms of Palmeroni's employment included a severance arrangement.

18.  Upon Palmeroni's termination, however, no severance was provided to him.

19.  Occhifinto and NVE thus defrauded Palmeroni of services.

20.  NVE thus breached its agreement with Palmeroni.

22.  NVE illegally terminated Palmeroni in retaliation for his disclosures to his supervisors, Occhifinto and Orcutt, and for his refusal to participate in activities which Palmeroni reasonably believed were in violation of the law and/or fraudulent.  Said retaliation is in violation of N.J.S.A.34:19–1 et seq.

23.  At all relevant times herein, third party defendants Occhifinto and Orcutt were both individuals acting directly or indirectly on behalf of or in the interest of NVE and with NVE's consent pursuant to N.J.S.A.34:19-2(a).

24.  Third party defendants Occhifinto and Orcutt illegally participated in the termination of Palmeroni's employment in retaliation for his disclosing to them and refusing to participate with them in their and the company's activities which Palmeroni reasonably believed to be in violation of the law and/or fraudulent.  Said retaliatory activity is in violation of N.J.S.A. 34:19-1 et seq.

25.  As a result of the actions and inactions stated above, Palmeroni suffered damages including, but not limited to, economic loss, time loss, emotional distress, and humiliation.

* * *

27.  NVE owed Palmeroni a duty not to retaliate against him because of his opposition to, reporting of and/or refusal to perform any act violative of a clear mandate of public policy.

28.  Palmeroni refused to participate in acts violative of a clear mandate of public policy.

29.  Palmeroni opposed and reported acts by NVE and/or its employees violative of a clear mandate of public policy.

30.  NVE undertook retaliatory acts against Palmeroni, including his wrongful termination, in retaliation for his opposition to, reporting of and refusal to participate in acts violating a clear mandate of public policy.

31.  Palmeroni was damaged thereby.

* * *

33.  NVE, and Occhifinto and Orcutt individually, illegally terminated or participated in the illegal termination of Palmeroni's employment in retaliation for his opposing and reporting acts of sexual harassment.  Said retaliation is in violation of N.J.S.A.10:5-12(d).

34.  As a result of the actions and inactions stated above, Palmeroni suffered damages including, but not limited to, economic loss, time loss, emotional distress, and humiliation.

* * *

36.  Defendants Occhifinto and Orcutt illegally aided and abetted each other and NVE in retaliating against Palmeroni for reporting and opposing their sexual harassment.  Said actions are in violation of N.J.S.A.10:5-12(e).

16

37. As a result of the actions and inactions stated above, Palmeroni suffered damages including, but not limited to, economic loss, time loss, emotional distress, and humiliation.

* * *

38. [Omitted by the Palmeroni Defendants]

39. NVE and Occhifinto represented to Palmeroni that NVE would provide him with a generous severance arrangement and would pay him a year-end bonus at least equal to the reduction in Palmeroni's salary.

40. At the time NVE and Occhifinto made these representations, they were already aware that such representations were untrue.

41. In reliance on these representations by NVE and Occhifinto, Palmeroni provided NVE with services.

42. Palmeroni was damaged thereby.

43. [Omitted by the Palmeroni Defendants]

* * *

44. NVE and Palmeroni entered into an agreement pursuant to which Palmeroni provided services to NVE and pursuant to which NVE was obligated in various ways to Palmeroni.

45. NVE breached its agreement with Palmeroni by failing to provide him with a severance arrangement and by failing to pay him an agreed upon bonus.

46. at sometime subsequent to Mr. palmeroni's employment, Mr. Occifinto informed him that NVE would be helping in the marketing for a new product NVE was manufacturing for company owned by Jared wheat

47. Mr. wheat was someone that had made Mr. Occifinto's acquaintance while he(Mr. week) was incarcerated for various drug offenses.

48. Mr. Occifinto informed Mr. palmeroni that Mr. wheat had synthesized a revolutionary herbal Viagra

49. defendant palmeroni told Mr. Occifinto that he (Mr. palmeroni) had serious reservations about advising our present clients who we were doing very successful business with to work with Mr. wheat and his company has defended palmeroni had been advised by several people (including senior vice president Ron Bossi) that was only a matter of time before Mr.

wheat was back in jail. Defendant palmeroni was told that Mr. wheat had a deep disdain for law enforcement and the FDA and was thought to be extremely dishonest and "a loose cannon".

50.after much discussion between Mr. Rosarbo and Mr. palmeroni and Mr. Occifinto, Mr. Occifinto advised Mr. palmeroni to handover the contact information for his top four convenience store clients to Mr. wheat and for defendant palmeroni to call each of those "heavy hitters", make an introduction to make sure that these customers new "Jarret was with us". Mr. Occifinto promised that would be the extent of defendant palmeroni's involvement on Mr. wheats project.

51. Before long Mr. wheat was having issues with one of NVE's biggest customers CB distributors, and their owner Carlos Bengoa.Mr. wheat and Mr. Bengoa had had some very nasty words pass between each other at a tradeshow because and differences on how stamina RX would be marketed. Mr. Bengoa called Mr. palmeroni and insisted that he had the product(stamina RX) assayed and that it contained prescription drugs such as Viagra. Mr. Bengoa was very irate, and said he was contacting the DEA because "Mr. wheat was a scumbag , and belonged back in jail". Mr. palmeroni brought Mr. Occifinto up to speed and transfer the call to his office which was connected to Mr. palmeroni's office. Mr. Bengoa also called Mr. Rosarbo later that day and told him there was "going to be trouble" Mr. Occifinto assured defendant palmeroni "that the product was fine, and this with all blow over"

52. some months later Mr. palmeroni was summoned to Mr. Occifinto's office, and told "things have changed" and "we are not leaving any money on the table. Defendant palmeroni was instructed over his strong objections, that he would personally oversee Mr. wheats introduction into the mass market including all of NVE's largest accounts, such as Rite aid Eckerd, etc. if Mr. palmeroni would not do it Mr. Occifinto said, he would find someone that would. Mr. palmeroni this time with Mr. Rosarbo implored Mr. Occifinto to seriously rethink the plan of marketing stamina RX as NVE's own product. Mr. Occifinto would not be convinced.

53. After many months of hard work and travel across the country Mr. palmeroni had succeeded in placing stamina RX into some of NVE's biggest customers. Orders had been placed and product was set to be shipped.

54. Defendant palmeroni was in Florida at a tradeshow, when he received a call that armed federal agents had raided NVE's headquarters and had seized all of the stamina RX as an adultered substance containing prescription drugs.

55. Defendant palmeroni spent the next several weeks, indeed the next several months, "cleaning up the mess that was made by being unable to ship product to all the stores that had cleared out their shelves and made room for it up to six months in advance. It was a nightmare for the company (NVE).

56. At approximately the same time defendant palmeroni was working on Mr. Occifinto's orders to play stamina RX in the United States market, Mr. Occifinto and Mr. wheat flew to

Amsterdam to make an export deal with a company formed by Thom Sikkink and  his partner Jeron Gravlyn. (The court should note these are this very same individuals that NVE claims were in "cahoots" with defendant palmeroni and defendant Rosarbo in this lawsuit)

57. Defendant palmeroni was told that a multimillion dollar export deal  was consummated in Amsterdam upon Mr. Occifinto's arrival back to the United States with Mr.wheat. Mr. Occifinto told Mr. palmeroni that Mr. palmeroni would not have to worry about the Amsterdam deal, "because all the money was staying there"

58. A short time later after the product was shipped Amsterdam Mr. palmeroni overheard a call with the private label shipping clerk Diane. A very large shipment of product had been stopped at customs upon arriving in the Netherlands and had been found to contain high amounts of controlled substances and prescription drugs. Upon going to pick up the shipment Mr. Gravlyn was incarcerated. Despite this Mr. Occifinto refused to stop the rollout to NVE's large customers as described above.

59. Sometime later Mr. palmeroni was summoned to Mr. Occifinto's office. Mr. Occifinto had received a lawsuit naming him and NVE. It was from several silent partners of Mr. Gravlyn and Sikkink that were involved in his Amsterdam deal and it was filed in federal court in New York City. NVE was being sued for proximally $900,000 that these partners in Amsterdam. They claimed that they had paid Mr. Occifinto a large down payment in cash while he was in Amsterdam and that they had proof by way of Mr. Occifinto's signature on a signed receipt.

60. Mr. Occifinto screamed to get those "asshole" duchies (Mr. Gravlyn, and Mr. Sikkink). Defendant palmeroni got them on the phone, at which point Mr. Occifinto screamed that he had already took care of this on that "other project" and that these guys better "make this go away".

61. Defendant palmeroni was later informed by Mr. Gravlyn upon his visit to NVE's offices that those partners were "connected with the Saudi's" and that it was good that Mr. Occifinto had figured out how to pay back the money, because Mr. Gravlyn was "on the hook" until this was all paid back (this being the debt incurred when the adulterer product was ceased in the Netherlands)

62. Mr. palmeroni was later informed that the lawsuit was dropped.around the same time, and several times after that Mr. palmeroni told Mr. Occifinto directly that he would have no more involvement whatsoever with anything to do with Mr. wheat or his company. Defendant palmeroni told Mr. Occifinto "no amount of money in the world is worth going to jail over this, I have sick daughter to look after and I can't do that from jail" Mr. Occifinto told defendant palmeroni "pipe down you're too busy with all the big money accounts anyway so shut up and focus on that, art(Prindle) and I will handle Jared (Wheat)

63. It is imperative that the jury know of all the machinations noted above. as the story that has been presented by Mr. Occifinto as far as overseas accounts in Gibraltar(he denies any knowledge" etc. and his interaction with the very same Dutch people he claims were "in on this scam with Rosarbo and palmeroni" were actually owed quite a bit of money by Mr. Occifinto and even had to go to jail for a short time because of what was described above. One could reasonably infer that there is much more going on behind the scenes that Mr. Occifinto has been willing to admit. And that his relationship with these gentlemen (Sikkink and Gravlyn) was much more complex than he(Mr. Occifinto) has admitted. it is also telling that Mr. Sikkink and Gravlyn had been the state several times during this lawsuit to visit Mr. Occifinto and yet they are not part of this case in any meaningful way.

64. Subsequent to Mr. wheat products stamina RX being seized, Mr. palmeroni became aware of Mr. Occifinto and NVE's plant manager Mr. Mike Williams making several trips to the country of Belize help set up a manufacturing facility with Mr. Jared wheat.

65. Mr. palmeroni have just arrived back from three weeks on the road for NVE when he turned on the national news.

66. On the national news the chairman of Pfizer was being interviewed concerning fake prescription drugs being manufactured outside the country.

67. The chairman of Pfizer noted that they were closing in on a large operation in the country of Belize. Defendant palmeroni was stunned and had a very bad feeling

68.defendant palmeroni immediately called Mr. Occifinto regarding this. Mr. Occifinto refused to talk to Mr. palmeroni on the phone, so Mr. palmeroni drove to his office and met Mr. Occifinto there.

69.Mr. palmeroni advised Mr. Occifinto what he'd seen on the news as far as Pfizer was concerned .; Mr. Occifinto denied any knowledge of anything. Mr. palmeroni once again advised Mr. Occifinto that he was a loyal employee, and was satisfied with the money he was making, and health insurance he had for his daughter but that he could not go to prison for anything Mr. Occifinto or the company may be involved in. Mr. Occifinto assured Mr. palmeroni neither Mr. Occifinto nor NVE, nor for that matter Jared wheat or his companies were involved in anything illegal. Furthermore Mr. palmeroni no longer dealt with Mr. wheat so Mr. palmeroni should just "shut the F – – – up."

70. Sometime later Mr. palmeroni once again saw a news story, this time talking about a joint raid with United States drug enforcement and the authorities in Belize. When he arrived back at NVE Mr. Prindle informed defendant palmeroni that Jared was "on the run". However he kept in contact with Mr. Occifinto by way of Mr. Prindle. Mr. Prindle acted like this was a big adventure. Mr. palmeroni felt physically sick.

71. Sometime after the raid mentioned above Mr. Occifinto have Mr. palmeroni clear his schedule for an unplanned trip. theTwo of them were to use Mr. Occifinto's private plane, they

were going to "stop in and visit some customers" and would be gone a few days. Mr. palmeroni thought this was extremely strange as he had never seen Mr. Occifinto take this type of trip in the past.

72. Mr. Occifinto and Mr. palmeroni did visit a couple of small customers. But soon it was announced that they would be heading to Atlanta. Atlanta was the headquarters of high-tech pharmaceuticals, Jared wheat's company.

73. Mr. Occifinto and Mr. palmeroni landed at a small airport outside Atlanta they were met by a gentleman named Calvin. Mr. palmeroni had never met Calvin, but Mr. Occifinto seemed very familiar with him.

74. Calvin who is apparently a high ranking employee at high-tech pharmaceuticals explained that the company was in chaos. Mr. wheat was still "in the wind" and things were falling apart quickly at the company.

75. Calvin also explained to Mr. Occifinto that several of the key people had been arrested at the company, at least one of the executives was charged with obtaining silencers to assassinate an FDA agent. Calvin suggested Mr. Occifinto takeover high-tech pharmaceuticals fully, lest he (Mr. Occifinto) lose millions of dollars, which Mr. Occifinto stood to lose as the main manufacturer for high-tech pharmaceuticals.

76. Calvin dropped Mr. palmeroni and Mr. Occifinto back at the airport. Once on the plane Mr. Occifinto asked Mr. palmeroni what he thought of NVE taking over the company. Mr. palmeroni responded that he wanted nothing to do with anything happening and high-tech pharmaceuticals. Mr. Occifinto assured Mr. palmeroni that he would just take over the company and then soon after get rid of all the employees and then just manufacturer and distribute from NVE's New Jersey location. Mr. palmeroni again indicated he wanted nothing to do with people running around purchasing silencers etc. Mr. Occifinto told Mr. palmeroni "there's nothing to worry about. And if you're worried about the three letter guys I've got that covered." The implication from Mr. Occifinto was that he was cooperating with the Drug Enforcement Administration or some other federal agency as he had in the past and therefore could play both ends against the middle if need be. Mr. Occifinto told Mr. palmeroni if if Mr. palmeroni was in involved, he wasn't sure Mr. palmeroni could be trusted. Mr. palmeroni laughed it off and said there was enough work at the company besides high-tech's business and Mr. palmeroni would prefer to stay in the dark and not be involved but would advised that NVE in no way get involved but instead take the loss and do no business with high-tech at all. Mr. Occifinto replied "keep dreaming"

77. Soon after this conversation above took place,Occifinto told Mr. palmeroni that the two of them were going to take an unannounced stop at Mr. Occifinto's $10 million plantation in South Carolina. This took Mr. palmeroni by surprise. Mr. Occifinto's plantation consisted of something like 10 homes on approximately 800 acres on a river that let out to the ocean. It was very isolated with no cellular service and although Mr. Occifinto frequently took certain other

21

employees to the plantation to "whore around" Mr. palmeroni had never set foot nor been invited to Mr. Occifinto's estate.Mr. palmeroni was not comfortable going to Mr. Occifinto's plantation alone especially with Mr. Occifinto in his extremely agitated state Mr. palmeroni insisted that he had to get home and was getting extremely sick after all the time on the road. after much insistence Mr. Occifinto agreed to let Mr. palmeroni catch a commercial flight home.

78. Mr. palmeroni was let go from NVE a short time after all of this occurred

79.not long after Mr. palmeroni was let go from NVE use made aware that Mr. Jared wheat had been arrested by the authorities on multiple charges including conspiracy to kill a federal agent( with a silencer) as well as manufacturing millions of doses of fake pharmaceuticals distributed worldwide including Lipitor, Viagra, and various blood pressure medications and cancer medications.

80. the information given above is important for the jury to know. Especially in light of recent statements by Mr. Rosarbo who quotes Mr. Occifinto as saying "Joe's can you get us all thrown in jail "it stands to reason that Mr. Occifinto was talking about the seriousness of the illegal activity that was spoken of in front of defendant palmeroni by Calvin. Mr. palmeroni made it clear that was not interested in would not stand for, and would not participate in any illegal activity. It stands to reason that Mr. Occifinto would start a campaign to discredit Mr. palmeroni for just such a reason.

81. Defendant palmeroni intends to introduce evidence that Mr. Occifinto continually misleads and hides evidence. He goes in the character of Mr. Occifinto that not only was evidence destroyed in this case, but that Mr. Occifinto was found to have lied to the court in Michigan concerning a laptop that Mr. Occifinto claimed to not own but was later found to have lied about. The court to recognize that Mr. Occifinto goes to great lengths to cover up evidence does not support his agenda. **He has established a pattern of lying and destroying evidence.** Mr. palmeroni will also introduce recently uncovered evidence evidence that Mr. Occifinto lied to the United States Congress. It naturally follows that Mr. Occifinto would lie anytime he finds advantages, without regard to the possible penalties.

**defendant palmeroni should also be allowed to introduce as part of his defense the theory that this lawsuit was brought to harass defendant palmeroni as well as defame him and prevent him from ever working in this industry again, especially for a competitor of NVE. The actions taken by NVE and Occifinto are very similar to those used in a so-called SLLAP suit and constitute a pattern of harassment . In furtherance of that, defendant palmeroni should be able to introduce the following.**

82. Mr. palmeroni's wife and other relatives were sued in this very lawsuit with all charges against them being dismissed. This has great relevance to the case because the court found no reason that they should be included in this lawsuit and great time and expense as well as immense amounts of stress all done to Mr. palmeroni's family to cause emotional harm and stress to Mr. palmeroni and his family. The court can clearly see that this was done in an

amended complaint that was brought after Mr. palmeroni was deposed in a case against NVE in federal court in Michigan. The jury should be the final arbiter as to why Mr. Occifinto and NVE would bring a federal lawsuit against innocent people.

83. Mr. palmeroni should be allowed to introduce evidence that after his testimony in the case mentioned above in federal court in Michigan, and the NVE and Mr. Occifinto brought an amended complaint that included every customer that Mr. palmeroni was working with after he left NVE. Mr. Occifinto obtained this information by going through Mr. palmeroni's supposedly private tax returns which the court granted access to.

84. Defendant palmeroni should be allowed to introduce evidence that NVE, Mr. Occifinto, and their attorneys at Pashman Stein, first brought an amended complaint that stated that defendant palmeroni, and defendant Rosarbo, stole and counterfeited NVE product and then resold it. Mr. palmeroni's attorneys at the time presented NVE's attorneys proof of bank wires form Mr. palmeroni and Mr. Rosarbo's companies totaling several million dollars to NVE for the supposedly stolen and counterfeited product and demanded that the amended complaint be withdrawn. At that time NVE withdrew that complaint and changed the amended complaint to the one we see now which changes the "theory" of how NVE was taken advantage of. Any jury could see the harassment implicit in these actions taken by NVE. They were simply throwing anything against the wall that would stick in order to prolong the lawsuit and therefore the financial and mental stress against palmeroni and his family.

85. Mr. palmeroni should be allowed to present evidence that shows that attorney Samero while representing NVE, continuously harassed Mr. palmeroni's fiancé at her place of work by serving her with several subpoenas, even though they had been advised that Mr. palmeroni's fiancé had an attorney representing her and the attorney had contact Mr. Samara directly on these matters. Mr. palmeroni's fiancé was a bank manager at this time and this aggressive conduct by NVE's attorneys was only to harass Mr. palmeroni and his fiancée while embarrassing Mr. palmeroni's fiancé to her subordinates.

86. Following in that pattern of harassment, Mr. Samara insisted on deposing Mr. palmeroni's fiancé within days of her pregnancy due date. Even worse, when Mr. palmeroni's fiancé could not show up for a deposition *because she was giving birt*h, Mr. Samara threatened sanctions on Mr. palmeroni's fiancé and her attorney and demanded to be given proof of the birth of Mr. palmeroni's and his fiancée's son. NVE's attorneys can cry and howl all they want this is not relevant, but any jury could see that there was no reason for these actions except harassment of Mr. palmeroni and his wife,as well as his unborn child. Federal law does not allow a lawsuit to be brought simply to harass or intimidate. Plaintiff can show no other reason why these actions were taken in this manner

87. In Mr. sumicek's sworn deposition, he testifies that Mr. Occifinto told him directly that even though he(Mr. Occifinto) may not win this lawsuit he would be destroyed financially either way. That testimony which has no reason to be thought untrue, shows that from the very

beginning that was Mr. Occifinto's intention. The jury is entitled to make their own decisions regarding that.

88. Palmeroni should be allowed to introduce evidence that he has tried to settle this case to Mr. Occifintos satisfaction a mere two days after Mr. palmeroni was terminated but that Mr. Occifinto would not even make a demand until approximately 10 years into the case. In a civil case where a monetary recompense is the only compensation available to a plaintiff, a reasonable person could extrapolate the fact that this case was about harassment and preventing Mr. palmeroni from making a living, as well as bankrupting him and his family. It is up to the jury to decide if this is Mr. Occifinto's true intention in bringing these scurrilous charges and they should be allowed to see and hear the evidence of this harassment in its entirety.

89. Mr. Palmeroni should be allowed to introduce evidence that Mr. Occifinto has spent millions of dollars on this case , even though his expected return is minimal. NVE's attorneys will cry that what Mr. Occifinto's legal bills were is protected by attorney-client privilege, but defendant palmeroni doesn't need any "privileged information". A reasonable person can extrapolate a reasonable figure by looking at the prevailing hourly wage for a litigation lawyer in New Jersey and the estimated time that has been put into this case by Mr. Occifinto's legal team. Mr. Occifinto has had to attorneys at all times involved in absolutely every aspect of this case and every appearance in this case including Mr. palmeroni's bankruptcy hearings as well as by information and evidence Mr. Rosarbo bankruptcy hearings. The court should reasonably wonder, with all the funds expended by NVE on this case, what reason would NVE have to spend millions of dollars with little or no return. This is not prejudicial, this is a cornerstone of the case. And it's something that the evensome of the judges have wondered aloud in this case.

**Plaintiff's Response to Palmeroni's Contested Facts**

The allegations set forth above all relate to Palmeroni's prior counterclaim against NVE. The Court dismissed Palmeroni's counterclaim on summary judgment. Palmeroni filed a motion for reconsideration of that decision which the Court denied. The allegations above are not relevant to any of the remaining claims in this matter. In addition to being irrelevant, the allegations set forth above are unduly prejudicial and would be highly likely to confuse the jury as to the issues to be decided in this matter. NVE has filed an in limine motion to exclude Defendants from referencing such allegations at trial which is currently pending before the Court. For all of these reasons, the Court should not include the allegations set forth above in the Final Pretrial Order.

**Rosarbo's Response to Palmeroni's Contested Facts**

PARTIES

    1. N/A
    2. N/A

3. N/A

1. N/A
2. N/A

a. As I stated before Mr. Prindle has his own agenda which Mr. O knew about, wasn't there at the time of the insurance misrepresenting.
b. N/A wasn't working there
c. N/A "                         "
d. N/A "                         "
e. I remember Jared Wheat, see attached paperwork as proof of Jared Wheat's character.


## VIOLATIONS OF THE LAD

1. Palmeroni opposed sexual harassment .

a. I wasn't there during this time but
b. I told you my experiences about this
c. subject matter
d. also just remembered at a tradeshow with my wife in the beginning of my job Bob Cella and Jeff were looking at playboy books right in front of my wife making general comments which made my wife very edgy. Told Joe P about it and he was livid. He told Mr. O about it and nothing happened but I didn't bring my wife on any more tradeshows that I attended with Bob C and Jeff.


## PALMERONI IS TERMINATED

7.-45. I wasn't working there at this time but from how I've seen Mr. O have no loyalty what so ever to anyone but himself I could believe what Mr P is saying.  He has no ethics scruples or morality. Mr. O is capable of doing anything to anyone.
46-50  I didn't know much about Mr. Wheat at this time except that he was a fast talker and was on;y concerned about his products.  I didn't trust him at all and felt he was going to put the company in a bad position somewhere along the line.
51-53  Mr. Bengoa and Mr Wheat were at each others throats

from the beginning and now that I've had time to remember and review testimony and documents I've come to this conclusion. Yes Mr Wheat was bad for our company and business and yes Mr Bengoa had arguments with Mr Wheat from the beginning but Mr Bengoa's attitude toward Mr Wheat is based on Mr Bengoa's own deceit and treachery. Mr. Wheat was another person that Mr O likes and that was going interfere with Mr Bengoa's agenda, plans to get close to Mr. O for his own personal advancement thru the industry.  Lets face it Mr. Bengoa's business grew dramatically from the time he met Mr P till the time he felt comfortable with his relationship with Mr O and didn't need Mr. P once again lots of treachery and deceit amongst the players.

54-55  I was there when Federal Agents raided NVE's head-quarters and took Mr. O child to my wife to my apartment for the day because I felt it was unsafe for a toddler to be there while a search was going on and didn't know the outcome of her father for that day.

56-81  I wasn't there during this time but have uncovered evidence to prove these allegations. see attached.  This all falls under the character and pattern of Mr O's criminal mind. He will push everything to the limit and I pity the person who doesn't agree with him. Whether it's Mr Wheat Mr Bengoa, Mr. Sikkink or Mr. Gravlyn ( the latter who i was involved in) the bottom line is Joe and I were the pawns to use at our expense.  Everyone of these people made money including us but we are the scapegoats now.  None of these other people are being sued because they are directly or indirectly still doing business with Mr. O.  We are not needed anymore so out you go. I also didn't agree with the womanizing life that always came into play.  I repeat this all falls under Mr O's patterns of criminality and character of how he disrespected his women.

        B. Palmeroni intends to prove the following contested facts with regard to damages. (This statement must include the factual basis for each defense against plaintiff's claims for damages).

        Palmeroni disputes that NVE was harmed at all by any of his actions, and if harmed, Plaintiff's damages are purely speculative and cannot be proven. The basis for this opinion is set forth in his expert opinion previously served upon counsel and filed with the court

A. Rosarbo intends to prove the following contested facts with regard to liability

A. Have already explained the selling of Ephedra thru SmartWorld USA and other companies

B. Rosarbo intends to prove the following contested facts with regard to damages. (This statement must include the factual basis for each defense against plaintiff's claims for damages).

B. I will also include factual evidence of continued criminal conduct. pattern and character. This is highly admissible because it shows a series of situations from beginning to now. Jury needs to hear this so they can have a complete understanding of how Mr.O criminal mind works.  As a USN Veteran of 10 years with good conduct medals and an honorable discharge my character is being questioned immensely

B. NVE was not harmed but came out smelling like a rose due to most if not all of there Ephedra based product was sold and didn't to my knowledge have any come back. If given the opportunity the Energy drink Y J Stinger would have been his next product to explode. Product had three different flavors that compared to Red Bull tasted *very* good. Packaging was very colorful. Product was I'm told given to Walter Orcutt who is the VP of NVE and it went no-where. Wouldn't doubt if he has those records that mysteriously disappeared at the most opportune time.

6.     **PLAINTIFF'S WITNESSES** (Aside from those called for impeachment purposes, only those witnesses whose names and addresses are listed below will be permitted to testify at trial).

A.  On liability, plaintiff intends to call the following witnesses who will testify in accordance with the following summaries:

1.  Robert Occhifinto – Mr. Occhifinto will describe the history of NVE, the introduction of the ephedra products, the success of ephedra products, the FDA's ban on ephedra products and its impact on the company, the hiring of Palmeroni and his responsibilities, the hiring of Vincent Rosarbo and his responsibilities, the NVE bankruptcy, the discovery of Mr. Palmeroni's duplicity and distributors, the termination of Rosarbo and Palmeroni.

2.  Vincent Rosarbo – Rosarbo will describe his job responsibilities as an employee of NVE, his relationship with Mr. Palmeroni, the formation of Smart World US and the reasons therefor, the formation of VAR and the reasons therefore, the

formation of AWD and the reasons therefor, the manner in which the distribution scam operated, the fact that Mr. Occhifinto did not know about the scam, the identity of the distributors that bought product from AWD, the authenticity of various records that bear on the scam and NVE's damages.

3. Jesus Palmeroni – Palmeroni will testify to his request for, and receipt of, payments from NVE product brokers.

4. Ronald Sumicek – Mr. Sumicek will describe the nature of his business, his relationship with Palmeroni and his payment of part of his commissions to Mr. Palmeroni.

5. Carlos Bengoa – Mr. Bengoa will testify that on behalf of CB Distributors, he purchased over $6,000,000 worth of product diverted by Palmeroni and Rosarbo, that Mr. Occhifinto knew nothing of these purchases, that CB Distributors was an NVE account before it allegedly became a brokerage customer of Sunbelt Marketing, that between 2000 and 2004, ephedra sales were booming and that there was very little selling effort required on the part of Palmeroni or anyone else.

6. Richard Horowitz – Mr. Horowitz will testify that the industry standard is that a 5% commission is paid by manufacturers to product brokers, that the market for ephedra products like NVE's tripled between 2000 and 2004 and that he paid kickbacks to Palmeroni under threat that he would lose the opportunity to be a broker of NVE products if he did not make the payments.

7. Glen Lee –  Mr. Lee will testify to standard sales practices at NVE, his experiences with Ronald Sumicek and Palmeroni that led him to believe that something suspicious might be going on, and how Palmeroni's accounts were handled after his dismissal.

8. Art Prindle – Mr. Prindle will testify to the environment in the sales department when Palmeroni was in charge and his handling of accounts since Palmeroni left.

9. Dirk Nieuwenhuis – Mr. Nieuwenhuis will describe the market for ephedra products between 2000 and 2004, will offer the opinion that Palmeroni and Rosarbo were cannibalizing NVE's sales rather than increasing the market for NVE products and that he was forced to pay kickbacks by Palmeroni if he wished to do business with NVE.

10. Erling Jensen – Mr. Jensen will testify to Mr. Occhifinto's management style, the standard brokerage commission in the industry and the loss and destruction of documents that led to the imposition of sanctions in 2011 and the discovery of Palmeroni and Rosarbo's duplicity as regards the distribution scam.

28

11. Phillip Yang – Mr. Yang will explain the reasons that records could not be retrieved from the MACS system.

B. On damages, plaintiff intends to call the following witnesses who will testify in accordance with the following summaries:

1. Darryl S. Neier, M.S. CFE (also an expert)

C. Defendants object to the following witnesses for the reasons stated:

**Palmeroni's Objections**

Carlos Bengoa testified that records requested by Palmeroni had been destroyed. Those documents were relevant and needed for Palmeroni's defense. He should not be allowed to testify.

defendants response – – plaintiff knows full well that Mr. Bengoa had documents subpoenaed in this case by Mr. palmeroni's former lawyer Mr. Grossman and indicated to Mr. Grossman that he did not have the documents.

Richard Horowitz should not be allowed to testify as an expert as he submitted no report and was not identified as an expert.

Glen Lee should not be allowed to testify about events subsequent to Palmeroni's termination or about Palmeroni's conviction. furthermore Mr. palmeroni uncovered evidence and testimony was given in this case that Mr. Lee sexually harassed an employee of NVE. Mr. Lee therefore would have grounds to be angry with Mr. palmeroni and to lie about Mr. palmeroni's conduct

Prindle should not be allowed to testify to the matters specified a) on relevancy grounds and b) because NVE destroyed all sales department records during Palmeroni's tenure

The Court should deny Nieuwenhuis' expert testimony for lack of expertise.

The Court should deny Jensen's testimony because Occhifinto's management style, particularly after Palmeroni's employment terminated, is not relevant; the spoliation sanction has been resolved and is the law of the case. Jensen has no expertise and was not listed as an expert. Jensen's employment at NVE began after  was fired.

Mr. Yang may have knowledge of the loss of records but that issue has long been decided and NVE was criticized by this Court for its failure to produce him to testify.

**Rosarbo's Objections**

29

1. Mr O says the termination of V Rosarbo which is true, yet under Plaintiff's contested facts Mr O says I choose to take the severance package. Alie -like I said before I wasn't given a choice, was told couldn't afford you take it or leave it so of course with that only choice I took it. Mr O will cover it up and I'm sure I will find other lies in there paperwork.

2. Vincent Rosarbo- none of these reasons were ever pointed out to me as far as testifying for plaintiff, why would I testify to it being a distribution scam and hang myself in the process. I already explained how upon reading my depo that I wanted to correct certain facts and that's being ·ignored. I stand by my letter that I put on record about being naive, intimidated, co-ersed and threatened about harm to to my family-wife and daughter.

5. Besides Mr O , Mr Bengoa is the one who profited the most on this deal. How does Mr Bengoa know what Mr O and I talked about. All I know is that Mr O himself asked me to talk to Mr Bengoa about getting him some money and my answer to Mr O was you didn't make enough and he gave me a dirty look. Like I said this is all about petty jealousies and greed. So next thing Mr. Bengoa is his star witness. I imagine that Mr Bengoa and Mr O became wealthy merchants off of our hard work and the people who are broke and in bankruptcy are getting sued. At a conference that Mr O initiated I was told by Earling Jensen after I told them what are you seeing me for why don't you sue Mr. Bengoa he has money at least, there answer was then he won't buy product from us anymore, So because of whatever deal/ entities they have going together Mr Bengoa is protected and so lets harass the people who have no money, no lawyers to defend them and also there families. Also there putting in motions for us not to be able to speak about it to the jury. I'm not a lawyer and I don't profess to be but this is crazy, vindictive and harmful to me and my family. For this career criminal who is driven by his enormous ego backed up by his money and political connected law firm to go this far is beyond me. It proves that he's very unstable and as long as he pays for his bills his politically connected law firm will do what he asks no matter how much time (courts and people) money he wastes. Also if there was no effort on the part of J Palmeroni or anyone else then explain to me the millions of dollars that was being spent on WWE and Nascar markets. The WWE and Nascar markets were the same people families with little children ranging from 8-16. I don't believe that was our market share. Also who got us into GNC, Rite-Aid, CVS and Duane Read, Mr P thats who and doesn't happen overbite, you have multiple meetings because its all about acquiring shelf space which works two-fold meaning our product in competition out. I maintained it by going to all the trade shows and working them to show that we backed our product with all customers. 6. Richard Horowitz broker who continually stuck by Mr P until he, this lawsuit made lots of money off of Mr P hard work. I don't remember any threat by Mr P because of commissions and I worked a lot of trade shows with Mr Horowitz. Its like everything else once Mr O gets involved certain people turn on you and there left alone. Glen Lee to my knowledge was the person who had Tammy Thorn Meza fired. I attended her depo and her testimony was that she was being sexually harassed by Mr Lee and she went to Mr O with it and she told to cool off and go home. Mr Lee wasn't even issued a warning. Sometime later she was let go. Mr Lee was also hired after my firing so that throws the reason that Mr O couldn't afford me out the window. I believe the reason I got fired was Mr O used to pay for dozens of trips for his sale team to procure prostitutes which I didn't partake in, nor did I want to be part of the shop gossip after all the men returned from the trip. One such trip stuck out in which Mr O asked me to attend in which Anthony Davis, his attorney and important

customer of NVE were going to the Dominican Republic to procure prostitutes and pay a $10,000.00 bride to the corporation buyer. I said I had no interest in any of that stuff and I also didn't want to engage in any shady activity. Mr O laughed it off and said don't be such a wimp. Its out of the country and the lawyer is handling that stuff anyway. After the incident and other outings that I also turned down I felt a coolness from him that I wasn't one of the boys. At that point I felt an isolation between Mr O and I started to grow. Art Prindle- was hired after me and immediately had his own agenda. He was put away for drug dealing and I believe that's how he met Mr O. At trade shows he had his cards printed up saying he was VP of sales and marketing meaning he was over Mr P and myself. I told Mr O about them and he told me tell Art Prinkle to replace the cards to a new hire position sales associate and also asked me to keep an eye on him. I met Mr O in Lewisburg Pen around 1995. We became friends and I noticed he was on the phone a lot. When asked his answer was his partner was ripping him off. I let it got hat. We reconnected in 2001 when I went there to look for ajob. I was hired as sales associate who I attached myself to Joe Palmeroni because he was the only one to help me since I was never in sales before. He taught me everything I know from pricing structure, talking to customers, the importance of trade shows, handling customers, problems and anything else that came with sale. also did factory work, drove a truck and moved our office from one location to another. When I started doing trade shows Mr O said wait until you see who I hooked you up with and my response was what did you mean by that. I'm married and I'm very faithful to my wife and marriage. I was introduced to Patty Cosentino and my wife and I became friends. After a few trade shows Mr O started showing up and I could see Patty and Mr O started to have a relationship. I also noticed that relationships were free and easy there which I wanted no part of. After a certain amount of time Patty became pregnant. Simultaneously Mr P got our product into GNC, Rite-Aid, CVS, Duane-Reade and dozens of convenience stores chains with that and maintaining our trade shows we became a presence with our product and tens of millions of dollars were made. The atmosphere should have been good but it wasn't it was tense because Patty C was pregnant and wanted the baby. I was told to talk her into having an abortion which I didn't do but I tried to comfort her as best as possible. The sales team was told by Mr O not to bother with her and one day she was gone. I was told she left the company. I was also told by Ron Bossi that he took the fall for a drug deal gone wrong and money laundering. It was natural to get close to Joe P cause he helped me out with my job. Mr O told me I had a blind loyalty to him but what I started noticing is that Mr O likes to live on the edge, has no loyalty to anyone but himself, sexually intimidates and harasses women and wants company doing it. He hires people with records so he can use them to his advantage and if you don't participate you eventually get let go. I was asked once to go on his trip to the D R with the sales team and I refused. I didn't want to be part of procuring prostitutes. He didn't ask me anymore but our relationship cooled. He also bragged about murdering someone which I believe was to intimidate you into believing he would do anything to anybody Mr P and myself tried to hold things together but I was always told Bob is Bob. He wanted to manufacture Stamina RX for Jarred Wheat with the ingredient Tidalafil which stimulates you and was the major ingredient in Viagra which Phizer makes. We tried to talk him out of it to no avail. sure enough we got raided by Federal Marshals and that product was shut down. I also learned that he became a federal witness when he was selling his product and they were turning it into Chrystal Meth. I state other facts in going over my pretrial

orders so I don't want to repeat myself. Mr O insist on us going to trial out of pure vindictiveness and we both don't have lawyers. We will do the best we could to defend ourselves.

5. Carlos Bengoa- was also master individual who started all this shenanigans in the first place getting close to Mr. P and myself, using us to corner the ephedra market and to eliminate competition, constantly complaining about competitors getting better pricing and selling products cheap getting close to Mr. O so he could get the best pricing than anybody once all this was established he turned against Mr P and myself.  Because of this his testimony would be prejudicial in nature.

9. Dirk Niewenhuis- His expert opinion states we were cannibalizing NVE's sales rather than increasing the market. Well when your told that the window for selling ephedra based products is closing due to the FDA's pressure on banning the product and to sell as much as you can with a bottom line price how can that be cannibalizing. It the product was Bayer Aspirin which will go on forever then I would agree on theory of cannibalizing. Just another reason to disqualify because of being  prejudicial.  Just like Mr Horowitz and Mr Bengoa if you testify against Mr. P and Mr. R I won't sue you.  Common sense alone will tell you how can you cannibalize a product whose shelf life is very limited and was well known to everybody in the industry as being limited.  We were all waiting for the ball to drop but keep selling as much as you could until you legally can't sell any more. I'm surprised at Mr Horowitz's take on the ephedra situation being that he's claiming to be an expert witness, for this reason I object Mr Niewenhuis as a star witness.

10. Earling Jensen- How can Mr Jensen testify to Mr Occhifinto's management style when during this time frame he wasn't working for the company.  When I was there everything was fast and loose due to the limited time frame you had to capitalize on the ephedra products. Mr O hardly in the office during this time frame.  Don't know how Mr Jensen can have a explantation to a point in time he was absent too.  For this reason I object to him being a witness.

7.     **DEFENDANT'S WITNESSES** (See instructions above).

A. On liability, Defendants intend to call the following witnesses who will testify in accordance with the following summaries:

**Palmeroni's Witnesses**

Vincent J. Rosarbo, 23 Thistle Meadow Lane, Branford, Connecticut 06405 - Rosarbo will testify to his activities in support of the alleged and denied conspiracies.  He will also testify to the effect that sales of Smart World US had on NVE

Jesus J. Palmeroni, 3308 Route 940, Mount Pocono, Pennsylvania 18344 - Palmeroni will testify to his activities in support of the alleged and denied conspiracies.  He will also testify to the effect that sales to the brokers who paid money to NRCG and sales of Smart World US had on NVE

Patricia Cosentino, 27 Lauren Lane, Sussex, New Jersey 07461 - Ms. Cosentino will testify the pricing structure of NVE goods varied from customer to customer, based on quantity and method timing of payment, and at the discretion of Robert Occhifinto

Tammy Thom Meza, 100 Holland Road, Wantage Township, New Jersey 07461- Ms. Meza will testify the pricing structure of NVE goods varied from customer to customer, based on quantity and method timing of payment, and at the discretion of Robert Occhifinto

Ronald Sumicek, c/o International Sales Group, Houston, Texas - will testify to his and his company's relationships with NVE, Inc., National Retail Consulting Group, Joe Palmeroni, as well as the pricing structure for NVE goods.

Ravi Bhatia, deceased. Defendant intends to use his deposition testimony on the issue of liability regarding the manner in which customers were assigned to brokers.

Jennifer Duane Hunsicker – document retention, pricing policies

Ron Bossi – – Mr. Bossi was vice president palmeroni was hired and had knowledge of many relevant things in this case

Kris Zabriskie – document retention, pricing policies

Donald Yoder – document retention, pricing policies

**Rosarbo's Witnesses**

Vincent Rosarbo - Same

Jesus Palmeroni - Same

Patricia Cosentino - Same and also being that we did trade shows together and worked side by side in the office she got to know my character personally

Tammy Thom Meza- Same and also work environment from when she worked under me and if it changed when I was terminated.  This all has to do with my character as a person which I believe will show the jury who I truly am.

Ron Bozzi - Same

Jennifer Duane- Hunsicker - same as Tammy

B.    On damages, Defendants intend to call the following witnesses who will testify in accordance with the following summaries:

### Palmeroni's Witnesses

Vincent J. Rosarbo, 23 Thistle Meadow Lane, Branford, Connecticut 06405, will testify NVE was not harmed, and probably profited his actions. The basis for this opinion is set forth in his deposition testimony and Palmeroni's expert opinion previously served upon counsel and filed with the court

Jesus J. Palmeroni, 3308 Route 940, Mount Pocono, Pennsylvania 18344 - will testify NVE was not harmed, and probably profited his actions.  The basis for this opinion is set forth in his deposition testimony and his expert opinion previously served upon counsel and filed with the court

Ronald Sumicek, c/o International Sales Group, Houston, Texas - will testify to his and his company's relationships with NVE, Inc., National Retail Consulting Group, Joe Palmeroni, as well as the pricing structure for NVE goods.

B.  Plaintiff objects to the following witnesses for the reasons stated:

Plaintiff objects to Palmeroni calling Patricia Cosentino and Tammy Thom Meza as witnesses for the reasons set forth in its Motions in Limine.  Their proposed testimony that "the pricing structure of NVE goods varied from customer to customer" is not relevant to any of the claims or defenses in this matter.   And, even if it were relevant, their testimony would be cumulative and unnecessary because Palmeroni and Rosarbo can testify to the same alleged facts.  The only reason to call those witnesses is to trot before the jury women who Mr. Palmeroni hopes will offer testimony that will have been stricken before the witnesses are called to testify.

Plaintiff objects to the testimony of Jennifer Duane Hunsicker, Kris Zabriskie and Donald Yoder because Palmeroni's description of their proposed testimony "document retention, pricing policies" is vague and ambiguous and does not appear to be relevant to any of the claims or defenses remaining in this matter.  Plaintiff also objects to the testimony of Donald Yoder because he was never identified as an individual with knowledge relating to this matter during discovery.

### Rosarbo's Witnesses

8.      **EXPERT WITNESSES** (No opposing counsel shall be permitted to question the expert's qualifications unless the basis of an objection is set forth herein).

A.  Plaintiff's expert witnesses are:

      a.   Darryl S. Neier, M.S. CFE
      b.   Carlos Bengoa
      c.   Dirk Nieuwenhuis

**B.  Palmeroni's objections to the qualifications of Plaintiff's experts are:**

As to Carlos Bengoa and Dirk Nieuwenhuis, lack of expertise at the time in issue and lack of industry expertise;

As to Sobel & Co., lack of qualifications and lack of evidentiary foundation to support its report;

C.      Palmeroni's expert witnesses are:

Jesus J. Palmeroni, 3308 Route 940, Mount Pocono, Pennsylvania 18344

D.      Plaintiff's objections to the qualifications of defendant's experts are:

Palmeroni lacks sufficient knowledge, skill, experience, training, or education to qualify as an expert.  His proposed expert testimony will not help the trier of fact to understand the evidence or determine a fact in issue. His proposed expert testimony is not based on sufficient facts or data. In addition, his proposed expert testimony is not the product of reliable principles or methods.

9.      **PLAINTIFF'S EXHIBITS** (Except for exhibits the need for which could not reasonably have been foreseen or which are used solely for impeachment purposes, only the exhibits set forth on the exhibit list attached hereto may be introduced at trial. Any objection to an exhibit, and the reason for said objection, must be set forth below or it shall be deemed waived. All parties hereby agree that it will not be necessary to bring in the custodian of any exhibit as to which no such objection is made).

A.  Plaintiff intends to introduce into evidence the exhibits listed on the attached exhibit list (list by number with a description of each):

1.      Smart World US Tax Records, Sarinelli–Smart World 0001-0018.

2.      Corporate filings for Smart World, Inc., Sarinelli–Smart World 0019-0035.

35

3.      1999 and 2000 orders, correspondence and payment confirmations between NVE and its distributor in The Netherlands, Smart World. NVE-004152-B-4174-B.

4.      Lakeland Bank records reflecting payments made by Brand New Energy to NRCG, Lakeland Bank-035, 54 and 57.

5.      Checks reflecting payments made by VAR to Palmeroni or NRCG, or NRCG to VAR, or AWD to NRCG, Lakeland Bank, 062, 86, 87, 100, 108, 118, 147, 150, 156, 170, 174, 175, 186, 194, 198, 205, 221, 225, 231, 242, 245 and 260.

6.      Checking account statements for AWD, BoA-AWD-009, 14, 19, 24, 29, 34, 40, 45, 51, 52, 57, 63, 68, 73, 78, 83, 88, 93, 98, 103, 108, 113, 118, 123, 128, 131, 137, 142, 148, 153, 158 and 163.

7.      VAR checking account statements, BoA-VAR-0080, 86, 98, 109.

8.      Letter sent to Palmeroni on March 24, 2006, NVE-2935.

9.      Rosarbo Separation Agreement dated August 10, 2004, NVE-4299-B – 4302-B.

10.     Palmeroni Separation Agreement dated August 10, 2004, NVE-2929 – 2932.

11.     NVE's 2002 Employee Handbook, NVE 2864-2897.

12.     Handbook acknowledgement signed by Palmeroni, NVE-002858-A.

13.     Checks from International Wholesale Service, Inc. to AWD, BoA-AWD-0172, 175, 181, 182, 211, 215, 221, 223, 224, 228, 238, 242, 252, 254, 258, 264 and 272.

14.     Checks from Curtis Beverage, Alfredo Felice and Charmaine Felice to AWD, BoA-AWD-0186, 192, 195, 232-246.

15.     Checks from Curtis Beverage to VAR, BoA-VAR-0123.

16.     Check from Portzs to AWD in amount of $50,000, BoA-AWD-0238.

17.     Documents produced by Carlos Bengoa, bearing Bates Nos. NVE-CB-0001 to NVE-CB-0031.

18.     Fleet Bank and Bank of America bank account records for Smart World Inc. from 12/21/2002 through 5/31/2006, Sarinelli-Smart World 0177, 272, 273, 274, 275, 277, 279, 286, 287, 284, 295, 296, 297, 298, 299, 300, 302, 303, 305.

19.     Bank of America checking statements for Smart World, BoA-Smartworld 000180, 185, 190, 195, 200, 205, 210, 214, 217, 222, 227, 232, 237, 242, 247, 252, 257, 262 and 267.

20.     Handwritten Smart World US payment ledgers received from Sarinelli and Associates,  Sarinelli-Smartworld – 0036, 37, 38, 39, 40, 119, 256, 257, 258, 259, 260, 261, 381, 382, 383, 384,

21.     Checks from Dirk Nieuwenhuis to NRCG, Lakeland Bank, 109, 151, 163, 189, 213, 241, 244, 255, 278, 289, 296, 302, 359 and 360.

22.     Checks from Brand New Energy to NRCG, Lakeland Bank -035, 54 and 57.

23.     Internal NVE documents reflecting Smart World purchases of NVE products, NVE-004055-B – 004127-B.

24.     Corporate Charter of NRCG, Carinelli-NRGC-0016.

25.     General Ledger for America Wholesale Distributors

26.     General Ledger for Smart World, Inc.

27.     Palmeroni's state and federal tax returns: 2000 to 2012.

28.     Smart World, Inc.'s tax returns 2001 through 2007.

29.     American Warehouse Distributors, Inc. tax returns 2001 through 2007

30.     VAR's tax returns, 2002 through 2009.

31.     AWD Corporate Charter, Sarinelli-AWD 11.

32.     AWD Articles of Incorporation, Sarinelli-AWD 15.

33.     Income/withholdings summaries for Palmeroni, 2000 through 2005, NVE 002843-A – 2848.

34.     Palmeroni's resume, NVE 002862-A.

35.     Transcript of phone conversation between Palmeroni and Rosarbo dated November 10, 2010.

36.     NVE's International Price Lists

37. Domestic distributor purchases for Stacker

38. Domestic distributor purchases for ephedra free products

39. Daryl Neier's *curriculum vitae*

40. Wires to T&J Limited

41. Transcripts from deposition of Palmeroni

42. Transcripts from deposition of Rosarbo

43. Records of payments from PMI to Global NVE-PMI 000001-000080

44. Smart World Netherlands orders for NVE products, NVE-004055-B – NVE 004127-B

45. Summary of Payments from Sunbelt Marketing to NRGC

46. Summary of Payments from PMI to NRGC

47. Summary of Payments from Profit Motivators to NRGC

48. Summary of Payments from Nieuwenhuis to NRGC

49. Summary of Payments from Brand New Energy to NRGC

50. Summary of Payments from PMI to Global

51. Summary of Payments from CB Distributors to NRGC

52. Summary of Payments from CB Distributors to AWD

53. Summary of Payments from Brand New Energy to AWD

54. Summary of Payments from Householder to AWD

55. Summary of Payments from Sessions to AWD

56. Summary of Payments from ISG to AWD

57. Summary of Payments from Portzs to AWD

58. Summary of Payments from International Wholesale Service to AWD

38

59.     Summary of Payments from Alfredo Felice to AWD

60.     Summary of Payment from Curtis Beverage to AWD

61.     Summary of Payments from CB Distributors to VAR

62.     Summary of Payments from Brand New Energy to VAR

63.     Summary of Payments from Curtis Beverage to VAR

64.     Summary of Payments from CB Distributors to Smart World US

65.     Palmeroni's personnel file NVE-002858-A – NVE-002863-A

B.  Defendants object to the introduction of plaintiff's exhibits (set forth number of an exhibit and grounds for objection):

Doc. Category 17: Bengoa could produce no documents requested by Palmeroni; any documents in this category should therefore be excluded.

Doc. Category 20 should be excluded for lack of authenticity.

Doc. Category 27 should be limited to returns ending in 2009. Subsequent returns were produced under a discovery privilege and protective order.

Doc. Category 30 has no relevance to Palmeroni

10.     **DEFENDANT'S EXHIBITS** (See instructions above).

Palmeroni's Exhibits

A.  The Palmeroni Defendants intend to introduce into evidence the exhibits listed on the attached exhibit list (list by number with a description of each):

Insurance documents provided by NVE, NVE3357 to NVE303

Deposition of Erling Jensen, Vincent Rosarbo, Ronald Sumicek, Tammy Thom Meza, Patricia Cosentino, Robert Occhifinto and Darren Householder

B.  Plaintiff objects to the introduction of defendant's exhibits (set forth number of exhibit and grounds for objection):

Plaintiff objects to the Palmeroni Defendants' intention to introduce "insurance documents" as evidence because those documents are not relevant to any of the claims or defenses remaining in this matter.   In addition, the Palmeroni Defendants have failed to properly identify the documents they intend to introduce – NVE3357 to NVE303 is not a valid Bates range.

Plaintiff objects to the introduction of the deposition transcripts identified by the Palmeroni Defendants' because they are inadmissible hearsay and they do not qualify for any of the exceptions to the hearsay rule.

Plaintiff does not object to reading of testimony into the record for witnesses who are unavailable as that term is defined by the Federal Rules. However, Plaintiff reserves the right to object to such testimony on other grounds.

(Copies of exhibits are to be made for opposing counsel, and a bench book of exhibits is to be delivered to the Judge at the start of trial. If counsel desires to display exhibits to the jury, sufficient copies should be available to provide each juror with a copy; alternatively, enlarged photographic or projected copies may be used).

11.    **PLAINTIFF'S LEGAL ISSUES**

Plaintiff has filed motions on any outstanding legal issues.  (See Paragraph 2 (b) above).

12.    **DEFENDANT'S LEGAL ISSUES**

**Palmeroni**

·      NVE was not harmed at all by any of his actions, and if harmed, Plaintiff's damages are purely speculative and cannot be proven.

·      Whether Palmeroni can be held vicariously liable for the conduct of Vincent Rosarbo

**Rosarbo**

13.   **CHOICE OF LAW:** (If there is any issue as to what state's law is applicable to any count of the complaint, set forth the choice of law question. This issue shall be separately briefed in accordance with an order to be entered herewith).

No choice of law issues.  The parties agree that New Jersey substantive law applies.


14.   **MISCELLANEOUS** (Set forth any other matters which require action by, or should be brought to the attention of the Court).

- Palmeroni requests a Daubert hearing of all Plaintiff's expert witnesses.

- Defendant Jesus Palmeroni has petitioned for bankruptcy in the Middle District of Pennsylvania seeking relief under Chapter 13. NVE has moved for permission out of time to file a complaint that Palmeroni's alleged debt to NVE is non-dischargeable. The bankruptcy court has reserved decision.

- Rosarbo sets forth the following:

I'm not an attorney and I don't have great computer or typing skills. Some of my answers to the final pretrial order may be repetitive and the timeline may not be as smooth so I will summarize as best I could.  1995-1996 I met Mr. O in Lewisburg Camp, was first to greet him, became friends, he was on the phone a lot, worried about his company , got out 1996 didn't meet up again until 2001 when I was hired as a salesman, hooked up with Mr. P who was a good salesman and helped me along being I knew nothing about sales. As the ephedra sales expanded we grew as a company. Mr. P got us into all the major drug store chains and convenience store markets.  I maintained our markets by doing trade shows all over the US ( Las Vegas, Florida, Chicago and New Orleans) to name the major ones.  All the while everyone knew the ephedra window of opportunity was closing due to the big Pharmaceutical Co. lobbying for the FDA to close us down and they succeeded by labeling ephedra a controlled substance and banning ephedra based products.  During this time 2001-2004 NVE was grossing 10mil a month at its peek.  At this time the company was fast and loose with hardly any direction except to sell ephedra based products as fast as you could within a price range that continued to change as the window of opportunity closed.  Everyone knew it was only a matter of time before FDA banned ephedra based products.  Now due to this limited time frame there was a lot of treachery going on but mostly everyone was happy Mr.O because sales were booming. Whenever there were women around either at the trade shows or in the work environment itself there was always some kind of sexual harassment going on whether by talk, touch, looks or laughter which seemed to come along with the territory as it was explained to me.  I didn't participate and I always treated all the women with respect especially our own order takers and secretaries who worked directly under me.  Mr P did the same.  I also got to see Mr O in a different way.  In prison he was kind of quiet, shy and didn't participate with many people.  On the outside he was everywhere, didn't care much for laws, ethics or respect for other people.  The more money he

made the worse he got as far as arrogance and thinking he was invincible. He enjoyed living on the edge in business and with women.  Mr P and myself tried to tone it down cause we both saw it as disaster in the near future.

We wanted to build the company into something that we could be proud of for our customers and also for our workers.  After a while even though we were doing well as a company I was terminated.  I didn't quite fit in anymore as far as the womanizing and the way we did business, We were doing well and I was opposed to doing business with people who I felt were going to hurt us in the long run and get the company into trouble such as Mr. Jarod Wheat. Mr Wheat wanted to compete with Viagra and Cialis with his Stamina RX which he came to Mr. O with and naturally Mr. O with all our abjections jumped in.  Well that's what led to the Federal Marshall's raiding our company.  He was looking for the next Stacker2 miracle because ephedra based products as I said was closing fast.  i believe that product was YJ Stinger which was an energy drink that at the time would have competed with Red Bull because it gave you the same energy Red Bull gave you only it tasted great and the packaging was excellent.  I know Mr. P could have gotten that product into all the same drug store chains and convenience store markets we were already in.  Mr. O was also trying to get a manufacturing plant running in Belize that also has its own problems and headaches.  Don't know what happened there but I have proven facts about Mr. O and Mr. Wheat having problems in Belize.  see ( attached paperwork) Mr. O has been convicted for money laundering and drug smuggling.  His lasted coup was to infringe on 5Hour Energy with his product  6Hour Energy which ended in a lost lawsuit of 10mil plus court costs which could very well end up 25-30mil.  My point with all this is that this is Mr O's character and pattern in life which I was a small part of.  I did what I was told and recognized that I didn't fit into his lifestyle and used for the dirty work, moving his warehouse almost single handed into the new location, drove trucks picked orders, doing trade shows etc. I was terminated shortly there after.  That's why it's imperative I get to tell my side of the story to the jury because this is about my character vs his plus his criminal pattern.  He wanted to add Rico charges to my law suit.  I believe that what I have said , know and uncovered you could attach a Rico charge to him.

15.     **JURY TRIALS** - Not later than _____.

    A. Each side shall submit to the Judge and to opposing counsel a trial brief or memorandum in accordance with Local Civil Rule 7.2B, with citations to authorities and arguments in support of its position on all disputed issues of law. In the event a brief shall not be filed, the delinquent party's complaint or defense may be stricken.

    B. Counsel for each party shall submit to the Judge, with a copy to opposing counsel, written requests for instructions to the jury. Supplemental requests for instructions may be submitted at any time prior to argument to the jury. All requests for instructions shall be plainly marked with the name and number of the case, shall contain citations of supporting authorities, if any, and shall designate the party

submitting same. In the case of multiple requests by a party, these shall be numbered in sequence and each request shall be on a separate sheet of paper.

C.   Joint proposed verdict form/special interrogatories are to be submitted to the trial judge.

D.   Proposed *voir dire* questions are to be submitted to the trial judge.

16.   **NON-JURY TRIALS** - Not Applicable.

17.   **TRIAL COUNSEL** (List the names of trial counsel for all parties).

   a.   **Trial Counsel for plaintiff, N.V.E., Inc.,**
   Samuel J. Samaro, Esq.
   PASHMAN STEIN WALDER HAYDEN
   A Professional Corporation
   21 Main Street – Suite 200
   Hackensack, NJ 07601

   **b.   Trial Counsel for defendants Jesus J. Palmeroni and Vincent Rosarbo**

   Both appearing *pro se*

18.   **BIFURCATION** (Where appropriate, the issues relating to liability shall be severed and tried to verdict. Thereafter, all issues relating to damages will be tried).

The issues of liability and damages SHALL / **SHALL NOT** be tried separately.

19.   **ESTIMATED LENGTH OF TRIAL**

   ___ DAYS FOR LIABILITY

   and

   ___ DAYS FOR DAMAGES:

AMENDMENTS TO THIS PRETRIAL ORDER WILL NOT BE PERMITTED UNLESS THE COURT DETERMINES THAT MANIFEST INJUSTICE WOULD RESULT IF THE AMENDMENT IS DISALLOWED.

_____

SAMUEL J. SAMARO, ESQ.
**PASHMAN STEIN WALDER HAYDEN**
A Professional Corporation
*Attorneys for Plaintiff N.V.E., Inc.*
21 Main Street – Suite 200
Hackensack, NJ 07601
ssamaro@pashmanstein.com
T. (201) 488-8200
F. (201) 488-5556

_____

JESUS PALMERONI
Defendant *pro se*
3308 Route 940, Suite 104
Mt. Pocono, PA 18344

_____

VINCENT ROSARBO
Defendant *pro se*
23 Thistle Meadow Lane
Branford, Connecticut 06405

_____

HON. MADELINE COX ARLEO
UNITED STATES DISTRICT JUDGE

_____

HON. LEDA DUNN WETTRE
UNITED STATES MAGISTRATE JUDGE

DATED: