## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| N.V.E., INC., | Civil Action No: |
| Plaintiff, | 2:06-cv-05455 (MCA)(JAD) |
| v. | |
| JESUS J. PALMERONI, and VINCENT ROSARBO | |
| Defendants. | |

## PLAINTIFF N.V.E., INC.'S TRIAL BRIEF

**PASHMAN STEIN WALDER HAYDEN**
A Professional Corporation
Court Plaza South
21 Main Street, Suite 200
Hackensack, New Jersey 07601
*Attorneys for Plaintiff*
*N.V.E., Inc.*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS ........................................................................................1

LEGAL ARGUMENT...............................................................................................9

    I.    DEFENDANTS' KICKBACK SCHEME AND DISTRIBUTION SCHEME
         CONSTITUTE FRAUD ...........................................................................9

    II.   DEFENDANTS BREACHED THEIR DUTY OF LOYALTY TO NVE ..................14

    III.  DEFENDANTS UNLAWFULLY INTERFERED WITH NVE'S PROSPECTIVE
         ECONOMIC ADVANTAGE ....................................................................17

    IV.  DEFENDANTS ENGAGED IN A CIVIL CONSPIRACY TO
         COMMIT THE UNDERLYING TORTIOUS ACTS .................................20

    V.   DAMAGES FOR THE DEFENDANTS' UNLAWFUL CONDUCT ......................21

         A.  Disgorgement of Defendants' Ill-Gotten Profits for the Kickback
              Scheme and Distribution Scheme ...................................................21

         B.  Disgorgement of Defendants' Salary.............................................27

         C.  Punitive Damages ..........................................................................30

    VI.  THE COURT SHOULD ALLOW NVE TO ASK THE
         JURY SPECIAL INTERROGATORIES……………………….………………31

## **TABLE OF AUTHORITIES**

Page(s)

Cases

*A. Hollander & Son, Inc v. Imperial Fur Blending,*
    2 N.J. 235 (1949) ......................................................................................... 25

*Austin v. Wendell-W. Co.,*
    539 F.2d 71, 74–75 (9th Cir.1976)……………………………….........…………………32

*Auxton Computer Enterprises, Inc. v. Parker,*
    174 N.J. Super. 418, 423-24 (App. Div. 1980) ....................................... 14

*Banco Popular North Am. v. Gandhi,*
    184 N.J. 161 (2005) ..................................................................................... 20

*Berman v. Gurwicz,*
    189 N.J. Super. 89 (Ch. Div.1981) ......................................................... 9

*Call, Inc. v. Advanced Health Media, LLC,*
    No. CIV.A. 11-3723 FLW, 2012 WL 1079652 (D.N.J. Mar. 30, 2012) .................................. 18

*Cameco, Inc. v. Gedicke,*
    157 N.J. 504 (1999) ................................................................................ passim

*Chernow v. Reyes,*
    239 N.J. Super. 201 (App. Div. 1990) .............................................. 21, 22

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH,*
    No. CIV.A. 10-453 FLW, 2010 WL 5239238 (D.N.J. Dec. 16, 2010) .................................. 18

*Cty. of Essex v. First Union Nat. Bank,*
    186 N.J. 46 (2006) ...................................................................................... 23

*Di Cristofaro v. Laurel Grove Memorial Park,*
    43 N.J.Super. 244 (App. Div. 1957) .................................................... 19

*Graco, Inc. v. PMC Glob., Inc., No. CIV. A.,*
    08-1304 (FLW), 2009 WL 904010 (D.N.J. Mar. 31, 2009) .................................... 18

*Grillo v. Board of Realtors,*
    91 N.J. Super. 202 (Ch. Div .1966) ..................................................... 31

*GTE Prod. Corp. v. Broadway Elec. Supply Co.,*
    676 N.E.2d 1151 (Mass. App. Ct. 1997) ........................................ 13, 22

ii

*Guth v. Loft*,
 23 Del. Ch. 255 (Sup. Ct. 1939) ............................................................ 21

*Harris v. Perl*,
 41 N.J. 455 (1964) ............................................................................... 17

*Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc.*,
 282 N.J. Super. 140 (App. Div. 1995) ................................................... 19

*Ideal Dairy Farms, Inc. v. Labatt, Ltd.*,
 90 F.3d 737 (3d Cir. 1996)..................................................................... 18

*In re Docteroff*,
133 F.3d 210, 216 (3d Cir. 1997)……………………………………………..32

*In re Harris*,
 7 B.R. 284, 287 (S.D. Fla. 1980) …………………………………………31, 32

*In re Hunter*,
 32 B.R. 140, 142 (Bankr. S.D. Fla. 1983)…………………………………..32

*In re Hosey*,
 355 B.R. 311, 321 (Bankr. N.D. Ala. 2006)…………………………………..32

*In re Golden*,
 54 B.R. 957 (Bankr. D. Mass. 1985) ...................................................... 10

*In re Tri-Star Techs. Co., Inc.*,
 257 B.R. 629 (Bankr. D. Mass. 2001) .................................................... 16

*Kaplan v. Cavicchia*,
 107 N.J. Super. 201 (App. Div. 1969) .................................................... 25

*Kaye v. Rosefielde*,
 223 N.J. 281 (2015) .......................................................................... passim

*L. Martin Co. v. L. Martin & Wiles Co.*,
 75 N.J. Eq. 257 (1909).......................................................................... 25

*Lamorte Burns & Co. v. Walters*,
 167 N.J. 285 (2001) ......................................................................... 14, 17

*Liberty Mut. Ins. Co. v. Land*,
 186 N.J. 163 (2006) ............................................................................... 9

*Louis Kamm, Inc. v. Flink*,
 113 N.J.L. 582 (E. & A.1934)................................................................. 17

*Lyle Carlstrom Assoc., Inc. v. Lyle,*
   No. A-0664-05T5, 2007 WL 114203 (N.J. Super. Ct. App. Div. Jan. 18, 2007) ..................... 21

*Mizrack v. Fairmount Chem. Co., Inc.,*
   2013 WL 275958 (N.J. Super. App. Div., Jan. 25, 2013) ......................................................... 28

*Morgan v. Union Cty. Bd. of Chosen Freeholders,*
   494 268 N.J. Super. 337 (App. Div.1993) ............................................................................. 20

*Ortho Pharm. Corp. v. Sona Distributors, Inc.,*
   663 F. Supp. 64 (S.D. Fla. 1987) ............................................................................... 12, 13, 22

*Patel v. Soriano,*
   369 N.J. Super. 192 (App. Div. 2004) ................................................................................... 18

*Platinum Mgmt., Inc. v Dahms,*
   285 N.J. Super. 274, 303-04 (Law Div. 1995) .................................................................. 17, 25

*Printing Mart-Morristown v. Sharp Elecs. Corp.,*
   116 N.J. 739 (1989) ..................................................................................................... 17, 18, 19

*Ruger Chem. Co. v. Universal Preservachem, Inc.,*
   No. A-0018-07T3, 2009 WL 790486 (N.J. Super. Ct. App. Div. Mar. 27, 2009) ................... 27

*Sandler v. Lawn-A-Mat Chemical & Equipment Corp.,*
   141 N.J. Super. 437 (App. Div. 1976) ................................................................................... 30

*Schecter v. Friedman,*
   141 N.J. Eq. 318 (1948) ......................................................................................................... 25

*Sevenson Envtl. Serv. Inc. v. Diversified Royalty Corp.,*
   No. CV 08-1386, 2018 WL 5033750 (D.N.J. Oct. 16, 2018) ...................................... 28, 29, 30

*Shulton, Inv. V. Optel Corp.,*
   698 F. Supp. 61 (D.N.J. 1998) .................................................................................. 11, 12, 22

*Simulation Sys. Techs., Inc. v. Oldham,*
   269 N.J. Super. 107 (App. Div. 1993) ................................................................................... 21

*St. James v. Future Finance,*
   342 N.J. Super. 310 (App. Div. 2001) ................................................................................... 30

*Sustick v. Slatina,*
   48 N.J. Super. 134 (App. Div. 1957) ..................................................................................... 19

*United Board & Carton Corp. v. Britting,*
    63 N.J. Super. 517 (Ch. Div. 1959) .......................................................... 14, 17, 21

*Valle v. North Jersey Auto. Club,*
    141 N.J. Super. 568 (App. Div. 1976) ................................................................ 21

*Vibra-Tech Engineers, Inc. v. Kavalek,*
    849 F. Supp. 2d 462 (D.N.J. 2012) ............................................................. passim

*Wall Sys., Inc. v. Pompa,*
    324 Conn. 718 (2017) ............................................................................... 10, 16

*Wormhoudt Lumber Co. of Ottumwa v. Cloyd,*
    219 N.W.2d 543 (Iowa 1974) ........................................................................ 16

*Wright v. Apartment Inv. & Mgmt. Co.,*
    315 Ga. App. 587 (2012) ............................................................................. 10

*Zeliff v. Sabatino,*
    15 N.J. 70 (1954) .................................................................................. 22, 23

*Zippertubing Co. v. Teleflex Inc.,*
    757 F.2d 1401 (3d Cir. 1985) ........................................................ 24, 25, 26, 27

<u>Statutes</u>

11 U.S.C. § 523(a)(6)……………………………………………………………………….32

N.J.S.A. § 2A:15–5.09 ............................................................................... 30

N.J.S.A. § 2A:15–5.12 ............................................................................... 31

<u>Other Authorities</u>

Restatement (Second) of Agency § 387 ......................................................... 17

Restatement (Second) of Agency § 469 (1958) ................................................ 45

Restatement (Second) of Agency, § 401 ........................................................ 32

Restatement (Third) of Agency § 8.01 .......................................................... 46

## PRELIMINARY STATEMENT

Plaintiff NVE, Inc. brought this action against two former employees who utilized their positions of trust and responsibility to cheat the company out of millions of dollars.  Through threats and promises, Defendant Jesus Palmeroni forced NVE's brokers to pay him unlawful kickbacks, typically 20% of the commissions they earned by placing NVE's product line with wholesale purchasers.  In a second and even larger scheme, Palmeroni, along with his co-defendant, Vincent Rosarbo, diverted sales from NVE to their own competing companies.  That was accomplished by creating a sham entity to obtain NVE products at lower international prices and then reselling them to NVE's domestic customers, resulting in millions of dollars of improper profits to Defendants and the corresponding loss of millions of dollars to NVE.

Defendants' fraudulent conduct spanned virtually the entirety of their tenure with the Company and even for a time after their departure.   As its remedy for Defendants' disloyalty and fraud, NVE seeks forfeiture of the Defendants' ill-gotten profits and disgorgement of the salaries NVE paid them.

## STATEMENT OF FACTS

NVE is engaged in the manufacture, distribution and sale of nutritional supplements and energy drinks.[1]  Defendant Jesus "Joe" Palmeroni ("Palmeroni") was employed as salesman at NVE for over six years, from 1999 to 2006, eventually rising to the position of Vice President of Sales.  Defendant Vincent Rosarbo ("Rosarbo"), was a salesman at NVE beginning February 5, 2001 through August 18, 2004.  Defendants occupied positions of trust and were responsible for sales throughout the United States and internationally.

---

[1] NVE will establish the facts set forth in this section at trial.

1

Defendants' schemes are detailed more fully below and will be established by testimonial and documentary evidence at trial.

**Kickback of Commissions (the "Kickback Scheme")**

As a salesman and later a Vice President of Sales, Palmeroni was responsible for all domestic and international sales of nutritional and dietary supplements and energy drinks that NVE manufactured and sold.  At all times relevant to this dispute, NVE sold (and continues to sell) its products in a number of different ways NVE sold through telephone and internet sales, the products are sold directly to consumers.  Through brokers it sold the products to retailers and other wholesale buyers.  Finally, NVE sold the products to distributors, who purchase the products at wholesale prices and sell those products at higher prices to retailers.

The difference between brokers and distributors is that distributors actually purchase the products.  Brokers, on the other hand, only introduce wholesale buyers to NVE and thereafter serve as intermediary between the two to ensure that orders are placed and filled properly and that the relationship remains harmonious.  They do not take title to the products.  Palmeroni's job responsibilities included identifying, managing, and negotiating with distributors and brokers.

Between approximately 2000 to 2004, sales of NVE products, particularly Stacker 2, increased dramatically.  It would be very hard to overstate the success of Stacker 2 and other products containing a substance known as ephedra during that period.  Ephedra is an extract of the plant *Ephedra sinica*.  It is a naturally occurring stimulant that was used for many centuries in traditional Chinese medicine.  Before it was banned by the FDA in early 2004, it was in extremely high demand by consumers and retailers in this country and it was that demand that allowed  Palmeroni and Rosarbo to perpetrate their fraud.

2

As the Vice President of Sales, Palmeroni represented to certain brokers that he controlled the accounts and had the power to assign them and take them away.  He threatened some brokers that if they did not agree to pay a percentage of their commissions to him – typically 20% - NVE would stop doing business with them.

In some instances, Palmeroni caused NVE to pay commissions to brokers on accounts that had been direct accounts of NVE, sometimes called "house accounts," where brokerage commissions did not have to be paid because no broker brought them to NVE.  For example, two companies, Import Warehouse, Inc. and CB Distributors, Inc., were distributors of NVE products before Palmeroni was hired.  Nevertheless, Palmeroni "assigned" those accounts to a broker by the name of Ronald Sumicek ("Sumicek"), the owner and principal of Sunbelt Marketing ("Sunbelt"), who subsequently received commissions on orders placed by CB Distributors ranging from 2.5% and 5% of each order.  In exchange, Palmeroni required Sunbelt to pay entities owned by Palmeroni[2] 50% of all such commissions.

As a result of Palmeroni fraudulently designating Sunbelt as the broker on the Import Warehouse and CB Distributors accounts, NVE paid Sunbelt in excess of $961,573.27 in brokerage commissions for sales to Import Warehouse and CB Distributors.  Sumicek and Sunbelt in turn paid kickbacks to Palmeroni and his various entities in the amount of $417,348.73.

In other instances, the brokers simply paid a portion of their commissions to Palmeroni for the assignment or retention of NVE accounts.  A review of the bank statements and other

---

[2] Palmeroni created two entities - National Retail Consulting Group ("NRCG") and Global Marketing & Sales, LLC ("Global") to assist with the Kickback Scheme.  Palmeroni used NRCG and Global to accept kickbacks and other unlawful payments from the Conspiring Brokers.

financial documents confirm that that Palmeroni received no less than $1,201,492.98 in broker kickbacks.

The kickback scheme was uncovered in late 2005. NVE's owner, Robert Occhifinto, first became suspicious in or around November 2005, when he had a puzzling interaction at a trade show, which he described at his deposition:

> A. I was talking with Carlos Bengoa and Roger [Sumicek] came up to me…and started talking to me and there was – I introduced him to Carlos and basically they didn't seem like they knew each other, and later on I thought to myself how's this guy his broker if they don't even know each other?
>
> Q: This guy being?
>
> A: Roger not knowing Carlos when Roger was supposed to be representing Carlos.
>
> Q: Okay. Was there anything about the conversation with Mr. Bengoa or Mr. Sumicek, Roger Sumicek, that also gave you some inclination about a possible kickback scheme or broker scheme?
>
> A: Yes.
>
> Q: What was that?
>
> A: I said to Carlos, how do you guys not know each other, he's your broker. He said to me, that piece of shit, I hate those guys. How is he my broker? I've been buying from you for years. That's what I learned

After that conversation with Carlos Bengoa, Occhifinto, with the assistance of NVE's accounting department went back to NVE's office to look through all of the accounts that Sumicek was representing NVE on:

> A: I found that there were other people there that I didn't believe that he represented that were house accounts that he was getting paid a commission on.
>
> Q: And when you say other people there, are you referring to other customers for which Ronald Sumicek and Sunbelt were receiving commissions?
>
> A: Yes.

At the conclusion of the investigation in January 2006, NVE concluded that Palmeroni had improperly assigned house accounts to certain brokers and had received kickbacks for doing so.  As a result, the Company terminated Palmeroni's employment.

**Fraud Committed Upon NVE through Smart World (the "Distribution Scheme")**

On November 15, 2006 a complaint was filed against Palmeroni and certain brokers alleging that Defendant NVE defrauded NVE as a result of the kickback scheme.  Thereafter, through discovery, particularly third-party subpoenas served on banks, NVE found evidence of the Distribution Scheme.  On May 18, 2011, NVE amended its complaint to add new allegations and many new defendants.

As pieced together during discovery, beginning approximately in 2001 and continuing into at least 2006, Palmeroni and Rosarbo devised a scheme to defraud NVE by taking advantage of the fact that NVE charged much lower prices for products sold internationally than those sold domestically.   There were several reasons for the differential.  First, NVE wished to establish a better market for its products overseas and so wished to keep the wholesale price as low as possible. Second, because importers must pay duties on goods imported from foreign countries, prices must be reduced to keep them competitive.  And finally, international distributors do not have the advantage of NVE's comprehensive marketing program and thus incur greater marketing costs themselves.

The distributions scam worked this way:  Palmeroni and Rosarbo set up a company called Smart World, Inc. (hereinafter, "Smart World US") which had virtually identical name to a legitimate Dutch distributor of NVE products, Smart World (hereinafter, "Smart World Netherlands").  Smart World, Inc.'s purpose was to buy products from NVE at the international price and because of its name, not cause anyone at NVE to become suspicious.

Defendants also formed a company called American Wholesale Distribution, Inc. ("AWD") to sell the products purchased by Smart World, Inc.  The NVE products purchased by us, Smart World, Inc. offered for sale below the domestic wholesale price charged by NVE and the money to buy more products and to pay the co-conspirators – Palmeroni and Rosarbo – used their share of the illicit profits.

Palmeroni orders for the products were obtained.  As the Vice President of Sales, he had relationships with the distributors and presumably knew them well enough to know who he could approach about buying NVE product from AWD at reduced prices as opposed to from NVE directly at higher prices.  All of AWD's customers were existing customers of NVE approached by Palmeroni about buying from AWD instead of from NVE.

It appears that in the early days of the scam, Palmeroni would call in Smart World orders himself to NVE's order processing group.  As time went on, the standard approach would be that Palmeroni would tell the actual customer, to call Mr. Rosarbo and Mr. Rosarbo would put in an order for Smart World US.  Still later, the customer would call Mr. Rosarbo, who would in turn would contact Smart World Netherlands and ask them to place the order, for which the Dutch company would receive a bribe.  Once the orders were filled, it would have to appear that they were being shipped overseas.  For that purpose, Palmeroni and Rosarbo hired a warehousing company called Foremost, which would pick up the merchandise at NVE's factory.  But instead of dropping them off at the pier or airport for international shipment, Foremost would store them in its warehouse located in Carlstadt, New Jersey.  From there, the products would be shipped to the customers around the country.

When AWD's bank account contained more money than was needed to purchase more product, Palmeroni and Rosarbo would distribute the ill-gotten gains to themselves.  For

purposes of receiving such payments, Palmeroni and Rosarbo set up other companies. Palmeroni's share was always sent by check made payable to National Retail Consulting Group, Inc.  Rosarbo's share was made payable to a company called VAR.  Bank of America records for AWD reflect that over the course of the scam, Palmeroni and Rosarbo sold almost $8 million worth of NVE's product to 14 companies or individuals, most of whom were NVE distributors.[3]

### Damages Resulting from Defendants' Actions

At trial, NVE will introduce expert testimony from Darryl S. Neier, a forensic accountant, who has completed an extensive review of the relevant documents in the record, including voluminous financial records relating to Defendants' fraudulent schemes, the vast majority of which came directly from Defendants' banks and accountants.  Neier will confirm that Defendants formed various shell companies and transferred the proceeds of their schemes through those entities in an attempt to disguise the true nature of their unlawful transactions.  He will testify about the economic damages that NVE suffered as a result of Defendants' fraudulent schemes.

With respect to Palmeroni's kickback scheme, Neier will discuss how Palmeroni's secret arrangements with the Conspiring Brokers damaged NVE.  Specifically, because of the kickbacks, Palmeroni did not negotiate the lowest possible commission rates for the Conspiring Brokers.  Moreover, NVE paid commissions to the Conspiring Brokers for "house" or "direct" accounts even though the Conspiring Brokers did not provide brokerage services for those accounts.  As a result of Palmeroni's failure to negotiate the lowest commission rates and his

---

[3] These include Darren Householder, Brand New, CB Distributors, Sessions Specialty Company, ISG, International Wholesale Service, International Wholesale Supply, Robert Cannizzo, Pamela Cannizzo, AMS Enterprises, Alfredo and Charmaine Felice, Curtis Beverage, American Nutritional, JMPS Properties, Inc., Katherine M. Portz and John J. Portz, Sr.

manipulation of house/direct accounts, NVE paid more in commissions to the Conspiring

Brokers than it would have but for Palmeroni's actions.  Neier will confirm that Sunbelt paid

kickbacks it received to Palmeroni's entities in the amount $ 417,348.73; companies owned by

the Horowitz family, including Profit Motivators, paid Palmeroni's entities $721,100.30 in

kickbacks; and Nieuwenhuis paid Palmeroni's entities $63,043.95 in kickbacks.  In total,

Palmeroni received a total of $1,201,492.98 in unlawful commissions kickbacks.

   In addition to the kickback scheme, Palmeroni and Rosarbo illicitly profited from their

use of Smart World US to manipulate NVE's price structure in order to purchase products at a

lower international price and resell the products to NVE's own distributors in the US at a price

lower than NVE offered.  Various NVE distributors paid millions of dollars to entities owned by

Palmeroni and Rosarbo, including AWD, NRCG, VAR, and Smart World US, for fraudulently

obtained NVE products.  Carlos Bengoa/ CB Distributors paid Palmeroni and Rosarbo entities

$6,180,483.43 from November 2001 through April 2006; Darren Householder/ Brand New

Energy paid $1,000,770.00 to Palmeroni and Rosarbo's entities from July 2003 and July 2007;

Sessions Specialty Company paid Palmeroni and Rosarbo's entities $426,857.58 between 2004

and 2006; Ronald Sumicek/International Sales Group paid Palmeroni and Rosarbo's entities

$35,251.52 between 2004 and 2005;  the Portzes/International Wholesale Service, Inc. and

International Wholesale Supply, Inc. paid Palmeroni and Rosarbo's entities $383,311.20 between

2004 and 2005; the Felices/Curtis Beverage paid Palmeroni and Rosarbo's entities $124,153.00

for between 2003 and 2005.

   In total, Palmeroni and Rosarbo's companies received $7,970,826.73 in funds by selling

fraudulently obtained NVE products to NVE's distributors.  Palmeroni and Rosarbo also sold

fraudulently obtained NVE products to non-NVE distributors in the amount of $3,273,082.57.  In

sum, Rosarbo and Palmeroni received a total of $11,243,909.30 from their sales of fraudulently

obtained NVE products.  Of that amount, once the products were sold, the cash gain in unlawful

profit that Palmeroni and Rosarbo made between 2001 through 2010 was $2,302.426.02.

In addition to the economic damages of $1,201,492.98 from the Kickback Scheme and

$2,302,426.02 for the Smart World price manipulation scheme, NVE seeks from Palmeroni and

Rosarbo salary that they received during their employment.  NVE paid Palmeroni salary totaling

$870,425.00 between 2001 and 2005, and paid Rosarbo salary of $310,578.67 between 2003 and

2004.

## LEGAL ARGUMENT

### I.   DEFENDANTS' KICKBACK SCHEME AND DISTRIBUTION SCHEME CONSTITUTE FRAUD

Under New Jersey law, "[t]he five elements of common law fraud are: (1) a material

misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of

its falsity; (3) an intention that plaintiff rely on it; (4) reasonable reliance by plaintiff; and (5)

resulting damages." *Vibra-Tech Engineers, Inc. v. Kavalek*, 849 F. Supp. 2d 462, 494 (D.N.J.

2012) (citing *Liberty Mut. Ins. Co. v. Land*, 186 N.J. 163, 175 (2006)). Additionally, although

generally, classic common law fraud requires a representation, silence "in the face of a duty to

disclose [] may be a fraudulent concealment." *Id.* (*quoting Berman v. Gurwicz*, 189 N.J. Super.

89, 93 (Ch. Div.1981), *aff'd*, 189 N.J. Super. 49 (App. Div.1983)).

It is undeniable that once the facts at trial unfold as laid out above, NVE will establish

that Defendants committed fraud.  Palmeroni's "Kickback Scheme" is the epitome of fraudulent

conduct.  Through various means including assignment of distribution accounts and threats to

take accounts away, Palmeroni leveraged his position at NVE to coerce brokers to pay him a

percentage of their commissions as kickbacks.  In turn, Palmeroni caused NVE to pay higher

commissions to the brokers to make up the difference in payments to him, or to pay broker fees for "direct" or "house" accounts of NVE for which NVE was not required to pay a broker fee. To that end, Palmeroni made material misrepresentations to NVE that certain accounts (e.g., Import Warehouse and CB Distributors accounts) were broker accounts and a commission had to be paid to Sumicek/ Sunbelt when, in fact, that was false.  In other instances, Palmeroni represented that the commission amount due to a broker was higher than it actually was.  In all instances, Palmeroni's representations were false and were made with the specific intent that NVE would rely on them, which it did.  Palmeroni went so far as to set up companies through which the brokers would funnel kickbacks from the marked-up and/or unauthorized commissions that he caused NVE to pay.  Needless to say, Palmeroni did not inform NVE of his clandestine arrangements with the brokers.

The details of Palmeroni's Kickback Scheme, when proven, will establish liability for fraud.  *See Vibra-Tech Engineers, Inc. v. Kavalek*, 849 F. Supp. 2d 462 (D.N.J. 2012) (awarding damages for, among other things, fraud based on former employees' competition and kickback scheme); *see also, e.g., Wall Sys., Inc. v. Pompa*, 324 Conn. 718 (2017) (Affirming judgment for fraud and other claims against former employee who was receiving kickbacks in exchange for hiring subcontractor to perform work at an increased contract price and sharing a portion of that price with the defendant); *Wright v. Apartment Inv. & Mgmt. Co.,* 315 Ga. App. 587, 595 (2012) (Affirming fraud verdict against employee Senior Director of Construction Services who had accepted kickbacks in exchange for awarding contracts to a specific general contractor); *In re Golden,* 54 B.R. 957, 963 (Bankr. D. Mass. 1985) (holding that employee committed fraud against employer by participating in a fraudulent scheme involving approving "unauthorized, exaggerated, false invoicing" and receiving kickbacks)

The *Vibra-Tech* decision is particularly instructive. In that case, an employer brought an action against two former employees (who were husband and wife) and their competing corporations, alleging that the former employees breached their employment agreements, violated the duty of loyalty, converted employers property, committed fraud, and engaged in a civil conspiracy in order to benefit their own competing corporations.  The former employees set up competing companies and diverted business away from Vibra-Tech, both in the course of their employment and during the non-compete period following termination.  The husband-former employee also set up a kickback scheme by becoming a distributor for a geotechnical equipment manufacturer, RST, who paid him commission based on his employer's purchase of RST's equipment.  Subsequently, the former employee set up his own company that he used to purchase RST's equipment, which he then resold to his employer at a markup.

The Court held that the former employees' scheme amounted to common law fraud because the defendants acted with the intent to defraud their employer and induced the company to purchase equipment at a higher price than was necessary.  849 F. Supp. 2d at 495.  Like in *Vibra-Tech*, Palmeroni acted with the specific intent to defraud NVE and induced it to either pay more for commissions than was necessary or in other instances to pay commissions when no commissions were due at all, thereby causing NVE to suffer damages.

Similarly, the details of the Distribution Scheme – through the use of Smart World - once proven at trial, will also state a claim for common law fraud.  Charging a lower price to international wholesale purchasers is not an unusual practice for manufacturers, and several reported cases involve schemes to purchase products at lower international prices for resale domestically.  Courts that have considered the question hold that such schemes are tantamount to common law fraud.  For example, in *Shulton, Inv. V. Optel Corp.,* 698 F. Supp. 61 (D.N.J. 1998),

the court permitted RICO and common law claims to proceed to trial in an action by manufactures of personal care products against the defendant buyers claiming that buyers fraudulently induced them to charge lower prices for its product by representing that those products would be sold abroad, when in fact, they sought to resell them domestically.  At the time of purchase, the defendants told the plaintiff that the goods purchased would be resold only in foreign markets, however, that was never their intention; the goods were resold in the domestic market at a price significantly lower than Plaintiff's domestic market price.  The court held that if the facts were proven at trial, the plaintiff could recover damages under state and federal RICO statutes and New Jersey; common law.  *Id.* at 62-64.

Similarly, in *Ortho Pharm. Corp. v. Sona Distributors, Inc.,* 663 F. Supp. 64 (S.D. Fla. 1987), the U.S. District Court for the Southern District of Florida held that the defendants' scheme to obtain American-manufactured prescription drugs at discounted international prices through use of an international company and falsely representing that they would be sold abroad amounted to common law fraud.  The facts of *Ortho Pharm. Corp.* bear a striking resemblance to the facts of this case.  There, the defendants conspired with a Hong Kong company to purchase American manufactured pharmaceuticals from Plaintiff, a subsidiary of J&J, at less than American wholesale prices, representing that the drugs would be sold in China.  However, the products the defendants purchased were actually intended for resale in the United States and would actually compete with identical products that J&J sold at considerably higher prices.  *Id.* at 65.

In assessing the plaintiff's claim for common law fraud (under the same elements as New Jersey law), the court held that it was "convinced" that the defendants deliberately and intentionally represented to the plaintiffs that the pharmaceuticals were being purchased for

resale in China; that the defendants knew that the representation of destination was false; that they intended J & J to rely on the false representation; and J & J did so rely on the false representation by agreeing to sell the pharmaceuticals at a substantial discount from the wholesale price. *Id.* at 67. The court held "[t]here is little question that J & J would not have sold the pharmaceuticals at issue in this case at such discounted wholesale prices absent the false representations as to the intended destination of the goods" and "Defendants sought to obtain pharmaceuticals at a price that they knew would not otherwise be available if they had properly disclosed the ultimate destination of the goods." *Id.* Defendants' actions, therefore, were fraudulent. *Id.*

Faced with similar facts an appeals court in Massachusetts reached the same conclusion. In *GTE Prod. Corp. v. Broadway Elec. Supply Co.,* 676 N.E.2d 1151, 1153 (Mass. App. Ct. 1997), the defendants perpetrated the fraud over a period of 8 years through a sham entity called Glomar. Defendants submitted claims to the plaintiff for special price breaks called "end user" discounts that identified Glomar as a customer of the defendants and as the buyer/"end user" of the lightbulbs, but instead sold the lightbulbs to another distributor who resold it to the public at lower prices than plaintiff's other distributors. The jury returned a verdict for common law fraud and RICO violations and awarded substantial compensatory and punitive damages.

Here, Palmeroni and Rosarbo's conduct is functionally the same as the conduct of the defendants in *Shulton, Ortho Pharm.,* and *GTE, supra,* with the greatly exacerbating detail that Palmeroni and Rosarbo were trusted insiders. If the conduct attributed to the defendants in those cases was properly classified as fraudulent, there would be no logical reason to classify Palmeroni and Rosarbo's behavior any differently.

13

## II.    DEFENDANTS BREACHED THEIR DUTY OF LOYALTY TO NVE

The concept of loyalty stems from agency principles, which provide that an agent has a duty to use his best efforts on behalf of the principal and not act in a manner inconsistent with the scope of his or her job duties and responsibilities. *See* Restatement (Second) of Agency § 387 ("Unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency"); Restatement (Third) of Agency, § 801 ("An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship.")[4]  "Loyalty from an employee to an employer consists of certain very basic and common sense obligations. *Kaye v. Rosefielde*, 223 N.J. 218, 229 (2015).  Merely acting contrary to the employers' interests constitutes a breach of the duty of loyalty. *See Vibra-Tech*, 849 F. Supp. 2d at 489 (citing *Cameco, Inc. v. Gedicke*, 157 N.J. 504, 517 (1999)).

Actions contrary to an employer's interest include competing with the employer, soliciting customers, or engaging in "other similar acts in direct competition with the employer's business" while being paid by the employer. *See United Board & Carton Corp. v. Britting*, 63 N.J. Super. 517, 522 (Ch. Div. 1959); *Lamorte Burns & Co. v. Walters*, 167 N.J. 285, 302-304 (2001); *Britting*, 63 N.J. Super. at 524; *Auxton Computer Enterprises, Inc. v. Parker*, 174 N.J. Super. 418, 423-24 (App. Div. 1980).  The duty of loyalty also precludes self-serving activities such as collecting unlawful commissions and kickbacks, which might cause an employee to act to the detriment of his employer. *See Cameco*, 157 N.J. at 522 (Employees should not "take advantage of their employers by engaging in secret self-serving activities, such as accepting kickbacks from suppliers").

---

[4] Restatement (third) of Agency has superseded the Restatement (Second) of Agency, however New Jersey courts continue to cite that provision in discussing the scope of the duty of loyalty. *See, e.g., Cameco, Inc. v. Gedicke*, 157 N.J. 504, 516 (1999); *Kaye v. Rosefielde*, 223 N.J. at 229.

"The scope of the duty of loyalty that an employee owes to an employer may vary with the nature of their relationship.  Employees occupying a position of trust and confidence, for example, owe a higher duty than those performing low-level tasks… An officer, director, or key executive, for example, has a higher duty than an employee working on a production line." *Cameco*, 157 N.J. at 516; 521.  Breach of the duty of loyalty is a fact sensitive inquiry that is not readily capable of being reduced to a mechanical description.  Instead, courts employ various factors in determining whether an employee breached a duty of loyalty: (i) whether there is exists a contract relevant to the employee's actions;[5] including (ii) whether the employer knew or agreed to the employee's actions; (iii) the status of the employee and his or her relationship to the employer; and (iv) the nature of the employee's [conduct] and its effect on the employer.  *Kaye*, 223 N.J. at 230 (citing *Cameco*, 157 N.J. at 521).

Here, Palmeroni's Kickback Scheme and his and Rosarbo's Distribution Scheme are quintessential breaches of an employee's duty of loyalty.  Both Defendants had been at the Company for years and were in sales.  Palmeroni held one of the highest positions in the Company as the Vice President of Sales.  Rosarbo has described himself as the number two guy in the sales department, just behind Palmeroni.  Defendants' position at NVE allowed them to oversee sales throughout the United States and abroad and gave them autonomy and discretion on how to effectuate sales in a manner that would maximize profits for the company.  NVE relied on the Defendants, as agents, to exercise the utmost good faith, loyalty, and honesty and to act solely for the benefit of the Company.

---

[5] Whether a contract exists between an employer or employee is not determinative.  An employee can breach a duty of loyalty to the employer even if the employee is not bound by any contracts. *Technology Dynamics, Inc. d/b/a Nova Battery Systems v. Emerging Power, Inc. et al.*, Docket No. A-0952-17T3, 2019 WL 962839 (N.J. Sup. Ct. App. Div. Feb. 26, 2019).

Instead, Defendants abused NVE's trust and acted for their own interests at the expense of the Company.  Rather than ensuring that the Company was paying minimum commissions to brokers and maximizing profit, Palmeroni concocted a scheme that had NVE pay more in broker's commissions than it otherwise would have.  He also entered into covert arrangements with certain brokers to receive a portion of their commission for sending them sales accounts and failed to inform NVE of those agreements.  Palmeroni's self-serving and unlawful Kickback Scheme clearly violated his duty of loyalty to NVE.  *See Cameco*, 157 N.J. at 522 (stating employees should refrain from "engaging in secret self-serving activities, such as accepting kickbacks"); *see also In re Tri-Star Techs. Co., Inc.,* 257 B.R. 629 (Bankr. D. Mass. 2001) (in Trustee's adversary proceeding to recover on behalf of corporate debtor's estate, finding that employee's receipt of undisclosed kickbacks from debtor's trade creditors violated fiduciary duty of loyalty); *Wall Sys., Inc.* 154 A. 3d at 999 ("The duty of loyalty also includes the duty to refrain from acquiring material benefits from third parties in connection with transactions undertaken on the employer's behalf. . . . This rule bars the collection of secret commissions and kickbacks"); *Wormhoudt Lumber Co. of Ottumwa v. Cloyd*, 219 N.W.2d 543, 545 (Iowa 1974) (holding that agent employed by lumbar company who got contractors to secretly to split a commission with him in exchange for sending them jobs was a "flagrant breach by an agent of his duty to be loyal to his principal").

Palmeroni and Rosarbo's Distribution Scheme was also a violation of their duty of loyalty to NVE.  Because Defendants were trusted insiders, they were able to manipulate NVE's processes, procedures, and its broker and distributor relationships to undermine the Company for their own gain.  They engaged in that behavior while receiving salaries, bonuses and benefits from NVE. *Vibra-Tech*, 849 F. Supp. 2d at 490 (finding that former officer/director/former employee breached his duty of loyalty by competing with the employer during the course of employment);

Britting, *supra*, 63 N.J. Super. at 530 ("it seems clear . . . that where former employees, in violation of the duty owed to their employer, have gone into secret competition with him, while still enjoying his trust and the benefits of their employment, the courts have generally required these disloyal employees to answer for their treachery"); *see also, e.g., Platinum Mgmt., Inc. v Dahms,* 285 N.J. Super. 274, 303-04 (Law Div. 1995) (holding that two key employees' solicitation of their employer's customers on behalf of their new prospective employer prior to their resignation "constituted proscribed acts of secret competition" in breach of the employees' duty of loyalty); *Lamorte*, 167 N.J. 290, 304-305, 309 (holding that two employees breached the duty of loyalty to their employer in forming a competing business and appropriating their former employers customer information while still employed, even though they did not solicit their employers' customers during the course of employment).

### III.   DEFENDANTS UNLAWFULLY INTERFERED WITH NVE'S PROSPECTIVE ECONOMIC ADVANTAGE

"An action for tortious interference with a prospective business relation protects the right "to pursue one's business, calling or occupation free from undue influence or molestation." *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 750 (1989) (quoting *Louis Kamm, Inc. v. Flink*, 113 N.J.L. 582, 586, 175 A. 62 (E. & A.1934)). "What is actionable is "[t]he luring away, by devious, improper and unrighteous means, of the customer of another." *Id.* The law protects not only a party's interest in a contract already made, but a "also a [person's] interest in reasonable expectations of economic advantage." *Id.* (quoting *Harris v. Perl*, 41 N.J. 455, 462 (1964)).

To prevail on its claim for intentional interference with prospective economic advantage, a plaintiff must show: (1) a reasonable expectation of advantage from a prospective contractual or economic relationship; (2) that defendants interfered with that advantage "intentionally and

with 'malice;'" (3) that defendants' interference caused the loss of the expected advance; and (4) that the injury caused damage. *Printing Mart,* 116 N.J. at 751-52 (1989); *Patel v. Soriano,* 369 N.J. Super. 192, 242 (App. Div. 2004). The proofs in this case easily meet the elements of tortious interference.

NVE undeniably had a reasonable expectation of economic advantage in its relationships with its customers and prospective customers. The burden of proving a reasonable expectation of economic advantage is "slight;" "[w]ithout searching far, courts have succeeded in finding a reasonable expectation of economic benefit." *Printing Mart*, 116 N.J. at 753. A plaintiff need only show "some reasonable expectation of economic advantage." *Id.* at 753-54. In other words, to meet this factor, all plaintiff must demonstrate is that it "was in 'pursuit' of business." *Ideal Dairy Farms, Inc. v. Labatt, Ltd.,* 90 F.3d 737, 747 (3d Cir. 1996) (citing *Printing Mart*, 116 N.J. at 753-54); *Call, Inc. v. Advanced Health Media, LLC,* No. CIV.A. 11-3723 FLW, 2012 WL 1079652, at *3 (D.N.J. Mar. 30, 2012) (plaintiff plead "sufficient facts to establish that it had a reasonable expectation of economic advantage" because "it was in pursuit of business since it was actively engaged in discussions with several parties.")

NVE had established relationships with dozens of distributors who purchased NVE's products on an ongoing basis prior to the interference. The Defendants, trusted insiders, interfered with those relationships by seizing opportunities for themselves. *See Graco, Inc. v. PMC Glob., Inc.*, No. CIV. A. 08-1304FLW, 2009 WL 904010, at *32 (D.N.J. Mar. 31, 2009) (approving sufficiency of tortious interference claim where plaintiff "argues that it has a reasonable expectation to continue its sales of [plaintiff's] products to its existing customers and distributors, and to sell products to other members of the trade"); *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, No. CIV.A. 10-453 FLW, 2010 WL 5239238, at *3 (D.N.J.

18

Dec. 16, 2010) ("a plaintiff does not need to allege specific prospective customers or contracts to show a reasonable expectation of prospective economic benefit"); *Di Cristofaro v. Laurel Grove Memorial Park,* 43 N.J. Super. 244, 255–56 (App. Div. 1957) (finding an independent maker of cemetery markers had a reasonable expectation of selling monuments to the public).

Moreover, Defendants interfered with NVE's prospective economic advantage "intentionally and with malice." *Printing Mart, supra.* Malice in this context "is not used in the literal sense requiring ill will toward the plaintiff . . . Rather, malice is defined to mean that the harm was inflicted intentionally and without justification or excuse." *Printing Mart,* 116 N.J. at 751. "[T]he gravamen of a claim for tortious interference with prospective advantage ... is that the defendants' conduct was somehow legally wrongful, rather than merely mean or spiteful." *Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc.,* 282 N.J. Super. 140, 204 (App. Div. 1995). As the Supreme Court in *Printing Mart* explained:

> [T]he ultimate inquiry is whether the conduct was both injurious and transgressive of *generally accepted standards of common morality or of law.* In other words, *was the interference by defendant sanctioned by the rules of the game*. There can be no tighter conception of liability in this area than that of the common conception of what is right and just dealing under the circumstances. *Not only must a defendant's motive and purpose be proper but so also must be the means*.

*Printing Mart*, 116 N.J. at 757 (quoting *Sustick v. Slatina*, 48 N.J. Super. 134, 144 (App. Div. 1957)).

Palmeroni and Rosarbo, trusted insiders, maliciously interfered with NVE's business relationships. The interference caused the loss of millions of dollars. As such, NVE is entitled to proceed with its intentional interference claim.

## IV.   DEFENDANTS ENGAGED IN A CIVIL CONSPIRACY TO COMMIT THE UNDERLYING TORTIOUS ACTS

The New Jersey Supreme Court defines civil conspiracy as follows:

> In New Jersey, a civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage. *It is enough [for liability] if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them.*

*Banco Popular North Am. v. Gandhi,* 184 N.J. 161, 177-78 (2005); *Vibra-Tech,* 849 F. Supp. 2d at 493–94. "The essence of the claim is not the agreement but the underlying wrong which would give rise to a cause of action." *Vibra-Tech,* 849 F. Supp. 2d at 493–94 (citing *Morgan v. Union Cty. Bd. of Chosen Freeholders,* 494 268 N.J. Super. 337, 364 (App. Div.1993)). Moreover, "[w]hile the unlawful agreement need not be expressed, and while the participants need not know all the details of the plan designed to achieve the objective or possess the same motives, they must share the general conspiratorial objective." *Weil v. Express Container Corp.*, 360 N.J. Super. 599, 614 (App. Div. 2003); *Banco Popular,* 184 N.J. at 177 (stating that the alleged conspirators must have understood the general objectives of the conspiracy, accepted them and made an implicit or explicit agreement to further those objectives).

The evidence of a conspiracy here is overwhelming.  First, there is ample evidence that Palmeroni conspired with various brokers to secure unauthorized commissions, and in turn, unlawful kickbacks.   Second, the evidence that Palmeroni and Rosarbo conspired to commit fraud, breach their duty of loyalty, and tortuously interfere with NVE's business by setting up competing businesses, lying about who the purchasers of diverted NVE products were and where the diverted the product would be sold, cannot fit more squarely within the definition of a civil conspiracy under New Jersey law.

## V.      DAMAGES FOR THE DEFENDANTS' UNLAFUL CONDUCT

### A.  Disgorgement of Defendants' Ill-Gotten Profits for the Kickback Scheme and Distribution Scheme

Under New Jersey Law, an employer may recover money damages for his employee's breach of the duty of loyalty. *Britting*, 63 N.J. Super. at 532.  The ability for such recovery stems from the Restatement (Second) of Agency which provides that "[a]n agent is subject to liability for loss caused to the principal by any breach of duty." Restatement (Second) of Agency, § 401. If "the employee usurped a corporate opportunity or secretly profited from a competitive activity, the employer may recover the value of the lost opportunity or the secret profit." *Cameco*, 157 N.J. at 518; *see also e.g., Valle v. North Jersey Auto. Club,* 141 N.J. Super. 568, 574 (App. Div. 1976) (stating that where theft of corporate opportunity occurs and "the interests of the corporation are betrayed, the corporation may elect to claim all of the benefits of the transaction for itself, and the law will impress a trust in favor of the corporation upon the property, interests and profits so acquire") (quoting *Guth v. Loft*, 23 Del. Ch. 255, 272 (Sup. Ct. 1939)).

"Damages may include profits the employee earned in another enterprise while still employed . . . and compensation for a direct injury suffered by the employer as a result of the employee's breach." *Cameco*, 157 N.J. at 518 (citations omitted); *Simulation Sys. Techs., Inc. v. Oldham*, 269 N.J. Super. 107 (App. Div. 1993) (awarding employer damages in an amount of former employee's profits where the former employee, a computer engineer, formed a company and for eleven months sold computer-related services in direct competition with his employer); *Britting*, 63 N.J. Super. at 532 ("It might be contended that these defendants are answerable in money damages and can be required to account to their employer for their ill-gotten gains, or the profits which the plaintiff would have made but for the disloyalty of the defendants"); *Chernow v. Reyes*, 239 N.J. Super. 201, 205 (App. Div. 1990) ("Defendant and his corporation are liable for any profits earned in a competitive business while he was employed by plaintiff*"); Lyle Carlstrom Assoc., Inc. v. Lyle,* No. A-0664-05T5, 2007 WL 114203 at *1 (N.J. Super. Ct. App. Div. Jan. 18,

2007) (where former employee deferred business from client to his personal account in violation of his duty of loyalty and two year non-compete agreement, finding that damages in the amount of defendant's profits was appropriate).

Indeed, the New Jersey Appellate Division has held that "[u]nder certain circumstances . . . we would be inclined to hold the former employee liable for all profits which resulted from competition with the employer during the term of employment, even where the profits were actually earned after employment ceased." *Chernow*, 239 N.J. Super. at 206.

Similarly, disgorgement of profits is an appropriate remedy for fraud. Typically in fraud cases New Jersey courts employ either the "out-of-pocket" rule or the "benefit-of-the-bargain" rule. *See Zeliff v. Sabatino,* 15 N.J. 70, 74–76 (1954). Out-of-pocket damages measure the replacement of lost profits or "recovery for the difference between the price paid and actual value of the property acquired." *Id.* Benefit-of-the-bargain damages are those that compensate for the difference between the "the price paid and the value of the property had the representations been true." *Id.* Those traditional damage theories for fraud, however, do not foreclose a disgorgement of profits remedy instead.[6] The Supreme Court emphasized that courts must not be rigid as to the

---

[6] In several cases discussed above that dealt with buyers fraudulently obtaining products at lower international pricing and then and reselling those products at below-cost domestic prices, courts have typically applied a straight-forward "benefit of the bargain" damages, and awarded plaintiffs the difference between the price paid and the actual market value of the product. *See Shulton*, 698 F. Supp. at 64 (finding that the proper measure of damages "the difference between the fraud induced export price and the domestic price plaintiff would have received absent the defendants' misrepresentations"); *Ortho Pharmaceutical Corp.*, 663 F. Supp. at 65-67 (same); *GTE Prod. Corp.*, 676 N.E.2d at 1153 (same).

Here, however, NVE is unable to take advantage of a strict "benefit of the bargain" theory of damages that measure the price difference because, as explained in prior submissions, it was unaware of the Distribution Scheme until years after it occurred and as such, is unable to reconstruct the invoices from the relevant time period with precision to establish what those numbers would have been. Application of the "benefit of the bargain" damages would have yielded NVE millions of dollars more than the disgorgement of profits that it seeks. Indeed, based on the

application of remedies for fraud, but rather, must use a flexible approach to ensure that the remedy

fits the facts of the particular case:

> The just method of determining damages necessarily varies with the facts of the particular case . . . No rule of damages capable of precise application in all cases can be laid down and followed. If a charge of fraud is sustained, all damages which are the proximate result of the wrong should be awarded. 'Regardless of whether the out-of-pocket rule or the benefit-of-the-bargain rule is the correct one, the fundamental rule universally employed' * * * is that 'The victims of fraud are entitled to compensation for every wrong which was the natural and proximate result of the fraud.' If one or the other rule is inflexibly adhered to, while certainty would be achieved it would in many instances be at the expense of justice.

*Zeliff*, 15 N.J. at 74–75.

In *Cty. of Essex v. First Union Nat. Bank*, 186 N.J. 46 (2006), an action brought by the

county against bank's successor in connection with fees that the bank charged as bond underwriter,

which position as a bond underwriter was obtained through bribery, the Supreme Court held that

disgorgement of unlawful profits was an appropriate remedy.  The court found that although the

county acknowledged it did not suffer damages on certain bond transactions, general principles of

equity mandate that the wrongdoer be relieved of any profit and the Bank official's unlawful

conduct entitled the County to disgorgement of the total fees received by the Bank on each of the

bond transactions. *Id.* at 61.

The *Vibra-Tech* decision also is instructive with respect to the appropriate method of

calculating damages.  In *Vibra-Tech*, the defendants concocted an elaborate scheme to divert

---

documents that were available, NVE's expert estimated that the Distribution Scheme resulted in a $7,893,070.18 difference between what NVE was actually paid and what it should have been paid by Smart World US.  Instead, NVE is relying on disgorgement of illicit profits from the Distribution Scheme as damages, which are substantially lower, totaling $2,302,426.02.  This is not an instance where a plaintiff would obtain a windfall in seeking disgorgement, rather the opposite is true.

their employer's prospective customers to their own competing enterprises.  The court stated that

two theories of recovery were available to the plaintiff:  lost profits and disgorgement.  Although

the court explained that lost profits theory was appropriate for plaintiff's claims of, among other

things, breach of fiduciary duty, tortious interference, and fraud, it found that "disgorgement of

profits is the more appropriate method of calculating the damages caused by the [defendants]":

> This is because of *the egregiousness of the Kavalek Defendants' conduct* and the
> fact that their schemes *were perpetrated fraudulently in clear violation of the
> fiduciary duties owed to their employer*. The principles of agency, on which the
> remedy of disgorgement is based, are directly applicable here. Section 403 of the
> Restatement (Second) of Agency makes it clear that "an agent [who] receives
> anything as a result of his violation of a duty of loyalty to the principal, [...] is
> subject to a liability to deliver it, its value, or its proceeds, to the principal." Here,
> the Kavalek Defendants gained hundreds of thousands of dollars in profits as a
> direct result of the violation of their duties. To the extent that the disgorgement
> figure exceeds the lost profits calculation, the Kavalek Defendants should not be
> allowed to keep the difference, which was gained by their unlawful conduct. If the
> Kavaleks were allowed to keep the difference, this would essentially allow them to
> benefit simply because they were able to obtain a better profit margin. There is little
> question that the profit margins that they achieved owed a great debt to their ability
> to use Vibra–Tech's confidential business information, its client lists and its
> equipment.

*Vibra-Tech*, 849 F. Supp. 2d at 497–98.

Like breach of fiduciary duty and fraud, disgorgement of profits is a proper remedy for

claims grounded in tortious interference with prospective economic advantage.  *See Zippertubing

Co. v. Teleflex Inc.*, 757 F.2d 1401, 1411 (3d Cir. 1985).  In *Zippertubing*, an insulation supplier

brought suit against a subcontractor for its competitor's tortious conduct that caused plaintiff to

lose a large contract.  Plaintiff did not attempt to establish the amount of their lost profits in order

to prove its damages but instead proved the amount of profits made by the defendant as a result

of its wrongdoing. *Id.* at 1411.  The defendant moved for judgment notwithstanding the verdict

claiming that New Jersey courts would not countenance the plaintiff's disgorgement of

wrongdoer's profits theory.  *Id.*  In rejecting the defendant's argument, the *Zippertubing* court

explained that:

> It is undoubtedly so that in most instances in which a New Jersey plaintiff has established liability for interference with a prospective advantage the judgment has been for the plaintiff's lost profits. Probably that is because in most instances the amount of plaintiff's loss and defendant's gain is the same. In the one case dealing with the question in New Jersey however, the Court of Errors and Appeals held that an accounting for profits is an appropriate remedy for interference with a prospective advantage. *Schecter v. Friedman*, 141 N.J. Eq. 318, 57 A.2d 251 (1948). That holding is consistent with the New Jersey law respecting the analogous business tort of misappropriation of a business name, *L. Martin Co. v. L. Martin & Wiles Co.*, 75 N.J. Eq. 257, 72 A. 294 (1909), and that of misuse of trade secrets. *A. Hollander & Son, Inc v. Imperial Fur Blending*, 2 N.J. 235 66 A2d 319 (1949).
>
> This remedy applied in *Schecter v. Friedman*, *supra*, is consistent with constructive trust principles, and "it is possible to think of the accounting for profits in this kind of case as simply a special form of constructive trust." (citations omitted). The *Schecter v. Friedman* remedy is, moreover consistent with the election of remedies available in New Jersey to the victim of a conversion of personal property. *Kaplan v. Cavicchia,* 107 N.J. Super. 201, 257 A.2d 739 (App. Div. 1969). All of these closely related damages rules are consistent with the policy of discouraging tortious conduct by depriving the tortfeasor of the opportunity to profit from the wrongdoing. Consistent with that policy, the trial court properly permitted the plaintiffs to prove as damages the amount of Teleflex's profits.

The *Zippertubing* court charged the jury as follows:

> The law says that when one has unlawfully deprived another of a contract or a business opportunity and has made that opportunity his own, he is not to be permitted to retain any of the profits, any of the benefits of his unlawful conduct. Therefore, it you were to find that the plaintiff has met its burden of proof as I have defined to you on each and every one of the elements of the case, it would be your job to award such damages as would deprive the defendant of any unlawful benefit of its unlawful conduct.

*Zippertubing*, 757 F.2d at 1411-12; *see also Platinum Mgmt.,* 285 N.J. Super. at 308 ("damages

to PMI proximately resulting from defendants' wrongs, measured by an accounting of profits . . .

are appropriately allowed in this case, involving essentially unfair competition-a wrongful

acquisition of PMI's customers in violation of a covenant not to compete and by intentional

interference with PMI's prospective economic advantage. . . It effects the policy of discouraging tortious or wrongful conduct by depriving the wrongdoer of the opportunity to profit from wrongdoing").

Here, by breaching its fiduciary duty of loyalty to NVE during their employment, committing fraud, and tortiously interfering with NVE's prospective economic advantage, the Defendants were able to enrich themselves, at the expense of NVE – while being paid a salary and expected to act in the best interests of their employer.  As a matter of law, policy, fairness, and equity, Defendants should not be permitted to retain any of the profits or benefits resulting from their fraudulent, unlawful and faithless conduct.  Under any of the theories of liabilities pled by NVE, the appropriate measure of damages are the profits that defendants earned through the Kickback Scheme and the Distribution Scheme.

Moreover, calculation of Defendants' profits should be measured by their gross, as opposed to net profits.  In *Zippertubing*, the Third Circuit rejected the defendant's objection to precluding the jury from deducting its indirect costs in calculating its profits, holding that when a wrongdoing is asked to disgorge profits, "[t]he wrongdoing should not be permitted, by misappropriating another's opportunity, to use that opportunity in order to help absorb fixed expenses of its own business.  757 F.2d at 1422.  The court in *Zippertubing* charged the jury as follows:

> In determining the amount of Telefex's profits, I instruct you that profits equal the total amount of money that Teleflex earned as a result of the Nab contract, less any direct expenses that were incurred with respect to this particular conduct [contract]. Thus, any direct costs of this project should be contracted from Teleflex's gross receipts in computing Teleflex's profits. You should not deduct from their gross receipts any expenses of running the business which they would have had anyway.

*Id.*  As the Third Circuit explained, "[i]t is obvious that fixed expenses are an essential element in determining the net profits of any business and must, for accounting purposes, be allocated among each of the business' sales activities.  Nevertheless . . . it does not follow that a proportionate share

26

of fixed expenses should be considered a cost factor in the computation of lost profits." Zippertubing, 757 F.2d at 1412; *see Ruger Chem. Co. v. Universal Preservachem, Inc.,* No. A-0018-07T3, 2009 WL 790486, at *6 (N.J. Super. Ct. App. Div. Mar. 27, 2009) ("defendants presented no evidence of its overhead expenses that should have been deducted from its gross profits. Thus, the jury could reasonably infer… that defendants' overhead may not have been impacted as a result of its sales to diverted Ruger customers. We, therefore, find no error in the court permitting plaintiff to present UPI's gross profits as a measure of calculating plaintiff's damages").

According to NVE's damages expert, who reviewed all financial information to determine the cash payments received by Palmeroni and Rosarbo, there were no mitigating cost reductions due to Defendants' fraud so the gross cash profit that Palmeroni and Rosarbo received is an appropriate measure of damages.  As such, upon a jury's finding that Defendants committed fraud, breached their duty of loyalty, and have tortuously interfered with NVE's economic advantage, the appropriate measure of damages an award of Defendants' total gross profits.

### B.  Disgorgement of Defendants' Salary

Under New Jersey law, an employer may seek forfeiture and disgorgement of compensation paid to a disloyal employee.  *Kaye v. Rosefielde*, 223 N.J. 218 (2015).  As the Supreme Court explained,

> the equitable remedy of disgorgement is derived from a principle of contract law: if the employee breaches the duty of loyalty at the heart of the employment relationship, he or she may be compelled to forego the compensation earned during the period of disloyalty. The remedy is substantially rooted in the notion that compensation during a period in which the employee is disloyal is, in effect, unearned.

*Id.* at 233; *see also Cameco*, 157 N.J. 504 (stating that an employer can recover compensation periodically paid to an employee during periods when the employee was in breach of the duty of

loyalty); *Mizrack v. Fairmount Chem. Co., Inc.,* 2013 WL 275958 (N.J. Super. App. Div., Jan. 25, 2013) (corporate officer of chemical manufacturer who surreptitiously accepted employment with a bio fuel company while remaining officer of manufacturer was required to disgorge fees earned from manufacturer during the period that his loyalty was divided); Restatement (Second) of Agency § 469 (1958) ("An agent is entitled to no compensation for conduct ... which is a breach of his duty of loyalty."); Restatement (Third) of Agency § 8.01 cmt. d(2) (2006) ("An agent's breach of fiduciary duty is a basis on which the agent may be required to forfeit commissions and other compensation paid or payable to the agent during the period of the agent's disloyalty."). Notably, the court in *Kaye* held that a showing of economic loss by an employer is not a prerequisite to granting the remedy of equitable disgorgement. 223 N.J. at 233.

The following factors are relevant to determining whether disgorgement is appropriate: (1) the employee's degree of responsibility and level of compensation; (2) the number of acts of disloyalty; (3) the extent to which those acts placed the employer's business in jeopardy; and (4) the degree of planning to undermine the employer that is undertaken by the employee. *Kaye*, 223 N.J. at 237 (citing *Cameco*, 157 N.J. at 521).

A recent decision illustrates the application of those factors. *Sevenson Envtl. Serv. Inc. v. Diversified Royalty Corp.*, No. CV 08-1386, 2018 WL 5033750, at *1 (D.N.J. Oct. 16, 2018) involved a lawsuit brought by an environmental clean-up service against its former employee who allegedly accepted kickbacks and stole from the company in his capacity as project manager. The former employee wrote and deposited checks into a shell account for his personal benefit over the course of seven years. *Id.* This court held that the employee's actions were so egregious as to warrant the equitable remedy of disgorgement. *Id.* at *4. Analyzing the case under the four-part *Kaye/Cameo* rubric, the Court determined that the evidence produced in that case more than

sufficiently established those factors.  Specifically, the court noted evidence of the employee's supervisory role and level of trust within the company; the high level of the employee's compensation; the employee's repeated disloyalty; a monetary loss to the company; and the creation of shell companies and the falsification of business records.  *Id.*  Significantly, although in ordering disgorgement, a trial court should apportion the employee's compensation only for periods during which the employee committed acts of disloyalty (as opposed to wholesale disgorgement), *Kaye*, 223 N.J. at 237, the court in *Sevenson* ordered disgorgement of compensation paid to the disloyal employee from March 2000 through October 2007, noting that the employee "was repeatedly disloyal over the span of at least seven years."  *Id.* at *4.

Here, the record similarly establishes the factors set forth in *Kaye/Cameo*, and upon a jury's finding that Palmeroni and Rosarbo breached their duty of loyalty, NVE seeks the equitable remedy of disgorgement to be imposed by this Court.  Palmeroni was the Vice President of Sales for NVE and was entrusted great responsibility to oversee all domestic and international sales. Although Rosarbo was subordinate to Palmeroni, he nevertheless had substantial responsibility and was trusted by NVE to act in the Company's best interest.

Both Defendants were well-compensated, earning six figure salaries, and both Defendants were repeatedly disloyal over a span of virtually all the years that they were employed at NVE.  In fact, Defendants continued the fraudulent scheme for some time after they had departed from the Company. Defendants used NVE's resources, price lists, customer information, and good will to advance their own self-interests and to divert prospective sales to their own entities that should have been brought to NVE.  Defendants took active steps to conceal their egregious breach of trust; they led NVE to believe they were faithful and loyal employees, all the while secretly enriching themselves at the expense of NVE, while being paid a salary to maximize the Company's sales.  It

would be inequitable for Defendants to retain the salary paid to them by NVE, and full disgorgement of all salary and benefits[7] in this instance is appropriate.  *See Sevenson*, 2018 WL 5033750, at *4.

### C.  Punitive Damages

Punitive damages are appropriate in cases where the wrongdoer's conduct is particularly oppressive, malicious, or in bad faith.  *See generally St. James v. Future Finance*, 342 N.J. Super. 310 (App. Div. 2001).  Punitive damages are governed by the Punitive Damages Act, N.J.S.A. § 2A:15–5.9. To recover punitive damages, the plaintiff must demonstrate

> by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions. This burden of proof may not be satisfied by proof of any degree of negligence including gross negligence.

*Id.* at 5.12(a).  Actual malice as defined as "an intentional wrongdoing in the sense of an evil-minded act." *Id.* at 5.10.  It defines "wanton and willful disregard" as a "deliberate act or omission with knowledge of a high degree of probability of harm to another and reckless indifference to the consequences of such act or omission." *Id; Sandler v. Lawn-A-Mat Chemical & Equipment Corp.,* 141 N.J. Super. 437, 448, 358 A.2d 805, 811 (App. Div. 1976), *cert. denied,* 71 N.J. 503 (1976). "Something more than the mere commission of the tort is always required for punitive damages. There must be circumstances of aggravation or outrage, such as spite or 'malice.'" *Grillo v. Board of Realtors,* 91 N.J. Super. 202, 232 (Ch. Div .1966).

---

[7] NVE seeks salary and benefits paid to Palmeroni from 2001 through 2005 in the amount of $870,425.00.  Because the only available information concerning Rosarbo's salary was from 2003-2004, and no information was available concerning benefits, NVE seeks disgorgement of salary for only those two years from Rosarbo, totaling $310,578.67.

The Punitive Damages Act contains a list of types of evidence that a jury must consider in determining whether punitive damages should be granted: "(1) The likelihood, at the relevant time, that serious harm would arise from the defendant's conduct; (2) The defendants' awareness or reckless disregard of the likelihood that the serious harm at issue would arise from the defendant's conduct; (3) The conduct of the defendant upon learning that its initial conduct would likely cause harm; and (4) The duration of the conduct or any concealment of it by the defendant." N.J.S.A. § 2A:15–5.12.

As set forth at length above, the evidence of Defendants' bad faith is overwhelming.  They were well-aware of their duties to NVE, the harm that stemmed from their actions, the value of the business opportunities that they diverted from NVE, and the ill-gotten profits they retained for their acts.  Defendants went to great lengths to conceal their schemes from NVE.  Upon a finding a jury's finding of liability, an imposition of punitive damages in this case would be appropriate. *See Vibra-Tech*, 849 F. Supp. 2d at 499-500 (upholding an award of punitive damages in the amount of 50% of $2,260,036 in economic damages for disloyal employees who concocted fraudulent scheme to divert business from employer).

## VI.   THE COURT SHOULD ALLOW NVE TO ASK THE JURY SPECIAL INTERROGATORIES

NVE seeks to ask the jury several special interrogatories related to the issue of whether its claims against Defendants are dischargeable in bankruptcy. More specifically, NVE requests the following special interrogatories:

- Do you find that Defendants Jesus Jose Palmeroni and Vincent Rosarbo willfully and maliciously caused an injury to Plaintiff when they breached their duty of loyalty?

- Do you find that Defendants Jesus Jose Palmeroni and Vincent Rosarbo willfully and maliciously caused an injury to Plaintiff when they intentional interfered with NVE's prospective economic advantage?

31

- Do you find that Defendants Jesus Jose Palmeroni and Vincent Rosarbo willfully and maliciously caused an injury to Plaintiff when they entered into a civil conspiracy to inflict an injury upon NVE?

As the Court knows, Defendants have filed several petitions for bankruptcy while this case has been pending. Although those petitions have all been dismissed, one or both of the Defendants may refile for bankruptcy. A debt cannot be discharged in bankruptcy if it is the result of a "willful and malicious injury by the debtor to another entity." 11 U.S.C. § 523(a)(6). If the Court allows special interrogatories set forth above, then the issue of dischargeability will not need to be re-litigated in bankruptcy court because it will be subject to the doctrine of collateral estoppel. *In re Docteroff*, 133 F.3d 210, 216 (3d Cir. 1997) (holding that the doctrine of collateral estoppel barred the debtor from relitigating certain issues relating to dischargeability that had already been litigated in a prior proceeding).

Several bankruptcy courts have recommended this procedure to avoid additional litigation on the issue of dischargeability. *See, e.g.*, *In re Hunter*, 32 B.R. 140, 142 (Bankr. S.D. Fla. 1983)(explaining that the record from a district court trial should include findings of fact or special interrogatories that would be relevant to the determination of dischargeability); *In re Hosey*, 355 B.R. 311, 321 (Bankr. N.D. Ala. 2006)("Had the Court been able to review the state court complaint or at least the jury instructions or special interrogatories, perhaps then this verdict might have been given more weight in determining fraud for purposes of this dischargeability proceeding.") In addition, the several courts have approved this procedure. *See, e.g.*, *Austin v. Wendell-W. Co.*, 539 F.2d 71, 74–75 (9th Cir. 1976) (explaining that the bankruptcy court may enter a determination of dischargeability if it is satisfied that the relevant issue with regard to dischargeability has been fully addressed in a special interrogatory); *In re Harris*, 7 B.R. 284, 287

32

(S.D. Fla. 1980) (approving the special interrogatory procedure discussed in *Austin*).  For all of these reasons, the Court should allow special interrogatories on the issue of dischargeability.

<div style="margin-left:40%;">

**PASHMAN STEIN WALDER HAYDEN**
A Professional Corporation
Attorneys for Plaintiff,
*NVE, Inc.*

By:      /s/ James W. Boyan III
         **JAMES W. BOYAN III**
</div>

DATED: March 3, 2020