1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF NEW JERSEY

3

4    N.V.E., INC.                    :   Civil No.
                                         06-cv-5455-MCA
5                   Plaintiff,       :
                                         TRANSCRIPT OF
6              v.                    :  HEARING ON MOTIONS

7    JESUS J. PALMERONI, a/k/a JOSEPH    :
     PALMERONI, VINCENT ROSARBO, NATIONAL
8    RETAIL CONSULTING GROUP, INC., AMERICAN :
     WHOLESALE DISTRIBUTION, INC., GLOBAL
9    MARKETING & SALES GROUP, LLC, and    :
     VAR CONSULTING, INC.,
10                                  :
                   Defendants.
11   ----------------------------------------x

12                              Newark, New Jersey
                                January 23, 2020
13

14   BEFORE:

15        THE HON. MADELINE COX ARLEO, U.S.D.J.

16

17

18
                                Reported by:
19                              CHARLES P. McGUIRE, C.C.R.
                                Official Court Reporter
20

21

22

23
     Proceedings recorded by mechanical stenography; transcript
24   produced by computer-aided transcription.

25

2

1    APPEARANCES:

2        PASHMAN STEIN WALDER HAYDEN
         21 Main Street
3        Hackensack, New Jersey 07601
         BY: SAMUEL A. SAMARO, ESQ., and
4            JAMES W. BOYAN, III, ESQ.
         Attorneys for Plaintiff

5

6        JESUS PALMERONI
         3308 Route 940
         Mount Pocono, PA 18344
7        Pro se

8        VINCENT ROSARBO,
         23 Thistle Meadow Lane
9        Branford, CT 06405
         Pro se

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1          THE COURT CLERK:  All rise.

2          THE COURT:  All right.  Good afternoon, everyone.

3          MR. SAMARO:  Good afternoon, Your Honor.

4          THE COURT:  Okay.  We're here for N.V.E. v.

5    Palmeroni.

6          Could I have appearances, please?

7          MR. SAMARO:  Good afternoon, Your Honor.

8          Samuel J. Samaro of the law firm of Pashman Stein

9    Walder Hayden on behalf of N.V.E.

10          THE COURT:  Okay.

11          MR. BOYAN:  James Boyan of Pashman Stein Walder

12    Hayden, also on behalf of N.V.E.

13          THE COURT:  Okay.

14          MR. PALMERONI:  Jesus Palmeroni, pro se.

15          THE COURT:  Okay.

16          MR. ROSARBO:  Vincent Rosarbo, also pro se.

17          THE COURT:  All right.  Everyone, have a seat.

18          All right.  So, what I wanted to do was go through

19    these in limine motions and make sure everyone was ready to

20    go forward with the trial.

21          I know that one of -- is it Mr. Rosarbo who has

22    the issue?

23          MR. ROSARBO:  Yes, Your Honor.

24          THE COURT:  Okay.  So, tell me.  I know you wrote

25    me a letter that you have an issue with your brother.  I'm

4

1    very sorry for his situation and will certainly accommodate

2    you in a reasonable way.

3            Could you give me any update as to his status in

4    your need to be with him?

5            You can stand.

6            MR. ROSARBO:  Excuse me, Your Honor, I'm sorry.

7            Well, he was initially diagnosed with stage four

8    small cell lung cancer, which is an aggressive lung cancer,

9    and it has spread since then into his bones and his brain

10   and also into his liver.

11           What they have done is, the protocol is to give

12   him a series of radiation treatments, followed by chemo

13   treatments, and then re-evaluate and then see if they took,

14   or if it's a choice of putting him into a -- we call it a

15   hospice, that just makes him comfortable until his life

16   passes on.

17           My reasons for all this is, I'm the only person

18   that he has to deal with.  My mother, father, and sister

19   both passed.  I'm his legal guardian.

20           THE COURT:  Does he have any children, or a wife?

21           MR. ROSARBO:  No.

22           THE COURT:  Partner?

23           MR. ROSARBO:  He's been autistic from birth, so he

24   doesn't understand quite a few things.  He's lost quite a

25   bit of weight.

5

1          THE COURT:  Who did he live with before this all

2  happened?

3          MR. ROSARBO:  He lived with himself.  He was

4  self-sufficient as far as taking the bus, cooking for

5  himself, cleaning.

6          THE COURT:  Did he work?  Did he have a job?

7          MR. ROSARBO:  No.  No.  He can't.  He's on Social

8  Security disability.

9          THE COURT:  Okay.

10          MR. ROSARBO:  He's on state grants.  So I took

11  care of the bills.  But he had no problem, other than what

12  just happened.

13          THE COURT:  And no children, I take it.

14          MR. ROSARBO:  No, none.  And he's lost quite a bit

15  of weight.  I go and see him one or two times a day.  I feed

16  him.

17          THE COURT:  Is he in a nursing home or a hospital?

18          MR. ROSARBO:  No, he's in the hospital right now.

19          He knows he's sick.  I don't think he understands

20  the graveness of it.  That's all on the doctors and us.

21          And what I'm trying to say is that at this point

22  in time, I'm stuck in the situation that if I have to make a

23  choice, I can't leave him and make the choice to do what I

24  have to do here.  I won't be able to do both at the same

25  time.

6

1          THE COURT:  When did they start his treatment?

2          MR. ROSARBO:  Oh, he's been in the hospital a

3   month.  They started his treatment two weeks ago as far as

4   radiation's concerned.  He has to build up another week or

5   so to even attempt chemo.

6          Today, I was supposed to have a family meeting.

7   It was canceled till tomorrow.  I had to come here.

8          THE COURT:  Got it.

9          MR. ROSARBO:  And I'll get a bigger update then.

10          But what I'm trying to say is, the reason why I

11   put in the extension for that time frame is, I'll definitely

12   know one way or the other whether it has taken, slowed it

13   down, or nothing has happened, and I'll have a choice to

14   make at that point.  I can't make that choice now.

15          THE COURT:  I'll hear from Plaintiff's counsel.

16          What I'm thinking about doing, certainly if you're

17   the primary caretaker for a special-needs family member who

18   has no one else and is in the last stages of life, I'm not

19   going to start the trial until --

20          MR. ROSARBO:  Thank you, Your Honor.

21          THE COURT:  -- that issue is concluded.

22          But I'd like to set a trial date, perhaps in

23   March, and if you're still involved with your brother in

24   March, we'll have a telephone call in February, and you can

25   send us an update letter before then, or call my chambers,

1    or send a letter would even be better because then we could

2    send it to everyone, I could have it e-filed, and if he

3    still needs your guidance and care, then I could kick it

4    again after that, based on what you tell me.  So we can even

5    set it down for a telephone call so you can have a number to

6    call in at the end of February, and we'll keep it in March,

7    for a lot of reasons.  Number one, I think it's the right

8    thing to do in a civil matter that's old as it is, and,

9    number two, I wouldn't want to start and then halfway

10   through a trial have to declare a mistrial because you tell

11   me he passed away or he got worse and you have to be with

12   him and you have to do funeral arrangements, and then we

13   have a situation where I have to declare a mistrial, and

14   then Mr. Occhifinto, his counsel, Mr. Palmeroni, we'll all

15   have to start over again, and that's not fair, either, and

16   the Court wastes its time.

17          So, I'll pick a firm date and I will do it as

18   firmly as we can under the circumstances, and we'll just see

19   how it goes from here.

20          MR. ROSARBO:  Thank you, Your Honor.

21          THE COURT:  But what I'd like to do is go through

22   these motions, have everything ready, and make sure that we

23   know we need witnesses ready and what the parameters of the

24   trial are.  Okay?

25          Anything you want to add, Mr. Samaro?

8

1          MR. SAMARO:  Only that in light -- I would never

2     oppose such a request, and we did not oppose the request;

3     but, in reliance upon the trial date that you did schedule,

4     Your Honor, I scheduled a family vacation beginning on the

5     14th of March.

6          THE COURT:  I will not stand in the way of family

7     vacations.

8          MR. SAMARO:  I'm sorry, Your Honor?

9          THE COURT:  I will not stand in the way of family

10    vacations.

11         MR. SAMARO:  So, Your Honor, as long as it starts

12    -- if it starts the 23rd, that will be fine.  My vacation is

13    supposed to start on the 14th.

14         THE COURT:  That's perfect.  We'll do it --

15    actually, you don't want to come back -- maybe we'll start

16    on March 24th.

17         MR. SAMARO:  That would be great, Judge.  Thank

18    you.

19         THE COURT:  That gives you a day to get ready.

20    And there will be jury selection to start with anyway.

21         All right.  So that's what we're going to do.

22    We'll tentatively schedule it for the 24th.

23         Before Mr. Samaro goes on vacation on the 14th,

24    we're going to have a telephone call on March 10th at -- do

25    we have a time?

CHARLES P. McGUIRE, C.C.R.

1          THE COURT CLERK:  Three o'clock.

2          THE COURT:  Let's do four in case I want to put

3     something in in the afternoon.

4          March 10th at 4 p.m.

5          I'm going to ask if Mr. Samaro could initiate the

6     call.

7          MR. SAMARO:  Will do, Your Honor.

8          THE COURT:  And before you leave, we have a

9     sign-in sheet; I'll make you a copy.  Are the phone numbers

10    of Mr. Palmeroni and Mr. Rosarbo provided?  Are they cell

11    phones?

12          MR. ROSARBO:  Yes, Your Honor.

13          THE COURT:  Okay.  So, what we'll do is, put in

14    your calendar March 10th at four o'clock, so you won't have

15    to come into Newark again.  Mr. Samaro will initiate a

16    telephone call.  He will give you a call.  I'll give him a

17    copy of the sheet, or he'll just call you in, and then we'll

18    have a telephone call for the sole purpose of finalizing the

19    trial date, whether it goes forward on the 24th or whether

20    we need a further adjournment, so then Mr. Samaro has

21    finality and understanding before he goes on vacation.

22    Okay?

23          MR. ROSARBO:  Thank you, Your Honor.

24          THE COURT:  All right.

25          So, there is a number of motions that have been

10

1    filed, and we'll go through them in order.

2          I want to begin with the motion to reconsider the

3    ruling of the prior District Court judge on the issue of the

4    adverse inference, and I read the papers, and I understand

5    the issues.

6          I will tell you what I'm going to do first, and

7    then I'm going tell you why.

8          This case has a long history, it has an '06

9    docket, and I got involved in this case I guess in '15,

10   having gone through the motions to dismiss, summary

11   judgment, lots of discovery.

12         But there were rulings made back in I think it was

13   2010 by a different District Court judge on the issue of

14   spoliation of evidence that appears to stem from the failure

15   to preserve some electronic discovery in the possession of

16   N.V.E.

17         The prior judge found that there was spoliation

18   based on gross negligence, and that gross negligence finding

19   was predicated, in part, on not having a litigation hold in

20   place back in '06, I guess it was, at the time that they

21   were on notice of this potential litigation.

22         Since that time, in '15, the law has changed.  The

23   rule speaks now to, spoliation, adverse inferences should

24   only be given where there's intentional conduct, not any

25   form of negligence, and the comments by Chief Judge Roberts

11

1    give some latitude for courts to provide that inference or

2    to decide whether or not to apply the new heightened

3    standard for cases that had not been decided -- strike that

4    -- where the conduct occurred before the new evidence

5    ruling, and gave a fair amount of discretion to the District

6    Court in whether to apply it retroactively or not.  I think

7    the comment says that the rule change takes effect on

8    December 1, 2015, and "shall govern all proceedings in civil

9    cases thereafter commenced, and, insofar as just and

10   practical, all proceedings then pending."

11        What makes this case a little bit different is

12   that the issue is raised and resolved before the rule

13   change, and the Plaintiff did not ask the Court to

14   reconsider it until the motions that were filed in December

15   of 2019, and I'm also mindful that the opponents to this

16   motion are pro ses.

17        So here's what I'm inclined to do, and I am

18   inclined to carry the motion until the close of the evidence

19   so I have a better sense of whether these documents that

20   were allegedly destroyed, or not preserved, I should say, go

21   to damages, whether they go to liability, whether it makes

22   sense, having heard all the evidence and understanding the

23   importance of those documents in context, whether I should

24   revisit that ruling.

25        MR. SAMARO:  May I, Your Honor?

1          THE COURT:  Sure.

2          MR. SAMARO:  That sounds fine to me.  The problem

3     there, I think, is that if Your Honor were of a mind to

4     simply deny the motion, then in our case-in-chief, we would

5     have witnesses on this question, because the jury is left

6     with the --

7          THE COURT:  Well, tell me what the documents are

8     that are at issue.

9          MR. SAMARO:  Well, so that's the thing:  It's

10    never been clear, to Your Honor.

11         THE COURT:  To me, either.  So that's why -- it's

12    hard to give an adverse inference -- I don't even know --

13    all I know, from what I read of the District Court's

14    opinion, is that there were some electronic documents that

15    were not preserved after a litigation hold.  That's all I

16    know.  So, I wouldn't even know:  Does it go to their

17    defenses to damages -- because it's the Defendants that are

18    claiming litigation hold -- or defenses to liability?

19         MR. SAMARO:  So, Your Honor, the case is filed in

20    '06.  The parties begin discovery, including document

21    discovery, around 2007.

22         Earling Jensen is here today.  He is the in-house

23    guy -- not a lawyer, but he is the CFO who, with my guidance

24    and instructions and the guidance and instructions of an

25    in-house lawyer, is gathering the documents that are

13

1    responsive to the discovery request, and that happens over

2    the course of a year, a year and a half, something like

3    that.

4              Mind you, at this time, files --

5              THE COURT:  We're talking about back in '07.

6              MR. SAMARO:  Yes.  Yes, Your Honor.

7              So, in that period of time, files are mostly paper

8    files.  You know, some of it is electronic, but in those

9    days, we were dealing with paper.  And so Mr. Jensen went

10   through all the documents they had, pulled all the records

11   that were responsive, and then they were produced.

12             Fast forward to 2009.  After this has all

13   happened, Mr. Jensen begins to throw some of those documents

14   out because they're no longer needed.  Not the ones that are

15   produced; the ones that he did not deem relevant at the

16   time.

17             So, what winds up happening is, the other side

18   finds out that records have been destroyed, and these

19   motions for spoliation are filed.  But no one has ever

20   established that anything evidential was lost.  And that's

21   the absolute truth, which is why --

22             THE COURT:  Can I ask you a question?

23             MR. SAMARO:  Yes.

24             THE COURT:  Because, in looking at the rule change

25   -- and it has to do with electronically stored

1    information --

2                    MR. SAMARO:  Right.

3                    THE COURT:  -- was this electronically stored

4    information?

5                    MR. SAMARO:  It was, Your Honor.  It was stored on

6    a system.  It was called the Mac system.  So it was both

7    stored on that computer system, and every single piece of

8    paper as far as we knew was also stored in paper form in a

9    file.

10                   And so what winds up happening is, in 2005 into

11   2006, they convert to a new computer program.  So the old

12   system was called the Mac system, and the new system was

13   called something else -- which my colleague can help me

14   with, if necessary -- the MAF 200.

15                   So, apparently, this Mac thing is -- the Mac

16   system is a really old computer program that over time --

17   and we've had it ever since.  It was never -- all of the

18   documents were stored on that thing, it was never destroyed.

19   But, years later, when all of this came up, we couldn't find

20   anybody who could actually go into the system and reproduce

21   the documents stored there.  Nobody denies that -- we didn't

22   throw that thing out.  We just can't -- it's -- whatever,

23   it's so old that nobody -- we would have to spend a lot of

24   money to do it.  They tried to find a couple of people who

25   could do it; they could not.  It was offered to them to do,

1      and nobody on that side did it.

2                So, we have the computer where all of the

3      documents were stored --

4                THE COURT:  Were they switched from Mac to the new

5      system?  Were they transferred?

6                MR. SAMARO:  So -- they were not.  I mean, I guess

7      they started fresh.

8                These are like orders.  These are invoices, you

9      know, these are business records on an ongoing basis.  So

10     they did not transfer the records.  PDF --

11               THE COURT:  But have the paper copies of whatever

12     is on Mac, and when the documents were requested in '07-'08,

13     were they turned over?

14               MR. SAMARO:  Yes.

15               THE COURT:  Do you have those invoice records?

16               MR. SAMARO:  Yes.  All of the things that were

17     relevant at the time, right, because, 2006, it was one case,

18     it was just about the kickback scheme.  We didn't know about

19     this whole distribution thing until 2010 into 2011, when the

20     complaint was amended.  So anything that was relevant back

21     in 2006 was both preserved and produced.  No one has ever

22     been able to say what document was lost, because no

23     documents were lost.

24               Judge Salas was very concerned because we did not

25     do a litigation hold letter and because I didn't personally

16

1    go down to supervise the collection of these documents, but,

2    frankly, there was in-house counsel.  In those days -- we do

3    it now, but in those days, this was not something that was

4    done routinely.

5            And so there is no -- as far as we know,

6    everything that was responsive to the requests at that time

7    was preserved and produced, and no one has ever pointed to a

8    document --

9            THE COURT:  At that time, it was the kickback

10   scheme that was --

11           MR. SAMARO:  That's right, Your Honor.

12           THE COURT:  So, from what I understand about the

13   distribution scheme, it would seem that the documents that

14   support the distribution scheme would be uniquely in the

15   possession of the Defendants, not in the possession of --

16           MR. SAMARO:  True, and -- well, right, and --

17   well, so what they were doing would be in their possession.

18   We would have had more of the invoicing and so on, which

19   would have helped us greatly with damages.  I mean, we had

20   to revise our damage theory because we didn't have some of

21   those records, and again, it's because we didn't know

22   anything about this until after 2009.

23           So whatever was responsive was found and produced,

24   and no one has ever established otherwise.

25           And so what we will need to do is, I'll have to

1    call Earling and other witnesses to come in and explain all

2    of this at some point to the jury if they will be offered

3    the opportunity to infer that maybe we did something

4    intentionally.

5            And so Your Honor's procedure is fine, except it

6    sort of anticipates a bifurcation, because, if Your Honor

7    were of a mind to give that charge, then I would have to put

8    on testimony about all of the things I just said.

9            THE COURT:  Mr. -- is it Palmeroni?

10           MR. PALMERONI:  Yes, Your Honor.

11           THE COURT:  Okay.  So let me focus you on your

12   response.

13           What if any documents were you unable to obtain as

14   a result of this inability to preserve documents?

15           MR. PALMERONI:  As Judge Salas said, N.V.E. wasn't

16   able to quantify everything that was destroyed.

17           THE COURT:  Give me an idea.

18           MR. PALMERONI:  Sure.  Absolutely.

19           THE COURT:  Let me put it in context.  You worked

20   for the company.  What was your title?

21           MR. PALMERONI:  Eventually, vice president of

22   sales.

23           THE COURT:  Okay.  So you were vice president.

24           MR. PALMERONI:  Yes.

25           THE COURT:  So you knew what kind of documents

1    were stored.

2              MR. PALMERONI:  Absolutely.

3              THE COURT:  You got a lot of documents that were

4    produced in paper form.  Tell me what documents you were

5    unable to obtain as a result of the documents not being

6    preserved and stuck in the Mac computer system.

7              MR. PALMERONI:  Absolutely, Your Honor.

8              First of all, being there seven years, I'd like to

9    weigh in on exactly how these documents were produced in the

10   first place, because that's important.

11             When an order would come in -- I'm going to speed

12   through it.  When an order would come in, there would be

13   paper copies, and they would be inputted into the Mac

14   system.  The Mac system had holds throughout it where things

15   had to be approved all the way to accounting.  Nothing could

16   be released down to shipping.  It was supposedly state of

17   the art at the time.

18             Because Mr. Occhifinto did not believe in

19   computers, he made sure that everything was in triplicate on

20   paper copy, both upstairs, outside of my office in the

21   secretarial pool, as well as downstairs in shipping, far,

22   far away, you know, a quarter mile away.  They had to have

23   it in triplicate.

24             What was contained in there was all of the

25   shipments that we're talking about in the time that they

1    brought this case; the pricing, which goes to the heart of

2    this case, goes to the heart of the case as far as the

3    so-called distribution scheme.

4            THE COURT:  Let me stop you for a minute.

5            The wrongful conduct, the alleged wrongful conduct

6    that is the subject of the complaint with respect to the

7    distribution scheme; when did it go from?  What's your case

8    from, Mr. Samaro?  What year to what year?

9            MR. SAMARO:  So the case is from 2000 on, Your

10   Honor.

11           THE COURT:  Till when?

12           MR. SAMARO:  To 2006, right?  2006?

13           THE COURT:  Okay.  All right.  So -- and I'm going

14   to get right back to Mr. Palmeroni.  What if any shipment

15   records and pricing records were produced for 2000 to 2006?

16           MR. SAMARO:  So we're missing pricing records from

17   that period of time because, again, these were not the

18   documents that were relevant until 2011, when we amended the

19   complaint, when we had figured out this distribution scheme.

20   At the time that we were producing documents and Mr. Jensen

21   was looking for documents, these were not issues in the

22   case.  We never thought that they would be issues.  We

23   served a lot of subpoenas on banks, and that's how we were

24   able to reconstruct the other part of this fraud, but we

25   didn't know it at the time, Judge.

1          THE COURT:  How did you reconstruct the pricing?

2     In other words, isn't your whole case that the product was

3     shipped through the European affiliate and purchased through

4     them and then rerouted through this new company that they

5     designed, and they sold it to your customers?

6          MR. SAMARO:  It is, Your Honor.  So, our damages

7     theory is disgorgement.  We can prove to the last nickel how

8     much they made through this scheme.

9          THE COURT:  How?

10         MR. ROSARBO:  Because we have all of the tax

11    records.  We have all of the checks.

12         THE COURT:  Whose tax records?

13         MR. SAMARO:  Theirs, the tax records for them

14    individually, the tax records for their company.

15         See, they ran all of this through companies, and

16    then formed these companies on the side that collected the

17    checks from the sales of this product.  And we've taken

18    their depositions.  Every nickel that they made through

19    those companies was by selling this diverted product.  And

20    so we know exactly what their profit was, and that's all

21    we're asking for.  If we had those records, we would be

22    asking for lost profit, which would be the amount we would

23    have sold the products for, but we can't because we don't

24    have those records.  We know -- you know, we have

25    approximately --

21

1          THE COURT:  And that would be higher.

2          MR. SAMARO:  That would be much higher.  It would

3   be double what we're able to establish now.

4          THE COURT:  Okay.  Go ahead, Mr. Palmeroni.

5          MR. PALMERONI:  Okay.

6          As Mr. Samaro just so succinctly stated, all of

7   the records for pricing and billing at that time are

8   missing, so they constructed a very convenient theory.  What

9   the Court may not be aware of as Your Honor was not on the

10  case at that time is, they first made an amended complaint

11  that all of this product was stolen and counterfeited.  When

12  my attorneys, who could not get ahold of Mr. Rosarbo,

13  finally got ahold of records that were turned over from

14  Mr. Rosarbo and then put into evidence by Mr. Samaro, we

15  found over $12 million in cash payments that were made

16  directly from Mr. Rosarbo to N.V.E.

17         At that time, we said, we need to -- we're going

18  to go for court sanctions here.  You're saying these things

19  were stolen and et cetera, stolen and counterfeited.  We

20  need to pull that amended complaint, which they did, and

21  then came back with the theory that they were wrong in a way

22  that things were sold below.

23         If Your Honor would, I have a memorandum that I

24  just discovered -- well, that was given to me that outlines

25  the different pricing that was occurring, and this is from

22

1    another employee at N.V.E. writing something to

2    Mr. Occhifinto and myself about the disparate pricing all

3    over the place.

4            They claim that these things were being sold at

5    this crazy price.  What they don't tell you is that Ephedra

6    was the main product.  Ephedra was about to be outlawed.

7    Mr. Occhifinto has been called in front of Congress to

8    testify, as well as other large companies that were

9    marketing this, and, although no one knew the hour of the

10   day -- the hour or the day that this would happen, it was

11   imminent, and it did happen.  And anybody that knew, as

12   Mr. Occhifinto did, the president of N.V.E., because he had

13   been through something similar before, anybody that was

14   involved in this knew that when the Feds came down, the

15   Federal Government came down and said this would no longer

16   be sold, you were going to be stuck with it, okay?  Zero.

17   Nothing.

18           He had tens of millions of doses, of raw product

19   doses in his warehouse.  He was selling it at any price

20   because our economies of scale were different than any other

21   company.  We were vertically integrated.  We were making the

22   stuff basically for free.  All of our competitors were

23   having another company make it for them.  Okay?  The profit

24   margins were in the thousands of percents.  Okay?

25           This memo, if I can give it to the Court -- I've

23

1    already given Mr. Samaro a copy, and Mr. Rosarbo has a

2    copy -- outlined that things were being sold at all

3    different prices.  Because no one knew the hour or the day,

4    we shipped to a lot of people.  We shipped to GNC, we

5    shipped to Rite-Aid, we shipped to a lot of jobbers, and

6    over 100,000 convenience stores -- I'm sorry, 80,000

7    convenience stores.  If we shipped Ephedra product to GNC,

8    at least, we were averaging about $12 million a year in

9    sales, okay, and the law came down, which eventually it did,

10   we would have to refund all that money.  Okay?

11           So what was happening in the background with

12   Mr. Occhifinto and Mr. Rosarbo is, this product was being

13   sold for cash at a large profit.  N.V.E. didn't lose money,

14   they made money.  In the end, when the law came down, both

15   Mr. Occhifinto and the companies that Mr. Rosarbo ran were

16   caught with product.  But they took the risk, they rolled

17   the dice, and they made millions before that happened.

18           All the records are destroyed that show that

19   pricing was all over the place.  You could come in with a

20   suitcase of cash and get it at half price.  Why?  Because

21   you had the cash, okay?

22           She outlines here, the person that was on our

23   sales team outlines here in the memo where she says, we're

24   doing deals all over the place because this guy's been with

25   us so long, this guy's -- that goes directly to the heart of

24

1    their case.

2          They're saying this stuff sold at this price, and

3    we never wavered.  That's not true.  It's not close to true.

4          THE COURT:  Are you going to have witnesses at

5    trial that are going to speak to that?

6          MR. PALMERONI:  We have myself, we have

7    Mr. Rosarbo.  We have -- I mean, we have this memo here.

8          THE COURT:  So let me understand.

9          MR. PALMERONI:  Yes.

10          THE COURT:  Let me just put it in context.

11          Let me understand.  Give me an example with real

12    numbers, Mr. Samaro.  So, all the products that were part of

13    this distribution scheme were Ephedra products?

14          MR. SAMARO:  Until later on -- so the brand name

15    is Stacker 2, and for most of this history, they are Ephedra

16    products.  In 2004, Ephedra is banned, and then this

17    distribution scheme continues with the Ephedra-free version

18    of the product.

19          THE COURT:  Got it.  So do you dispute that there

20    was all different pricing policies for Stacker 2 products

21    with the Ephedra?

22          MR. SAMARO:  The way it's described here, we

23    certainly do.

24          So, the most popular format for this product was

25    the 20-count bottle, and for the most part, as far as we can

1    tell, in the vast majority of cases, the wholesale price was

2    $2.75 domestically.

3                    THE COURT:  How much?

4                    MR. SAMARO:  $2.75 for a 20-count bottle.

5                    THE COURT:  What was retail?

6                    MR. SAMARO:  Retail was -- depended on the store.

7    You know, they would be sold -- these were wholesale sales,

8    so -- sometimes they were sold to convenience stores, which

9    were very expensive.  Maybe Earling could tell me.  I don't

10   know what the --

11                   THE COURT:  And how much was it sold to the -- is

12   it a European-related company?

13                   MR. SAMARO:  Right.  Mostly, a dollar-thirty.

14   Okay?

15                   THE COURT:  Okay.

16                   MR. SAMARO:  So here's what I can't tell you with

17   any precision, which is the complication for us.

18                   There were certainly times, if you called

19   Mr. Occhifinto and you were willing to buy a truckload, he

20   would discount the 2.75 to something else, maybe 2.50.  You

21   know, it varied.  It was never, never as low as the

22   international price.

23                   And we have Mr. Rosarbo's deposition where he

24   admits to all of this.  I mean, he's asked the question, you

25   know, was the price lower --

1          THE COURT:  Let me just understand.  The scheme is

2     that an existing client of N.V.E. wants a bottle, one bottle

3     of Stacker 2, so they buy it at the European price, resell

4     it at the U.S. price, and take the difference?

5          MR. SAMARO:  Yes, and --

6          THE COURT:  And were those existing clients or new

7     clients?

8          MR. SAMARO:  Everyone -- as far as I can tell,

9     Your Honor, everyone was an existing client.

10          Not only that.  Mr. Palmeroni is in charge of

11     sales, right?  So he's in charge of making these deals to

12     sell N.V.E. product.  He is the one diverting it.  You know,

13     they hire a warehouse.  They have the stuff delivered to

14     this warehouse.  It was bought in the name of an existing

15     European client, and then he would sell it to the very

16     customers that he was working with for us, for N.V.E.  So he

17     could decide, he could -- he was undercutting our prices

18     substantially, which, as Mr. Rosarbo said in his deposition,

19     is the only reason this scam worked, and it worked because

20     there was such a disparity.

21          THE COURT:  But Defendants don't deny that you

22     were doing this.

23          MR. PALMERONI:  Your Honor, I've spoken to this

24     since the beginning, since my first interrogatories.

25          I was approached by Mr. Rosarbo, who had been in

1    prison with Mr. Occhifinto, about selling some product that

2    was going to be seconds, mislabeled.  This happened daily at

3    N.V.E.  We didn't have trained personnel there, and when

4    sales went from one million a year to 80 million a year, it

5    was a mess.

6            Most of my time was spent on the road.  I was on

7    the road a minimum of --

8            THE COURT:  So, in other words, is your defense

9    that Mr. Occhifinto was complicit in this scheme?

10           MR. SAMARO:  Yes.  Well, I don't know exactly the

11   terminology, if that's the right terminology.  He was making

12   money with Mr. Rosarbo.

13           THE COURT:  Did he know you were doing this?  Did

14   he know that you had existing customers, and instead of

15   selling it for the going rate -- whether or not

16   Mr. Occhifinto as president sold it for 2.75 or 2.25 or, you

17   know, a dollar-ninety, that's, you know, that's whatever --

18   you know, businesses do what they want to do to get rid of

19   their product and cut their own profit.  But that's markedly

20   different than saying, I'm going to take an existing client,

21   I'm going to buy it at the European price, and then I'm

22   going to resell it to the same clients and pocket the

23   difference, because, if that's it, Mr. Occhifinto wouldn't

24   be necessarily involved in that, because he could have just

25   sold it for a dollar-thirty from his own warehouse.  He

1    wouldn't have had to have a second company that sounded very

2    close to the name of the European international company.

3              MR. PALMERONI:  Your Honor, they admit that they

4    don't have the records for --

5              THE COURT:  No, I'm not asking about the records.

6    But their theory is -- they had the records from the

7    international company?

8              MR. SAMARO:  No, they don't.  No.

9              THE COURT:  They had none of those records,

10   either?

11             MR. SAMARO:  No, Your Honor.

12             MR. PALMERONI:  No, and Judge Salas speaks to it.

13   They don't have the records for what they supposedly sold it

14   to Europe for.  They don't have the records for -- and the

15   reason I say Mr. Rosarbo is because he was the operator of

16   the company day-to-day.  My end was --

17             THE COURT:  There are no records at all, even from

18   clients?  You couldn't reconstruct any records?  Was there a

19   consistent price?  You said a dollar-thirty?

20             MR. SAMARO:  There are some records, Judge, on

21   this, but -- there are some records.  What we have are the

22   checks.  We have the very checks from our clients, the

23   distributors of this product, to their company, right?  They

24   had this company, American Wholesale Distributors, that was

25   selling our product at this reduced rate.  We have those

1    checks.  That profit, whatever they were sold for, all of

2    that profit was because they were running this side

3    business, diverting our product.

4          THE COURT:  Have they admitted that?  What did

5    they say under oath when they were asked about -- the money

6    that was in these companies, whose money was it?

7          MR. SAMARO:  So, it's very interesting.

8    Mr. Rosarbo in his deposition admits to this whole scheme.

9    Chapter and verse, everything I've just said, he admits to.

10          Mr. Palmeroni, on the other hand, says -- and they

11   got millions of dollars.  We have them getting millions of

12   dollars for this.  Mr. Palmeroni says, I had no idea what

13   Vinnie was doing, I was just collecting these checks.

14   Well --

15          THE COURT:  All right.  Well, whatever.

16          So, let me just finish up on this point.

17          I'm inclined to stick with my initial ruling,

18   which is, I'm going to hold on it, for this reason.

19          It's a big issue.  It's not a minor issue in the

20   case; it's a substantial issue as to any of the pricing

21   documents.  I'm not sure it's going to be relevant, but

22   we'll see how the trial unfolds.

23          And you can explain, which you'll have to explain

24   anyway to the jury, that, you know, that some of the

25   documents weren't preserved.  I mean, you're going to have

1    to explain it.  It's your choice; you don't have to explain

2    it, and they may get an adverse inference.  You may

3    reference it, and you can decide.

4         But right now, right now, the ruling of the

5    District Court is that -- to get an adverse inference at the

6    jury charge.  I will reconsider that ruling at the end of

7    the close of evidence, for these reasons, why I'm not doing

8    it right now.  One, I'm not really sure what the relevance

9    of the documents are.  Number two, so much time has passed.

10   You knew about this rule change in 2015, and no one made

11   this application to me.

12         MR. SAMARO:  So, Your Honor, we --

13         THE COURT:  So let me just finish why, and this

14   really goes to what makes it different than any of the other

15   cases, where, you know, post-'15, a ruling is made by the

16   Court applying this conduct from '14.  That's what Chief

17   Judge Roberts's ruling, notes meant to address.

18         But, for example, there is the Mac or whatever

19   it's called --

20         MR. PALMERONI:  The Mac system, Your Honor.

21         THE COURT:  -- the Mac system, that can't be

22   unlocked other than at great expense.  And if you had made

23   this motion, rather than making it -- literally, the papers

24   are filed December 23rd of 2019, maybe that would put them

25   on notice to get the documents from other sources, spend the

1    money on an expert.  Maybe you would have considered it if I

2    had denied it.

3           But to make that ruling now when they have relied

4    on this somehow in some of their defense that they don't

5    have the documents, we didn't do anything wrong, I can't

6    really tell that at this point.

7           So, you know, what makes it a little different,

8    without hearing all the evidence, I'm not convinced that it

9    would be fair to the Defendants to change that ruling

10   literally on the eve of trial when we've known about the

11   change in law for five years.

12           MR. SAMARO:  Can I just say, Your Honor --

13           THE COURT:  Sure.

14           MR. SAMARO:  So Judge Salas's ruling was based

15   upon the Judge Scheindlin opinion from Manhattan, from the

16   Southern District, and that case, not long after Judge Salas

17   made her ruling, was overruled by the 2nd Circuit in another

18   case, and then that logic was adopted by the 3rd Circuit in

19   yet another case.  And so we brought a motion for

20   reconsideration to Judge Salas, pointing out that the state

21   of the law at that time --

22           THE COURT:  Pre-'15?  Pre-'15?

23           MR. SAMARO:  What's that?

24           THE COURT:  Pre-rule change.

25           MR. SAMARO:  Yes.  Well, because, in our view, and

32

1    I think this is right, the law had already changed.

2                THE COURT:  I hear you.  I appreciate that.

3                MR. SAMARO:  It had already changed in this

4    district, and so that's why we caught that.

5                So I don't know how many reconsideration motions

6    we're going to file, but now we find ourselves on the eve of

7    trial with, you're right --

8                THE COURT:  I hear you.  But I'll tell you -- I

9    hear you, and I appreciate that, and that's another factor.

10   But when the rule was changed, the Supreme Court of the

11   United States said that "It shall take effect on 2015 and

12   shall govern in all civil proceedings thereafter commenced,

13   and, insofar as just and practical, all proceedings then

14   pending."

15               So he really gave an opening to say, reconsider it

16   even if it's pending.

17               This had already been decided, but I think it

18   fairly falls with impending, because there had not been an

19   adverse inference given yet at trial.

20               So, what I'm saying is -- I'm not faulting you,

21   Mr. Samaro, at all.  I'm just saying it becomes difficult

22   when a ruling was made by a judge 10 years ago, the rule

23   changed five years later.  Unlike other cases, the documents

24   are locked away in this old computer, and then on the eve of

25   trial, 10 years later, we're changing the ruling.  I hear

33

1    you.  And the Defendants are pro ses, and the documents are

2    locked away.  I feel like that "Saturday Night Live" skit

3    with Al Gore, when he says, it's in a lockbox:  It's in a

4    lockbox somewhere, and we can't access the documents.

5              MR. SAMARO:  I'd just like to say one other thing

6    for the record.

7              So, before the last trial date -- we have been at

8    the pretrial, post-pretrial stage for three years, and in

9    early iterations of the pretrial -- well, one, we filed a

10   motion for reconsideration then, some years ago, and it's

11   always been in our pretrial order that we intended to do

12   this.  That's been out there for three years.

13             THE COURT:  So noted.

14             MR. SAMARO:  Thank you, Judge.

15             MR. PALMERONI:  Your Honor, I mean, Mr. Samaro has

16   had a lot of time and a lot of legal training to talk about

17   this, but --

18             THE COURT:  You're doing okay.

19             MR. PALMERONI:  Judge Salas looked into this

20   deeply.  She had oral arguments that went on for hours.  She

21   admonished the other side for not being prepared, for not

22   bringing certain people that they said they were --

23             THE COURT:  Counsel -- sir, let me state, I don't

24   need argument on that.

25             MR. PALMERONI:  Okay.  That's fine.

34

1          THE COURT:  Judge Salas did what she thought was

2    appropriate under the law.  She followed the directive of

3    the Southern District of New York.  The only reason we're

4    having this argument is because the 3rd Circuit and the

5    Supreme Court of the United States now have a different

6    standard.  If this issue was before me now, you would not

7    have an adverse inference.

8          MR. PALMERONI:  Okay.

9          THE COURT:  You would not have one because the law

10   is very clear that it has to be intentional, with the intent

11   to deprive the other party of the information used in the

12   litigation.

13         MR. PALMERONI:  And that's what I want to speak

14   to, Your Honor, and I'll be very quick.

15         I know you don't want to hear what Judge Salas

16   said, but it says:  "As a result, Mr. Palmeroni is

17   prejudiced as to both defend the claims against him and

18   prosecute his counterclaims.  Whether or not the law has

19   changed -- " --

20         THE COURT:  The counterclaims are gone.

21         MR. PALMERONI:  I understand that.  I'm just

22   reading what she said.  I was prejudiced by it.  Okay?

23         THE COURT:  You're not prejudiced by the

24   counterclaims because I've dismissed the counterclaim.  So

25   there's no prejudice.

1          MR. PALMERONI:  No, no.  She said both.  I'm sorry

2   to -- I'm just reading the full sentence.  I didn't want to

3   cut it off.

4          "As a result, Mr. Palmeroni is prejudiced in his

5   efforts to both defend the claims against him..."  I'll just

6   stop there.

7          THE COURT:  I hear you.  I hear you.

8          MR. PALMERONI:  And the standard at the time -- I

9   need to speak to this, because we can whitewash all we want

10  and say, well, they didn't do it on purpose, there wasn't a

11  litigation hold.  When I arrived at N.V.E. in 1999,

12  Mr. Samaro was already counsel for N.V.E.  He prepped me for

13  deposition.  They had been in litigation from years before I

14  left to years after.  To say there was no litigation hold or

15  they didn't -- I think we would have -- we would have gone

16  after that in court, but what Judge Salas said was, because

17  there was gross negligence, she didn't have to go there.

18         But they had been marked for spoliation in a

19  Michigan case that ran at the same time as this.  They were

20  in a New Jersey case against the State of New Jersey where

21  evidence was -- disappeared.  It's a pattern, Your Honor,

22  because, I was showing -- they were in bankruptcy when they

23  brought this.  They hid it from the Bankruptcy Court.  I was

24  not wanting to partake in bankruptcy fraud.  I was -- and I

25  admitted from the beginning -- I was picking up money in

1    suitcases at Mr. Occhifinto's private plane for his product,

2    okay?  Once it went into bankruptcy, I don't know where the

3    money goes.  He can claim it, he cannot claim it.  That's

4    not on me.  Once we went into bankruptcy, I refused to do

5    it.  The records show clearly, and that's why they were

6    destroyed after my counterclaim was brought and after my

7    defense on this was brought, they were destroyed or not

8    destroyed, and it happens that everything was destroyed.

9    They would send out the product, and I described it before

10   any of this.  My story has never changed; theirs has, quite

11   a few times, but mine's never changed.  They -- that

12   accounting system, when we would send something out for

13   $250,000, okay, and I have to go pick up the cash, it would

14   say zero.  The invoice would say zero.  Shipping would send

15   it out.  Mr. Occhifinto would initial it.

16          THE COURT:  So here's the theory -- and I'll get

17   to the other motions later.

18          And let me just tell you, because you're not a

19   lawyer, and you're going to abide by my rulings.  And this

20   is the most important ruling.  Listen to it carefully.  If

21   you try to say something that's contrary to my rulings, you

22   will be shut down immediately, and the jury will understand

23   that you were shut down immediately.  In other words, this

24   is not -- and we'll get to these later -- this is not going

25   to be -- this case will be decided on the facts about this

37

1    case.

2           So, you talk about money and cash and midnight and

3    bags and all this stuff.  That is not what this case is

4    about.  This case --

5           MR. PALMERONI:  It's about money, Your Honor.

6           THE COURT:  This case is about their theory that

7    you and Mr. Rosarbo had a scheme where you purchased the

8    product with a European company and you routed it back to

9    your company, and then that company sold it to the

10   distributors, and you pocketed the difference.  That's their

11   theory.

12          They're not disputing -- I haven't heard them --

13   that in the U.S. company that Mr. Occhifinto sold product at

14   lower costs.  He might have even sold it in cash.  There's

15   nothing wrong with selling things and taking cash if all the

16   other requirements about cash are complied with.  He could

17   sell his own U.S. product.  This case is not about, he sold

18   deep discounts to U.S. companies.  What it's about is that

19   you set up a company, you and Rosarbo, and you bought

20   product through the European company and then sent it back

21   through a company you set up with a very similar name, and

22   from that company, you sold product to the existing

23   customers.

24          The pricing is important in understanding what you

25   would have been selling to those customers as, and that's

38

1    one thing to say how much -- so there's all different ways

2    to calculate damages, and one of the ways is to say -- and

3    the Plaintiff can request whatever damages he wants.  I

4    mean, he is the master of his own complaint.  He can say, I

5    want lost profits.  I want the difference between -- if I

6    had all my invoices and I would have been selling to all

7    these folks at 2.75 a bottle, and I lost the profit on

8    that -- and I lost, you know, all the profit on that sale at

9    the 2.75, that would be one measure of damages.  Another

10   measure of damages could be, I want whatever profit you made

11   from this scheme if the jury is satisfied that it satisfied

12   the elements of fraud.  And I could get disgorged from you

13   whatever money you got, even, theoretically, if you sold it

14   for less than what they were selling in the U.S., then -- or

15   even less than the -- well, it would never be less than a

16   dollar-thirty, but even less than what we were selling in

17   the U. S., you still profited by a scheme that cut N.V.E.

18   out of the loop, and the profit went right from the European

19   to you.

20            MR. PALMERONI:  There's no proof of what was sold,

21   Your Honor.

22            THE COURT:  But listen.  Listen.

23            MR. PALMERONI:  There's no proof.  A lot of that

24   product was seconds, it was mislabeled, sometimes went to

25   Europe, sometimes went in --

1           THE COURT:  But, counsel, listen.  Listen to me.

2           MR. PALMERONI:  I'm sorry.

3           THE COURT:  That's your defense.  Your defense is,

4      we sold what?  You sold old product, expired product; none

5      of your product was good product.  You had a company --

6      like, Mr. Rosarbo at his deposition confirmed the whole

7      scheme.  He said, we set up a company with the same name and

8      we used it to buy product from the international company and

9      route it through and then send it to the other folks.

10          Now, if you're going to say that wasn't the

11     scheme, the scheme was, we had this company to sell

12     independently seconds and reject products to customers, you

13     still sold product to customers who were customers of N.V.E.

14     and deprived them of the ability to sell their own good

15     product to them.

16          So, you can say that, and the jury can evaluate

17     all that.  The narrow issue before me is, should the jury be

18     given an adverse inference, meaning, should they be

19     instructed as a matter of law that the destruction of

20     documents warrant, I don't know, some kind of instruction

21     that they could consider that in arriving at damages?  I

22     mean, I've got to think about, Judge Salas did not

23     articulate what the adverse inference would be.  What that

24     would be would really be -- whether it goes to liability or

25     damages would be for me to see as the evidence goes through

40

1    at trial.

2           So here's why we're going to stop talking about

3    this issue right now:  I'm reserving on it.  Right now, you

4    have an adverse inference.  We don't know what that adverse

5    inference will be.  The Plaintiff has said, given the change

6    in the law, that should be vacated, and I am going to hold

7    that motion until at least the close of Plaintiff's case,

8    probably the close of all the evidence, and I'll decide at

9    that point whether I should give the inference, because

10   that's all that matters is this narrow issue of, in addition

11   to a big stack of jury instructions, should they be given an

12   adverse inference charge as well.

13          So, that is something -- right now, it's the law

14   of the case.  I may consider it.  I think I'm best to

15   consider it to see whether it's appropriate then.

16          So I'm going to hold on that, and if I change my

17   mind between now and when we start the trial, if I look at

18   this more closely, you will be told, or for any reason.  My

19   only concern in letting it go until the end is that it's not

20   fair to the Plaintiff and the Defendants, especially the

21   Plaintiff, on how to affirmatively put in evidence of his

22   case, what he's going to open on, whether that's going to be

23   an issue.  But I'm inclined to hold it until the end because

24   I think that's appropriate.

25          So let's put that on hold, and you'll have another

41

1    opportunity to fully be heard.  I have the briefing from

2    Mr. Samaro and his law firm, and if we have to take a break

3    and half a day and argue this one out before the jury is

4    sent to deliberate, we'll do it then.  Okay?

5              MR. PALMERONI:  Your Honor, one more thing, not on

6    this, but you keep referring to Mr. Rosarbo's deposition.

7              THE COURT:  I did it twice because Mr. Samaro did.

8    I recalled that from the motion practice.

9              MR. PALMERONI:  Okay.  Mr. Samaro is very aware of

10   a letter that all of us received from Mr. Rosarbo

11   undercutting what he called his tainted testimony.  He was

12   unrepresented, and the letter, which I don't have in front

13   of me, is -- I -- it's -- it's -- he talks about secret

14   meetings with Mr. Occhifinto which Mr. Occhifinto claimed in

15   a deposition when we had him where he meant to discuss what

16   would be said before he was deposed.  That letter talks to

17   witness tampering, to extortion.  I'm not a lawyer, but --

18   I'm not law enforcement, but he's already undercut --

19             THE COURT:  Didn't you have a lawyer in this case

20   early on?

21             MR. PALMERONI:  Did I?

22             THE COURT:  Yes.

23             MR. PALMERONI:  Mr. Vort passed away.

24             THE COURT:  Okay.

25             MR. PALMERONI:  Here in court.

42

1          THE COURT:  Okay, and you never retained a new

2     lawyer.

3          MR. PALMERONI:  No one's willing to step in at

4     this late date with all the paperwork for the kind of money

5     -- I was in bankruptcy.  I've been in bankruptcy, as

6     Mr. Rosarbo was.

7          THE COURT:  Okay.

8          MR. PALMERONI:  So there wasn't any money really

9     to -- but no one's interested, even -- I mean, it's just a

10    really old case.

11         THE COURT:  When you testify and he is deposed, he

12    will, you know, when he's put on cross -- when he speaks,

13    we'll have to talk about, during your case, you're going to

14    be your own witness, and we're going to have to talk about a

15    protocol for that.

16         MR. PALMERONI:  Yes, ma'am.  I wouldn't know how

17    to do it at all anyway, so I would look to your guidance,

18    obviously, Your Honor.

19         THE COURT:  So we're going to talk about that,

20    Mr. Samaro, because he's going to be his own witness.  Then

21    you're going to cross-examine him.  I'm going to take a look

22    at that.  It may be appropriate to have a list of questions

23    that he will ask himself or that will be asked.  The Court

24    will ask them, or you can think of a protocol how we're

25    going to allow both -- the Defendants sound like they're the

43

1    only two witnesses in the defense.  Will you be calling them

2    in your primary case?

3            MR. SAMARO:  So, I believe at this point, we will

4    limit how we call them to using depositions.  So, in other

5    words, what I envision is the first day of trial being

6    primarily comprised of deposition testimony from

7    Mr. Rosarbo.

8            THE COURT:  Read-ins.  As an admission.

9            MR. SAMARO:  Yes, from one end to the other.

10           THE COURT:  So, I don't understand how you would

11   read in anything other than admissions.

12           MR. SAMARO:  Well, so the rule says that I can use

13   the deposition for anything I want.  The rule says --

14           THE COURT:  But you can, subject to the evidence

15   rules.

16           MR. SAMARO:  But the specific rule says that I can

17   use the transcript for any purpose that I would have a

18   witness testify to, and so it's -- again, it's all of the --

19           THE COURT:  Well, I think we're mixing up a couple

20   of concepts.  I want to make sure we understand how the

21   trial is going to go forward.

22           What rule are you talking about that says you can

23   use depositions for any purpose?

24           MR. SAMARO:  I will tell you.

25           So, it's Federal Rule of Civil Procedure 32,

44

1    Judge.

2            THE COURT:  Thirty-two is called "Model Diagram

3    Exhibits and Lodging."

4            MR. SAMARO:  32(a).  Do we have the right --

5            THE COURT:  I'm sorry, I'm in the wrong rules.

6    Sorry.

7            It says, "(a):  At a hearing or trial, all or part

8    of a deposition may be used against a party on these

9    conditions:

10            "(A) the party was present or represented at the

11    taking of the deposition or had reasonable notice of it;

12            "(B) it is used to the extent it would be

13    admissible under the Federal Rules of Evidence if the

14    deponent were present and testifying..."

15            MR. SAMARO:  Right, Judge.  So that says to me

16    that, whatever I would get through this witness if I called

17    him as a witness, I could instead substitute for his

18    deposition.

19            THE COURT:  I'm not sure that that's the

20    construction of 32(a).  I'm going to take a look at it.  I

21    think the deposition can be used to the extent it would be

22    admissible under -- so you can use it the same way you would

23    use it if he was testifying, meaning if there was an

24    admission.  It doesn't mean you can read an entire

25    deposition, because most of a deposition is hearsay, and

1    just like he couldn't testify to hearsay at a trial and he

2    couldn't testify -- he might have been asked hearsay

3    questions -- if this rule is construed the way you suggest

4    it is, it would be to get around all the hearsay rules.

5           MR. SAMARO:  Your Honor, don't get me wrong:  To

6    the extent there's anything objectionable about the question

7    and answer, then I wouldn't -- I'm not just going to use the

8    whole transcript without going through it and segregating

9    those aspects that I think are both useful to my case and

10   admissible.  To the extent it would be hearsay, then, of

11   course, I couldn't use it.

12          THE COURT:  So, I'm not convinced that that's the

13   construction of (B).  It would be, if he was present and

14   testified in a court, and you cross-examined him, and at the

15   end, you could read in parts of his deposition.  Whether

16   he's here or not, just like this rule says, we can only read

17   in admissions or statements against interest.  You couldn't

18   read in everything.

19          So, just like if a party is present at trial, and

20   he's here, at the end, the only thing you can read in is

21   admissions.

22          MR. SAMARO:  Your Honor, I've done it the other

23   way before, and I am happy to provide --

24          THE COURT:  It may be the same thing.

25          MR. SAMARO:  Yes.  I'm happy to provide a brief on

46

1    this, if you'd like, and we --

2              THE COURT:  Well, I don't want a brief.  I want

3    context.  Are you planning to -- like, I want to know what

4    you want to read in.  I want it done by our hearing, our

5    telephone call in February.

6              How long was the deposition taken for?  A day?

7              MR. SAMARO:  Well, he had three days.

8              THE COURT:  Well, then, you should have for me

9    what you plan to read, and let him object to it.  That will

10   hold us back -- that's something that should have been done,

11   frankly, in the final pretrial conference:  That's what

12   we're prepared to read in, we're reading it in because X, Y

13   and Z, and then we'll let him respond to it.

14             MR. SAMARO:  Your Honor, in all fairness, when we

15   were before Judge Wettre, we asked her, would you like page

16   and lines for purposes of this pretrial, because everybody

17   seems to have their own form, and --

18             THE COURT:  Mr. Samaro, I'm not casting blame.

19   I'm telling you that I want it now.

20             MR. SAMARO:  Of course.

21             THE COURT:  I don't want just line and page.  I

22   want you to give me a stack of what you're going to read in,

23   and I will take a look at it.

24             MR. SAMARO:  We absolutely will, Your Honor.

25             THE COURT:  And just bear in mind, he's going to

1    testify.  So, I'm not going to tell you how to run your

2    case, but you're going to do all these read-ins and not call

3    his as a witness, as an adverse party?

4              MR. SAMARO:  So what we -- probably not.  I assume

5    he will testify when it's his turn, and then I will

6    cross-examine him then.  What I have done before and what

7    I'd like to do now is have somebody else take the stand --

8    not him, of course, an actor, who I will ask the question

9    to, and he will respond to it so the jury will hear.

10             THE COURT:  I'll decide that, that's ministerial,

11   at the time.  I'm not calling in actors.  Normally, I have

12   lawyers just read in the questions and answers.  But we can

13   reconsider that at the time you're going to do it.

14             MR. PALMERONI:  Your Honor, as far as this

15   procedure goes, it seems as if -- and I've obviously never

16   done it before, but it seems as if we're still deciding how

17   this is going to work as far as protocols.

18             THE COURT:  No.  Counsel --

19             MR. PALMERONI:  I'm saying, for me being -- for me

20   being on the stand, I mean.  I mean, is that normally how

21   it's done?

22             THE COURT:  It's not normal that in civil cases --

23   it's highly unusual that folks are pro se in civil cases,

24   especially of this magnitude.  It's very rare.

25             MR. PALMERONI:  Would I be able to have someone

48

1    question me?  It's a strange -- I don't know the dynamic --

2              THE COURT:  No, there's a protocol that I'm going

3    to take a look at.  It wasn't given to me.  I want

4    Mr. Samaro to submit something to me before our next

5    hearing.  There may be a protocol where you will prepare the

6    questions that you want asked.  Maybe the Court will ask

7    them, maybe you will ask them to yourself, I'm not sure, but

8    it's going to be something along those lines.  It's not

9    going to be a free-flowing narrative of you up there just

10   telling your story.  There are going to be questions that

11   you're going to have to prepare.

12             But I want to think about what that proper

13   procedure is.

14             I don't know if Mr. Samaro has thought it through.

15             MR. SAMARO:  Yes, I've seen it done that way, Your

16   Honor.  I've seen judges just allow the witness to give a

17   narrative.

18             I think a narrative is rough in this case.

19             THE COURT:  I do, too, and that's why -- you could

20   -- you know, I may ask you to give me a rough outline of

21   questions in areas that you want to cover in your story, and

22   either I'll ask them or I'll have you ask them to yourself.

23   First, you know, I'm going to give some background -- like

24   broad questions, and you can give a little narrative, but

25   it's not going to be just, you get up there and say, ladies

49

1    and gentlemen, I'm going to tell you my story.  It's not

2    going to be that.  It's going to be questions.  Maybe I'll

3    ask the questions.  You can give them to me the day that you

4    want to testify.  Maybe you ask them to yourself.  I'll take

5    a look at what is the better practice, and that way -- and

6    the reason why I would do that, so you know, is that there

7    are Rules of Evidence that guide what witnesses can say at

8    trial.  Either it's hearsay that's prohibited, but there are

9    all kinds of exceptions to the hearsay rules.  There are

10   other Rules of Evidence.  There are foundational questions.

11   And although I will give you latitude because you're a

12   pro se, if you're just given a completely free, open

13   platform to tell your story, it would be unfair to me and to

14   the jury and to Plaintiff's counsel that they wouldn't be

15   able to object before something was said that might be

16   inappropriate.

17         So, if you set up your questions, and I'll give

18   you plenty of advance notice so you can think about what you

19   want to tell the jury, and I'll finish up these motions in a

20   minute.  That way, either I'll ask the questions, or some

21   neutral person, Amy or myself, or you will state the

22   question, and then answer them, so we know what is coming,

23   and you can -- you certainly don't have to tell us your

24   answer, but -- for example, Mr. Samaro is going to want to

25   cross-examine you.  He's going to cross-examine you based on

50

1    what you said and whether it's inconsistent with the prior

2    testimony, and he's going to cross-examine you generally,

3    and he's not going to be able to prepare his

4    cross-examination if he doesn't have a sense of what the

5    subject area -- what the questions are as you've asked them.

6              So, I will let you know that protocol when we

7    speak again in February.  Okay?

8              MR. PALMERONI:  Thank you, Your Honor.

9              THE COURT:  And, since you asked:  It is unusual.

10             So that's the second.  And then I want to go

11   through the other motions.

12             So there are a number of motions that were filed

13   in limine by the folks representing N.V.E.

14             And so let me just make an overall comment here,

15   because I know I have a pro se.

16             Trials are governed by evidence rules, and

17   Rule 401 of the Federal Rules of Evidence provides that

18   evidence is relevant if it tends to make a fact of

19   consequence more probable or less probable.

20             And even if evidence is relevant, it may be

21   excluded in my discretion if its probative value is

22   substantially outweighed by danger of unfair prejudice,

23   confusion of issues, misleading a jury, or by considerations

24   of delay, waste of time, or needless presentation of

25   cumulative evidence.

1          So that will govern my rulings here.  And I'm

2     mindful that this case is about an affirmative claim brought

3     by the Plaintiff on a very narrow ground.

4          The final pretrial is the document that will

5     govern the trial in this matter, and it's one that was

6     entered into with everyone present, and signed by Judge

7     Wettre.

8          And it sets forth -- you know, I don't have it

9     with me, it's in my chambers, but I believe there are five

10    causes of action, Mr. Samaro.  What are the five causes of

11    action that are in the complaint?

12          MR. SAMARO:  Fraud -- so these are the ones that

13    remain, Your Honor.

14          THE COURT:  Okay.

15          MR. SAMARO:  Fraud is Count 6.  Fraud, deceit,

16    Count 7.

17          THE COURT:  Is that the same thing?

18          MR. SAMARO:  Yes, I think so.

19          THE COURT:  Okay.

20          MR. SAMARO:  It doesn't strike me as any

21    different.

22          Interference with economic advantage, unlawful

23    interference, Count 8; civil conspiracy, Count 9; and breach

24    of duty of loyalty, Count 11.

25          THE COURT:  Okay.  And all of these stem from two

52

1    things, the distribution scheme and the kickback scheme.

2    And so those are the issues that are going to be relevant to

3    the claims in this case, and why we talked earlier about the

4    importance of any of these from the documentary evidence.

5              So, there are a couple of issues that the

6    Plaintiff has raised and has asked the Court to make an

7    in limine ruling on some evidence, and I'm going to go

8    through this in the order that it's set forth in the brief.

9              I'll ask Mr. Rosarbo or Mr. Palmeroni if they have

10    anything to add.

11              The first issue is, the fact that Mr. Occhifinto

12    had a child with another employee is not relevant.

13              I agree with that.  It is not relevant under 401.

14    I'm inclined to rule it's not relevant under 401, or, even

15    if it was, that it would be excluded under 403.

16              Anything you want to add?  If you want to be

17    heard, you can be heard.

18              Mr. Rosarbo?

19              MR. ROSARBO:  Yes, Your Honor.

20              The reason why I think that is relevant is, the

21    nature of how I met Patty Cosentino --

22              THE COURT:  It's not relevant.  It's just not

23    relevant.  It's not about how you met.  It is prejudicial.

24              This case is not about sexual harassment; it's not

25    about in-office relationships, it's not about having a child

1    outside of marriage.  It would not make any of the facts

2    about the fraud, the interference with economic advantage or

3    duty of loyalty any more probable.  It's not even a close

4    call, actually.

5              MR. ROSARBO:  All right.  How about when that came

6    about, that she was pregnant, and we were told to -- she

7    used to sit right next to me, and we were told to, like, not

8    even hear that she was an employee, to freeze her right out.

9              THE COURT:  That is absolutely irrelevant to the

10   claims that he has filed against you for fraud, interference

11   with economic advantage, and breach of the duty of loyalty

12   stemming from the kickback scheme and the distribution

13   scheme.  It's just not relevant, and I'm keeping it out of

14   the case.

15             Similarly, the same ruling with respect to

16   Mr. Occhifinto's wealth or lack of wealth:  It's not

17   relevant.  How much money you have or you make now is not

18   relevant.  The fact that you've had a bankruptcy is not

19   relevant.  What's relevant is fraud, the civil conspiracy,

20   the breach of duty of loyalty, and your defenses to that.

21             MR. ROSARBO:  Okay.  So how about Mr. Occhifinto,

22   while I was in bankruptcy, going into my Bankruptcy Court

23   and intimidating my bankruptcy people?

24             THE COURT:  It's irrelevant.  It's not part of

25   this case.

54

1          MR. ROSARBO:  What I'm trying to say is, we could

2     have had this trial already in Connecticut with -- I could

3     have had representation, with a judge, and the case would

4     have been over.  So, as far as they were concerned, that

5     couldn't happen because they came up with some bogus

6     complaint about, the people would have to travel to

7     Connecticut.  Well, his main witnesses are from Wisconsin

8     and California.

9          THE COURT:  It's irrelevant to this case.  This

10    case is not about the Bankruptcy Court.  It just isn't.

11    This case is about what happened from 2000 to 2006 at your

12    workplace.

13         MR. ROSARBO:  You're absolutely right, Your Honor.

14    What I'm trying to say is, Bob Occhifinto's pattern and

15    character is consistent with his criminality of many years

16    that go on and on and on.  He hasn't changed his tune.  He's

17    been like this for an extended period of time.  He's

18    continually in litigation, and he doesn't have any loyalty

19    whatsoever except for himself, and he starts out making out

20    that he's your friend until he feels that, you know, he

21    doesn't need you anymore, and then he just throws you to the

22    wayside, and then also he harasses you.  He's harassed me

23    ever since I got into this case.  He didn't belong in my

24    Bankruptcy Court.

25         THE COURT:  Sir.  Sir, listen:  This is what you

1    have to understand: --

2             MR. ROSARBO:  Go ahead.

3             THE COURT:  -- that that is not part of this case;

4    that the facts in this case will be -- what I allow in will

5    be governed by the Rules of Evidence and the claims that

6    have been asserted here.

7             There is no claim here for harassment.  I don't

8    think there could be.  But there is no counterclaim for

9    harassment, that you continued to be an employee and he

10   retaliated against you.  There's no sort of claims about

11   that.  So, yes, that's your view, that this is who he is,

12   that he's a criminal, you've said it a few times, this is

13   criminal behavior, he was a bad guy.  That doesn't come in.

14   That's not a defense to what you did.  This is not about

15   him, it's about you in this case.  There is no counterclaim.

16   It's about his affirmative claims against you.

17            So, what I'm trying to do is go through the motion

18   that Plaintiff's counsel has made about what he's asking --

19   what's to be kept out, and I want you to understand, first,

20   no references to the woman and the baby, or to the fact that

21   she had a baby, or was pregnant, or had a relationship with

22   him; two, his wealth or lack of wealth are also not

23   relevant.

24            MR. PALMERONI:  Your Honor, can I --

25            THE COURT:  Yes.

56

1          MR. PALMERONI:  I'm sorry, I don't want to be too

2     long.

3          Mr. Occhifinto is N.V.E.  N.V.E. is

4     Mr. Occhifinto.  The people that we have now putting forward

5     things, Earling Jensen was not there when I worked there,

6     was not there during any of this Ephedra and Mr. Occhifinto.

7     So I am not arguing except that in terms of having

8     Mr. Occhifinto on the stand and the jury being able to

9     assess his character and veracity of what he's telling the

10    jury --

11         THE COURT:  I'm going to stop you right there.

12         MR. PALMERONI:  Okay.

13         THE COURT:  There are evidence rules, sir.  You

14    don't get to put in someone's character.  There are rules

15    about character evidence, and this does not go to character.

16    The fact that somebody had a baby out of wedlock, the fact

17    that someone is even -- let me finish.  I'm going to say it.

18    This is -- I'll read you 404(a):

19         "Character Evidence.

20         "Evidence of a person's character or character

21    trait is not admissible -- " -- not admissible -- " -- to

22    prove that on a particular occasion the person acted in

23    accordance with the character or trait."

24         It's not admissible.

25         "Exceptions for a Defendant...in a Criminal Case.

57

1           "Exceptions for a Witness.

2           "Evidence of a witness' character may be

3       admitted...", and that's where we get into prior wrongs and

4       we get into crimes.

5           But you can't put in -- you can't just say he's a

6       bad guy.  You can't get up there and say he's a bum, he's a

7       bad guy.  You can't say it.  It's not relevant, and I'm not

8       going to allow you to do it.  It's not a claim in the case.

9           You can cross-examine him, if you choose,

10      consistent with the Rules of Evidence, to the extent that he

11      says something that you believe is false, and you have a

12      good-faith basis for saying so, you can cross-examine him on

13      inconsistencies in any deposition or prior sworn statements.

14      You can cross-examine him on inconsistencies in his

15      courtroom testimony.  But --

16          MR. ROSARBO:  Your Honor -- go ahead, I'm sorry.

17          THE COURT:  Here's what I'm not going to do.  I'm

18      not going to be the teacher on evidence.  I'm going to make

19      rulings.  I'm going to make rulings on examples that are

20      given to me.

21          So, Plaintiff's counsel has made a motion.  I'm

22      giving you the basis for my ruling, and when I make a

23      ruling, that means that you cannot reference -- whatever I

24      say, you can't reference at trial.  If you do, you will be

25      shut down on the witness stand on it.  If you try to say it,

58

1    it will not bode well for you.  Once I make a ruling, it

2    governs this case.

3            I'm not going to help you develop what you can

4    cross-examine Mr. Occhifinto on.  That's up to you as

5    pro ses, representing yourself, mindful of the Federal Rules

6    of Evidence.  If you try to cross-examine him on any of

7    these topics, you will be shut down.  I will instruct the

8    witness not to answer, and I will admonish you, because I've

9    already made a ruling on it.

10           If you go to some other area that isn't covered by

11   any of these rulings, he'll object and I will say,

12   sustained, don't answer the question, and that means you

13   move on to another topic.

14           You don't fight with me.  You don't argue with me.

15   I make the rulings.

16           But what I'm not going to do is tell you what area

17   you can or cannot go into.  I'm going to tell you that

18   issues like character and prior bad acts are discussed in

19   the Rules of Evidence, and there's a body of case law that

20   talks about it, and we're governed by law in the 3rd Circuit

21   Court of Appeals and by the Supreme Court.  That's what we

22   do in Federal court.

23           All I'm going to do today is, I'm going to rule on

24   what is in this motion.

25           The first one happened to be about his reference

1    to having had a child with Cosentino.  I'm finding that is

2    not relevant and doesn't fit into any other rule.

3           Reference to his wealth or his lack of wealth is

4    not relevant.

5           And I'm going to move on.  And I have your

6    opposition.  I hear you.  I understand you're not lawyers.

7    I want you to understand that these are my rulings, and in

8    Federal Court, particularly now, but more so before the

9    jury, do not argue with me.  I make a ruling, you accept it,

10    and you move on.  And if I make any critical mistakes, any

11    mistakes at all, you can take an appeal to the 3rd Circuit

12    Court of Appeals, and if I'm wrong, they will fix it.  But

13    you're not going to be arguing with the Court in trial, and

14    you're not going to argue with me today.

15           So I'm giving you a little bit of extra room

16    because you are pro ses and you're representing yourselves.

17    But his wealth is just not relevant.

18           MR. ROSARBO:  I'm the last person that would argue

19    with you, Your Honor.  I don't want to argue with you.

20           THE COURT:  Good.

21           MR. ROSARBO:  Can I just say one thing?

22           THE COURT:  Yes.

23           MR. ROSARBO:  What about the meeting I had with

24    him before any of this, and me being intimidated, and him

25    including my wife and my daughter in this case?

60

1      THE COURT:  So, listen:  That's not something

2  that's been briefed to me.  I'm going to go through these

3  motions.  And when you testify, if you want to try to bring

4  that out, I'll rule then whether I'm going to allow it under

5  the Rules of Evidence.

6      MR. ROSARBO:  Okay, Your Honor.

7      THE COURT:  But I will tell you right now, things

8  that happened after this case ended, things that happened in

9  the workplace unrelated to these two schemes, things that

10 happened years ago, none of that is coming in.

11     Now, a conversation you had with him right around

12 the time of this lawsuit, that may be evidential, I don't

13 know, but I'm not going to give opinions on it.  I'm only

14 going to do it when I hear the questions and I hear the

15 proffer at the right time.  Now is not the right time.

16     MR. ROSARBO:  I understand, Your Honor.  I only

17 said it because I had to spend money to protect them from

18 him, which they had nothing to do with the case whatsoever.

19     THE COURT:  And that's not part of this case right

20 now.  Conversations you had with him at some point, either

21 right before, during, or after this trial may or may not be

22 evidential and relevant.  I'll decide that at trial.

23     MR. ROSARBO:  Okay, Your Honor.  Thank you.

24     THE COURT:  All right?

25     Allegations of N.V.E. hiring undocumented workers.

61

1           The immigration status of employees is not

2     relevant to any claims or defense.  It's out.

3           Testimony relating to N.V.E.'s trial in Michigan.

4           It looks like Mr. Palmeroni wants to introduce

5     evidence that Occhifinto made an illegal offer to settle

6     with him if he changed his testimony in an unrelated

7     trademark infringement case filed against N.V.E. in

8     Michigan.

9           Mr. Palmeroni?

10          MR. PALMERONI:  Yes, Your Honor.

11          The Court should be aware that the complaint was

12    only amended after my testimony in this case.

13          So, what happened was, I was subpoenaed by a law

14    firm in Michigan, and I reported for the subpoena.  My

15    testimony was somewhat detrimental to N.V.E.'s case.  I say

16    "somewhat" because even the trial judge ruled that I had

17    said some things that were -- could be construed as

18    pro-N.V.E., I guess, and some things that were not

19    pro-N.V.E.

20          However, he was being sued by a giant company, he

21    eventually lost for $12 million, and when that came up for

22    case, we were here for settlement.  I was approached by

23    Mr. O'Connor and told that if I offered evidence against the

24    rest of the people that were still in the case, and at that

25    time, there was people from Texas, people from California,

1    and Mr. Rosarbo, if I changed my testimony in the Michigan

2    case and if I gave them a million dollars, this would all go

3    away.  Okay?

4              That's relevant, because this case was brought --

5              THE COURT:  Say that again.  What was said to you?

6              MR. PALMERONI:  Okay.  So, what was said to me

7    was, first of all, I had to present evidence against the

8    remaining people in the -- still in this case, so that would

9    be, at that time, it was Brand Distributing out of

10   California, Sumicek out of Texas, Mr. Rosarbo.  I would have

11   to change my testimony in the Michigan case to be all

12   positive for N.V.E. and make a long-term offer to sometime

13   in the future come up with, whether it's payments or

14   whatever, a million dollars.  Okay?

15             I soundly rejected it, but, more than that, the

16   reason it's relevant is, these amended charges were brought

17   after my testimony came, and what they did was, they took my

18   checkbook and all the stuff I turned over in discovery, and

19   anybody I was dealing with, they brought into this case.

20   That was the message.  The message is, if you deal with me,

21   I'm a bad guy, you're going to be dragged through the court.

22   And chapter and verse, that's what happened.  Not to

23   mention, you know, my wife, my sister, et cetera, and, you

24   know, Mr. Rosarbo mentioned his family.  This was done after

25   I testified against his interests in Michigan in a case that

1    they appealed for years and that they lost soundly.  They

2    finally went up against someone that had a billion dollars

3    and was able to fight them, and I'm not able to do that, but

4    I'm certainly not going to commit perjury for anyone.

5              The door was open.  Mr. Basil was in the room, as

6    well as the other Defendants.

7              THE COURT:  Okay.  So I am going to exclude that

8    evidence under both 401 and 403, and primarily under 403.

9              403 empowers me to exclude evidence even if it was

10   somehow relevant and probative on some kind of point, which

11   I'm not sure it even is.  It is outweighed by danger of

12   unfair prejudice, confusion of issues, misleading the jury,

13   or consideration of delay, waste of time, or needless

14   presentation of cumulative evidence.

15             As I said, this case is about what happened here,

16   and to open up the door to a whole other procedure that went

17   on for years in Michigan would unduly delay this case.

18             And the motion is granted.  It will be kept out of

19   the case.

20             Next one, the suggestion that N.V.E. improperly

21   marketed certain products.

22             The reference to Black Beauties and Yellow

23   Jackets, that they named some of their products after street

24   drugs, has no relevance, and that will be kept out of the

25   case.

64

1          MR. PALMERONI:  Your Honor.  Your Honor, in this

2     case, these are some of the items that were sold.  They're

3     saying they -- but of course, there's no records, but these

4     were their marquee products, okay, and that goes to -- I

5     feel it's very relevant, because the law was coming down on

6     him.  He was getting rid of these through Mr. Rosarbo.  They

7     tried to say it was Stacker 2 and all that.  They don't have

8     proof or records, nor does Mr. Rosarbo have proof or records

9     of what was sold.  But this was their biggest selling

10    products -- these were their biggest selling products.

11          THE COURT:  I'm granting the motion.  I will --

12    there will be some latitude at trial -- is that the official

13    name of the product?

14          MR. SAMARO:  So, it was the official name of

15    several of the products.  As far as I know, Judge, none of

16    these were involved in the overseas diversion things.

17          THE COURT:  So here's what I'm going to do.  I'm

18    going to withdraw what I just said.  I'm going to wait to

19    see what happens at trial.  If these products are the

20    official names of products that are reflected on records for

21    the overseas sales, either the fraud or the kickbacks, I'll

22    take it as I see it.  I'm not going to -- I'm going to wait

23    and see how the evidence comes in at trial as to various

24    products through the Plaintiff's case.  I'm going to hold

25    off.  I'm going to carry that motion until trial.

1          Mr. Rosarbo, I am very impressed that you take

2     care of your disabled relatives, including your brother, and

3     I mean that.  Taking care of family members is the most

4     important thing we do on this earth, and I'm glad you got to

5     tell me about it, and I will accommodate that, because I

6     think we are human before we are anything else in this

7     world, and certainly being a brother is one of the greatest

8     titles you can ever have in life.

9          But that information is not relevant to the case

10     here, and the jury is not going to learn about your care for

11     your disabled brother, because that injects sympathy for you

12     and distracts from the true issues, which are the legal

13     issues in this case.  I'm not going to allow you to

14     reference, anyone to reference that he cares for his

15     disabled relative.

16          MR. ROSARBO:  Your Honor, I understand that, and

17     that's fine.  I only want to say one thing.

18          The whole time that I was doing my deposition,

19     Mr. O'Connor talked about my brother forever and a day, and

20     now that I look back at it, it was his way of trying to

21     soften me up so that I wouldn't say or do anything against

22     them, and then now all of a sudden, I can't talk about my

23     brother, because it was every day.

24          THE COURT:  I hear you.

25          MR. ROSARBO:  I understand.  I agree with what

66

1    you're saying totally.

2              THE COURT:  Then sit down.  Thank you.

3              Next one, Defendant should not be permitted to

4    testify about various matters concerning Jared Wheat.

5              This is what the brief says:  That Wheat is an

6    ex-con that developed an herbal supplement called StaminaRX

7    that was marketed as a substitute for Viagra.  N.V.E.

8    manufactured this product for Wheat, and it was said to

9    contain Tadalafil.  It was raided by the FDA.

10             So, what are we talking about here?

11             MR. PALMERONI:  Well, I can't speak for

12   Mr. Rosarbo, but I'll take what I'm talking about, Your

13   Honor.

14             This was -- this is endemic, or it's -- it

15   characterizes what was going on and what's happening at

16   N.V.E.  There was all kinds of stuff being made there that

17   was then had to be got rid of, because at that time, the FDA

18   came with guns drawn.  I was not in the office, Mr. Rosarbo

19   was, as well as some other people.  I was at Eckerd in

20   Florida.

21             That being said, that is another time where there

22   was product that was being made that shouldn't have been

23   made.  There is no proof of what -- I say Mr. Rosarbo

24   because he handled the day-to-day, he got the product from

25   N.V.E.  There is no proof of what product he was selling or

1    he was taking.

2            THE COURT:  This goes back to the initial issues.

3    We don't have the records.  I get that.  But whether or not

4    Mr. Occhifinto was selling products that were about to be

5    raided, that he was raided by the -- they were selling

6    products that were illegal and shouldn't have been sold, how

7    is that relevant to the claims in this case?

8            MR. PALMERONI:  Because Mr. Occhifinto in his

9    deposition testified that they never made a mistake on any

10   labeling, that there was never any seconds, that there was

11   never anything he had to get rid of.  So that directly

12   impeaches his testimony, because there were things that were

13   -- he was manufacturing at one point and then had to get rid

14   of at another point.  There were things that he was making

15   wrong.  The FDA brought -- brought action against him for

16   these things he wasn't supposed to be making.  He would

17   never take a loss on anything.  So those things went out the

18   back door.

19           THE COURT:  Let me stop you for a minute.

20           If he said under testimony that, I never did

21   anything, I didn't make anything wrong, I didn't do anything

22   wrong, you may be able to ask him that on cross-examination:

23   Isn't it true that you did sell product that didn't pass the

24   FDA?

25           MR. PALMERONI:  That's all I'm asking, Your Honor.

68

1          THE COURT:  But that's different than putting in

2     affirmative proof, and that's only because you have a

3     good-faith basis to believe that he did something, he wasn't

4     truthful at his deposition, in his sworn statement.  I will

5     allow that.  But I'm not going to let you put in information

6     about this whole scheme with this guy named Jared Wheat and

7     the FDA and everything else.

8          MR. PALMERONI:  And, Your Honor, I'm not asking

9     for that --

10         THE COURT:  If he said at his deposition, we were

11    never investigated by the FDA, they never came and talked to

12    me, and, in fact, they did, you can ask him about that.

13         But that's not what this motion is about.  This

14    motion is about, you're not going to put in affirmative

15    evidence about Wheat being an ex-con and selling him a

16    herbal supplement that was manufactured that had an illegal

17    substance in it and he was investigated by the FDA.

18         MR. PALMERONI:  Forgive me, Your Honor.  I don't

19    understand the difference between affirmative -- what you're

20    saying is what I'm looking at.

21         THE COURT:  Here is what affirmative is.

22    Affirmative is when you take that witness stand and you tell

23    your story to the jury, you can't say, not only -- this is

24    what you guys can't do.  You can't say, there was no --

25    let's put it this way.  You can talk about what happened

1      with respect to the distribution scheme and the fraud

2      scheme.  You can't say things like, Mr. Occhifinto had a

3      relationship with a coworker and had a baby; Mr. Occhifinto

4      was involved in this Michigan lawsuit, and this is what

5      happened to me.  You cannot say that he had undocumented

6      workers in the company, that this was a crummy company, and

7      all these other wrongs that were going on.

8             If Mr. Occhifinto takes the witness stand, you may

9      be able to cross-examine him if he says something contrary

10     to what he said in his deposition.  That's impeachment.  And

11     I will help you with that.  That's to impeach his

12     credibility.

13            MR. PALMERONI:  And that's all I'm looking for,

14     Your Honor.

15            THE COURT:  Well, this is not your motion, it's

16     their motion.  That's what I'm ruling on.

17            So Mr. Samaro is saying he wants to preclude you

18     from talking about this whole scheme, alleged scheme with

19     Jared Wheat and the FDA investigation.

20            MR. PALMERONI:  But when you say preclude me, it

21     sounds almost like I can't state my case as far as to show

22     how products were being made that were seconds, that were

23     overruns, that were illegal or whatever.

24            THE COURT:  All right.  Let me stop you for a

25     minute.

1          Products that were illegal, that were overruns,

2     that were seconds; how is that relevant to his claim in this

3     case that, again, you --

4          MR. PALMERONI:  Because Mr. Rosarbo told me that's

5     what he was selling.  That's what he wanted the initial

6     investment for.  I've said that since the beginning of the

7     case.

8          THE COURT:  But to the extent that he -- so where

9     did he get those from?

10         MR. PALMERONI:  Mr. Occhifinto.  They couldn't be

11    sold anyplace else, is my point, Your Honor.  So he made a

12    profit on them instead of throwing them in the garbage,

13    because they don't have the records of what went out or what

14    -- he doesn't have the records, but I'm supposed to be told

15    that I don't --

16         THE COURT:  So your defense is that Mr. Occhifinto

17    gave Mr. Rosarbo bad drugs, expired, seconds --

18         MR. PALMERONI:  Absolutely.

19         THE COURT:  -- and told him, gave him permission

20    to sell those to his clients.

21         MR. PALMERONI:  That's correct.  He paid him cash

22    up front.

23         THE COURT:  Mr. Samaro?

24         MR. SAMARO:  It's directly contradicted by

25    Mr. Rosarbo in his deposition.

1          THE COURT:  But that doesn't mean I'm going to

2     stop him from saying it now.

3          MR. SAMARO:  No, fine.

4          THE COURT:  He can cross-examine on it.  If his

5     defense is --

6          I will give you a little bit of latitude.  If your

7     defense is, Mr. Occhifinto and I had an agreement that he

8     would give me seconds and expired Stacker 2-like products

9     and he was totally on board with me selling them through

10    this company, if you want to say that, that is your defense,

11    I'll let you say that.  But it's going to be contradicted by

12    -- he's going to cross-examine you on it, so, yes.

13         But I'm not going to let you get into there were

14    illegal immigrants and there were pregnant women and there

15    was a --

16         MR. ROSARBO:  That's fine, Your Honor.  I

17    understand where you're coming from.  That's fine.

18         THE COURT:  If your defense is, I wasn't stealing

19    from the company, I had a deal with Mr. Occhifinto to sell

20    seconds and expired drugs that he couldn't get rid of

21    because of the FDA coming in and taking Ephedra off the

22    market, and he allowed me to do this, you can say that.

23         MR. ROSARBO:  Thank you.

24         THE COURT:  But you do it at your own risk.

25    Understand that, according to Mr. Samaro, you told a very

1    different story at your deposition, and there may be some

2    paper trail that contradicts that.

3             MR. ROSARBO:  I understand that, Your Honor.

4             THE COURT:  All right.

5             MR. ROSARBO:  That's fine.

6             THE COURT:  All right.

7             The last one is, the Court should preclude

8    Defendants from referencing N.V.E.'s application to the DEA

9    or the denial of that application.

10             What's that about?

11             "Through Occhifinto's deposition, Palmeroni's

12    counsel questioned him about N.V.E.'s application to the DEA

13    to sell pseudoephedrine.  The fact that N.V.E. applied to

14    the DEA for license to sell pseudoephedrine while Occhifinto

15    was in prison is not relevant."

16             So what are you looking to keep out here,

17    Mr. Samaro?

18             MR. SAMARO:  Anything about that story, that

19    N.V.E. was denied a license to sell this product, because it

20    has no relevance to this case at all.  And that product has

21    nothing to do with any --

22             THE COURT:  Well, when did that happen?

23             MR. SAMARO:  This is '96 or earlier, when he's

24    still in jail.

25             THE COURT:  What's the relevance?

1          MR. PALMERONI:  The only relevance, Your Honor,

2     is, it's a pattern of sidestepping the rules, sidestepping

3     the rules, sidestepping the rules.  While he's in prison, he

4     puts in something to the DEA.  The DEA rejects and finds

5     that he lied in his submission.  So, while it may not be

6     relevant that he was in jail, their findings are relevant in

7     that -- I mean, the jail is the time period, but this was

8     two years before he says I started working for him, and the

9     final ruling came a month before I started working for him,

10    or in that time frame, and the DEA said he lied in his

11    application.  That's the relevant part.  Whether it happened

12    when he was in prison or not, that, I mean, that's just the

13    context of what had happened.

14          THE COURT:  I'm keeping out the FDA, and keeping

15    out him being in prison.  If there's any relevance that

16    comes up at trial about the license - I doubt it - I'll hear

17    it, but you can tell me in advance of testifying.  But no

18    reference to being in prison, and no reference to his making

19    that application 10 years before this whole scheme.  I'm

20    inclined to keep the whole thing out.

21          So, let's go back to convictions, and let me tell

22    you what the rule is.

23          There's a rule that addresses specifically whether

24    prior convictions can be admitted at trial, and it's

25    Evidence Rule 609, and this is what it says.

74

1          In general, the limitation is -- if it's more than

2     10 years old, it's only admissible if its probative value

3     substantially outweighs its prejudicial effect, and that's

4     the standard here.

5          So, both of these convictions were from a long

6     time ago.

7          Mr. Samaro, I don't know, there was one for

8     Occhifinto in '91 for sale of hash, and I know that he was

9     convicted of money laundering and released from prison in

10    1997, and that is way more than 10 years since today at

11    trial, it's more than 20 years since those events occurred.

12         The rule precludes admission of evidence unless a

13    conviction is more than 10 years old unless its probative

14    value substantially outweighs its prejudice.

15         The advisory note says it is intended that

16    convictions over 10 years old will rarely be admitted, only

17    in exceptional circumstances.

18         I should also note here that I know Mr. Rosarbo

19    has a prior conviction.  Does Mr. Palmeroni?

20         MR. PALMERONI:  Yes, I do, Your Honor.

21         THE COURT:  And here's what I'm inclined to do:

22    I'm inclined to keep out all prior convictions.  They're all

23    more than 10 years old, none of them are relevant, and no

24    one has convinced me that, especially for drugs, the three

25    that are for drugs would be relevant.

1          The money laundering is a closer call because

2     prior crimes that involved a dishonest act or false

3     statement are always admissible, at least on

4     cross-examination of a party.

5          I haven't seen any law that says that money

6     laundering falls within that, and I've seen cases to the

7     contrary.  If I'm convinced between now and court that that

8     is not the case, I'll reconsider that.

9          But as of right now, I'm not satisfied that,

10    convinced that anyone's conviction should come in.  They're

11    all long ago, they're all dated, and it's a high burden to

12    convince me when the law says substantially outweighs its

13    prejudice.  It's very prejudicial to hear that there have

14    been prior convictions.  There are drug sentencings, drug

15    convictions.

16         I take it -- I know from Mr. Rosarbo, I'm not sure

17    about Mr. Palmeroni, but I'll let you be heard on it before

18    I make my final ruling.

19         MR. PALMERONI:  The only thing I have to say, Your

20    Honor, is, as far as the 10-year part, because this case has

21    stretched out 13 years, I don't think that was in the spirit

22    of what they were talking about.

23         He is saying that in '99, I did this; 2000, I did

24    this.  He was released from prison in '96, when the 10 years

25    starts, even if he was convicted in '94.  So I don't think

1    this falls within that.  If this case went on another 15

2    years, this gentleman is bringing a case, saying, this

3    happened at this time, okay?  That's what he's saying.  So

4    just because the case stretches --

5           THE COURT:  That's your interpretation of the

6    rule.  The rule doesn't say that.  It's not 10 years from

7    the time of the events that give rise to the lawsuit; it's

8    10 years from the time of trial.  And it's more than 10

9    years.  That's the rule.

10          So, it's a good ruling, because your conviction

11    gets kept out as well.

12           MR. PALMERONI:  Your Honor, I was convicted at 19

13    years old, and it was for marijuana, and if we need to bring

14    that in in order to bring --

15           THE COURT:  It's out.  It's completely out.  It's

16    out.  It's not even close.

17           MR. SAMARO:  I just wanted to say, Your Honor,

18    that we also moved to exclude the prior criminal history of

19    a fellow by the name of Art Prindle, who is a witness in the

20    case, and it's in our papers.  And his conviction is also

21    for drugs, hashish or something, and it's also more than 20

22    years old.

23           THE COURT:  The same rule will apply to everyone,

24    unless I'm convinced otherwise, and unless there's some

25    change at trial.

Case 2:06-cv-05455-MCA-AME  Document 760  Filed 04/04/20  Page 77 of 107 PageID: 11699

77

1           I think I made clear that the counterclaim

2    evidence is out.

3           And in terms of, like I said, to the extent that

4    -- I'm going to allow you some room on your defense, and

5    your defense is, Mr. Occhifinto was well aware, was selling

6    me secondary and expired product, and that was what we were

7    selling, I will allow you to go into that.

8           If there are any other issues that you need me to

9    address as you prepare for trial, we're going to talk about

10   it again when we have our conference call -- what date is

11   it, on February 24th?  No, we're talking on March 10th,

12   correct?

13          Do you want to do it in person on March 10th?  Or

14   no?  You tell me.

15          MR. PALMERONI:  For me, phone would be better,

16   Your Honor.

17          THE COURT:  We'll do it by phone, then.  All

18   right?  Because we're going to talk about the trial date,

19   and if there are any other evidence rulings that you want to

20   address, I need to know in advance, and you've got to send

21   me a letter.  But I expect to talk about the trial date.

22          I also expect to talk about the protocol for

23   direct examination of the co-defendants.  It may be --

24   you're going to have a joint -- right?  You're both going to

25   be pro se?  No?

78

1        MR. PALMERONI:  We're both pro se, but we're not

2   joined in any way, shape or form, Your Honor.

3        THE COURT:  Okay.

4        MR. PALMERONI:  He's only on part of the suit.

5   He's not even part of the kickback scheme.  And he's

6   introduced stuff against my interest.

7        THE COURT:  Got it.  I hear you.

8        So, if you want to send me a submission before

9   March 10th about how you wish to proceed, you can do so.

10  We'll talk about it on March 10th.  Mr. Samaro can submit

11  something to me as well, meaning how you're going to tell

12  your story to the jury.  How you are cross-examined by

13  Mr. Samaro will be based on -- he's a lawyer.  He will

14  cross-examine you consistent with the Rules of Evidence, and

15  I will jump in if I believe that he is crossing a line.

16       And when you cross-examine witnesses, I will give

17  you some latitude because you're pro se, but you're going to

18  have to ask leading questions on cross-examination, which

19  means questions that suggest an answer, but I'll give you a

20  little bit of latitude on that because you are a pro se.

21       But the difficult part is your direct of yourself,

22  because, as I said, I'm not inclined to have you just do a

23  full narrative.  I may ask you to think about giving written

24  questions in advance, either I can ask you or my staff can

25  ask you or you can ask yourself, so that there is some

1    organization to your direct examination, and it will also

2    help guide you for you to tell your story as a Defendant.

3    And if there's something as you want to tell your story and

4    you write out the questions, which you should do before we

5    meet again on March 10th, and there's an area that you think

6    you want a ruling from me about, can I go into this or can I

7    go into that, that will prompt you to think about it, and

8    you can raise that with me and explain to me why it may be

9    relevant and why you should be able to explain something.

10   You can't talk about the baby, you can't talk about the

11   alleged illegal hires, but there may be some other issues

12   relating to Mr. Occhifinto that you may want to raise or a

13   story you may want to tell, and you can ask me for a ruling

14   about that on March 10th.  You can ask me any time; you can

15   do it at the end of the day, before the day begins, because

16   my goal at trial is to make sure it goes as smoothly as

17   possible for the jury and they don't get bogged down in a

18   lot of conferences and a lot of objections, because then

19   they are not, you know, they're not going to be happy, and I

20   want to, you know, keep their volunteer time to a minimum.

21           Do you have any sense, Mr. Samaro, how many

22   witnesses you're going to have?

23           MR. SAMARO:  Probably in the nature of -- I should

24   say in the realm of five.  Depends on what happens.

25           THE COURT:  Okay.  Do you have any sense of how

80

1     many trial days you'll need?

2              MR. SAMARO:  So we talked about this being a

3     10-day trial total.  I think that's probably -- probably

4     longer than we need.

5              THE COURT:  Okay.

6              MR. SAMARO:  But, you know, it's a fairly

7     complicated case.

8              THE COURT:  Okay.  So here are some other things

9     I'm going to need from you.

10             I need a neutral statement of the case.  You can

11    send it to your adversaries.  A neutral statement is

12    something we read to the jury to tell them, this is a case

13    in which N.V.E. and Occhifinto allege X, Y, and Z;

14    Defendants deny the charges.  Very simple, so we can read it

15    to the jury, in case they know any of you personally, they

16    heard of the drug, you know, they were in litigation against

17    the company - something that would prevent them from serving

18    impartially as a juror.

19             So I need a very short statement.  You can send it

20    to them.

21             I also need before trial -- you can get that to me

22    before the March 10th conference call.

23             I also need jury instructions, and if you could

24    get those to me, and, of course, send a copy to Mr. Rosarbo

25    and Mr. Palmeroni.

81

```
 1              And there's a third thing I need:  A copy of all

 2     exhibits you're going to use, and expert reports, and that

 3     goes for Defendants.

 4              Are there any exhibits you're going to be using

 5     and entering at trial?

 6              MR. PALMERONI:  There are a few, Your Honor.

 7              THE COURT:  So make copies.

 8              MR. PALMERONI:  Um-h'm.

 9              THE COURT:  Have them ready.  There only can be

10     ones that were identified in the final pretrial order, and

11     make copies -- come to trial with a copy for the Court, a

12     copy for the Court Reporter, and a copy for Mr. Samaro, and

13     one for yourselves.  You should have four copies of every

14     document.  If he already has the document in his list --

15     he's going to give me an exhibit book by the 10th and have

16     them sent over.  If they're already in exhibit books, you

17     can just use those as exhibits.  You don't have to have your

18     own exhibits.

19              If they're going to move an exhibit in and it's in

20     your book, I'll allow them to use it, as long as they've

21     identified them as exhibits.

22              I think that's it.

23              Is there anything else?

24              MR. SAMARO:  Well, Your Honor, so, you talked

25     before about us sending you the deposition pages that we
```

82

1    intend to use.  Would you like page and line before March

2    10?

3                THE COURT:  I'd like to actually see the pages.

4    You're going to need the pages anyway for trial, --

5                MR. SAMARO:  Right.

6                THE COURT:  -- so you might as well just give me

7    the pages with the cover letter, saying, here are the

8    following pages, and list them, and actually give me the

9    actual pages.  Given that we have pro ses on the other side

10   and you're reading in a party deposition, I want to see the

11   exact pages.

12               MR. SAMARO:  Got it, Judge.

13               So, they also, especially Mr. Palmeroni, suggested

14   they're planning to use deposition transcripts.  Can they

15   just tell us, deposition transcript of whomever?  It would

16   be helpful to us --

17               THE COURT:  Sure.

18               MR. SAMARO:  -- if we could have a page and line.

19               THE COURT:  Are you going to be using any

20   depositions?

21               MR. PALMERONI:  Yes.  Yes, Your Honor.

22               THE COURT:  Of whom?

23               MR. PALMERONI:  Of Occhifinto, of -- well, I mean,

24   I have to -- I have to look at them again, but of

25   Occhifinto, of myself, of Mr. Jensen, perhaps.

83

1          THE COURT:  I need line and page numbers.  This is

2     what you have to do.  You have to prepare for trial.  March

3     10th.  If you don't submit to the Court -- we're going to do

4     this in person on March 10th.  There are too many issues

5     now, and I want to make sure we're here to go over

6     everything together.  March 10th will be in person, unless

7     Mr. Rosarbo cannot be here because of his brother.

8          MR. SAMARO:  Is that going to be also at 4 p.m.,

9     then?

10          THE COURT:  That will be at 3 p.m.  All right?

11     I'll do an order that you'll get.

12          And by March 10th, you have to give me a list,

13     because, if things go as planned, the trial will be in two

14     weeks after that.  I want a list mailed to the Court, just

15     like you did the last time, of all the pages you wish to

16     read in on depositions.  It has to be relevant.  Remember,

17     you can call Mr. Occhifinto in your case if you want to.  If

18     you want to -- you may be allowed to use some or all of his

19     deposition, or not all of it, and you can tell me what pages

20     you want to read in.  But I have to have a list of those so

21     Mr. Samaro can look at them and decide whether he has any

22     objections.  All right?

23          MR. SAMARO:  Your Honor, also, would you like a

24     verdict form?

25          THE COURT:  Yes.  That was the other thing.  I

84

1   need a verdict form.  That goes hand-in-hand with the jury

2   instructions.

3              MR. SAMARO:  And the voir dire?

4              THE COURT:  Yes, that's what I was thinking.  I

5   couldn't remember.  Voir dire.  I have the general voir dire

6   questions, so I'll use the standard ones that I use in all

7   my cases.  If there are any additional ones that you think

8   should be given in this case -- in other words, there are

9   standard questions that I use to question the jury.  We'll

10  have jury selection first, it will probably take a day or

11  two, and they will be asked questions:  Do you know any of

12  the witnesses; do you have -- you know, any questions that

13  are designed to see if the witness has any bias.  I'll ask

14  them -- they'll hear your names, they'll see you, and if

15  they know you personally.  There may be some additional

16  questions that you want to ask the jury that are relevant to

17  bias.  You can send those to me before March 10th as well.

18             MR. SAMARO:  There was also a motion, Your Honor,

19  to strike our expert, and that expert is an economist.

20             THE COURT:  Yes.

21             MR. SAMARO:  And also, a motion by Mr. Rosarbo to

22  have his deposition stricken, and, finally, a motion to

23  dismiss the entire case.

24             THE COURT:  Okay.  The motion to dismiss the case

25  is denied for the reasons set forth in my summary judgment

CHARLES P. McGUIRE, C.C.R.

85

1    opinion.  It's going forward to trial.

2              In terms of the expert, I did take a look at

3    N.V.E.'s expert.  It's an economist.

4              I'll hear first from Mr. Samaro on that point.

5              MR. BOYAN:  Thank you, Your Honor.  I'm actually

6    going to address this one.

7              THE COURT:  Okay.

8              MR. BOYAN:  And I just want to correct one thing.

9    He's actually a forensic accountant, Mr. Neier.

10             THE COURT:  Okay.

11             MR. BOYAN:  And we have called Mr. Neier to offer

12   expert testimony.  We set forth the reasons in our

13   opposition as to what things we're going to have

14   Mr. Neier opine on in his testimony, and, you know, in

15   summary, we believe that we can meet all three of the

16   requirements of the Daubert standard.

17             The first would be, is Mr. Neier qualified to

18   serve as an expert.

19             We feel that he is well qualified.  We submitted a

20   copy of his CV and also set forth a narrative of his

21   experience in our opposition papers.  He has significant

22   experience.  He worked for the Morris County Prosecutor's

23   Office for a long career, rising up in the ranks there.

24   After that, he joined Sobel & Company, founding their

25   litigation and forensic accounting practice there at Sobel.

86

1          He has obtained several degrees relating to

2     forensic accounting and certifications.  He has taught for

3     the National White Collar Crime Institute, Seton Hall School

4     of Business, N.Y.U. School of Law, several other places.

5          He has testified in other cases throughout

6     New Jersey and in other locations.  He's also testified in

7     arbitration matters and before other panels and tribunals.

8          So he has lots of experience as a forensic

9     accountant, and we believe that he is eminently qualified to

10    serve as an expert in forensic accounting in this case.

11         Mr. Palmeroni doesn't dispute his qualifications

12    in his motion to exclude Mr. Neier's testimony.  He just

13    notes that he has a long, a lengthy CV.

14         As to the second aspect of the Daubert standard,

15    Mr. Neier's testimony is reliable.  His testimony is

16    reliable because he relied on the Defendants' own records to

17    support the conclusions that he made.  We obtained by

18    subpoena bank records from the banks that the Defendants

19    used, Bank of America, Lakeland Bank, several other banks,

20    and obtained their statements for these companies that they

21    set up, and went through all those.  We also obtained copies

22    of all the canceled checks that went through all those

23    companies, and we obtained tax records from the companies

24    and from Mr. Palmeroni individually.  Mr. Neier took all

25    that information from the Defendants and compiled it and

1      summarized it into a more understandable forum.  He

2      summarized the payments that were made to the Defendants'

3      companies from these -- what we call conspiring brokers that

4      were N.V.E.'s customers who were buying the product from the

5      Defendants' companies at a lower price; we have, you know,

6      volumes of checks from these companies.  He has listed the

7      amount that they paid to the Defendants' companies, and

8      shows how much they received.  He also shows how much they

9      paid N.V.E. for this product that they were doing, and from

10     that, he was able to calculate damages based on a

11     disgorgement method of calculating damages.  He looked at

12     the total amount that the Defendants' companies paid to

13     N.V.E. and the total amount that they received, and the

14     difference between that is the profit.

15              THE COURT:  So let me stop you for a minute.

16          I'm looking at his report on page 11 and 12.

17              MR. BOYAN:  Yes, Your Honor.

18              THE COURT:  And he talks about, it's not

19     disgorgement as the remedy, it's the lost profit to N.V.E.

20              MR. BOYAN:  He does reference lost profits in his

21     report, Your Honor, but he also says that the primary -- to

22     get later on into his conclusions, the primary method that

23     he used, starting on page 17, there's a description of the

24     economic damages.  He says that he considered two separate

25     economic theories, lost profits and what he calls unjust

1    enrichment or restitution, what we would refer to as

2    disgorgement, and he says that, you know, while the lost

3    profits may have, you know, provided another measure of

4    damages, he's relying exclusively on restitution damages in

5    this case because it's much more clearly supported by the

6    records that we have.

7            The records for the restitution part of it are

8    crystal clear.  We have Defendants' own records, their bank

9    statements, their checks, their tax returns.  From that,

10   there's really no dispute that neither of the Defendants

11   have disputed the authenticity or accuracy of any of those

12   records.

13           THE COURT:  The records meaning how much money was

14   in the account of their company.

15           MR. BOYAN:  How much money was in?

16           THE COURT:  Given to, was it Smart World (U.S.)?

17           MR. SAMARO:  Smart World (U.S.), yes.

18           THE COURT:  That's the disgorgement amount;

19   correct?

20           MR. BOYAN:  It's a little more complicated.  They

21   used several other companies as well.  They used Smart World

22   (U.S.) to purchase the product from N.V.E. because it was

23   the same name as a company in the Netherlands, Smart World

24   (Netherlands), but then they also used several other

25   companies, American Wholesale Distributors and VAR, which

1   was Mr. Rosarbo's company, to receive the payments from the

2   conspiring brokers.  They didn't have the conspiring brokers

3   pay Smart World (U.S.) directly, they had the conspiring

4   brokers pay these other entities, and then the other

5   entities were funneling --

6           THE COURT:  Are you talking about -- I'm talking

7   about the distribution scheme.

8           MR. BOYAN:  This is the distribution scheme.

9           THE COURT:  Okay.

10          MR. SAMARO:  You're saying brokers.  You mean

11  distributors.

12          THE COURT:  Yes.

13          MR. BOYAN:  Distributors.  I'm sorry.

14          THE COURT:  That's okay.

15          MR. BOYAN:  Sorry.

16          But the money would flow to these other entities,

17  VAR and AWD, from the distributors, who were buying this

18  product from the Defendants, and then they would funnel it

19  back into Smart World (U.S.) so Smart World (U.S.) could

20  continue to buy more products from N.V.E.

21          THE COURT:  From N.V.E., or from N.V.E. Europe?

22          MR. BOYAN:  There is no N.V.E. Europe.  They were

23  buying them from N.V.E. and saying that the products were

24  being shipped to Europe, where they were actually just being

25  shipped to a warehouse.

CHARLES P. McGUIRE, C.C.R.

1              THE COURT:  Got it.

2              MR. BOYAN:   His records also show the bribes that

3      they were paying to the people who actually ran Smart World

4      (Netherlands), that as part of this scheme, in order to use

5      Smart World's name and to continue the scheme, they had to

6      pay bribes to Smart World (Netherlands), and they showed

7      wire payments to another company owned by the actual owners

8      of Smart World (Netherlands), TNJ Limited, and they were

9      wiring money to their account in Gibraltar to basically keep

10     them happy so they would not report on this scheme back to

11     N.V.E., and they wired large sums of money to this TNJ

12     Limited.  Mr. Neier talks about that in his report as

13     further evidence of this scheme.

14             THE COURT:  So let me ask you about the -- I get

15     the disgorgement theory, but we go back to the lost profit

16     theory for the distribution scheme, and on page 10, the

17     expert says, "In document production, we identified 27

18     invoices from 2005 to 2007."  So he only has a two-year

19     period, and then he said, on page 11, "The only Smart World

20     (U.S.) invoice available to us from '05 to '07 was Smart

21     World was purchasing Stacker 2 and 3 Ephedra-free products

22     from N.V.E.  In early 2004, Ephedra was banned in the United

23     States.  While we were not provided with Smart World (U.S.)

24     invoices prior to '05, we did receive copies of domestic

25     distributor invoices from 2002 to '3, which indicate that

91

1    N.V.E. was selling Stacker 2 and 3 with Ephedra count

2    bottles for 3.77, the same price that Stacker 2 and 3 was

3    out of Ephedra."

4         So, how does he know the quantity that was sold?

5    In other words, he has random invoices, and he has -- since

6    they're random, he only has a handful that -- how do we know

7    that that invoice indicates a constant price?

8         On page 12, the second paragraph, he states:  "We

9    determined that from '01 to '03, the market between the

10   international and domestic prices was 91 percent.  Because

11   of the average of the pre-Ephreda ban and the post-Ephreda

12   ban rate, we determined it should have been paid for

13   products."

14        So how do you come up to that amount?  In other

15   words, he doesn't know how much of the product was sold.  He

16   has random invoices over the 2005 to '07 period.  He has

17   invoices for -- 27 invoices, and from that, how does he get

18   how many were actually sold?

19        MR. BOYAN:  We're not relying on that information.

20   That is background.  He was saying it as an example because

21   there are incomplete records.  Based on the records we did

22   have, he wanted to show kind of average prices that things

23   were --

24        THE COURT:  But I'm looking at total.

25        Look at page 12.  He has a table four.  We know he

1    has records for '05, '06, and '07, he has random records,

2    and he looks at what was actually paid and what was actually

3    paid to N.V.E. and the payment at domestic rates.

4            How does he know -- if he only had random -- I

5    understand the markup, and I understand the difference.  How

6    does he get the 524,016?

7            You'd only know that if you know the amount of

8    product that was sold.

9            MR. BOYAN:  Your Honor, yes, I think that they

10   based it on the amounts that Smart World (U.S.) was paying

11   to N.V.E. for the products, so they -- I believe that he was

12   -- we know that much, how much they were paying in checks to

13   N.V.E., and he said --

14           THE COURT:  Who was paying N.V.E.?

15           MR. BOYAN:  Smart World (U.S.).

16           THE COURT:  Was paying to N.V.E.

17           MR. BOYAN:  N.V.E., yes, to purchase products.  So

18   if they said they bought $100,000 of product, and based on

19   the average price per bottle, he would say that that was

20   roughly, you know, how much they would have been able to

21   make on that same amount of product if it was sold at the

22   actual price.

23           But, you know, but we're not relying on this as a

24   lost-profit method of damages.

25           THE COURT:  So why is it in here?

1          MR. BOYAN:  I think that it was for completeness.

2   We're not going to offer any opinion testimony from

3   Mr. Neier on that.

4          THE COURT:  So you're not relying on this at all.

5          MR. BOYAN:  Not the lost-profits theory as a

6   measure of damages.

7          THE COURT:  Are you relying on it for any other

8   purpose?

9          MR. BOYAN:  Relying on what for any other purpose?

10          THE COURT:  The lost profits.

11          MR. BOYAN:  I think we would generally introduce

12   evidence, it doesn't necessarily have to be through

13   Mr. Neier, that what some of the invoices show the product

14   was being sold for at that time, what the average price was

15   to domestic --

16          THE COURT:  To what end?  In other words, you say,

17   we may want to use it like -- so you only get to testify at

18   trial on a damage theory that -- you don't get to testify

19   about anything in your report.  So if he's only going to

20   testify at trial about a damage theory based on

21   disgorgement, the money that went into the U.S. company that

22   you got records on, what is the relevance of through this

23   witness putting in some random -- you can put it in through

24   Occhifinto, probably, as background, what he was selling

25   things for generally to understand the scheme, because you

1    have to educate the jury as to what the fraud was.  The

2    fraud was, you were buying it through this company that had

3    the same name as the European company and then you were

4    reselling it; right?  So you could explain the scheme and

5    you could show that through invoices, but I'm not sure

6    you're going to get into it through the expert if he's only

7    going to offer a disgorgement theory.  Because, frankly, the

8    lost-profit theory is a little bit -- is tenuous, because

9    you don't have the documentation.  You're making a lot of

10    assumptions that are really not based on evidence.

11          MR. BOYAN:  I understand, Your Honor, and, yes, we

12    are proceeding on the disgorgement method, and I agree that

13    we can get that evidence of pricing through fact witnesses,

14    so it may not be necessary to get it through Mr. Neier.  We

15    can have him focus on calculation of damages and calculation

16    of the amounts.

17          THE COURT:  And I'll make one other point, and

18    this is about opening the door, because once any witness is

19    going to testify about 26 invoices, it opens the door to,

20    where are all the other invoices, which you're going to have

21    to explain anyway.  I mean, there's no other way around it,

22    unless you say, we're not going to mention anything about

23    invoices.  You can't explain the fraud without explaining

24    the invoices.  Once you explain 27 invoices, you open the

25    door to, where are the other 5,000 invoices.

1          So it's in.  Whether or not I allow an adverse

2     inference doesn't really change the issue of that you're

3     going to have to explain it, because it really goes to the

4     scheme and why you don't have documents to show every bit of

5     the scheme, and also if you want to get in those documents

6     through your client.

7          So would I be correct in striking -- or you're

8     withdrawing that part of your expert report that deals with

9     lost profits?

10          MR. SAMARO:  Absolutely, Your Honor, yes.

11          THE COURT:  Okay.  That simplifies a lot of things

12     for trial.

13          And anything you want to -- because that was the

14     only thing that gave me pause in this expert report, the

15     lost profits.

16          And since that is now withdrawn, that they're only

17     relying on disgorgement and profit, I'm satisfied that this

18     expert preliminarily is sufficient under Daubert in terms of

19     being reliable.  He certainly has the credentials.  It's

20     reliable insofar as he looked at records of profit, and it

21     has a fit to the damage theory in this case.

22          But I'll hear from either side, both Defendants,

23     before I make a ruling.

24          MR. PALMERONI:  All right.  So if you'll allow me

25     to ask the question, there are two theories, from what

96

1    you're telling me.  One is lost profit, and one is

2    disgorgement.

3           Lost profit is out.

4           Disgorgement would be -- would be -- the theory

5    would be, they have to prove exactly what?

6           THE COURT:  Disgorgement is an equitable remedy

7    that says the person that received the value of the fraud

8    should be disgorged of that amount.

9           MR. PALMERONI:  Okay, and how do we assess --

10    again, the records are incomplete.  There's no Ephedra

11    records.  We have no records of what it was going to -- we

12    have no records of how many items were sold, we have no

13    records of what items were sold, and he says in here that he

14    leaned a lot of it on testimony from -- or from dealing with

15    Mr. Jensen, who was not there at the time.

16           THE COURT:  Let me stop you for a minute.

17           MR. PALMERONI:  Sure.

18           THE COURT:  He is not going to testify about lost

19    profits anymore.  He is going to testify about disgorgement,

20    meaning how much money went into Smart World and American

21    Wholesale Distributors and VAR Consulting and NRGC.  That's

22    on page 13 of the report.  That's money that he says is

23    ill-gotten gain of this fraudulent distribution scheme.

24    That's his theory, and it's based on looking at those bank

25    records, looking at the checks that went there, and assuming

1    that, making an assumption that those records are -- those

2    checks that went to those four entities were ill-gotten gain

3    from the distribution scheme.

4              You're correct, they don't have all of the

5    invoices of the sales.  But he's not looking for a

6    difference between what the company would have made and what

7    the company -- and the lost profits that it didn't make,

8    because these profits were diverted elsewhere to these other

9    four companies.

10             So, this, what you're really alleging is, what

11   you're really saying is, the money that was in, for example,

12   the 1,614,000 was not the result of this distribution

13   scheme; this was a result of the fact that I was selling

14   secondary and expired product with Mr. Occhifinto's consent,

15   and that money went into Smart World.  That goes to weight

16   of the evidence, and you can cross-examine him on that and

17   say, how do you know that that money was an ill-gotten gain?

18   You can probe that topic.  And that goes to credibility and

19   weight.  It doesn't go to admissibility.

20             Daubert means, does he have enough qualifications,

21   is his methodology reliable enough that he can testify as an

22   accounting forensic expert about the loss.  I am satisfied

23   that he does.  But it doesn't mean that you can't

24   cross-examine him at trial as to the veracity or the

25   strength of his opinions, whatever your defense is.  You

98

1    know what your defenses are.  Whatever money that was in

2    those accounts are not the product of ill-gotten gain,

3    they're the product of something else.  You can ask him

4    about that.  That's cross-examination.  That's challenging

5    the credibility of the witness' conclusions.  But I'm going

6    to let him testify as a threshold matter.  All right?

7            MR. ROSARBO:  Your Honor, I heard everything that

8    he said.  I have no problem with any of that, his

9    qualifications, any of that.

10           The one thing that I believe is important in this

11   case is, all of that makes sense if you have a product, like

12   a Bayer aspirin, that's going to be sold forever.  We were

13   in a situation where this product was going to be closed in

14   a very, very short time.  Everybody knew about it, and all

15   -- the only thing on Bob's mind was to get rid of all his

16   Ephedra products.

17           THE COURT:  Let me stop you, Mr. Rosarbo.  I have

18   to stop you, because we're not going to do this.  I made a

19   ruling, and it's done.  I'm giving you a little bit of

20   latitude because you're pro se.  This is not how it works.

21   The Court makes rulings, we move on.  We don't then argue

22   it.  I gave you the reasoning.

23           You have a different theory.  Your theory is, we

24   weren't doing this, we didn't set up a company with the same

25   exact name called -- whatever the --

1    What was the U.S. company that they allege?

2    MR. BOYAN:  Smart World (U.S.).

3    THE COURT:  Smart World (U.S.).  Their whole

4    theory is, you set up Smart World (U.S.) as a fraud.  In

5    other words, you were buying it -- to Mr. Occhifinto's mind,

6    it was going to the European company at a lower price, and

7    then you were selling it to their customers, and so he lost

8    the sales and you got rich.  That's his theory:  You duped

9    us.

10   If your answer is, I didn't dupe you, I didn't

11   defraud you, I was with you selling seconds and expired

12   products at a discount, and you knew about it, and we were

13   in that together, that's a valid defense, and you can ask

14   him about that.

15   MR. ROSARBO:  I can say that?

16   THE COURT:  You can.  I said that.

17   MR. ROSARBO:  All right.  I'm sorry.  Okay.

18   THE COURT:  And I'll give you more -- and that's

19   your defense.  But they're going to put on the theory that

20   you defrauded them.

21   MR. ROSARBO:  That's fine.

22   THE COURT:  And that's how the case is going to

23   go.

24   MR. ROSARBO:  Okay.

25   THE COURT:  You'll be able to put in -- and I've

1    said that already.  But I'll give you a chance to be heard

2    in court.

3              When I make a ruling, it's over, and we move to

4    the next issue.

5              MR. ROSARBO:  All right.

6              THE COURT:  There's an issue about your

7    deposition.  You want it stricken, the whole deposition.

8              MR. ROSARBO:  Well, I never got to see the whole

9    -- I was under the impression that after my deposition, I

10   had a certain amount of time to see the deposition, and if

11   there was something there that I didn't agree with, I could

12   have explained that, or counteracted it, let's put it that

13   way.

14             I never got to see my deposition until -- I don't

15   even know when I got to see it, and the trial was -- I mean,

16   not trial --

17             THE COURT:  When was your deposition taken?

18             Here's what you can't do.  You can't change your

19   deposition transcript.  You're allowed to correct a

20   typographical or an inaccuracy that the reporter is taking

21   down.  If you said, my name is Vincent P. Rosarbo, and they

22   only put Vincent Rosarbo, you could say, I said P, I want it

23   put in, and maybe the Court Reporter missed it.  I live at

24   50 Main Street, and he put 500 Main Street; that's a

25   correction.  If he took down an answer wrong or you asked

1    the question wrong, you can ask that your notation be

2    attached to the deposition.  It's not an opportunity to

3    change your deposition testimony, it just isn't.  It's to

4    correct a mistake, like a mistake that the Court Reporter

5    made in taking down your information.

6            MR. ROSARBO:  I guess what I'm trying to say is,

7    am I going to be allowed to say that I had meetings with him

8    before the deposition, and I was intimidated, nervous,

9    scared, whatever, naive?  Am I going to be allowed to say

10   that so the jury understands exactly where my head was at

11   during that time?  Because that's what happened.

12           THE COURT:  So, Mr. Samaro, I'm sure if he wants

13   to say that, he can say that.

14           MR. SAMARO:  Your Honor, it's fine with me.  If he

15   wants to say that it wasn't his real testimony because he

16   was coerced somehow, that sounds fair to me.

17           But it's why I think in this particular case

18   especially that we're interested in showing the jury the

19   whole deposition, not everything, but a lot of it, because,

20   when you read the text, you'll never believe what he's

21   saying right now.  He fights back and, you know, it's just

22   not the testimony of somebody going through that.  So he can

23   say that --

24           THE COURT:  I'm sorry, when was he fighting back?

25   At the deposition?

1          MR. SAMARO:  Yes.  So at these depositions, the

2     first day was -- was calmer than the other days, but he was

3     not at all cowed or acting coerced or toeing the party line

4     or anything like that.  This was the testimony -- and in the

5     beginning, he was specifically asked, you're not here with a

6     lawyer today; do you think you need a lawyer?  You're

7     voluntarily deciding to go forward anyway.

8          THE COURT:  I hear you.

9          MR. ROSARBO:  I don't remember that.  I'm sorry,

10    Your Honor.

11         THE COURT:  What I need to do is, before -- I'm

12    going to hold on it.  I want the deposition transcript of

13    Mr. Rosarbo.

14         Mr. Rosarbo, this is an issue that's been raised.

15         MR. ROSARBO:  Just one thing, Your Honor.  He

16    wasn't at the deposition.

17         MR. PALMERONI:  He wasn't even at the deposition.

18         MR. ROSARBO:  So I don't know how he can say that.

19         MR. SAMARO:  I have the transcript.

20         MR. ROSARBO:  But he's talking about my mood, my

21    this, my that.  He wasn't there.  He didn't see anything

22    like that.  He's just going by words.  That's all.  He can

23    make a story about anything in words.

24         THE COURT:  Do you have a copy of it?

25         MR. SAMARO:  We filed it, Judge, with these

103

1    motions.

2              THE COURT:  The whole deposition, all pages?

3              MR. SAMARO:  Yes.  All pages.

4              THE COURT:  All right.  So here's what I'm going

5    to ask you to do.  Can you provide them a copy of the

6    deposition?

7              MR. SAMARO:  Of course, Judge.

8              THE COURT:  Do you have a copy of your deposition?

9              MR. ROSARBO:  Yes I do, Your Honor.

10             THE COURT:  You have it.  I'm going to read yours,

11   and I'm going to revisit this issue after I read it in

12   detail.

13             Certainly you can say, I was coerced; I was

14   intimidated; he was my boss, I worked for him, and I was

15   nervous, and he put a lot of pressure on me, and he

16   intimidated me.

17             What you can't say is, and he was a criminal, and

18   I thought he was going to hurt my family.

19             You can say, I was worried about -- you know, if

20   he made the threat to you at any time, that's a truthful

21   statement, if you want to say it under oath, you can, but

22   what you can't do is violate any of my other rulings.  You

23   can't say, he had a baby out of wedlock; he was a bad guy;

24   he hired illegal aliens, and he had a criminal record.

25             MR. ROSARBO:  I understand, Your Honor.

1          THE COURT:  If you want to truthfully say that he

2     threatened you, and that's your truth, and you're going to

3     say it under oath with your hand on the bible or under

4     affirmation, you can say that, and I'll give you room to

5     explain if you want to -- if you are now going to say you

6     didn't give truthful testimony at your deposition.

7          But the jury will see your deposition.  If you're

8     going to disavow the whole deposition, they probably will

9     see the whole deposition, and they're going to hear how you

10    testify into court.

11         MR. ROSARBO:  That's fine, Your Honor.

12         THE COURT:  So that's the general ruling that I

13    will tell you.

14         MR. ROSARBO:  That's fine.  That's fine, Your

15    Honor.

16         THE COURT:  All right.  Anything further?

17         MR. SAMARO:  Not on our side, Your Honor.  Thank

18    you.

19         THE COURT:  So, before our meeting, which is going

20    to be in person in March, we still have a couple of things

21    to get ready for.

22         Last, Mr. Rosarbo has a personal issue with his

23    brother, and he will send me a letter or call at least a day

24    or two before, and we'll do it on a day that works.

25         But I expect to get the protocol for the direct

1    exam.

2          I ask Mr. Samaro to get jury instructions, the

3    neutral statement, and the voir dire questions to your

4    adversary in advance of March 10th, or you can bring them to

5    court on March 10th, and a copy of the exhibit books, and

6    then we will -- I'm trying to think.  Is there anything --

7    you know what?  I've changed my mind again.  We're going to

8    do it by phone on March 10th.  You can submit all these

9    things to me in advance; no reason to bring everyone in.  We

10   can talk about the protocol for the direct exam right before

11   we start trial.

12         All right.

13         MR. SAMARO:  Your Honor, we would also do a trial

14   brief to support the jury charges, and the pretrial order

15   suggests or has a deadline for supplying that.  Would you

16   like one as well?

17         THE COURT:  Yes.  March 10th, if you want to give

18   me a trial brief.  I don't really need it, but it's always

19   welcome.

20         MR. PALMERONI:  Your Honor.

21         THE COURT:  March 10th, by phone, and Mr. Samaro

22   will initiate the call.  So before leaving, give him a copy

23   with your phone numbers.

24         THE COURT CLERK:  What time, Judge?

25         THE COURT:  Three o'clock.

1          Yes.

2          MR. PALMERONI:  Just so I have clarity, my motion

3    to dismiss, it was dismissed on what authority?

4          THE COURT:  I granted the summary judgment motion,

5    and once I granted summary judgment and found that there was

6    a fact issue, it's inappropriate until the end of the

7    Plaintiff's case to make a motion to dismiss the case.

8    There's no authority for it.  I found that there was a fact

9    issue.

10          MR. PALMERONI:  Okay, because I had gone into

11    jurisdiction.

12          THE COURT:  Remind me what the issue was.

13          MR. PALMERONI:  When they brought the case, they

14    had brought it under 1331, 1327, 1364, and these all had --

15          THE COURT:  I have the issue now.  I'm sorry.  I

16    neglected to deal with your motion.

17          You argued to the Court subject matter

18    jurisdiction, and I know there's a RICO claim at some point,

19    but, nonetheless, there still remains complete diversity

20    among remaining parties.  As such, the Court has subject

21    matter jurisdiction.  Plaintiff N.V.E. is a New Jersey

22    corporation.  Mr. Palmeroni is a domiciliary of

23    Pennsylvania.  Mr. Rosarbo is a domiciliary of Connecticut.

24          And Mr. Occhipinto is a resident of New Jersey?

25          MR. SAMARO:  Yes.

1          THE COURT:   Okay.   So there's complete diversity.

2     The amount in controversy exceeds $75,000.   To the extent

3     that diversity did not exist at the time the complaint was

4     filed, it is irrelevant.

5          The Supreme Court has explained that diversity

6     defects can be cured by dismissal, can be cured by

7     dismissal, does not destroy diversity.   Here, Defendants

8     that may have been New Jersey domiciliaries for diversity

9     purposes have been dismissed, and only Palmeroni and Rosarbo

10    remain, so there is diversity between the parties right

11    now.   All right?

12          Thank you.

13          MR. SAMARO:   Thank you, Judge.

14          THE COURT:   All right.

15          THE COURT CLERK:   Court's in recess.

16       (Matter concluded)

17

18          Pursuant to Section 753, Title 28, United States

19          Code, the foregoing transcript is certified to be

20          an accurate record as taken stenographically in

21          the above entitled proceedings.

22

23

24                              s/CHARLES P. McGUIRE, C.C.R.

25

CHARLES P. McGUIRE, C.C.R.